# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

---

### CASE NO. 3:19-cv-363

---

### TAGNETICS, INC.

*Appellant/Alleged Debtor*

v.

### KENNETH KAYSER, ET AL.

*Appellees/Alleged Judgment Creditors.*

---

**Appeal from the United States Bankruptcy Court for the Southern District of Ohio
(The Honorable Guy R. Humphrey)
Case No. 19-30822**

---

### BRIEF OF APPELLANT

---

Stephen B. Stern, Admitted Pro Hac Vice
KAGAN STERN MARINELLO & BEARD, LLC
238 West Street
Annapolis, MD 21401
(410) 216-7900 – Telephone
(410) 705-0836 - Facsimile
stern@kaganstern.com (email)

Robert Kracht, (#0025574)
McCarthy, Lebit, Crystal & Liffman Co. LPA
101 W. Prospect Avenue, Suite 1800
Cleveland, Ohio 44115
(216) 696-1422 – Telephone
(216) 696-1210 – Facsimile
rrk@mccarthylebit.com  (email)

{01416539-1}

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Tagnetics, Inc., is a nongovernmental corporate body appearing in the United States District Court for the Southern District of Ohio, Western Division at Dayton.  Pursuant to Federal Bankruptcy Procedure Rule 8012, Tagnetics, Inc., has no parent company and no publicly traded company owns 10% or more of the stock issued by Tagnetics, Inc.

{01416539-1}

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ……………………………………………………i

TABLE OF AUTHORITIES ………………………………………………………………..iii

JURISDICTIONAL STATEMENT ………………………………………………………viii

STATEMENT REGARDING ORAL ARGUMENT ……………………………………….ix

STATEMENT OF THE CASE ………………………………………………………......1

QUESTIONS PRESENTED …………………………………………………………......3

STATEMENT OF FACTS ……………………………………………………………..4

STANDARD OF REVIEW ………………………………………………………….....10

ARGUMENT ……………………………………………………………….............11

      A.     THE BANKRUPTCY COURT ERRED WHEN
            IT HELD THAT THE AGREED UPON RELEASE DID
            NOT INCLUDE OR APPLY TO INDIVIDUALS/ENTITIES
            RELATED TO THE PARTIES, SUCH AS PARENT
            COMPANIES, SUBSIDIARIES, AFFILIATES, OFFICERS,
            DIRECTORS, HEIRS, AND PERSONAL REPRESENTATIVES……………..11

      B.     ALTERNATIVELY, IF THE BANKRUPTCY COURT DID
            NOT ERR REGARDING THE SCOPE OF THE RELEASE,
            THE SETTLEMENT AGREEMENT IN ITS ENTIRETY IS
            NOTENFORCEABLE BECAUSE THERE WAS NO MEETING
            OF THE MINDS…...……………………………………………………….22

CONCLUSION………………………………………………………………………..26

CERTIFICATE OF COMPLIANCE WITH RULE 8015(a)(7)……...………………………...27

CERTIFICATE OF SERVICE ……………………………………………………… .28

## <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

### <u>Federal Cases</u>

*Am. Annuity Group v. Guar. Reassurance,*
    140 F. Supp. 2d 859 (S.D. Ohio 2001) …………………………………………….......25

*Arnoul v. Busch Entm't Corp.,*
    2008 U.S. Dist. LEXIS 104709 (M.D. Fla. 2008) ……..………………………………13

*Autotek Sealants v. Koshy (In re Autotek Sealants),*
    1998 U.S. App. LEXIS 5771 (6th Cir. 1998) …………..………………………………19

*Banta Props. v. Arch Specialty Ins. Co.,*
    2014 U.S. Dist. LEXIS 192154 (S.D. Fla. 2014) …….………………….……………13

*Booth v. North American Aluminum Corp.,*
    423 F.2d 545 (6th Cir. 1970) …………..…………………………...………....………..19

*Cogent Solutions Grp., LLC v. Hyalogic, LLC,*
    712 F.3d 305 (6th Cir. 2013) ……….………………………..……..……..……………22

*Construction Interior Sys. v. Marriott Family Restaurants,*
    984 F.2d 749 (6th Cir. 1993) …......……………………………………….……..………18

*Energy Mktg. Servs. v. Homer Laughlin China Co.,*
    2000 U.S. App. LEXIS 22412 (6th Cir. 2000) …………………………….…………10

*Ferro Corp. v. Garrison Industries, Inc.,*
    142 F.3d 926 (6th Cir. 1998) …………………..……………………....…..……..….10

*First American Nat'l Bank v. Fidelity & Deposit Co.,*
    5 F.3d 982 (6th Cir. 1993) …………………………..……….……..……….……10

*Fulps v. Sprinfield,*
    715 F.2d 1088 (6th Cir. 1983) ………..……………………..……..……….……19

*Int'l Bhd. of Elec. Workers v. Nat'l Labor Relations Bd.,*
    788 F.2d 1412 (9th Cir. 1986) ………..…………………………………………24

*Lafata v. Dearborn Heights Sch. Dist. No. 7,* No. 13-CV-10755,
    2013 U.S. Dist. LEXIS 173731 (E.D. Mich. Dec. 11, 2013) ……………………………20

*Lane v. LaFollette, Tenn.*,
  490 F.3d 410 (6th Cir. 2007) …………………..………………………………..……20

*Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*,
  210 F.3d 672 (6th Cir. 2000)……………………...…………………………..…………...…11

*Memphis Light, Gas & Water Division v. Craft*,
  436 U.S. 1 (1978) …………………………………………..…………………………………21

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1949) ………………………………………….…………………………..……21

*Over & Under Piping Contrs., Inc. v. Vt. Gas Sys.*,
  2019 U.S. Dist. LEXIS 807 (D. Vt. 2019) …………………………………….…………13

*Perlmuter Printing Co. v. Strome, Inc.*,
  436 F. Supp. 409 (N.D. Ohio 1976) ……...…………………………………..……22, 23

*Probst v. Cent. Ohio Youth Ctr.*,
  511 F. Supp. 2d 862 (S.D. Ohio 2007) ……………………………………….......…20

*RE/MAX Int'l, Inc. v. Realty One, Inc.*,
  271 F.3d 633 (6th Cir. 2001)……………………………………….…………….……11

*Roberts v. Principi*,
  283 F. App'x 325 (6th Cir. 2008) ……………….………………………..…….20

*Transco Secur., Inc. v. Freeman*,
  639 F.2d 318 (6th Cir. 1981) ……………………………………..…….…..……21

*Trs. of the Painters, Union Deposit Fund v. G&T Commer. Coatings, Inc.*,
   2014 U.S. Dist. LEXIS 129945 (E.D. Mich. 2014) ………….………………..………24

*Sloan & Co. v. Liberty Mut. Ins. Co.*,
  653 F.3d 175 (3d Cir.2011) …………………………………………..…………….……18

*United States v. Donovan*,
  348 F.3d 509 (6th Cir. 2003)…………...……………………………………..…..……11

*Van Sickle v. Automatic Data Processing, Inc.*,
  952 F. Supp. 1213 (E.D. Mich. 1997) ………..………………………………....…20

## State Cases

*Alamo Financing, L.P. v. Mazoff*,
  112 So. 3d 626 (Fla. 4th DCA 2013) ……………………..……………..………13

*Alexander v. Buckeye Pipe Line Co.*,
 53 Ohio St. 2d 241 (Ohio 1978)…….…………………………..…………...………..11

*Ansevin v. Ansevin*,
 2010-Ohio-1301 (7th Dist. 2010) …………….……………………………………….……24

*Bank of Am., N.A. v. Seymour*,
 2019-Ohio-2884 (10th Dist. 2019) ……...…………………………………...…………25

*Beechwood Villa Apartments v. Nord Bitumi U.S., Inc.*,
 1990 Ohio App. LEXIS 1561 (12th Dist. 1990) ………………….…………………….24

*Bd of Trs. of Fla. Atl. Univ v. Bowman*,
 853 So. 2d 507 (2003) …………………………………….…………….…………..12

*Bulger v. Bulkowski*,
 1983 Ohio App. LEXIS 11580 (6th Dist. 1983) ………….………………………………22

*Carey-All Transp., Inc. v. Newby*,
 989 So. 2d 1201 (Fla. 2d DCA 2008) …………..………………………………….13

*Chirila v. State Chiropractic Bd.*,
 145 Ohio App. 3d 589 (10th Dist. 2001) ……..…………………….……….………20

*Cont'l W. Condo. Unit Owners Ass'n v. Howard E. Ferguson*,
 74 Ohio St. 3d 501 (Ohio 1996) ……………………………..……………..………..22

*Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*,
 78 Ohio St. 3d 353 (Ohio 1997) ……...……………………………..…………………11

*Inland Refuse Transfer Co. v. Browning-Ferris Indus. Of Ohio*,
 15 Ohio St. 3d 321 (Ohio 1984) ………………………………...……...…………11

*Joseph v. Dever*,
 1986 Ohio App. LEXIS 7942 (1st Dist. 1986) ………...…………………………………25

*Kelly v. Med. Life Ins. Co.*,
 31 Ohio St. 3d 130 (Ohio 1987) ……...…………………….……….………………11

*Kilko v. Lockhart*,
 2012-Ohio-5026 (11th Dist. 2012) ……...…………………………...………..10

*Kostelnik v. Helper*,
 96 Ohio St. 3d 1 (Ohio 2002) ………………….…………………………………21

v

{01416539-1}

*Langfan v. Carlton Gardens Co.*,
    183 Ohio App. 3d 260 (3d Dist.) …….…………………...………………….…………..10

*Ledyard v. Auto Wonders Mut. Ins. Co.*,
    137 Ohio App. 3d 501 (Ohio Ct. App. 2000)……………………………….….………..11

*Metalworking Machinery Co. v. Fabco, Inc.*,
    17 Ohio App. 3d 91 (3d Dist. 1984) …….………………...………….….……………18

*Michele K. Feinzig, P.A. v. Deehl & Carlson, P.A.*,
    176 So. 3d 305 (Fla. 3d DCA 2015) ……….………………………...……….…...……12

*Natl. City Bank v. Concorde Controls, Inc.*,
    2002-Ohio-6578 (Ohio 2002) ……………………………………………………………10

*Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*,
    73 Ohio St. 3d 107 (1995) …….……………………………………………...……….…10

*Nilavar v. Osborn*,
    127 Ohio App. 3d 1 (2d Dist. 1998) …….…………………………….……………... 17

*Obregon v. Rosana Corp.*,
    232 So. 3d 1100 (Fla. 4th DCA 2017) ………….………………………………………12

*Roberts v. Marks*,
    2017-Ohio-1320 (2017)……………………………………………...….………10

*R&L Carriers, Inc. v. Emergency Response & Training Sols., Inc.*,
    2019-Ohio-3539 (Ohio Ct. App. 2019) ………….…………………………………..……22

*State ex rel. Jenkins v. Indus. Comm'n*,
    2017-Ohio-7896 (10th Dist. 2017) ……….…………….……………….………….20

*State Farm Mut. Auto. Ins. Co. v. Nichols*,
    932 So. 2d 1067 (Fla. 2006) …….……….……………………...…………………13

*Stewart v. Gordon (1899)*,
    60 Ohio St. 170 (1899) ………….…….…………………………………………25

*Sutton Bank v. Progressive Polymers, LLC*,
    2019-Ohio-3239 (2019) ……………….……………………………..……….10

*Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*,
    140 Ohio St. 3d 193 (2014) …………….…………………….…….…..………….18

*Turoczy Bonding Co. v. Mitchell*,
    2018-Ohio-3173 (Ohio Ct. App. 2018) …………………………..…………………….22

*Washkewicz v. Seredick*,
    1986 Ohio App. LEXIS 5216 (8th Dist. 1986) …………………………….…………14, 19

*Wilson v. Pride,*
    2019-Ohio-3513 (8th Dist.2019) ………...……………………………………...………24

## COURT RULES

Rule 8003(a)(1) of the Federal Rules of Bankruptcy Procedure ………………………………...viii

Rule 8015(a)(7) of the Federal Rules of Bankruptcy Procedure ………………………………..27

28 U.S.C. § 158(a)(1) ………………………………………………………………………...viii

## TREATISES

Black's Law Dictionary (5 Ed. 1979) ……………………………………………………………18

1 Williston, Contracts (4 Ed.1990) 244, Section 4:2 ……………………………………………16

{01416539-1}

**JURISDICTIONAL STATEMENT PURSUANT TO RULE 8014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

This Court has jurisdiction on appeal from the United States Bankruptcy Court for the Southern District of Ohio, Western Division at Dayton, pursuant to Rule 8003(a)(1) of the Federal Rules of Bankruptcy Procedure and 28 U.S.C. § 158(a)(1).  This appeal stems from a final order of the Bankruptcy Court for the Southern District of Ohio, Western Division at Dayton, dated October 25, 2019, wherein the Bankruptcy Court granted in part and denied in part Appellant Tagnetics, Inc.'s Motion to Enforce Settlement Agreement.  Specifically, Appellant Tagnetics, Inc., appeals the Bankruptcy Court's Order when it found that the scope of the release given by the parties did not extend to related third parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives.  Alternatively, if the Bankruptcy Court properly found that the release did not extend to related third parties, the Bankruptcy Court erred by granting Tagnetics, Inc.'s Motion to Enforce Settlement Agreement even in part because there was no meeting of the minds and, as a result, there was no settlement agreement to enforce.

{01416539-1}

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant Tagnetics, Inc., requests oral argument, which it contends is likely to significantly aid the Court in rendering its decision in this matter.

## **STATEMENT OF THE CASE**

This appeal stems from a decision of the United States Bankruptcy Court for the Southern District of Ohio, Western Division at Dayton, granting in part and denying in part a Motion to Enforce Settlement Agreement filed by Appellant Tagnetics, Inc. ("Tagnetics"). The Bankruptcy Court found that a settlement agreement entered into by Tagnetics on the one hand, and Kenneth K. Kayser ("Kayser"), Ronald E. Earley ("Earley"), and Jonathan Hager ("Hager") (collectively, the "Remaining Petitioning Creditors") on the other hand, was enforceable, but the phrase "full mutual releases (no carve outs)" did not include a release of individuals/entities related to the parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives.

On or about July 19, 2019, the parties began in earnest discussing settlement of this matter, mostly through exchanging emails. Ultimately, Tagnetics and the Remaining Petitioning Creditors agreed to a settlement, the key terms of which were documented in an email from Tagnetics' counsel at 3:27 p.m. on July 26, 2019. *See* Ex. 1 (Email from S. Stern to R. Earley, with copy to K. Kayser and J. Hager, dated July 26, 2019 at 3:27 p.m.).[1] The email confirming the key terms of the agreement stated the following:

> Ron, Ken, and Jon:
>
> Below sets forth the terms of the agreement we reached by phone. Each of you please reply confirming agreement to these terms and then I need you to initiate a call with the court to advise of the settlement (it makes no sense for any of us to have to show up at court on Monday now that we have an agreement in place that will be documented more thoroughly in a settlement agreement. We can work through the written settlement agreement over the weekend.
>
> Key Terms:

---

[1] Each of the exhibits attached to and referenced in this Brief (other than the transcript of the hearing on October 18, 2019) were admitted into evidence (as confirmed in the hearing transcript, which is an exhibit itself) and identified in the Record Extract filed on November 13, 2019 [Dkt. No. 137].

Payment of $90,000 total ($30,000 each) within three days of a fully executed agreement.

The remaining schedule of payments as you proposed below,[2] except in 12 and 18 months instead of 6 and 12 months.

Full mutual releases (no carve outs)

Dismissal/withdrawal of claims by each of you to be filed within one day of receiving payment.

I believe that captures the key terms we discussed.  Please confirm.

Stephen

*See id.*  Hager confirmed the parties' agreement by stating the following in an email: "Mr. Earley is discussing this with the court at this moment.  I am responding for Kayser, Earley and Hager saying *we agree to the terms put forth as documented above* [sic]."  *See* Ex. 1 (Email from J. Hager to S. Stern dated July 26, 2019 at 3:56 p.m.) (emphasis added).  Two minutes after sending that email, Hager followed up with another email to "clarify that [the Remaining Petitioning Creditors] agree to the terms you set forth in your last email and represented below" and copied the key terms from Tagnetics' counsel's email at 3:27 p.m.  *See* Ex. 1 (Email from J. Hager to S. Stern dated July 26, 2019 at 3:58 p.m.).

On August 14, 2019, Tagnetics' counsel sent a draft agreement (the "Settlement Agreement") to the Remaining Petitioning Creditors reflecting the terms to which the parties agreed.  *See* Ex. 2 (Email from S. Stern to K. Kayser, R. Earley, and J. Hager, with draft Settlement Agreement attached, dated August 14, 2019 at 6:00 p.m.).  The Remaining Petitioning Creditors, however, incorrectly contended (and still contend) that the Settlement Agreement, as drafted, omitted a number of terms.  Specifically, the Remaining Petitioning Creditors requested a number

---

[2] The schedule of payments below is the schedule of payments that is reflected in the email on July 25, 2019 at 1:25 p.m.  *See* Ex. 1.

of carve outs from the release in the Settlement Agreement. Among the requested carve outs from the release is the Remaining Petitioning Creditors' ability to sue individuals/entities related to Tagnetics, such as its parent companies, subsidiaries, affiliates, officers, and directors, including, but not limited to, Compass Marketing, Inc. ("Compass Marketing"), which currently owns slightly more than 10% of Tagnetics, and owns options and notes that are convertible to preferred stock of Tagnetics that would enable Compass to own more than 37% of Tagnetics.

Tagnetics responded to these mischaracterizations of the Settlement Agreement, but it was not enough to get the Remaining Petitioning Creditors to sign on to the terms to which they previously agreed. Hence, Tagnetics was left with no alternative but to file the Motion to Enforce Settlement Agreement.

On October 18, 2019, the Bankruptcy Court held an evidentiary hearing on Tagnetics' Motion to Enforce Settlement Agreement. On October 25, 2019, the Bankruptcy Court rendered its decision enforcing the terms of the Settlement Agreement, but held the use of the phrase "full mutual releases (no carve outs)" did not include "affiliates, parent corporations, officers, directors or other undisclosed third parties" not expressly identified during settlement negotiations, including Compass Marketing. It is from this ruling that Tagnetics files this appeal.

## QUESTIONS PRESENTED

I.   WHETHER THE BANKRUPTCY COURTY ERRED WHEN IT HELD THAT THE PARTIES' SETTLEMENT AGREEMENT DID NOT INCLUDE A RELEASE OF TAGNETICS' (AND THE REMAINING PETITIONING CREDITORS') RELATED INDIVIDUALS/ENTITIES.

II.  IF THE BANKRUPTCY COURT PROPERLY FOUND THAT THE RELEASE DID NOT INCLUDE A RELEASE OF INDIVIDUALS/ENTITIES RELATED TO THE PARTIES, WHETHER THERE WAS NO MEETING OF THE MINDS AND, THUS, NO SETTLEMENT AGREEMENT TO ENFORCE.

{01416539-1}

## STATEMENT OF FACTS

The parties commenced settlement discussions in earnest on or about July 19, 2019. *See* Ex. 1 (Email from S. Stern to K. Kayser dated July 19, 2019 at 4:14 pm). On July 20, 2019, the Remaining Petitioning Creditors set forth a detailed proposal that included payments to Kayser ($151,582), Earley ($186,980), and Hager ($148,144). *See* Ex. 1 (Email from K. Kayser to S. Stern dated July 20, 2019 at 4:54 p.m.). The Remaining Petitioning Creditors' July 20 proposal also included a number of non-monetary terms, as well as other monetary terms, including, but not limited to:

- A mutual release of all issues arising from [the Remaining Petitioning Creditors'] employment by Tagnetics, [the Remaining Petitioning Creditors'] role as directors of Tagnetics, and [the Remaining Petitioning Creditors'] participation in the petition for involuntary bankruptcy,

- An acknowledgement of Kayser's and Earley's stock ownership, confirmation of number of shares, and unrestricted shareholder's rights,

- Agreement that all provisions of [the Remaining Petitioning Creditors'] contracts, including non-compete, have expired or are cancelled[,]

- Acknowledgment of an outstanding loan from Ron Earley to Tagnetics, principal plus interest to be paid upon sale (to be defined) of Tagnetics, Principal is $30000 and current balance is approximately $60,000[,]

- Acknowledgment of KVL Core Technology License, $250,000 to be paid upon transfer, sale, or license of Tagnetics' shelf tag technology or the sale of the company, [and]

- Acknowledgment of $315,000 of differed [sic] salary to be paid to Kayser upon sale of Tagnetics or other liquidity event.

*See id.*  Tagnetics clearly rejected this demand from the Remaining Petitioning Creditors, stating that "the demand [they] put forward [was] not realistic."  *See* Ex. 1 (Email from S. Stern to K. Kayser dated July 23, 2019 at 10:46 a.m.).[3]

After Tagnetics rejected the aforementioned demand from the Remaining Petitioning Creditors, the Remaining Petitioning Creditors then followed up with a new demand later that afternoon, stating only, "Here is our offer after your email this morning.  Let us know if there is any interest."  *See* Ex. 1 (Email from R. Early to S. Stern dated July 23, 2019 at 1:34 p.m.). Notably, the entirety of the remainder of the email consists solely of the following chart:

|  | Ronald E Earley | Kenneth W Kayser | Jon Hager |
|---|---|---|---|
| Initial Payment | $50,000 | $50,000 | $50,000 |
| Second payment 6 mo. | $25,000 | $25,000 | $25,000 |
| Third payment 12 mo. | $25,000 | $25,000 | $25,000 |
| Balance as a note to be paid upon liquidity event | $86,980 | $51,582 | $48,144 |
|  | $186,980 | $151,582 | $148,144 |

*Id.  No other terms or conditions and no reference to an earlier email or previously discussed settlement terms were included* in the Remaining Petitioning Creditors' July 23 offer.  *See id.* While the Remaining Petitioning Creditors' July 23 offer was not acceptable to Tagnetics, "th[e] structure [was] more in line with what Tagnetics thinks is feasible, but the initial payment [wa]s way too high."  *See* Ex. 1 (Email from S. Stern to R. Earley dated July 24, 2019 at 5:56 p.m.). Tagnetics made a counteroffer, consistent with the structure of what the Remaining Petitioning Creditors proposed (meaning consistent with the payment schedule), but with a lower initial payment, and the sum by which the initial payment was reduced "would be rolled to the final scheduled payment to each of" the Remaining Petitioning Creditors.  *Id.*  Again, Tagnetics

---

[3] Tagnetics' counsel provided a much more detailed explanation in rejecting the Remaining Petitioning Creditors' demand, most of which is not relevant for purposes of this appeal, but Tagnetics' counsel did recommend to the Remaining Petitioning Creditors that they "can and should seek [their] own counsel."  *Id.*

"encourage[d] each of [the Remaining Petitioning Creditors] to seek [their] own legal advice." *Id.* The Remaining Petitioning Creditors rejected Tagnetics' counteroffer, without making a counteroffer of their own. *See* Ex. 1 (Email from R. Earley to S. Stern dated July 24, 2019 at 7:43 p.m.).

Despite not receiving a counteroffer, Tagnetics invited the Remaining Petitioning Creditors to make one. *See* Ex. 1 (Email from S. Stern to R. Earley dated July 25, 2019 at 12:42 p.m.). A short while later, the Remaining Petitioning Creditors made the following offer:

|  | Ronald E Earley | Kenneth W Kayser | Jon Hager |
|---|---|---|---|
| Initial Payment | $30,000 | $30,000 | $30,00 |
| Second payment 6 mo. | $30,000 | $30,000 | $30,000 |
| Third payment 12 mo. | $30,000 | $30,000 | $30,000 |
| Balance as a note to be paid upon liquidity event | $96,980 | $61,582 | $58,144 |
|  | $186,980 | $151,582 | $148,144 |

Notably, *no other terms or conditions and no reference to any prior email or previously discussed settlement terms were included* in this most recent offer from the Remaining Petitioning Creditors. *See* Ex. 1 (Email from R. Earley to S. Stern dated July 25, 2019 1:25 p.m.). And, notably, the total payments to each of the Remaining Petitioning Creditors remained identical to the previous demand made by the Remaining Petitioning Creditors on July 23, 2019 at 1:34 p.m. *Compare* Ex. 1 (Email from R. Earley to S. Stern dated July 23, 2019 at 1:34 p.m.) *with* Ex. 1 (Email from R. Earley to S. Stern dated July 25, 2019 at 1:25 p.m.).

Tagnetics rejected this July 25 demand, wanting to hear from each of the Remaining Petitioning Creditors as to whether this was the path they wanted to pursue. *See* Ex. 1 (Email from S. Stern to R. Earley dated July 26, 2019 at 8:24 a.m.). Tagnetics again encouraged the Remaining Petitioning Creditors to "seek advice from bankruptcy counsel." *Id.* Then, throughout the day on July 26, 2019, Tagnetics' counsel and Earley spoke numerous times over the course of several

hours negotiating a potential settlement. Ultimately, Tagnetics and the Remaining Petitioning Creditors agreed to a settlement, the key terms of which were documented in an email from Tagnetics' counsel at 3:27 p.m. *See* Ex. 1 (Email from S. Stern to R. Earley, with copy to K. Kayser and J. Hager, dated July 26, 2019 at 3:27 p.m.). The email confirming the key terms of the agreement stated the following:

> Ron, Ken, and Jon:
>
> Below sets forth the terms of the agreement we reached by phone. Each of you please reply confirming agreement to these terms and then I need you to initiate a call with the court to advise of the settlement (it makes no sense for any of us to have to show up at court on Monday now that we have an agreement in place that will be documented more thoroughly in a settlement agreement. We can work through the written settlement agreement over the weekend.
>
> Key Terms:
>
> Payment of $90,000 total ($30,000 each) within three days of a fully executed agreement.
>
> The remaining schedule of payments as you proposed below,[4] except in 12 and 18 months instead of 6 and 12 months.
>
> Full mutual releases (no carve outs)
>
> Dismissal/withdrawal of claims by each of you to be filed within one day of receiving payment.
>
> I believe that captures the key terms we discussed. Please confirm.
>
> Stephen

*See id.* Hager confirmed the parties' agreement by stating the following in an email: "Mr. Earley is discussing this with the court at this moment. I am responding for Kayser, Earley and Hager saying *we agree to the terms put forth as documented above* [sic]." *See* Ex. 1 (Email from J. Hager

---

[4] The schedule of payments below is the schedule of payments that is reflected in the email on July 25, 2019 at 1:25 p.m. *See* Ex. 1.

{01416539-1}

to S. Stern dated July 26, 2019 a 3:56 p.m.) (emphasis added).  Two minutes after sending that

email, Hager followed up with another email to "clarify that [the Remaining Petitioning Creditors]

agree to the terms you set forth in your last email and represented below" and below they copied

the key terms from Tagnetics' counsel's email at 3:27 p.m.  *See* Ex. 1 (Email from J. Hager to S.

Stern dated July 26, 2019 at 3:58 p.m.).  Then, further confirming the payment terms the parties

had reached, Hager sent yet another email at 4:35 p.m. that same day "*confirming the following*

*payment schedule and amount as part of this agreement*" which included the following chart:

|  | Timing | Ronald E. Early | Kenneth W Kayser | Jonathan Hager |
|---|---|---|---|---|
| Initial Payment |  | $30,000 | $30,000 | $30,000 |
| 2nd Payment | 12mos from initial payment | $30,000 | $30,000 | $30,000 |
| 3rd Payment | 18mos from initial payment | $30,000 | $30,000 | $30,000 |
| Balance as a note | Paid upon the next liquidity event | $96,980 | $61,582 | $58,144 |
| TOTAL Settlement |  | $186,980 | $151,582 | $148,144 |

*See* Ex. 1 (Email from J. Hager to S. Stern dated July 26, 2019 at 4:35 p.m.) (emphasis added).

Notably, *no other terms or conditions and no reference to any prior email or previously discussed*

*terms were included in any of the emails from the Remaining Petitioning Creditors* confirming the

key terms of the agreement, and the payment schedule in the last email from the Remaining

Petitioning Creditors is exactly as described by Tagnetics' counsel in his email at 3:27 p.m. that

same day.

Tagnetics' counsel sent a draft agreement of the Settlement Agreement to the Remaining

Petitioning Creditors on August 14, 2019 reflecting the terms to which the parties agreed.  *See* Ex.

2 (Email from S. Stern to K. Kayser, R. Earley, and J. Hager, with draft Settlement Agreement

attached, dated August 14, 2019 at 6:00 p.m.).  The Remaining Petitioning Creditors, however,

incorrectly contended (and still contend) that the Settlement Agreement, as drafted, omitted a

{01416539-1}

number of terms.[5]  By way of example, the Remaining Petitioning Creditors requested a number of carve outs from the release in the Settlement Agreement.  *See* Ex. 3 (Email from S. Stern to K. Kayser, R. Early, and J. Hager dated August 19, 2019 at 7:48 p.m., describing in items 4 and 5 carve outs from the release).  Among the requested carve outs from the release is the ability to sue individuals/entities related to Tagnetics, such as Compass Marketing.  *See* Ex. 3 (Email from J. Hager to S. Stern dated August 16, 2019 at 2:19 p.m.).

Even though the Remaining Petitioning Creditors were seeking the ability to sue individuals/entities related to Tagnetics, they conceded that the scope of the release did apply to related parties, such as affiliates.  *See id.* (stating that "[i]f Compass [Marketing] is not an operating affiliate [sic] then they are not party to this settlement").[6]  Stated differently, the Remaining Petitioning Creditors acknowledge that if Compass Marketing is an affiliate of Tagnetics, it is subject to the release in the Settlement Agreement.  This concession demonstrates in no uncertain terms that the Remaining Petitioning Creditors understood the term "full mutual releases (no carve outs)" to mean that third parties related to Tagnetics – at the very least, affiliates – were to be subject to and included in the release.

Tagnetics challenged the Remaining Petitioning Creditors' mischaracterizations of the Settlement Agreement, but it was not enough to get the Remaining Petitioning Creditors to sign on to the terms to which they previously agreed.  *See* Ex. 3 (Email from S. Stern to J. Hager dated August 19, 2019 at 7:48 p.m.); Ex. 4 (Email from J. Hager to S. Stern dated August 20, 2019 at

---

[5] While the Motion to Enforce the Settlement Agreement concerned several terms of the agreement between the parties, the only issue on appeal regarding the terms of the agreement is whether the scope of the release included individuals/entities that are related to the parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives.

[6] Compass Marketing is an "affiliate" of Tagnetics under Ohio law.  *See* OHIO REV. CODE ANN. §1334.01 (E), (F) (defining an affiliate to be any "person" who "[o]wns, controls, or holds, with the power to vote, ten per cent or more of the outstanding voting securities" and a "person" as "an individual, corporation, . . . association, or other business entity").

9:23 a.m.). Hence, Tagnetics was left with no alternative but to file the Motion to Enforce Settlement Agreement.

On October 18, 2019, the Bankruptcy Court held an evidentiary hearing on Tagnetics' Motion to Enforce Settlement Agreement. On October 25, 2019, the Bankruptcy Court rendered its decision enforcing the terms of the settlement agreement, but held that the use of the phrase "full mutual releases (no carve outs)" did not include individuals/entities related to the parties, such as "affiliates, parent corporations, officers, directors or other undisclosed third parties" not expressly identified during settlement negotiations. It is from this ruling that Tagnetics files this appeal.

## STANDARD OF REVIEW

The interpretation of a contract "is a matter of law subject to a de novo standard of review." *Sutton Bank v. Progressive Polymers, LLC,* 2019-Ohio-3239 (2019) (quoting *Kilko v. Lockhart*, 2012-Ohio-5026, ¶ 30 (11th Dist. 2012) citing *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St. 3d 107, 108 (1995). "A court must interpret a contract so the intent of the parties may be ascertained and given effect." *Natl. City Bank v. Concorde Controls, Inc.*, 2002-Ohio-6578, ¶ 24 (2002) (citation omitted); *see also Energy Mktg. Servs. v. Homer Laughlin China Co.,* 2000 U.S. App. LEXIS 22412 (6th Cir. 2000) ("[C]ontract interpretation is a question of law and is subject to de novo review.") (citing *Ferro Corp. v. Garrison Industries, Inc.*, 142 F.3d 926, 931 (6th Cir. 1998) (quoting *First American Nat'l Bank v. Fidelity & Deposit Co.*, 5 F.3d 982, 984 (6th Cir. 1993)). "Similarly, the construction and interpretation of contracts are matters of law subject to a *de novo* standard of review." *Roberts v. Marks,* 2017-Ohio-1320, ¶ 11 (2017) (quoting *Langfan v. Carlton Gardens Co.*, 183 Ohio App. 3d 260, ¶ 9 (3rd Dist.)).

## ARGUMENT

A. **THE BANKRUPTCY COURT ERRED WHEN IT HELD THAT THE AGREED UPON RELEASE DID NOT INCLUDE OR APPLY TO INDIVIDUALS/ENTITIES RELATED TO THE PARTIES, SUCH AS PARENT COMPANIES, SUBSIDIARIES, AFFILIATES, OFFICERS, DIRECTORS, HEIRS, AND PERSONAL REPRESENTATIVES**

The primary role of a court in examining a written instrument is to determine and give effect to the intentions of the parties. *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 78 Ohio St. 3d 353, 361 (Ohio 1997). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Id.* (quoting *Kelly v. Med. Life Ins. Co.*, 31 Ohio St. 3d 130, 132 (Ohio 1987)). The Court must give plain language its ordinary meaning unless "manifest absurdity" results or unless some other meaning is clearly evident from the face of the overall contents of the contract. *Id.* (citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241, 245-46 (Ohio 1978)).

If the contract language is clear and unambiguous, there are no issues of fact to be determined. *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 684 (6th Cir. 2000) (citing *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio*, 15 Ohio St. 3d 321, 322 (Ohio 1984)). The language will be enforced as written. *See Ledyard v. Auto Wonders Mut. Ins. Co.*, 137 Ohio App. 3d 501, 505 (Ohio Ct. App. 2000). Whether the language of an agreement is ambiguous is a question of law for the Court to decide. *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003). When "there is no dispute as to the terms of the agreement," as is the case here, "[s]ummary enforcement . . . is the *only* appropriate judicial response, absent proof of fraud or duress." *See RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 650 (6th Cir. 2001) (emphasis added).

{01416539-1}

The scope of the release to which the parties agreed is clear and unambiguous. The parties agreed to "[f]ull mutual releases (no carve outs)." *See* Ex. 1 (Email from J. Hager to S. Stern dated July 26, 2019 at 3:58 p.m.). While the Remaining Petitioning Creditors sought multiple carve outs from the release by way of the additional payments and the ability to sue Tagnetics and its related individuals/entities, the only issue on appeal regarding the scope of the release is whether it applies to parent companies, subsidiaries, affiliates, officers, directors, and other parties related to Tagnetics and the Remaining Petitioning Creditors (such as heirs and personal representatives).

It is common practice to include in any full release of a business entity a release of the entity's parent companies, subsidiaries, and affiliates (as well as other related individuals, including, but not limited to, officers and directors), and it is understood that a general release encompasses such entities/individuals that are related to the business entity that is a party to a settlement. Indeed, numerous court decisions have reached this very conclusion. *See, e.g. Bd of Trs. of Fla. Atl. Univ v. Bowman,* 853 So. 2d 507, 509 (2003) ("The Plaintiffs were also required to release all their claims against not only Defendant, but also Defendant's agents, employees, and servants. *These factors are typical of a "general release" and do not invalidate the Proposals for Settlement*.") (emphasis added); *Michele K. Feinzig, P.A. v. Deehl & Carlson, P.A.*, 176 So. 3d 305, 309-10 (2015) ("In the instant case, the mutual release calls for the law firms – the actual parties to the lawsuit, expressly identified in the body of the proposals for settlement as the offeree and offeror – to release each other. *As is standard in release language*, each law firm's release includes claims "on behalf of itself and its respective officers, directors, agents, employees, stockholders, subsidiary corporations, parent corporations, affiliates, underwriters, successors and assigns. . . .") (emphasis added); *Obregon v. Rosana Corp.*, 232 So. 3d 1100, 1105 (Fla. 4th DCA 2017) (using *Bowman* as authority to hold that inclusion of "legal representatives" in a general

release was typical of a general release.); *Alamo Financing, L.P. v. Mazoff*, 112 So. 3d 626, 629 (Fla. 4th DCA 2013) (explaining that inclusion of language such as "*heirs, legal representatives, agents, employees, attorneys, subsidiaries, affiliates, and parent corporations, among others*" is "*simply standard language in a general release* . . . and should not invalidate the proposal") (emphasis added); *Carey-All Transp., Inc. v. Newby*, 989 So. 2d 1201, 1204-05 (Fla. 2d DCA 2008) (holding that language in a general release, which was attached to a proposal for settlement, defining "Releasee" as named defendant and "its predecessors, successors . . . *agents, servants and employees*, and former employees," was not too broad and ambiguous, and language of general release was "typical of the language contained in many general releases") (emphasis added); *Banta Props. v. Arch Specialty Ins. Co.*, 2014 U.S. Dist. LEXIS 192154, *7 (S.D. Fla. 2014) (citing *State Farm Mut. Auto. Ins. Co. v. Nichols,* 932 So.2d 1067, 1079 (2006) (stating that, "[t]raditionally, general releases have included expansive language designed to protect the offeror from unforeseen developments or creative maneuvering by the other party"); *Arnoul v. Busch Entm't Corp.*, 2008 U.S. Dist. LEXIS 104709, *8 (M.D. Fla. 2008) ("Words such as "associated" constitute "standard" language "sufficiently clear and unambiguous" to constitute a reasonable good-faith release."); *Over & Under Piping Contrs., Inc. v. Vt. Gas Sys.,* 2019 U.S. Dist. LEXIS 807, *11 (D. Vt. 2019) ("Counsel for VGS made clear that the agreement would include broad general releases that are commonplace in Vermont legal practice. Witnesses for VGS confirmed that such releases include, as standard language, the employees and agents of a released corporate entity. Counsel for Over & Under understood that the releases would be broad. Their subsequent efforts to narrow the scope of the releases to exclude corporate agents were in breach of their initial agreement.") (emphasis added).[7]

---

[7] Tagnetics has found no authority in Ohio or the Sixth Circuit that has addressed the issue before this Court regarding the scope of the releases

Tagnetics' counsel testified at the October 18 hearing, consistent with the decisions of these courts. Indeed, the unrebutted evidence at the evidentiary hearing on October 18 showed that, in over twenty years of practicing law, Tagnetics' counsel could not recall a single instance where a settlement of a business entity did not include a release of related individuals/entities, such as parent companies, subsidiaries, affiliates, and others. *See* Ex. 5 at p. 42:21 – 43:15 (Transcript of Hearing before United States Bankruptcy Court on October 18, 2019). Inclusion of such related parties is "standard operating procedure" and "typical in agreements." *Id.*[8] Yet, the Bankruptcy Court disregarded this unrebutted testimony, which was improper and in error. *See, e.g., Washkewicz v. Seredick*, 1986 Ohio App. LEXIS 5216, *17 (8th Dist. 1986) (explaining in the context of whether an individual had the capacity to enter into an agreement, "[t]he trial court's complete disregard of now admissible, unimpeached, unrebutted testimony" was "against the manifest weight of the evidence and constitutes an abuse of discretion and reversible error").

It should be no surprise then that the same exact "standard" and "typical" release language found in the Settlement Agreement also was included the settlement agreement Kayser signed on behalf of Kayser Ventures, Ltd., earlier in this same litigation. *Compare* Ex. 2 at Sections 4, 5 and 6 (stating Kayser (a Remaining Petitioning Creditor) "hereby releases and discharges Tagnetics, as well as its current and former parent companies, corporate and operating affiliates, subsidiaries, and related entities (including specifically Compass Marketing, Inc.)") *with* Ex. 6 at Section 5 (stating Kayser Ventures, Ltd., "hereby releases and discharges Tagnetics, as well as its current and former parent companies, corporate and operating affiliates, subsidiaries, and related entities

---

[8] The fact that the Remaining Petitioning Creditors are proceeding pro se should not excuse any potential lack of familiarity with these norms, particularly in this case where they were urged in multiple occasions to seek their own counsel. *See* Ex. 1 (Emails from S. Stern Email to K. Kayser, R. Earley, and J. Hager, dated July 26 at 8:24 a.m., July 24, 2019 at 5:56 p.m., and July 23, 2019 at 10:46 a.m.); Ex. 3 (Email from S. Stern to K. Kayser, R. Earley, and J. Hager on August 19, 2019 at 7:48 a.m.); *see also* Ex. 5 at 24:23-25:5, 32:22-33:2, 105:22-106:24, 160:20-24.

{01416539-1}

(including specifically Compass Marketing, Inc.)").[9]  It must be noted that Kayser Ventures, Ltd., is owned by Kayser, one of the three Remaining Petitioning Creditors in this matter.  Thus, at the very least, Kayser was aware, or otherwise had (or should have had) knowledge that Tagnetics expected the release to apply to its parent companies, subsidiaries, corporate and operating affiliates, and other related individuals/entities (and Tagnetics in turn would give such a reciprocal release).[10]

Notably, Kayser made no objection to the scope of the release at the time he signed a settlement agreement on behalf of Kayser Ventures, Ltd.  Only after receiving the draft Settlement Agreement did he and the other Remaining Petitioning Creditors seemingly have an alleged "misunderstanding" as to the scope of the phrase "full mutual releases (no carveouts)" to mean that the release being given by the Remaining Petitioning Creditors did not apply to Tagnetics' related individuals/entities.  For Kayser (and the Remaining Petitioning Creditors) to now argue that "full mutual releases (no carve outs)" means something less would be to ignore the objectively manifested and express understanding of Kayser Ventures, Ltd., regarding the scope of the release, as evidenced by Kayser's signature on the settlement agreement with Kayser Ventures, Ltd.

Further adding to the disingenuous position taken by the Remaining Petitioning Creditors is the fact that they conceded that the scope of the release applied to related parties, such as affiliates.  *See* Ex. 3 (stating that "[i]f Compass [Marketing] is not an operating affiliate [sic] then they are not party to this settlement").  As this statement demonstrates, the Remaining Petitioning Creditors understood that, if Compass Marketing was an affiliate of Tagnetics (i.e., a related third

---

[9] The settlement agreement between Tagnetics and Kayser Ventures, Ltd., S-Tek, Inc., and Robert Strain has been redacted to protect other terms of the agreement from disclosure.

[10] The settlement with Kayser Ventures, Ltd., included a specific, negotiated carve out for Kayser's individual claim that was still pending against Tagnetics at the time Kayser Ventures, Ltd., reached its agreement with Tagnetics.

party that is "typical[ly]" included in the release of a business entity), the Remaining Petitioning Creditors would be releasing their claims against Compass Marketing.

The scope of the release Tagnetics proposed to give to the Remaining Petitioning Creditors also bears consideration:

> 7. <u>Tagnetics Releases.</u>  In exchange for the consideration described herein, *Tagnetics, Inc., on its own behalf and on behalf of its current and former parent companies, corporate and operating affiliates, subsidiaries, and related entities, as well as each of their current and former directors, officers, shareholders or other equity holders, agents, employees, accountants, attorneys, and insurers, hereby releases and discharges* Kayser, Earley, and Hager, from any and all causes of action, claims, debts, costs, liabilities, and demands arising from the beginning of time until the date of this Agreement, including, but not limited to, any and all causes of action, claims, debts, costs, liabilities, and demands arising out of or in any way relating to any investment, loan, ownership interest, employment relationship, contract, intellectual property, or any other relationship with Tagnetics (or any current or former parent companies, corporate and operating affiliates, subsidiaries, or related entities of Tagnetics, including specifically Compass Marketing, Inc.), whether known or unknown, by statute, contract, or otherwise, including, but not limited to, any claims for: (i) breach of employment contracts; (ii) breach of express or implied contract or unjust enrichment; (iii) fraud, breach of the covenant of good faith and fair dealing, or any other tort theory; (iv) violation of any federal, state or local law, regulation or public policy; and (v) any other claim that arises out of or in any way relates to Kayser's, Earley's, or Hager's business, investment, ownership interest, employment, or other relationship with Tagnetics or any Tagnetics Releases. Tagnetics understands that this is a GENERAL RELEASE.

*See* Ex. 2 (Draft Settlement Agreement between Tagnetics and Remaining Petitioning Creditors, attached to email dated August 14, 2019 at 6:00 p.m.) (emphasis added).

Notably, the Remaining Petitioning Creditors made no congruent argument that they should not receive a release from Tagnetics and all related individuals/entities, because each Remaining Petitioning Creditor knew and/or understood that this is precisely what each was bargaining for and receiving.  Put another way, the Remaining Petitioning Creditors were satisfied receiving "full mutual releases (no carve outs)" because they were concerned about exposure from other agreements and they were adamant that they needed full releases.  *See* Ex. 5 at 31:21-32:3,

71:3-72:15. The Remaining Petitioning Creditors now argue, however, that, despite understanding each of them would receive a "full mutual release[ ] (no carveouts)" from Tagnetics, and thereby extinguish any other exposure they may have from Tagnetics, they did not understand the term "full mutual release[ ] (no carveouts)" to give Tagnetics a reciprocal release that would give it the peace of mind that they themselves sought to have. If the understanding of the agreed upon settlement terms exchanged by email was not as Tagnetics argues here (i.e., to include a release of Tagnetics' parents, subsidiaries, affiliates, officers, directors, and other related individuals/entities), it makes no logical sense that Tagnetics and its related individuals/entities would give up rights and/or causes of action that it (or its parents, subsidiaries, affiliates, officers, directors, and other related individuals/entities) may otherwise have against the Remaining Petitioning Creditors. Offering such a release to the Remaining Petitioning Creditors reflects Tagnetics' objective (as well as subjective) understanding of the terms of the release. *See Nilavar v. Osborn*, 127 Ohio App. 3d 1, 12 (2nd Dist. 1998) (quoting 1 Williston, Contracts (4 Ed.1990) 244, Section 4:2) ("Consistent with the notice that assets is to be judged objectively, the modern law properly construes both acts and words as having the meaning which a reasonable person present would ascribe to them in view of the surrounding circumstances."). In a similar vein, it is logical that Tagnetics would seek an equally broad release so as to protect it and its related individuals/entities from future exposure at the hands of the Remaining Petitioning Creditors. A "secretly held, unexpressed intent" of the Remaining Petitioning Creditors to exclude similar/mirrored release language for Tagnetics "is not relevant to whether a contract was formed." *Id.*

The Remaining Petitioning Creditors cannot on the one hand claim "full mutual release[ ] (no carve outs)" means a release *only* for Tagnetics (no parents, subsidiaries, affiliates, officers,

{01416539-1}

directors, and other related individuals/entities) while on the other hand receiving the benefit of a

much broader release from Tagnetics (and all of its related individuals/entities). To be sure, the

email exchanging the agreeable settlement terms is illustrative, as it uses only *one line/statement*

*to describe the proposed release language* – "full mutual releases (no carveouts)." Put another

way, if the scope of the release language for each party was meant to be general and broad for the

Remaining Petitioning Creditors and restrictive for Tagnetics, the email containing the settlement

terms would necessarily have to include separate terms addressing the scope of each. Moreover,

it bears repeating, the Remaining Petitioning Creditors understood that the term "full mutual

releases (no carve outs)" necessarily included, at a minimum, affiliates, which are related third

parties that are "typical[ly]" included in releases of business entities. *See* Ex. 3 (stating that "[i]f

Compass [Marketing] is not an operating affiliate [sic] then they are not party to this settlement");

*see also* Ex. 5 at 42:21-43:15. Indeed, the parties did not contemplate broad release language for

one party and more restrictive release language for another party. Had they, Tagnetics would not

have used the word "mutual" when proposing the release language. *See Construction Interior Sys.*

*v. Marriott Family Restaurants*, 984 F.2d 749, 756 (6th Cir. 1993) ("[C]ontract terms are to be

given their plain, ordinary meaning unless: (1) expert testimony provides a different meaning . . .

(2) some other meaning is clearly evidenced from the face or overall content of the instrument; or

(3) manifest absurdity would result."); *see also Metalworking Machinery Co. v. Fabco, Inc.,* 17

Ohio App. 3d 91, 93 (3rd Dist. 1984) (quoting Black's Law Dictionary (5 Ed. 1979) ("'Mutual' is

defined in Black's as: 'Common to both parties. Interchangeable; reciprocal[.]'")). To reach any

other conclusion would make the word "mutual" superfluous, which is contrary to how courts are

to interpret contract terms. *See Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*, 140 Ohio St.3d

193 (2014) (quoting *Sloan & Co. v. Liberty Mut. Ins. Co.*, 653 F.3d 175, 181 (3d Cir. 2011)

("[C]ourts should not interpret contracts in a way that 'render[s] at least one clause superfluous or meaningless.'")); *see also Fulps v. Sprinfield*, 715 F.2d 1088, 1093 (6th Cir. 1983) (explaining in the context of interpreting a statute, the court is required to construe the language "so as to avoid making any word meaningless or superfluous").

Assuming *arguendo* that the Bankruptcy Court meant to find the phrase "full mutual releases (no carve outs)" ambiguous, it failed to properly consider "evidence of custom and trade usage . . . to aid in interpreting the [Settlement Agreement] and to ascertain with greater certainty what the parties intended." *Autotek Sealants v. Koshy (In re Autotek Sealants)*, 1998 U.S. App. LEXIS 5771, **10-11 (6th Cir. 1998) (citing *Booth v. North American Aluminum Corp.*, 423 F.2d 545, 547 (6th Cir. 1970)). In fact, Tagnetics presented unrebutted testimony at the hearing on October 18 that, *inter alia*, in over twenty years of practice, counsel could not recall a single instance where a settlement agreement involving an entity did not include a release of the specifically identified entity *and* its unnamed "affiliates, parent corporations, subsidiaries" and other related individuals/entities. *See* Ex. 5 at 42:21-43:23. The Bankruptcy Court erred by not considering, and not relying on, this unrebutted testimony. *See Washkewicz*, 1986 Ohio App. LEXIS at *17 (holding in the context of whether an individual had the capacity to enter into an agreement, "[t]he trial court's complete disregard of now admissible, unimpeached, unrebutted testimony" was "against the manifest weight of the evidence and constitutes an abuse of discretion and reversible error").

If this Court agrees with the Bankruptcy Court that the term "full mutual releases (no carve outs)" is ambiguous, the Bankruptcy Court still erred because Tagnetics was not afforded the opportunity to present further evidence to show that, in light of the ambiguity, "full mutual releases (no carve outs)" includes Tagnetics' (and the Remaining Petitioning Creditors') related

individuals/entities, such as "affiliates, parent corporations, [and] subsidiaries." *See Chirila v. State Chiropractic Bd.,* 145 Ohio App. 3d 589, 59 (10th Dist. 2001) ("The fundamental requirement of procedural due process is notice and hearing, that is, an opportunity to be heard. Procedural due process also embodies the concept of fundamental fairness.") (internal citations omitted); *see also State ex rel. Jenkins v. Indus. Comm'n,* 2017-Ohio-7896, ¶¶ 4-5 (10th Dist. 2017) (explaining in the context of an order denying permanent total disability for a claimant, "[w]e agree with the magistrate that due process of law principles require that relator receive notice that the issue of voluntary workforce abandonment has been raised and relator must be given the opportunity to address that issue. Here, it is uncontested that no party raised or argued the issue of voluntary workforce abandonment at the hearing. Nor did the staff hearing officer ('SHO') raise the issue during the hearing. It appears that the SHO raised his issue for the first time in the decision denying relator's PTD application"); *see also Roberts v. Principi*, 283 F. App'x 325, 332 n.3 (6th Cir. 2008) ("Because counsel raised the issue only at oral argument, however, we decline to review it."); *Lane v. LaFollette, Tenn.*, 490 F.3d 410, 420 (6th Cir. 2007) (holding issue waived by first raising it at oral argument); *Lafata v. Dearborn Heights Sch. Dist. No. 7*, No. 13-CV-10755 (E.D. Mich. Dec. 11, 2013) ("Generally, courts will not consider theories or arguments raised for the first time at oral argument."); *Probst v. Cent. Ohio Youth Ctr.*, 511 F. Supp. 2d 862, 871 (S.D. Ohio 2007) ("It is well established that a moving party may not raise an issue for the first time in its reply brief or at oral argument."); *Van Sickle v. Automatic Data Processing, Inc.*, 952 F. Supp. 1213, 1221 (E.D. Mich. 1997) (holding summary judgment inappropriate on an issue raised for the first time at a hearing, because the opposing party did not have an opportunity to respond).

To this end, Tagnetics' Motion to Enforce the Settlement Agreement argued that the terms exchanged by email and incorporated into the draft Settlement Agreement were unambiguous. *See*

Tagnetics' Motion to Enforce Settlement Agreement. In response, the Remaining Petitioning Creditors raised no alternative argument that the terms exchanged by email were ambiguous, and, in fact, they agreed there was no ambiguity. *See* Remaining Petitioning Creditors' Response to Tagnetics' Motion to Enforce Settlement Agreement (stating "[w]e understand the English language"). Thus, Tagnetics had no notice and, therefore, could not adequately prepare testimony and/or other evidence that would tend to support Tagnetics' interpretation of the settlement terms.[11] *See Transco Secur., Inc. v.* Freeman, 639 F.2d 318, 323 (6th Cir. 1981) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1949), for the proposition that "[d]ue process requires 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections'"); *see also Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1 (1978) (stating that the purpose of notice is to apprise the affected individual of, and permit adequate preparation for, an impending hearing).

For the foregoing reasons, the Court should reverse the decision of the United States Bankruptcy Court for the Southern District of Ohio, Western Division at Dayton, and hold that the parties' Settlement Agreement, which included the phrase "full mutual releases (no carve outs)," resulted in an agreement that released Tagnetics' (and the Remaining Petitioning Creditors') parent companies, subsidiaries, affiliates, officers, directors, and other related individuals/entities (such as heirs and personal representatives).

---

[11] While Tagnetics' counsel provided testimony regarding the customary usage of the terms "full mutual releases," *see* Ex. 5 at 42-43, out of an abundance of caution, Tagnetics had no need to present (at that time) additional evidence on this issue, as apparent ambiguities with the scope of the proposed lease language were not raised by either party at the time of hearing.

**B.  ALTERNATIVELY, IF THE BANKRUPTCY COURT DID NOT ERR REGARDING THE SCOPE OF THE RELEASE, THE SETTLEMENT AGREEMENT IN ITS ENTIRETY IS NOT ENFORCEABLE BECAUSE THERE WAS NO MEETING OF THE MINDS**

"A settlement agreement is a type of contract and is governed by reference to state substantive law governing contracts generally." *Cogent Solutions Grp., LLC v. Hyalogic, LLC*, 712 F.3d 305, 309 (6th Cir. 2013) (internal quotations and citations omitted).  Here, Ohio contract law should be applied based on the applicable law provision in the Settlement Agreement.  *See* Ex. 2 at Section 20.

A settlement agreement is a "binding contract designed to terminate a claim by preventing or ending litigation." *R&L Carriers, Inc. v. Emergency Response & Training Sols., Inc.*, 2019-Ohio-3539, ¶ 30 (Ohio Ct. App. 2019) (internal quotations and citations omitted).  "[S]ettlement agreements are highly favored in the law." *Cont'l W. Condo. Unit Owners Ass'n v. Howard E. Ferguson*, 74 Ohio St. 3d 501, 502 (Ohio 1996).

Like any other contract, an enforceable settlement agreement requires "an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Kostelnik v. Helper*, 96 Ohio St. 3d 1, 3 (Ohio 2002) (quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F. Supp. 409, 414 (N.D. Ohio 1976)).  "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Id.*  "In order for a meeting of the minds to occur, both parties to an agreement must mutually assent to the substance of the exchange." *Turoczy Bonding Co. v. Mitchell*, 2018-Ohio-3173, ¶ 18 (Ohio Ct. App. 2018).  "Once there is such a meeting of the minds, one cannot refuse to proceed with settlement due to a mere change of mind." *Id.*

"Under the objective theory of mutual assent followed in all jurisdictions, a contracting party is bound by the apparent intention he outwardly manifests to the other contracting party.  To

22

the extent that his real, secret intention differs therefrom, it is entirely immaterial." *Bulger v. Bulkowski*, 1983 Ohio App. LEXIS 11580, *4 (6th Dist. 1983); *see also Perlmuter Printing Co.*, 436 F. Supp. at 414.

As stated *supra*, on October 18, 2019, the Court held a hearing on Tagnetics' Motion to Enforce Settlement Agreement.  On October 25, 2019, the Bankruptcy Court rendered its decision enforcing the terms of the Settlement Agreement, but holding that the use of the phrase "full mutual releases (no carve outs)" did not include the parties' "affiliates, parent corporations, officers, directors or other undisclosed third parties."

Tagnetics incorporates the argument from Section A above.  While it will not be repeated fully here, the following is a brief recitation of the argument and supporting facts:

- Tagnetics included the same exact release language in an earlier agreement in the very same case, which was signed by Kayser in his capacity as the owner of Kayser Ventures, Ltd.

- Kayser made no argument at that time that a full release does not (or should not) include Tagnetics' related individuals/entities.  Only after receiving the draft Settlement Agreement did Kayser and the other Remaining Petitioning Creditors object to the scope of the release.

- The release given by Tagnetics to the Remaining Petitioning Creditors included not only Tagnetics, but "its current and former parent companies, corporate and operating affiliates, subsidiaries, and related entities, as well as each of their current and former directors, officers, shareholders or other equity holders, agents, employees, accountants, attorneys, and insurers . . . ." The Remaining Petitioning Creditors, however, make no argument that their understanding of the settlement terms did not include a release by Tagnetics and its related individuals/entities of the Remaining Petitioning Creditors.

- In fact, the Remaining Petitioning Creditors concede that they understood the term "full mutual releases (no carve outs)" to include a release of related third parties.  *See* Ex. 3 (stating that "[i]f Compass [Marketing] is not an operating affiliate [sic] then they are not party to this settlement").

- Tagnetics' offer to release the Remaining Petitioning Creditors of claims not only by Tagnetics, but also its related individuals/entities, provides clear

23

and substantial evidence that Tagnetics objectively (and subjectively) understood the scope of the release applied to the parties to the litigation and their respective related individuals/entities.

*See Trs. of the Painters, Union Deposit Fund v. G&T Commer. Coatings, Inc.,* 2014 U.S. Dist. LEXIS 129945, **25-26 (E.D. Mich. 2014) (explaining that, when determining the intent of the language of the contract, a court may look to "other indicia of intent, such as 'the bargaining history, the context in which the contract was negotiated, the interpretation of the contract by the parties, and the conduct of the parties bearing upon its meaning'") (quoting *Int'l Bhd. of Elec. Workers v. Nat'l Labor Relations Bd.,* 788 F.2d 1412, 1414 (9th Cir. 1986)).

Based on the prior history and the settlement negotiations, including objective (and subjective evidence of Tagnetics' understanding based on the scope of the release it offered to the Remaining Petitioning Creditors and it sought in return, as well as the customary usage of the phrase "full mutual releases (no carveouts)" and the Remaining Petitioning Creditors' acknowledgement that the release applied to related third parties (at the very least affiliates), there can be no meeting of the minds between Tagnetics and the Remaining Petitioning Creditors if the phrase "full mutual releases (no carve outs)" is found to exclude the parties' related individuals/entities, such as parent companies, subsidiaries, affiliates, officers, and directors. *See Beechwood Villa Apartments v. Nord Bitumi U.S., Inc.,* 1990 Ohio App. LEXIS 1561 (12th Dist. 1990) (finding that no "meeting of the minds" occurred when the litigants had differing views as to the scope of the release in exchange for the settlement funds); *see also Wilson v. Pride,* 2019-Ohio-3513, ¶ 41 (8th Dist.2019) (refusing to enforce a settlement agreement when, based on the parties' testimony and court record, the "terms of the alleged agreement were not stated with sufficient particularity" and, thus, there was no meeting of the minds).

24

A court sitting in equity may reform a contract "when, due to a mutual mistake of the parties, the contract does not evince the actual agreement entered into between the parties." *Bank of Am., N.A. v. Seymour,* 2019-Ohio-2884, ¶ 20 (10th Dist. 2019).  A court may only order a contract to be reformed, however, "based on mutual mistake where the record contains clear and convincing proof that the parties made the same mistake and both parties understood the contract as the party seeking reformation alleges it ought to have been." *Id.* (internal citations omitted).

Here, the Bankruptcy Court reformed the language of the Settlement Agreement while making no finding of a mutual mistake, which is contrary to law.  Indeed, the opinion delivered by the Bankruptcy Court makes no reference to a mutual mistake.  To be sure, it is clear from the arguments presented in the Motion to Enforce Settlement Agreement, and Remaining Petitioning Creditors' reply thereto, that the parties raised and/or made no such argument that there was a mutual mistake.  In fact, and as demonstrated in Section A above, the parties inherently *disagreed* regarding the scope of the parties to be released.  Faced with each parties' position regarding the scope, the Bankruptcy Court improperly reformed the Settlement Agreement without first finding a mutual mistake, when it should have simply found that there was no actual meeting of the minds. *See Am. Annuity Group v. Guar. Reassurance,* 140 F. Supp. 2d 859, 867 (S.D. Ohio 2001) ("Reformation is improper due to unilateral mistake . . . [t]he rationale is that in the case of unilateral mistake, there is no meeting of the minds, and, hence, no contract to be reformed.") (internal citations omitted); *see also Joseph v. Dever*, 1986 Ohio App. LEXIS 7942, *24 (1st Dist. 1986) (citing *Stewart v. Gordon (1899)*, 60 Ohio St. 170, 176 (1899), for the law of the State of Ohio that "[n]o reformation of an instrument can be made that does not conform to the intent of both parties; the court cannot by reformation make a new contract").

Assuming *arguendo* that a court could reform a contract in the absence of a finding of mutual mistake (which Tagnetics contends it cannot), reformation is otherwise inappropriate in this matter, as it forces Tagnetics into a settlement to which it did not agree. It bears repeating that Tagnetics' understanding of the scope of the release included a release of all of its (and the Remaining Petitioning Creditors') related individuals/entities, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives, as evidenced not only by the release it sought but the release it offered. In addition, based on the prior course of dealing with Kayser (while he was acting on behalf of Kayser Ventures, Ltd.), which included the same release that Tagnetics included with the Settlement Agreement, it was reasonable to expect that "full mutual releases (no carve outs)" included all of Tagnetics' related individuals/entities. Moreover, the Remaining Petitioning Creditors acknowledged that the release applied to related third parties (at the very least affiliates of Tagnetics). Instead, the Bankruptcy Court read the settlement terms as narrowly as possible, finding that the agreed upon terms only included a release of Tagnetics and the Remaining Petitioning Creditors (and no other related individuals/entities). Objectively, Tagnetics' understanding of the settlement terms was fundamentally different than the Remaining Petitioning Creditors' understanding (if the Remaining Petitioning Creditors' position before the Bankruptcy Court and this Court is to be believed) and, therefore, the Bankruptcy Court should not have enforced the agreement *in toto*, as there was no manifestation of assent and/or meeting of the minds.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should reverse the decision of the United States Bankruptcy Court for the Southern District of Ohio, Western Division at Dayton and hold either (1) the term "full mutual releases (no carve outs)" included releases of not only the parties to this

{01416539-1}

litigation, but related individuals/entities, such as parent companies, subsidiaries, affiliates, officers, and directors, or (2) if the term "full mutual releases (no carve outs)" is not given the meaning advocated by Tagnetics, there was no meeting of the minds and, thus, there was no settlement agreement to enforce.

## CERTIFICATE OF COMPLIANCE WITH RULE 8015(a)(7) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

Appellant Tagnetics, Inc. hereby certifies that the foregoing Brief of Appellant complies with the page limitations prescribed by Rule 8015(a)(7) of the Federal Rules of Bankruptcy Procedure. Specifically, Appellant Tagnetics, Inc.'s certifies that the foregoing contains 8,691 words and 769 lines of text.

Respectfully submitted,

_____/s/ Stephen B. Stern_____          _____/s/ Robert R. Kracht_____
Stephen B. Stern, Admitted Pro Hac Vice     Robert Kracht (#0025574)
Kagan Stern Marinello & Beard, LLC          McCarthy, Lebit, Crystal & Liffman Co., LPA
238 West Street                             101 W. Prospect Avenue, Suite 1800
Annapolis, Maryland 21401                   Cleveland, Ohio 44115
(410) 216-7900 – Telephone                  (216) 696-1422 – Telephone
(410) 705-0836 – Facsimile                  (216) 696-1210 – Facsimile
stern@kaganstern.com (email)                rrk@mccarthylebit.com (email)

*Counsel for Appellant/Alleged Debtor*      *Counsel for Appellant/Alleged Debtor*
*Tagnetics, Inc.*                           *Tagnetics, Inc.*

27

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on February 27, 2020, a copy of the foregoing Brief of Appellant was served (i) **electronically** on the date of filing through the Court's ECF System on all ECF participants registered in this case at the email address registered with the court and (ii) electronically by email on counsel for Tagnetics, Inc., Stephen Stern, Esq. (Stern@kaganstern.com), Douglas Draper, Esq. (ddraper@hellerdraper.com) and Leslie Collins, Esq. (lcollins@hellerdraper.com), and (iii) by **ordinary U.S. Mail** on February 27, 2020 addressed to:

Kenneth W Kayser
PO Box 115
Catawba, VA 24070

Ronald E. Early
6429 Winding Tree Drive
New Carlisle, OH 45344

Jonathan Hager
842 Paint Bank Road
Salem, VA 24153

MaryAnne Wilsbacher
Office of the United States Trustee
170 North High Street
Suite 200
Columbus, Ohio 43215

                                                  */s/ Robert R. Kracht*
                                            Robert R. Kracht (#0025574)

{01416539-1}