# EXHIBIT 5

# In The Matter Of:

*TAGNETICS, INC.*

*October 18, 2019*

*LEGAL ELECTRONIC RECORDING, INC.*
*216-881-8000*
*www.lerinc.com*

Original File 20A7013.prn
Min-U-Script® with Word Index

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

|  |  |  |
|---|---|---|
|  | * |  |
| IN RE: | * | Case No. 19-30822 |
|  | * |  |
| TAGNETICS, INC. | * |  |
|  | * | October 18, 2019 |

* * * * * * * * * * * * * * *

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE GUY R. HUMPHREY
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

STEPHEN B. STERN, ESQ.
ROBERT R. KRACHT, ESQ.
For Tagnetics, Inc.

KENNETH W. KAYSER
RONALD E. EARLEY
JONATHAN HAGER
Petitioning Creditors


Transcribed by:
- - - - - - - - - - - - - -
Legal Electronic Recording, inc.
5230 St. Clair Avenue
Cleveland, Ohio 44103
(216) 881-8000
www.lerinc.com

Proceeding recorded by electronic sound recording,
transcript produced by transcription service.
Job #20A7013

2

WITNESSES:


ON BEHALF OF TAGNETICS, INC.:

STERN, STEPHEN

      Direct examination...........Page 18
      Cross-examination............Page 60
      Redirect examination.........Page 86

ON BEHALF OF KENNETH KAYSER:

KAYSER, KENNETH

      Direct testimony.............Page 93
      Cross-examination............Page 105

EARLEY, RONALD

      Direct examination...........Page 129

ON BEHALF OF RONALD EARLEY:

EARLEY, RONALD

      Direct testimony.............Page 132
      Cross-examination............Page 138
      Redirect testimony...........Page 144

ON BEHALF OF JONATHAN HAGER:

HAGER, JONATHAN

      Direct testimony.............Page 148
      Cross-examination............Page 156

**TAGNETICS (19-30822) 10-18-19**

3

1      (Proceedings begin at 9:34 a.m.)

2           THE CLERK:  The United States Bankruptcy

3  Court for the Southern District of Ohio is now in

4  session until adjournment this 18th day of October

5  2019, the Honorable Guy R. Humphrey presiding.  You may

6  be seated.

7           On the docket for this morning is Case Number

8  19-30822, Tagnetics, Incorporated.  May the Court

9  please have appearances, beginning with counsel for

10  Tagnetics?

11           MR. STERN:  Good morning, Your Honor.

12  Stephen Stern on behalf of Tagnetics.

13           THE COURT:  Good morning, Mr. Stern.

14           MR. KRACHT:  Your Honor, Robert Kracht, from

15  McCarthy Lebit, in Cleveland, Ohio counsel for

16  Tagnetics.

17           THE COURT:  Good morning, Mr. Kracht.

18           MR. KRACHT:  Thank you.

19           THE CLERK:  Gentlemen, each stand and state

20  your full name for the record.

21           DR. KAYSER:  My name is Kenneth Kayser.

22           THE COURT:  Good morning, Mr. Kayser.

23           MR. EARLEY:  Ronald Earley.

24           THE COURT:  Good morning, Mr. Earley.

25           MR. HAGER:  This is Jon Hager.

4

1         THE COURT: Good morning, Mr. Hager. Okay, I

2 think we're here for the hearing, evidentiary hearing,

3 on the motion to enforce settlement, filed by

4 Tagnetics, and the response of the Petitioning

5 Creditors, Mr. Kayser, Mr. Earley and Mr. Hager.

6         We reviewed everything extensively, I think,

7 from that perspective. We're ready to go, but I think

8 before we get started, I thought we would go over some

9 preliminary matters, make sure we're all on the same

10 page on everything. But before I get into my

11 preliminary matters, are there any preliminary matters,

12 which the parties wish to address with the Court?

13         MR. STERN: Your Honor, are we going to have

14 the opportunity for a brief opening statement after the

15 preliminary matters?

16         THE COURT: Oh, yes, yes.

17         MR. STERN: Then nothing at this time.

18         THE COURT: Absolutely. I just wanted to

19 kind of lay the groundwork for everybody, particularly

20 since we have pro se parties. I like to try to lay the

21 groundwork as best as possible, so everybody

22 understands as best as possible, you know, how

23 hopefully things will operate during the course of the

24 day today.

25         Anything you, the pro se Petitioning

5

1    Creditors, wish to raise with the Court at this time,

2    before I get into my preliminary matters?

3                DR. KAYSER:  No, sir.

4                MR. EARLEY:  No, thanks.

5                THE COURT:  All right.  Since Tagnetics has

6    filed a motion, we'll have Tagnetics -- after opening

7    statements, we'll have Tagnetics present its case.

8    They may call witnesses.  They will first conduct

9    examination of any witnesses they have.  We call that

10   direct examination.  And then the Petitioning Creditors

11   will have the right to conduct any cross-examination of

12   those witnesses, and then Tagnetics will have the right

13   to conduct what we call redirect examination, if they

14   want, questions based upon any questions you may have

15   asked them, and then you would be entitled to conduct

16   any cross-examination of those witnesses.

17               Let's -- to the extent possible, let's avoid

18   going back over the same ground we've already gone

19   over, you know.  And then after they complete their

20   case, after Tagnetics completes its case, then the

21   Petitioning Creditors will have an opportunity to

22   present your cases.

23               You each, in effect, have your own case, and

24   you can each call whatever witnesses you want in your

25   own cases.  You may testify in your own cases.

1    Fortunately or unfortunately, this is not the first

2    time I've had pro se parties in my courtroom.  It

3    creates an awkward situation -- it makes it more

4    awkward for hearings, because if you want to testify in

5    your own case, what you have to do is get in the

6    witness box, and in effect give a narrative, explain,

7    you know, what statements you want to state that you

8    think, you know, from an evidentiary factual viewpoint

9    support your position.

10           If an objection is stated during your

11   testimony, you need to make sure you stop and let me

12   rule on the objection, and then after I rule on the

13   objection, then you can proceed in accordance with my

14   ruling on the objection.

15           You will not be able to ask each other

16   questions.  In effect, Mr. Kayser can't put Mr. Hager

17   on the stand and stand at the lectern and ask

18   questions, because unless any of you are lawyers -- my

19   understanding, none of you are lawyers; is that

20   correct?

21           DR. KAYSER:  Yes.

22           THE COURT:  That would constitute the

23   unauthorized practice of law.  So you can testify in

24   your own cases, but you can't examine each other in

25   your own cases, and you can have, you know, each other

7

1   testify in your cases, but again, you're going to have

2   to get in the witness box and give a narrative of what

3   you think support the cases.

4          Let's see if there's anything -- are there

5   any questions on how that will operate?

6          DR. KAYSER:  Yes, Your Honor.  We had

7   intended to each call each other as witnesses and ask

8   the questions that apply to us all.

9          THE COURT:  I kind of thought that might be

10  the case from the way you filed your witness list, but

11  you cannot do that.  That is the unauthorized practice

12  of law.  You will not be able to do that.  You may feel

13  it puts you at a disadvantage, but you make conscious

14  decisions to hire lawyers or not to hire lawyers.

15         DR. KAYSER:  Understood.

16         THE COURT:  And because you didn't hire a

17  lawyer, I cannot -- I can't let you guys serve as

18  lawyers.  You need to go to law school, pass a bar

19  exam, to do that.  And since you haven't done that,

20  you're not entitled.  That's the law.  That's the law

21  in Ohio.

22         DR. KAYSER:  Yeah.  We're okay with it.  We

23  do understand.  Your Honor, I'm sorry to ask for a

24  clarification, but if each of us can call witnesses,

25  can we -- but we can't call each other as witnesses?

1        THE COURT:  You can call each other as

2   witnesses, yes.  You can do that.  You each can get up

3   there and testify in what we call a form of a

4   narrative, stating your -- you know, what facts you

5   think support each other's cases, but one of you can't

6   be at the lectern asking another questions to elicit

7   that testimony.  That's serving as a lawyer, and that's

8   the unauthorized practice of law, and you can't do it.

9        DR. KAYSER:  Understood.  Your Honor, one

10  question.  How do we present the exhibits then?

11        THE COURT:  You can just say -- well, you can

12  have the exhibits in the witness box, and then

13  describe, okay, you know, I'm looking at, and you have

14  to make sure that Tagnetics' counsel have copies of

15  those exhibits, so they know what you're testifying

16  about.  And you can say, Your Honor, I'm looking at an

17  email dated July 20th, 2019, it's from me to Mr. Stern,

18  you know, and then that way you identify the document.

19  And then that's how.  And then when you're done you can

20  move for admission of those exhibits, and that's how

21  you would introduce exhibits.

22        DR. KAYSER:  We'll do our best.

23        THE COURT:  I understand.  It's -- you know,

24  it's -- that's what the law is.  I have to enforce the

25  law and apply the law, and that's the risk you take in

9

1    the situation you're in, representing yourselves on a
2    pro se basis.
3             When we get done with all the evidentiary
4    presentations, you'll be able to make closing
5    arguments.  That's where you have the opportunity to
6    stand at the lectern and argue why the facts, which
7    have been elicited today, support your legal position.
8             Now, with respect to the exhibits, I think
9    there's some overlap with the exhibits.  It's from a
10   Court perspective, if you both -- let's say you both
11   have July 20th, 2019 email as an exhibit, the Court
12   finds it easier just to use one of those set of
13   exhibits.  They're duplicative on each side, rather
14   than referring -- using two different copies of the
15   same exhibit.
16            To that extent, the Court's preference would
17   be to use Tagnetics' exhibits to the extent they're
18   duplicate, just because they're a little bit easier for
19   us to follow as they're more separate emails, for
20   instance.  But that's the only reason.  From
21   administrative ease purposes, that would work better
22   from the Court's perspective.
23            So if Tagnetics has introduced, you know, the
24   July 20th email, my preference is if you're going to
25   refer to the July 20th email, just to use Tagnetics'

1  exhibit for that, so we don't have to, like I say, have

2  duplicative same exhibits.  And if Tagnetics has

3  introduced a document already, and particularly if I've

4  admitted it, you don't need to go through the process

5  of identifying it and having it admitted.  It's already

6  been admitted.  You can use that.  We don't need to go

7  over that groundwork with an exhibit that's already

8  been admitted.

9          Any other questions before we get started

10  with opening statements?

11          MR. KRACHT:  Your Honor, I just want to note,

12  one of our exhibits is a composite exhibit of all of

13  what we believe to be the relevant emails and it's

14  actually the A.  Is that going to pose --

15          THE COURT:  No, that's fine.  I think that's

16  -- you know, as long as each one gets admitted or the

17  whole total gets admitted, that's fine.

18          MR. KRACHT:  And if for some reason we would

19  have say one or two excluded, that could be removed

20  from the exhibit at the time.

21          THE COURT:  Yeah, I think that's fine.

22          MR. KRACHT:  Thank you.

23          THE COURT:  Any questions from the

24  Petitioning Creditors?  No, okay.  Great.  Why don't we

25  have opening statements then?  Now, on the opening

11

1   statements -- go ahead and take the lectern, Mr. Stern.

2   I just want to ask, when you are making opening

3   statements or talking to Court, not as a witness,

4   please take the lectern.  Our recording system works

5   much better that way.  Now, if you're just making an

6   objection to a witness's testimony, you can just stand

7   up and make your objection from your seat, but

8   generally making presentations and lengthier

9   discussions with the Court, my preference is for you to

10  stand at the lectern.  When you're testifying, you'll

11  be in the witness box.

12         I'm trying to think if there was something

13  related to that.  Well, that's all I can think of.  I'm

14  sorry, Mr. Stern.  One other thing we could do, let's -

15  - what I'd like to do is have Ms. Behnken swear in the

16  three Petitioning Creditors and then we'll take a five-

17  minute break and you can make your opening statements.

18         The reason I'd like the Petitioning Creditors

19  to be sworn is what we have found after, like I said,

20  unfortunately having a number of pro se parties in the

21  courtroom before, it's difficult for them to separate

22  out what's a legal argument or a statement at the

23  lectern, versus testimony, and so it's easier for us

24  just to have them under oath for everything they state,

25  and that way we don't have to worry about well, was

1  that sworn testimony or not sworn testimony.  So

2  anything you state, we're going to, in effect, treat as

3  sworn testimony, and swear you in now.

4            THE CLERK:  Your Honor, are you okay with

5  swearing all of them at the same time?

6            THE COURT:  Yeah, that's fine.

7            THE CLERK:  Gentlemen, please stand.

8            (Petitioning Creditors sworn.)

9            THE CLERK:  Thank you.

10            THE COURT:  Okay, let's take a five-minute

11  recess and then you can make your opening statements.

12            THE CLERK:  All rise.  Court is in recess.

13            (Off the record from 9:50 a.m. until 9:58

14  a.m.)

15            THE CLERK:  Court is again in session.  You

16  may be seated.

17            THE COURT:  Okay.  I wanted to clarify one

18  thing.  Now, we have to treat each of the Petitioning

19  Creditors' cases, in effect, as a separate case.  Mr.

20  Kayser, if you want to call Mr. Hager or Mr. Earley in

21  your case, you can, and you can examine them from the

22  lectern.  And Mr. Earley, you can do the same with Mr.

23  Kayser and Mr. Hager.  And same with Mr. Hager, he can

24  call Mr. Kayser and Mr. Earley, and examine them.

25  That's -- a pro se party can do that.  That's not the

13

1   unauthorized practice of law.

2           Now, Mr. Kayser though can't question

3   witnesses in Mr. Hager's case or Mr. Earley's case, and

4   vice versa.

5           DR. KAYSER:  Okay.

6           THE COURT:  So Mr. Kayser, if you want to

7   examine Mr. Earley and Mr. Hager in your case, you may

8   do so, and Mr. Earley, you can do the same with the

9   other two, and Mr. Hager, you can do the same with the

10  other two.  You just can't serve as lawyers in anybody

11  else's case.  Okay.  I wanted to clarify that.  We're

12  all on the same page with that?

13          DR. KAYSER:  Yes, Your Honor.

14          THE COURT:  Great.  We ready for opening

15  statements?

16          MR. STERN:  Yes, Your Honor.

17          THE COURT:  You may proceed, Mr. Stern, and

18  then after Mr. Stern makes the opening statement for

19  Tagnetics, each of you can make your opening

20  statements, if you wish.

21          MR. STERN:  Good morning, Your Honor.  May it

22  please the Court, I am Stephen Stern on behalf of the

23  alleged Debtor, Tagnetics, Inc.  We are here today on

24  our motion to enforce the settlement agreement.  We

25  think the terms are pretty clearly set forth.  The

1  pertinent email is a series of emails that I refer to

2  in the motion as our term sheet that were exchanged on

3  July 26, 2019, and it lays out very clearly the terms

4  of the -- the key terms of the agreement.

5          And as that email string reflects, the

6  alleged Creditors, not once, not twice, but three times

7  confirmed in writing the terms of that -- those key

8  terms of the settlement agreement, and this was

9  communicated to the Court, that we have an agreement in

10 place.

11         It was only after the fact, when we exchanged

12 the written settlement agreement, where we learned

13 about these alleged concerns that they had, clearly

14 going beyond the scope of the payment terms that were

15 set forth, and the phrase -- key phrase in the term

16 sheet says "full mutual releases, no carve-outs."  And

17 as the Creditors are seeking, there's a number of

18 carve-outs that they are seeking.

19         One thing that I would like to point out, and

20 if there was any confusion when looking at our brief, I

21 refer to 123, there's a reference to an email in the

22 brief on July 26.  It is on Page 6 of our brief, where

23 we copied the chart of an email that was sent from Mr.

24 Hager to me on July 26 at 4:42 on there.  That was not

25 attached to our brief.  That was our exhibits, Exhibit

15

1   I.  That was added after the fact.  Exhibits that we

2   put for our exhibits today do mirror the exhibits we

3   had attached to our motion, except Exhibit I is the

4   only added one, and that is the one that contains that

5   missing email there, in the event there's any confusion

6   on the part of the Court when looking through the

7   brief.  My apologies about that oversight.

8         But as that third email reflects, in caps it

9   says, "Total settlement," with those numbers, and yet

10  the alleged Creditors are seeking additional payments

11  beyond that total settlement figure, and again seeking

12  exceptions to the full mutual releases, no carve-outs.

13        Those discussions happened over a period of

14  time, and those emails reflect, I repeatedly encouraged

15  the alleged Creditors to seek counsel, to advise them

16  on this process.  And just to be perfectly frank, was

17  quite surprised when seeing the exceptions and the

18  additional payments that they were seeking after the

19  fact.

20        We think the settlement agreement, which was

21  -- I think it's Exhibit C -- Exhibit B, with the

22  exhibits, Exhibit 2, to the motion, accurately sets

23  forth the key terms of the agreement, and we're ready

24  to proceed with the evidence that supports that.

25        Thank you, Your Honor.

16

1        THE COURT:  Thank you, Mr. Stern.  Okay.  One

2   of you want to at least start?

3        MR. EARLEY:  Yes, sir, and I'll give the

4   opening statement for all three of us.

5        THE COURT:  Okay.

6        MR. EARLEY:  Your Honor, the Petitioning

7   Creditors intend to show that the terms of the proposed

8   settlement agreement offered on August 14th in no way

9   resembles the proposal forwarded -- put forth by the

10  Petitioning Creditors on July 20th, 2019.

11       We also will show that the negotiations

12  between Tagnetics and the Petitioning Creditors between

13  July 20 and July 26 only focused on cash payments, and

14  not any other term or terms of the agreement.  The

15  evidence will show a significant difference in the

16  proposed settlement agreement, once Tagnetics secured

17  the postponement of the scheduled trial.

18       THE COURT:  Thank you.  I will accept that as

19  the opening statement of Mr. Earley.  Mr. Kayser, do

20  you wish to state anything different?  You don't need

21  to state the same thing Mr. Earley just stated.  Is

22  there anything additional you --

23       DR. KAYSER:  There's nothing more I need to

24  state until testimony.

25       THE COURT:  Okay.  So are you adopting Mr.

1   Earley's opening statement as your opening statement?

2             DR. KAYSER:  Yes.

3             THE COURT:  Okay, thank you.  Same questions

4   for you, Mr. Hager.

5             MR. HAGER:  I'll adopt his statement.

6             THE COURT:  This all goes back to the fact

7   that you can't be each other's attorneys, and -- but I

8   don't want to cover the same ground if we don't have to

9   cover the same ground on this stuff.  Okay.  Mr. Stern,

10  do you have any witnesses you wish to call?

11            MR. STERN:  Yes, Your Honor.  I'll be the

12  testifying witness and Mr. Kracht will examine me.

13            THE COURT:  Okay.

14            MR. STERN:  I'm just going to take up with me

15  the binder of exhibits.

16            THE COURT:  That's fine.  I do have one

17  point.  As you referenced Exhibit I, which you said was

18  not attached to your motion.  It does not appear that

19  it's in my booklet either, so --

20            MR. STERN:  Really?  May I take a look at

21  that?

22            THE COURT:  Yeah, absolutely, please.  Ms.

23  Behnken.

24            MR. STERN:  Does your binder have Exhibit I?

25  Okay.

18

1     THE COURT:  Okay, thank you.

2     THE CLERK:  Sir, please stand.  Raise your

3  right hand.

4     MR. STERN:  My apologies.

5        STEPHEN STERN, WITNESS, SWORN

6     THE CLERK:  Please state your full name for

7  the record.

8     MR. STERN:  Stephen with a P-H, Stern, S-T-E-

9  R-N.

10     THE CLERK:  Thank you.

11     DIRECT EXAMINATION OF STEPHEN STERN

12  BY MR. KRACHT:

13  Q    Mr. Stern, you're one of the lawyers for

14  Tagnetics in this case, correct?

15  A    I am.

16  Q    Can you provide some background of your nature

17  of your practice?

18  A    Sure.  I was admitted to practice in 1996, after

19  I graduated from GW Law School.  I forget whether I was

20  admitted in October, November, December, but that was

21  when I was first admitted to practice, and have been

22  practicing for approximately 23 years.

23     My practice is litigation oriented.  The early

24  part of my career did a lot of employment counsel

25  litigation and then over the last I'd say probably 15,

1  16 years, a good amount of commercial and business

2  litigation, in courts.  And along the way, negotiated

3  many, many settlements.

4  Q     Do you practice in the area of bankruptcy at

5  all?

6  A     I do not.

7  Q     So this is your first foray into that?

8  A     It is.

9  Q     But you do -- would you say that the majority of

10  your cases in your litigation practice go to trial, or

11  are they settled?

12  A     Trial is definitely the exception.  Most are

13  either resolved through settlement negotiations or on

14  motions.

15  Q     Okay.  And so the settlement that we're talking

16  about today in this case that we're seeking to enforce,

17  is that something that is unique in your experience of

18  how a settlement was negotiated?

19  A     No.  The only unique part I'd say is that this

20  happened while I was on vacation, the discussions.

21  Q     What role did you play in connection with the

22  settlement negotiations with the Petitioning Creditors?

23  A     Sure.  I forgot the exact date.  I can refer to

24  the exhibits, but we -- that week -- I guess the week

25  before I went on vacation, had some discussions.  I

1    forgot whether it was with Mr. Kayser or Mr. Earley,

2    opening the door -- it may have just been the email,

3    when we first started communicating about the

4    possibility of having settlement discussions.

5         They happened on and off over that week, leading

6    up to the 16th.  There was some discussions that were -

7    - or demands that were made by the alleged Creditors,

8    flat out rejected those.  Then they made some -- then

9    we made some counteroffers.  Those were flat out

10   rejected, and then the discussions really picked up in

11   earnest the 24th, 25th and 26th.  Really, the 26th is

12   the key day.

13   Q    Okay.  I'm going to try to use this contraption

14   here, and if you can turn to Tagnetics' Exhibit A,

15   please?

16   A    Okay.

17   Q    If I can adjust this?  Okay.  Can you identify

18   Exhibit A?

19   A    Sure.  This is a series of emails, email string,

20   between me and the alleged Creditors.  Even though

21   sometimes only one of the alleged Creditors' emails

22   appears, I remember on these emails, I was

23   communicating with all of them, and that's reflected on

24   some of them.

25        The email string starts on -- with an email from

21

1   me addressed to Mr. Kayser on Friday, July 19th, 2019,

2   at 4:14 p.m., and then you can see the series of emails

3   back and forth, where demands were made, rejected, and

4   the reflection of our settlement negotiations, at least

5   in writing, but does not account for every telephone

6   communication that occurred.

7   Q      Okay.  So Exhibit A then goes from most recent

8   to the earlier emails, so --

9   A      Yes.

10  Q      So it's in reverse order, correct?

11  A      Correct.

12  Q      Now, did you have any phone conversations during

13  this period with any of the Petitioning Creditors?

14  A      I did.  I don't remember speaking -- when we had

15  our first conversations.  I may have spoken with Mr.

16  Kayser once or twice, but on the date -- key day, July

17  26, I was speaking primarily, if not exclusively, with

18  Mr. Earley.

19  Q      Okay.  Directing your attention to Exhibit A, if

20  you can go through several of those earlier emails,

21  where there are a number, it would appear, of both

22  monetary items that are being discussed, as well as

23  non-monetary items.  Can you address those, please?

24  A      Sure.  I guess the first one does reflect that I

25  spoke with Mr. Kayser, either earlier that day or the

22

1    day before, because it opens up with, "Following up on

2    our conversation, this email identifies everyone who

3    should be copied on email communications, regarding

4    potential settlement discussions."

5    Q     And that's the July 19 email, correct?

6    A     Yes, and this is where I was setting the

7    groundwork, because I was going away on vacation the

8    following day.  I wanted to make sure that people were

9    available to communicate, in the event I had trouble

10   being able to access email or phone calls.  I wanted to

11   make sure my partner, Jon Kagan, was available to step

12   in if need be.  Fortunately, there were no difficulties

13   communicating.  I was able to communicate the entire

14   time, so he was not really involved in the process.

15   Q     Okay.  I'm directing your attention to the next

16   email in line there.  It looks like it's July 20th at

17   4:54.

18   A     Yes, I see that one.

19   Q     And who is that from?

20   A     That was sent from Mr. Kayser to me, and with a

21   CC to a number of other people involved in the case,

22   including the other alleged Creditors, you as my co-

23   counsel, and other people -- other attorneys that were

24   as co-counsel in the case.

25   Q     Okay.  And can you describe for the Court what

1  was the subject matter of that email?

2  A    Sure.  This reflects a substantive communication

3  about potential settlement, where Mr. Kayser, on behalf

4  of -- what I interpreted, on behalf of himself, and it

5  does say "our final offer," so I interpreted this to be

6  him speaking on behalf of him, Mr. Earley, and Mr. --

7  I'm drawing a blank.

8  Q    Mr. Hager?

9  A    Mr. Hager.  My apologies.  That they made

10 monetary demands, which are reflected there in the

11 first part of the email.  You can see certain monetary

12 amounts to Mr. Earley, Mr. Kayser, Mr. Hager, with the

13 total being -- or payments to all three of them --

14 $486,700 and change.  And then it goes on to proceed

15 with setting forth other combination of non-monetary

16 demands, and some other monetary demands to be made, to

17 be included, as well, in the settlement.

18 Q    And did you respond to those gentlemen?

19 A    Yes.  My response is reflected in the next email

20 in the string, which is on Page 5 of the exhibit.  It's

21 an email from me to Mr. Kayser, Mr. Earley, Mr. Hager.

22 It's address to Ken, Ron and Jon.  It's at 10:46 a.m.,

23 and in that email I acknowledge receipt of their

24 demand, and while I -- and I'm reading the second

25 sentence, "While I and the Tagnetics team appreciate

24

1   the overture to try to reach negotiated resolution,

2   event you put forward is not realistic." And I go on

3   to explain why what they're requesting is not even on

4   the table for a realistic settlement discussion.

5   Q     Okay. And would you present to the Court what

6   those objections were to that proposal?

7   A     Sure. So part of the problem was a large

8   monetary payment up front, initial payment, and that

9   was something I explained in Paragraph 2, that is not

10  feasible. Talked a little bit about some of the

11  structures to a deal that we could possibly accommodate

12  at the time, but was only -- what was a potential

13  possibility, not making any clear offer or saying this

14  will be a deal term.

15        Then in the third paragraph I go on to say,

16  "insisting on any other structure than what I've

17  outlined above all but assumes that we proceed with the

18  bankruptcy proceeding." So structurally they're

19  putting forth all these monetary terms, was way out of

20  line with what Tagnetics was willing or able to do.

21  Q     Okay. Directing your attention to the response,

22  I take it, from that.

23  A     Yeah. I'm just -- this is where I first

24  encouraged them to seek their own counsel in this --

25  I'm sorry, I did not do that there. Oh, no, I do. If

25

1    you look at the one, two, three, fourth email, I do at

2    the very end of that say, "You can and should seek your

3    own counsel, as I'm sure he or she will tell you the

4    same thing," the stuff that I was saying about what

5    happens if you proceed with bankruptcy.

6    Q     That's the fourth paragraph on the July 23rd

7    email at 10:46; is that correct?

8    A     Yes.

9    Q     Did any of the Petitioning Creditors respond to

10   that communication?

11   A     They did.  A little while later, not much after

12   my email, Mr. Earley responded in an email at 1:34

13   p.m., again with some CCs on it, and then after

14   rejecting, without putting out any specific terms, he

15   then put forth a new offer, and it says, "Stephen, here

16   is our offer after your email this morning.  Let me

17   know if there is any interest."  And in that email

18   there's a chart that is reflected at the top of Page 5

19   of this email string, and it lays out a series of

20   monetary payments.  There are no other terms referenced

21   in that email.  It is strictly a monetary payment

22   chart.

23   Q     And did you respond to that proposal?

24   A     I did.  My next email is the following day in

25   the afternoon.  Looks like on July 24th at 5:56 p.m.,

26

1   just Ron, Ken and Jon, "Thank you for your revised

2   demand.  This structure is more in line with what

3   Tagnetics thinks is feasible, but the initial payment

4   is way too high for a cash-strapped company."  And I go

5   on to explain what we're looking at in terms of a

6   potential lower initial monetary payment.  Then after -

7   - which we offered a lower number there.

8           "The remainder of the payment schedule, after

9   the initial payment you proposed, is acceptable,

10  provided that the payments are contingent," and I go on

11  to some contingencies.  And I go on explaining that

12  further.  And then just go on to continue explaining

13  that in the email.

14  Q     Okay.  Did you receive a response to your email

15  from any of the Petitioning Creditors?

16  A     It was a flat-out rejection completely, email

17  from Mr. Earley later that evening, on the 24th.  His

18  email is very short and succinct.  It says, "Stephen,

19  no chance.  Look forward to meeting you on Monday."  So

20  no counter proposal or anything on that.

21  Q     And that's reflected, is it not, in what's

22  referenced as a July 24, 2019 email from Mr. Earley to

23  you at 7:43 p.m., correct?

24  A     That's correct, and that's on Page 3 of the

25  exhibit.

27

1 Q    Did you respond to Mr. Earley's response?

2 A    I did.  The next day I sent a short email that

3 says, "It seems silly and, quite frankly, odd to simply

4 cut off negotiations.  If there is a counteroffer you

5 would like Tagnetics to consider, please send it and I

6 will forward it to the company for consideration.

7 Continuing down this path essentially guarantees that

8 you, Ken and Jon do not receive any money, and each of

9 you are at risk for having to pay money, parens, and

10 the money that Ken received last week in settlement

11 through KBL is subject to a preference and will have to

12 be returned if the Court imposes a bankruptcy on the

13 company.  I look forward to your response."  And that's

14 on July 25th, 2019, at 12:42 p.m. from me to all three

15 of them, even though it only shows Ron's name there.

16 Q    And that would be at the top of Page 3 of

17 Exhibit A, correct?

18 A    Correct.

19 Q    Okay.  Did you receive a response from any of

20 the Petitioning Creditors to that email?

21 A    I did.  Later that day, looks like even less

22 than an hour later, I received a response from Mr.

23 Earley at 1:25 p.m., and that email is reflected at the

24 bottom of Page 2 of the exhibit, on to the top of Page

25 3, and again it's pretty short and to the point.  It

1    says, "Stephen, they raised 90,000 for the first

2    settlement, they should be able to find another 90 for

3    us.  Here is my counter proposal."  And it lists that -

4    - well, I'll call the payment schedule chart that was

5    included below, with different numbers, and it shows an

6    initial payment 30,000 each, to each of the three

7    alleged Creditors, and then two subsequent payments at

8    six and 12 months, and then there is an additional

9    payment at -- upon the occurrence of what was referred

10   to as a liquidity event, and then the last line of that

11   chart shows the total payments to each of the three

12   alleged Creditors.  No other terms or conditions are

13   reflected in that email or counter proposal from Mr.

14   Earley.

15   Q      Okay.  And that response shows up on Page 2, at

16   the bottom of Page 2, email from Mr. Earley, dated July

17   25th at 1:25, and the chart you're talking about

18   carries over onto the next page, top of Page 3,

19   correct?

20   A      Correct.

21   Q      Did you respond to that email?

22   A      I did.  The next morning at 8:24 a.m., I sent an

23   email, again, to -- responding, saying, "Ron, while we

24   appreciate your logic around the $90,000" -- it says

25   "90k number," "$90,000 number, you are miscalculating

1   the company's situation.  We had hoped to negotiate

2   with you outside of court on settlement while the

3   parties pursued arbitration, as the terms of your

4   contracts require, but the Court ruled against that.

5   The company does not have an ability to raise another

6   90k in the near term.  Now, unfortunately, the options

7   to avoid substantial risk on both sides is very

8   limited.  The three of you prevail on Monday, your

9   claims will be worthless, and Ken and Bob, as well as

10  S-Tek and counsel for KBL, and S-Tek will have to

11  return the money they received last week.  If Tagnetics

12  prevails, the company will move to require that you pay

13  all Tagnetics' attorneys' fees and litigation costs in

14  this matter, which are significant and growing by the

15  day."

16      Go on to proceed, "Tagnetics and I cannot

17  understand why each of you are pursuing the course of

18  action that essentially guarantees you will not get

19  paid the amounts you claim you are owed.  The company

20  has made a reasonable proposal.  I would like to hear

21  back from each of you on the company's most recent

22  proposal.  Ken and Jon, I have not heard back from you

23  and I would like to know your position, as well.  As

24  before, in light of the risks involved, I suggest you

25  seek advice from bankruptcy counsel.  The path you have

1  chosen seems counterproductive and contrary to the

2  outcome you claim to seek."

3  Q     Did you receive a response from any of the

4  Petitioning Creditors to that email?

5  A     I did.  So really -- well, what happened between

6  that and the next email, which is on this email string,

7  is at, looks like 3:27 p.m., or that email at 8:24

8  p.m., I remember this very distinctly, because that was

9  my last day of vacation.  We were heading home that

10 day, and I was supposed to be driving.  I was in the

11 passenger seat.  Had a bunch of calls in the morning on

12 matters related to this and other stuff, and then

13 starting early in the afternoon, I remember it was

14 around one o'clock, give or take a little bit, the

15 phone calls became fast and furious between me and --

16 not exclusively Mr. Earley, certainly primarily with

17 Mr. Earley.  I think it was exclusively with Mr.

18 Earley, where we were calling one another frequently,

19 going back and forth, trying to negotiate a settlement.

20 And we ultimately did reach one.

21      And I remember, when we finally came to terms on

22 one, I was very deliberate in how I worded things, and

23 one of the key terms, before we closed the deal, one of

24 the things that they insisted on, was that they get

25 full releases, completely, and I had some real concerns

31

1    about that, representing the company for certain

2    reasons that I don't think are pertinent here, but I

3    said, I'm duty bound to bring this to my client's

4    attention, I will do that, I will tell you I'm not

5    recommending it, but I'll let the client know.  And

6    after some discussions with the CEO of the company, I

7    was told I was authorized to make an agreement that

8    included the monetary terms that we ultimately agreed

9    to, which are reflected in the email, but the key was

10   also full mutual releases, no carve-outs.  And that's

11   reflected in my email later on that reflects the terms.

12        And I remember, the company was fine, giving the

13   three alleged Creditors full releases, despite some of

14   the reservations I had, as long as it was mutual, full

15   mutual releases, no carve-outs, and that was the phrase

16   that went over, over and over again, in my discussions.

17   Q    And that discussion occurred on that issue as a

18   result of concerns that one or more of the Petitioning

19   Creditors had about claims that the company may have

20   against them, correct?

21   A    Correct.  They were very clear about that, and

22   wanted to be released from certain terms of other

23   agreements that they had with the company, and it was

24   adamant that that was not negotiable from their

25   perspective, and so they wanted to make sure that they

1 were fully released, and the company's response was, if
2 we're going to fully release them, we're going to get
3 full release, as well, and move on from there.
4 Q      So was the concept of a mutual release with no
5 carve-outs dictated by the Petitioning Creditors?
6 A      I think so, because they were the ones that was
7 driving it, and my client -- our client ultimately said
8 they were fine with it, as long as it's mutual, and
9 they were willing to go along with that.
10 Q      Okay.  Directing your attention to Page 1 of
11 Exhibit A, I think you referred to that in opening as
12 the term sheet?
13 A      This is.  This is where, after we had --
14 remember, there were many phone calls.  When we finally
15 came to terms, I remember I said to Mr. Earley, I'm
16 going to then send you an email that sets forth the key
17 terms, and I want to make sure that I hear back from
18 you guys, confirming before we call the Court, that
19 this is what we agreed to.  We should not be calling
20 the Court until we have an email exchange confirming
21 this is what we agreed to.
22      I was very sensitive to the fact that we have
23 pro se parties.  I was also very aware of the
24 sensitivity of these negotiations.  I was very, very
25 deliberate about this, because now that we were at that

33

1    point, I wanted to make sure there was no

2    misunderstandings. And I wrote it out that way too.

3    My email clearly says, at 3:27 p.m., "Ron, Kevin, Jon,

4    below sets forth the terms of the agreement we reached

5    by phone. Each of you please reply, confirming

6    agreement to these terms, and that I need you to

7    initiate a call to the Court to advise of the

8    settlement. It makes no sense for us to have to show

9    up at court on Monday, now that we have an agreement in

10   place that will be documented more thoroughly in a

11   settlement agreement. We can work on the written

12   settlement agreement over the weekend." And I wrote,

13   "Key terms: Payment of $90,000 ($30,000 each), within

14   three days of a fully executed agreement. The

15   remaining schedule of payments as you proposed below,

16   accepting 12 and 18 months instead of six and 12

17   months." And that's referring to the schedule that I

18   was referring to, the schedule chart that's reflected

19   in July 25th email.

20           And then that phrase, "full mutual releases (no

21   carve-outs)." Then another term, "Dismissal/withdrawal

22   of claims by each of you to be filed within one day of

23   receiving payment." And I said, "I believe this

24   captures the key terms we discussed. Please confirm."

25           And then I remember there was a bit of a delay.

34

1    I was a bit surprised by the delay. I called Mr.

2    Earley once or twice. I may have spoken with Mr.

3    Kayser. I don't remember exactly who I was speaking

4    with at this time. I'm pretty sure at least one of

5    them was Mr. Earley. And I said -- and I got an email

6    response from Mr. Hager at 3:56 p.m. saying, "Mr.

7    Earley is discussing this with the Court at this

8    moment. I am responding for Kayser, Early and Hager,

9    saying we agree to the terms put forth as documented

10   above." He wrote "above," but it's really -- I

11   interpret that to mean the email below. And so that

12   was confirmation number one, that the term sheet, as I

13   described it, in my 3:27 p.m. email, is agreed to and

14   confirmed.

15   Q    Okay. Then at the top of Exhibit A on Page 1,

16   there's another email from Mr. Hager.

17   A    Yes.

18   Q    At 3:58, which is within the same time frame

19   here. And could you address that, as well?

20   A    And there, so to me that's confirmation number

21   two. What he did is he copied my email at 3:27 p.m.

22   and copied it into his email. He says, "Stephen, I

23   will clarify that we agree to the terms you set forth

24   in your last email and represented below. Key terms."

25   And lists those four key terms that I just described

1   moments ago, and no other terms, none of these other

2   terms that were referenced in the July 20th email or

3   anything earlier.  These are the key terms of the

4   settlement agreement.

5   Q      All right.  I'm asking you to refer now to

6   Exhibit I, which now the Judge has a copy of, as well.

7   Can you identify what Exhibit I represents?

8   A      So again, there was some back and forth about

9   when I was going to hear from the Court.  I ultimately

10  did speak with -- forgive me for referring to you by

11  your first name.  I remember Joni.  I don't want to

12  mispronounce the last name.  I did eventually speak

13  with her.

14        I got an email from Mr. Hager at 4:09 saying,

15  "Stephen, the Court will be calling you momentarily to

16  confirm we have an agreement among all parties."  And

17  then a short while after that, he sent another email to

18  me, again -- so for the third time, confirming the key

19  terms of the agreement.  It's the top email in that

20  string on Exhibit I, July 26, 2019, it says at 4:36

21  p.m., and it's from Mr. Hager to me, with a copy to Mr.

22  Earley and Mr. Kayser.  It says, "Stephen, to make sure

23  there is no confusion, we are confirming the following

24  payment schedule and amount as part of this agreement,"

25  and lays out that payment chart that I was referring to

36

1  earlier.  It's the same exact one that we agreed to,

2  except the only difference is there's two differences,

3  or three.

4        The second and third payments instead of six and

5  12 months, now are written out to be 12 and 18 months,

6  which accurately reflects what we agreed to, and then

7  in the bottom line where totals of payments, it says,

8  "Total settlement," and the "Total" is written in all

9  caps, to me emphasizing the point, this is what we

10 agreed to, total settlement payment, nothing more

11 beyond that.

12 Q     Thank you.  Directing your attention now to

13 Exhibit B.

14 A     B as in boy?

15 Q     B as in boy.  Can you identify that?  I believe

16 there's an email on the first page.

17 A     Yes.  This is -- so the first page is the cover

18 email that I sent to Mr. Kayser, Mr. Earley and Mr.

19 Hager, attaching the draft settlement agreement.  I

20 worked on the settlement agreement.  Admittedly, it

21 took me a little bit longer than I had originally

22 anticipated.  That was unfortunate, but I did get it to

23 them, out by the date that I committed to getting it to

24 them, after we had the status conference with the

25 Court, and then the subsequent pages of that exhibit

1   reflect what the agreement that I drafted, that I

2   believe accurately reflects and is taken off of the

3   term sheet, those email exchanges between me and the

4   alleged Creditors, on July 26th.

5   Q      All right.  I'm also directing your attention

6   now to Exhibit H, if you will.  Originally there are

7   six Petitioning Creditors; is that correct?

8   A      Correct.  Originally six, three of which settled

9   out earlier in this case, and Exhibit H reflects a

10  redacted version of that settlement agreement with the

11  other three Petitioning Creditors in this case.  Those

12  Petitioning Creditors were KBL Ventures, LTD, which I

13  understand to be owned by Mr. Kayser, one of the

14  remaining Petitioning Creditors and one of the people

15  here today, and that is reflected in -- at least as the

16  CEO, because if you look at the last page of that

17  exhibit, he is the one that signed on behalf of Kayser

18  Ventures, LTD.  That's on Page 6.

19        The other settling Petitioning Creditors in that

20  settlement agreement were S-Tek, Inc., and a gentleman

21  by the name of Robert Strain.

22  Q      You negotiated that settlement, as well; is that

23  correct?

24  A      I did.  I negotiated that settlement with Kayser

25  Ventures and S-Tek were represented by counsel and Mr.

38

1   Strain was proceeding pro se. Most of the negotiations

2   were with the attorney. There was some negotiations

3   separately with Mr. Strain, but not much.

4   Q    Other than -- well, the redacted sections here

5   most likely deal with the monetary aspects of the

6   transaction, I take it?

7   A    They were. It deals with the monetary aspects

8   of it, some non-monetary terms, typical language about

9   -- you know, I took out all those terms. I left in

10  here for purposes of this proceeding only the

11  introduction, just show who this is between, the

12  signature page again to show who it's between, and then

13  elements of or portions of the releases, because one of

14  the objections that we got subsequent to sharing the

15  draft settlement agreement was including Compass

16  Marketing, Inc., specifically among the releases. And

17  I was very, very surprised to see that, because first

18  of all --

19  Q    What you're saying is that after you transmitted

20  what has been identified as a part of Exhibit B, the

21  settlement agreement, regarding the remaining

22  Petitioning Creditors, that one of the issues that came

23  up was whether or not there should be a carve-out as to

24  Compass?

25  A    Yes. I'm sorry. Thank you for that

39

1    clarification.  So, yes.  After I transmitted Exhibit

2    B, one of the responses I got back from the alleged

3    Creditors was an objection to including Compass

4    Marketing, Inc., in the release.  If you look at

5    Exhibit B for a moment, if you look at -- in Paragraph

6    -- in Section 4, Section 5 and Section 6, which are the

7    releases that would be provided by Mr. Kayser, in 4 Mr.

8    Early, in 5 Mr. Hager, and 6, I'll just read the

9    opening of Mr. Kayser's paragraph, because the language

10   mirrors itself.  "In exchange for the consideration

11   described herein, Kenneth Kayser on his own behalf and

12   on behalf of his heirs, successors and assigns, as well

13   as all corporate and operating affiliates, related

14   entities, in which Kenneth Kayser has controlling

15   interest, hereby releases and discharges Tagnetics, as

16   well as its current and former parent companies,

17   corporate and operating affiliates, subsidiaries, and

18   related entities (including specifically Compass

19   Marketing, Inc., as well as each of their current and

20   former directors, officers, shareholders and other

21   equity holders, agents, employees, accountants,

22   attorneys, insurers, collectively the Tagnetics

23   releasees.)"  And that language appears in each of the

24   release paragraphs.

25        The reason why --

**TAGNETICS (19-30822) 10-18-19**

40

1  Q    Was this any different than the nature and scope

2  of the releases in the original settlement agreement

3  that's referenced as Exhibit H, with the --

4        DR. KAYSER:  Your Honor, I object to this

5  line of questioning as relevance.  I mean, what was

6  appropriate to settle with Kayser Ventures is not

7  necessarily appropriate with what a settlement would be

8  with the individuals who had contracts with Tagnetics.

9        THE COURT:  Any response, Mr. Kracht?

10        MR. KRACHT:  Yes, Your Honor.  We're getting

11  to the point that we were going to try to make on that.

12  It has to do with whether there was a carve-out or not

13  that was requested and the logic of that, and how these

14  otherwise were similar agreements drafted after

15  negotiations by Mr. Stern, with the original -- the

16  other Petitioning Creditors that were released, which

17  included in part, because of his status with Kayser

18  Ventures, Mr. Kayser, as well.

19        THE COURT:  I'm going to overrule the

20  objection, but let me state this.  I'm going to let you

21  finish this questioning, but I'm going to be honest.

22  I'm very skeptical of the position that Compass -- this

23  argument or position that including Compass in the

24  release would be a carve-out.  I don't understand that

25  from a legal perspective.  I don't follow your argument

41

1   that including Compass in the release would be a carve-
2   out. And okay, I can understand that, if the July 26th
3   emails said based upon all the terms in the settlement
4   agreement with Strain and KB whatever, and so forth,
5   but that's not what the July 26th email says.
6                   MR. KRACHT: Correct, Your Honor.
7                   THE COURT: So I'm being honest with you, I'm
8   --
9                   MR. KRACHT: Quite frankly --
10                  THE COURT: I'm not buying it right now, and
11  you're going to have to do an awful lot of convincing
12  that including Compass in the release is a carve-out.
13                  MR. KRACHT: We're not saying that, Your
14  Honor. We're saying that there was no carve-out,
15  saying that the release didn't apply to Compass. They
16  were a part of the overall release that was given. A
17  carve-out of Compass would have said, you know, the
18  Tagnetics, its officers, directors, affiliates, blah,
19  blah, blah, excepting Compass, which would give -- what
20  would have occurred if that happened, would have been
21  they would have been able to retain any claims they may
22  have against Compass. That would have been the carve-
23  out. We didn't agree to the carve-out.
24                  THE COURT: I understand that's your
25  argument. I understand that.

42

1        MR. KRACHT:  Mm-hmm.

2        THE COURT:  But your July 26th emails don't

3  say Tagnetics, its affiliates, Compass, blah, blah,

4  blah.  And so I don't know how you explode and include

5  your July 26 email to include all the affiliates and

6  everything, when the key terms and everything else,

7  from what I read, don't include affiliates and blah,

8  blah, blah, and officers and agents and blah, blah,

9  blah.

10       MR. KRACHT:  That's why we're --

11       THE COURT:  The settlement agreement does.

12       MR. KRACHT:  That's why we're contrasting, to

13  the extent there is something to contrast, the earlier

14  settlement agreement, because there is a distinction,

15  there was a carve-out there that we were going to get

16  to.

17       THE COURT:  Again, I'll let you proceed with

18  this questioning.  I'll overrule the objection, but,

19  you know, I'm skeptical about this position.

20       MR. KRACHT:  Understood.

21       MR. STERN:  Well, as in every settlement

22  agreement I've drafted in my career on behalf of a

23  company, I don't think there's a single one that I

24  could think of off the top of my head, where I did not

25  include the entity itself that's a party to the case,

43

1   its parents, affiliates and subsidiaries.  That's
2   standard operating procedure in any settlement
3   agreement, I think I've ever done in my entire career.
4   And in this case, an affiliate of Tagnetics is Compass
5   Marketing, Inc., and as evidenced by the fact that we
6   included specifically Compass Marketing, Inc. in the
7   prior settlement that Mr. Kayser had signed, to show
8   that this is not a surprise.  This is something that
9   was standard procedure in settlements generally,
10  parents, subs, operating affiliates, so that's in all -
11  - typical in agreements, and in this case specifically
12  Compass, because Mr. Kayser had signed on that before.
13  And we didn't specifically mention Compass before that
14  either, until we got to the draft settlement agreement,
15  which Mr. Kayser signed, without objection.
16       So when I got the objection later on, after I
17  sent Exhibit B to the alleged Creditors, I was very
18  surprised.  I'm just mirroring the language that was
19  acceptable before, and is typical in all sorts of
20  agreements about -- where you release affiliates,
21  parents and subs, and that's -- again, I don't think
22  I've ever done an agreement where it didn't include
23  that language.
24  BY MR. KRACHT:
25  Q    Now, when you look at Exhibit H, the prior

44

1  settlement, there was a carve-out that was addressed in

2  that particular case, right?

3  A      Yes, thank you.  So we did have to include a

4  carve-out and we could provide an un-redacted version,

5  if need be.  It is redacted in here.  But the KBL

6  releases, because Mr. Kayser is an individual who owns

7  KBL, as we understood it, there is a carve-out at the

8  end of his -- of his release, because if you look at

9  the language -- I'm going to read Page 2, Section 5, of

10 Exhibit H.

11             "KBL releases.  In exchange for the

12 consideration described herein, Kayser Ventures, LTD,

13 on its own behalf and on behalf of its current and

14 former parent companies, corporate operating

15 affiliates, subsidiaries and related entities, as well

16 as each of their current and former directors,

17 officers, shareholders and other equity holders," and

18 then go on and on.  Releases, Tagnetics, and again has

19 the same language there, "its corporate operating

20 affiliates, subsidiaries and related entities,

21 including specifically Compass Marketing, Inc."

22       The reason why we had to include a carve-out at

23 the end of Section 5, because we knew that Mr. Kayser

24 had his own individual claims, and based on that

25 language, we did not negotiate a separate settlement

1  for his individual claims.  We knew that he was

2  proceeding on those.  It was part of the understanding

3  of the deal terms.  It would have been intellectually

4  dishonest to try to -- try to get a release of his

5  individual claims, when you had the KBL claims and were

6  only negotiating about KBL at the time.  We were not

7  negotiating about Mr. Kayser's individual claims.

8       So, at the end of this paragraph -- it is

9  redacted, but we could provide an un-redacted version.

10      DR. KAYSER:  Your Honor, I object.  I do not

11  have in front of me what he's reading from, and so I

12  can't follow what's going on here.  And in addition,

13  this is irrelevant.  What Kayser Ventures' settlement

14  said does not affect and was never meant to affect, and

15  my counsel for Kayser Ventures isn't here.

16      THE COURT:  Do you have -- let me ask you,

17  Mr. Kayser, do you have their exhibits in front of you?

18      DR. KAYSER:  But it's redacted in there,

19  also.  And I didn't bring with me the settlement

20  agreement from Kayser Ventures.

21      THE COURT:  Well, I think he was reading from

22  -- is the carve-out redacted or is the carve-out -- are

23  the carve-outs redacted?

24      MR. STERN:  It should be at the end of --

25      THE COURT:  I'm going to sustain the

46

1 objection then.  If you're talking about something that

2 was redacted from the exhibit, I agree.  I think Mr.

3 Kayser is absolutely right, and I'm going to sustain

4 the objection, to the extent you're testifying about

5 him trying to read something that's redacted from an

6 exhibit.  And let me say this much, I will probably --

7 if they move admission of Exhibit H, I will probably

8 admit it, but I'm, again, being forthright and honest,

9 from what I've seen of everything, I tend to agree,

10 Exhibit H, I think, is irrelevant.  I'm being

11 forthright and honest with you.  You know, I think

12 really for the most part, Exhibit H is irrelevant,

13 because what you -- what terms you entered into with

14 other parties on another settlement, even though a same

15 case, I'm struggling to understand the relevance to

16 settlement with these three other parties.

17 　　　　　　MR. KRACHT:  Just a question, Your Honor.

18 Would it be permissible to substitute Exhibit H,

19 redacted version, with a revised version that shows

20 that language that we're talking about now?

21 　　　　　　THE COURT:  Is there objection --

22 　　　　　　DR. KAYSER:  Yes, I would object in that it's

23 irrelevant.

24 　　　　　　MR. KRACHT:  Mr. Kayser was a party to --

25 　　　　　　DR. KAYSER:  It's a separate entity.  The

**TAGNETICS (19-30822) 10-18-19**

47

```
 1   fact that I happened to be the chairman of that company
 2   is not relevant to this portion of the case.
 3             THE COURT:  Mr. Earley, any objection?
 4             MR. EARLEY:  I object also.  I agree.
 5             THE COURT:  Mr. Hager?
 6             MR. HAGER:  I object, likewise.
 7             THE COURT:  Yeah, I'm going to sustain those
 8   objections.  You know, we had exhibit filing date, and
 9   that's why we have exhibit filing dates.  You had
10   plenty of opportunity to consider this.  And now you
11   want to substitute one that you think is more favorable
12   to you than the one you submitted in this largely
13   redacted version.  And not only that, I mean, I often
14   will allow exhibits to be introduced, even though they
15   missed the filing date, but I do -- again, coupled with
16   the fact that I do believe Exhibit H is not -- is
17   largely, if not totally, irrelevant to what's before me
18   today, I'm going to sustain the objection.
19             MR. KRACHT:  Thank you, Your Honor.
20             THE COURT:  To the request you've made.
21   BY MR. KRACHT:
22   Q    Okay.  Mr. Stern, if you can look to Exhibit C?
23   A    Yes.
24   Q    Can you identify that document?
25   A    This is an email from me to Mr. Hager, with a
```

1    copy to Mr. Kayser, and Earley, on August 19, 2019, at

2    7:48 p.m., where I am responding. It's an email

3    string. That's the most recent one in the string was

4    the one I just identified. There's an earlier email in

5    this string from Mr. Hager to me, with a copy to Mr.

6    Kayser, Mr. Earley, on August 16th, 2019, at 2:19 p.m.

7    Q    And that's on Page 2 of Exhibit C, correct?

8    A    Yes, and in that first email in the string, from

9    Mr. Hager, it sets forth a number of objections that

10   they have to the terms -- the written terms of the

11   settlement agreement, that I provided to them, as in

12   Exhibit B, on August 14th.

13   Q    Okay. And you responded to those objections to

14   the settlement agreement?

15   A    I did, and that's my August 19th email to them,

16   which is the first page of the exhibit, where I try to

17   go through the substantive discussions and explain, you

18   know -- I mean, I guess my opening line is, "Many of

19   the terms included below clearly fall outside the scope

20   of what we agreed to, the email exchange we had on July

21   26, 2019, at 3:56 p.m. and again at 3:58 p.m."

22   Apparently some of the times must have been flipping

23   back and forth in the emails, now that I'm looking at

24   this. "Without going blow by blow, the terms of

25   Paragraph 4 clearly call for payments that were not

49

1     included in the July 26 email exchange, setting forth
2     the settlement payments.  In addition, those requests
3     for additional payments clearly seek an exception to
4     the full mutual releases, no carve-outs.  I'm not sure
5     how you can now ask for payments that were not
6     previously agreed to, seek exceptions to full mutual
7     releases, no carve-outs."
8          And it goes on to explain those a little bit
9     more detail.  I'm going, again, back to the full mutual
10    releases, no carve-outs, that's a repeated theme of
11    these discussions.  There's some other terms at the
12    bottom, where they were making a request for default
13    judgment.  Again, that was something that was
14    entertained in earlier emails.  I'd have to look back
15    at email or Exhibit A.  I think it was on the 20th.  It
16    was around where maybe 23rd, 24th, where the discussion
17    of default judgment was a possibility, but it clearly
18    wasn't one of the terms that were agreed to, because
19    there were not one, not two, but three emails
20    confirming the key terms of the agreement, without any
21    discussion for these other non-monetary terms.  Not
22    once was that included.
23    Q    And those non-monetary terms would have been
24    various carve-outs that they were seeking now after the
25    fact?

50

1    A    Correct.

2    Q    Directing your attention to Exhibit D.

3    A    Yes.

4    Q    Can you identify that, please?

5    A    So this is a response to -- another response to

6    the draft settlement agreement I provided on the 14th.

7    This is an email from Mr. Earley on the 16th at 11:52

8    a.m., and he expresses concerns similar to Jon Hager's,

9    and added a few other terms about a $30,000 loan

10   accruing interest, and then something related to stock

11   ownership.  He refers to Jon's, even though Jon's

12   didn't come to me until later in the day, I believe.

13   So obviously they -- I'm assuming they exchanged

14   discussions or emails and didn't realize the timing of

15   events, but these two were -- I interpreted as being

16   sent in collaboration with one another.

17   Q    Directing your attention to -- we'll skip over

18   E.  If you'd take a look at Exhibit F?

19   A    And then this is -- Mr. Earley apparently sent

20   an email to Mr. Hager and Mr. Kayser on August 20th,

21   2019, at 5:13 p.m., which he subsequently forwarded to

22   me on the 21st of August at 7:25 a.m., and it was only

23   to me, where they're identifying some additional

24   concerns about the settlement agreement, based on a

25   conversation that Mr. Earley had with a lawyer.  There

51

1   were concerns about the general release language.  It

2   sought a new provision that wasn't discussed before, an

3   acceleration clause for payments, something about a

4   non-compete agreement, which was not previously

5   discussed, and changing the voluntary dismissal of this

6   proceeding to without prejudice, instead of with

7   prejudice.  And then another statement about some

8   $30,000 loan, all of which we did not discuss

9   previously.

10  Q     So --

11  A     The only thing that might arguably have been

12  discussed, but again was Item 1, where they're making

13  an exception for Compass Marketing, but again from my

14  mind, full mutual releases, no carve-outs, that means

15  all parents, subs, and operating affiliates.  Compass

16  Marketing is an operating affiliate under Ohio law, as

17  I understand it, because of its ownership interest in

18  the entity.  We just decided to identify specifically

19  in the agreement, so that there wasn't an ambiguity

20  about that later on, because under Ohio law, as I

21  understand it, it constitutes an affiliate.

22  Q     So how did you and Tagnetics view these post-

23  settlement communications from the Petitioning

24  Creditors?

25  A     Sure.  I guess -- I want to be careful about not

1  revealing privileged communications, but Tagnetics was

2  surprised.  I was certainly surprised.  This to me was

3  clearly outside the scope of what we agreed to.  I was

4  -- as I mentioned earlier, I wanted to be very careful

5  about how I communicated those terms at the end, before

6  we called the Court.  And as I mentioned before, there

7  is not one, not two, but three confirming emails to

8  them, confirming the total payments and what the key

9  terms were, repeating the full mutual releases, no

10 carve-outs.  So this to me looked like more and more

11 exceptions.  To use the phrase, buyer's remorse.  I

12 don't know why there's been a change of heart, it

13 seemed to me, but that's the way I was interpreting it,

14 and that's the way I can fairly describe what

15 Tagnetics' reaction was, as well.

16 Q     Okay.  If you'll take a look at the next

17 exhibit?  I believe it's the final one, Exhibit G.

18 A     Okay.

19 Q     Can you identify that?

20 A     Sure.  This looks like -- let me go back to the

21 first email here.  This is more in the string of the --

22 so the first email in the string is from Mr. Hager to

23 me, with a copy to Mr. Kayser and Mr. Earley, on August

24 16th, where they identified their concern slash

25 objections to the settlement agreement that I provided

53

1   on the 14th.

2       The next email in that string is my response

3   that we had identified earlier.  I think that was

4   Exhibit D.  No, C is the next one in that string, I

5   believe, if I'm reading them correctly.  Yes.  And then

6   this is a response to my August 19th email, and this

7   came from Mr. Hager to me, with a copy to Mr. Kayser

8   and Mr. Earley on August 20th, 2019, at 9:23 a.m.,

9   again trying to explain what I saw as the different

10  terms and conditions than what we had agreed to on July

11  26th.

12  Q    Essentially then, to try to re-trade the

13  settlement that was reached on July 26th?

14  A    Yes.

15       MR. KRACHT:  I have nothing further, Your

16  Honor.

17       THE COURT:  Thank you, Mr. Kracht.

18       MR. KRACHT:  Would you entertain introduction

19  at this time or would you prefer to do that --

20       THE COURT:  Yeah, I think that would be fine,

21  if you want to move admission.

22       MR. KRACHT:  I'd like to move to admit

23  Exhibits A through I.

24       THE COURT:  Did you cover Exhibit E?

25       MR. KRACHT:  I did not, and if I could have a

54

1  minute talking to my co-counsel, would that be

2  permissible?

3          THE COURT:  Yeah, you may do so.  Unless you

4  want to be on the record with this discussion, I'd get

5  away from a microphone.  Yeah, Petitioning Creditors,

6  you can figure out whether you have any objections to

7  admission of these exhibits and if you want to, you

8  also -- I'll wait.

9          (Pause.)

10          MR. KRACHT:  Your Honor, after conferring

11  with co-counsel, I'm going to, if you would permit, ask

12  him a few questions about that exhibit.

13          THE COURT:  That's fine.

14  BY MR. KRACHT:

15  Q      Directing your attention to Exhibit E.

16  A      Yes.

17  Q      Can you identify that, please?

18  A      Sure.  When preparing the motion to enforce the

19  settlement agreement, I drafted this declaration for

20  Mr. Luis Fernandez, where -- who was the CFO of

21  Tagnetics, and he is now -- at the time he signed this,

22  he was Acting CFO, and so I drafted this, sent it to

23  him, asked him to make whatever tweaks or modifications

24  he needed to make.  He made a few small tweaks, signed

25  this and sent it back to me to include with our brief

1   on the motion to enforce settlement agreement.

2   Q     Okay.  And it addresses what particular point?

3   A     It addresses specifically Compass Marketing,

4   Inc.'s ownership interest in Tagnetics, Inc.

5   Q     And that was to what, demonstrate that it's an

6   affiliate?

7   A     Yes.  To show -- because with the research that

8   I had conducted under -- or my office had conducted and

9   shared it with me, so I didn't actually do the

10  research, to make sure I'm accurate in my statement to

11  the Court.  So, but based on my firm's research, under

12  Ohio law, an affiliate is any person, and a person is

13  defined as an individual or a corporate entity, that

14  owns more than ten percent of another company.  And in

15  this case, based on the ownership interest of Compass

16  Marketing having more than ten percent, we deemed it to

17  be an affiliate under Ohio law.

18  Q     Okay, thank you.

19          MR. KRACHT:  Nothing further, Your Honor.

20          THE COURT:  Okay.  And you're moving

21  admission of Exhibits A through I?

22          MR. KRACHT:  Yes, Your Honor, correct.

23          THE COURT:  Okay.  Petitioning Creditors, you

24  can let me know if you have any objections to the

25  admission of any of those exhibits.  You also have the

1    right to, if you want to ask Mr. Stern or any other
2    witnesses questions about those exhibits, because you
3    dispute their authenticity or something like that,
4    before I admit them, you have the right to do that too.
5    So if you want to have me reserve my ruling on the
6    admission of those exhibits until you have the
7    opportunity to examine witnesses about those exhibits,
8    we can do that also.
9            DR. KAYSER:  Your Honor, I'm concerned about
10   the admission of this particular affidavit.
11           THE COURT:  Exhibit E, Mr. Fernandez's
12   affidavit?
13           DR. KAYSER:  From Luis Fernandez, yes.  And
14   the reason being that, you know, I was a long-time
15   director of this company, and as of the time of my
16   serving on the Board of Directors, Compass Marketing
17   was not a ten percent shareholder of this company.  And
18   that action may have taken place after the petition for
19   involuntary bankruptcy was filed, and I would have to
20   contact the lawyer, and we don't have Luis Fernandez
21   here to testify when this change to the ownership of
22   Tagnetics occurred, and I think that's an important
23   consideration.
24           THE COURT:  I think Mr. Kayser is making a
25   hearsay objection to the admission of Exhibit E.  He

57

1   didn't label that as a hearsay objection, but I think

2   he articulately objected to Exhibit E on the basis of

3   it being hearsay.  Mr. Earley, do you have an objection

4   to the admission?

5           MR. EARLEY:  I also object.

6           THE COURT:  Mr. Hager?

7           MR. HAGER:  Also object.

8           THE COURT:  Based upon their objections, I

9   will not admit Exhibit E.  I think it is flat-out

10  hearsay.  Mr. Kayser articulately stated why hearsay

11  should not be admitted, particularly hearsay such as

12  this, an affidavit of somebody who is not testifying

13  today, that they do not have the ability to cross-

14  examine on these statements.  So I will not admit

15  Exhibit E.

16          (Exhibit E rejected.)

17          THE COURT:  What about the other exhibits,

18  Mr. Kayser and Mr. Earley and Mr. Hager, other than E?

19  Is there an objection or do you want me to reserve

20  ruling on those exhibits?

21          DR. KAYSER:  Can we have just a moment, Your

22  Honor?

23          THE COURT:  Yeah, absolutely.  In fact, why

24  don't we take a five-minute recess?  You can discuss

25  those and then we'll --

1          DR. KAYSER:  Appreciate it.  Thank you.

2          THE COURT:  -- come back after a five-minute

3     recess.

4          THE CLERK:  All rise.  Court is in recess.

5          (Off the record from 11:02 a.m. until 11:14

6     a.m.)

7          THE CLERK:  Court is again in session.  You

8     may be seated.

9          THE COURT:  Okay.  We finished, I think, with

10    the direct examination of Mr. Stern.  And Mr. Kracht

11    proposed the admission of Exhibits, Tagnetics' Exhibits

12    A through I.  I already ruled on Exhibit E and

13    determined that E would not be admitted, based upon it

14    being hearsay, and I don't believe there's any

15    exception to the hearsay rule, which would cover an

16    affidavit of a person who is not here to testify.

17         And so I think that leaves the remaining

18    exhibits.  And the Petitioning Creditors were

19    conferring as to whether they had any objections to the

20    admission of those other exhibits.  So I think that's

21    where we lie.

22         Mr. Kayser, any objection?  And as I pointed

23    out earlier too, if you want the Court to reserve

24    ruling on admission of these other exhibits until you

25    have the opportunity to examine Mr. Stern or any other

59

1   witnesses, concerning those exhibits, that's also

2   something which the Court can do.  So that being said,

3   Mr. Kayser?

4           DR. KAYSER:  I don't believe I have any

5   objection to the other exhibits.  They are primarily

6   documents --

7           MR. HAGER:  Your Honor, I guess the question,

8   when you mention if we would like to cross, do we

9   suggest that we reserve your ruling or --

10          THE COURT:  You can still cross.  You'll

11  still have the opportunity to cross-examine Mr. Stern

12  about his --

13          MR. HAGER:  Sorry.

14          THE COURT:  -- testimony.  It's a good

15  question.  It's a good question.  You still have the

16  right to cross-examine Mr. Stern.  All I was -- point I

17  was making is -- is if you want me to reserve ruling on

18  admission of the other exhibits, until you cross-

19  examine Mr. Stern, because you may have some issue

20  about the authenticity or something of any of these

21  exhibits, I can reserve ruling on admission of those

22  exhibits until you have that opportunity.

23          MR. HAGER:  Thank you.

24          THE COURT:  So I believe Mr. Kayser said he

25  has no objections to admission of the other exhibits,

1    other than, you know, Exhibit E.  Mr. Earley, what
2    about you?
3                   MR. EARLEY:  The same.  No objections.
4                   THE COURT:  Mr. Hager?
5                   MR. HAGER:  I have no objections.
6                   THE COURT:  Okay.  Then the Court will admit
7    Tagnetics' Exhibits A through I, except for E.  We are
8    not -- the Court is not going to admit Exhibit E, but
9    will admit the other exhibits.
10                  (Exhibits A, B, C, D, F, G, H, I admitted
11   into evidence.)
12                  MR. KRACHT:  Thank you, Your Honor.
13                  THE COURT:  Okay.  Now I think we're ready
14   for any cross-examination of Mr. Stern.  Mr. Kayser, do
15   you wish to cross-examine Mr. Stern?
16                  DR. KAYSER:  I have a few questions for Mr.
17   Stern, yes.
18                  CROSS-EXAMINATION OF STEPHEN STERN
19   BY DR. KAYSER:
20   Q    Mr. Stern, on -- from the email of July that I
21   sent to you on July 20th, did that form the basis for
22   the remainder of our negotiations?
23                  MR. KRACHT:  Objection.  Do you have an
24   exhibit you can refer to, please?
25                  DR. KAYSER:  It's our Exhibit 1, and I

1  believe it was your Exhibit --

2          MR. STERN:  Looking at Exhibit A, what is

3  Page 6 of the -- is that the one you're referring to?

4  BY DR. KAYSER:

5  Q      Yeah.

6  A      I don't know if I'd describe it as it forms the

7  basis of our subsequent negotiations, because I

8  responded by rejecting that email, and then I think

9  really where -- if you wanted to talk about one that

10 really forms the basis of it, you could maybe point to

11 either the July 23rd email from Mr. Earley, or the July

12 25th email from Mr. Earley, where those -- some of the

13 charts were there, and that set forth the terms.

14 Q      Would you read the top to the first line of that

15 email to me?

16 A      Which email are you referring to?

17 Q      The July 20th email, Exhibit 1 or Exhibit A.

18 A      So the first line says, "Stephen, as time is

19 very short, you should consider this as our final

20 offer.  If your client agrees to these terms, we will

21 send a letter to the Judge, indicating we have reached

22 an agreement.  This entire transaction must be

23 completed, including the transfer of funds, in time to

24 cancel the trial."  That's the opening paragraph I just

25 read.

62

1  Q     Doesn't that statement presume that our position

2  was, this is our final offer?

3  A     It does say it was the final offer, but

4  obviously it wasn't.

5  Q     Did we subsequently agree to renegotiate the

6  payment schedule?

7  A     I don't know about renegotiate.  That suggests

8  that there was an agreement in place and then we're

9  modifying it.

10 Q     In your response to this document -- let me find

11 the right response.  Can you give me -- in the response

12 to that, in Exhibit -- same exhibit.  Okay.  Page 5 of

13 Exhibit A.

14 A     So my response --

15 Q     The only objection you state in here is an

16 objection to the cash amount and to the payments --

17 actually, to the payment schedule.

18 A     That's not correct.  The opening paragraph of my

19 response on July 23rd is two sentences.  My opening

20 sentence says, "I'm in receipt of your demand to

21 resolve the litigation involving Tagnetics."  Second

22 sentence says, "While I and the Tagnetics team

23 appreciate the overture to try to reach a negotiated

24 resolution, the demand you put forward is not

25 realistic."

63

1  Q     And the next statement is, the next sentence?

2  A     Yeah, and I go into some of the discussion, but

3  I -- I didn't qualify --

4  Q     The only thing discussed in this email is the

5  amount of cash, not the terms and conditions.  Why

6  didn't you include any argument about the terms and

7  conditions?

8  A     That is not correct.  If you look at the email

9  further down, there is a discussion about the default

10 judgment, so it's not only about monetary terms.  I

11 remember that was one of the discussions that we were

12 having.  So it's not limited only to monetary terms.

13 And as the final email on July 26 reflected, there were

14 non-monetary terms addressed in that.

15 Q     Can I ask you about your use of the word carve-

16 out?  That doesn't seem to be -- is that a good legal

17 word to use?

18 A     Well, it was -- I don't know how to really

19 answer that.  Let me try my best.  So it says, the

20 phrase that we're using on the 26th says, "full mutual

21 releases, no carve-outs."  No exceptions would be

22 another way of saying it.

23 Q     What's the definition of the word carve-out?

24 A     I would describe it as an exception to whatever

25 is agreed upon in terms of whatever the scope of the

1    agreement is.  In this case, we're talking about

2    releases.

3    Q     Is it a good legal word?  I'm just asking you

4    whether, as a lawyer, do you think that carve-out is a

5    clear word to use, without knowing what the context in

6    which carve-out is used?

7    A     I've used that phrase before.  Other lawyers

8    have used that phrase before.  It's not the first time

9    by any stretch in the course of my career, and the

10   phrase "carve-out," at least referencing July 26th as

11   the point it follows -- I'm reading from my email at

12   3:27 p.m., which is on Exhibit A.  Full mutual

13   releases, parens, no carve-outs, so meaning no

14   exceptions to the mutual releases.

15   Q     But you're adding a context to it, and is carve-

16   out a word that's defined by context?

17   A     I think every word requires an examination of

18   context.

19   Q     Have you ever looked carve-out up in a

20   dictionary?

21   A     I have not.

22   Q     Then I can't ask you what it says.  But carve-

23   out -- I can't testify here.

24         One last question.  In the settlement agreement

25   you sent us on August 14th, why did you mention Ron

65

1    Earley's loan in the section on Ron Earley, if you had
2    dismissed all of these terms?
3    A     I know it was referenced at one point and we
4    limited to the monetary terms, as the chart reflects on
5    Mr. Earley's 25th email, and then again on Exhibit I,
6    the email that was sent by Mr. Hager, showing the
7    entirety of the monetary terms.  And I was just
8    reiterating that that loan is not part of this, because
9    it says, "total settlement."  There's no other monetary
10   payments to be made.
11   Q     Exhibit --
12   A     It is not unusual in my experience, at least the
13   way I draft agreements, when there is some discussion
14   of some point about maybe some other side term,
15   whatever the case may be, or some other agreement
16   that's out there, I like to make sure when there's a
17   release, we're enunciating the entire list of things,
18   to make sure that there's no argument later on --
19   Q     So you --
20   A     -- that I didn't include that or wasn't clear.
21   Q     So in your -- it was mentioned in the settlement
22   agreement that you were wiping out Ron's loan; is that
23   how you would characterize it?
24   A     I'd have to look back to the settlement
25   agreement that I drafted that I have a recollection of

66

1   including some references to other agreements.

2   Q     If you did that with Ron Earley's loan, why

3   didn't you do it with the other outside-the-contract

4   dollar amounts that -- for instance, the Kayser

5   Ventures, Core Technology license and also the other --

6   the deferred salary that was to be excluded in our

7   document?

8   A     Well, that's not accurate either, because if you

9   look at your release and this language is mirrored in

10  Mr. Earley's release and it is mirrored in Mr. Hager's

11  release.  I'm looking at Page 3 of Exhibit B.  I don't

12  want to reread the entire paragraph, but I go through

13  an illustrative list of examples, whether known or

14  unknown, by statute, contract or otherwise, including

15  but not limited to any claims for -- so I'm now

16  articulating the various types of claims you or any of

17  your colleagues may bring against Tagnetics.  Unpaid

18  wages, Romanette one.  Romanette two, unpaid notes or

19  other loans, including unpaid interest.

20  Q     All right.  I have no other questions.

21  A     Romanette three, unpaid dividends.  I think it's

22  important that I complete my testimony here.  Profits

23  or other distributions.  Romanette four, unpaid

24  royalties.  Romanette five, breach of contract

25  regarding goods or services provided or rendered, or

67

```
1    equipment loaned to Tagnetics.  Romanette six, breach
2    of express or implied contract or unjust enrichment.
3              DR. KAYSER:  Your Honor --
4              MR. STERN:  Romanette seven --
5              DR. KAYSER:  -- I'm done questioning.
6              THE COURT:  Okay.
7              MR. STERN:  I'm just answering the question
8    that was asked.
9              THE COURT:  I understand.  Yeah, and you're
10   referring to the draft settlement agreement, and I
11   think we can read the rest of that.
12             MR. STERN:  Okay.  They are a list of
13   illustrative types of claims.
14             THE COURT:  You made your point in response
15   to his question.  No further questions of Mr. Stern?
16             DR. KAYSER:  You guys?  Jon?
17             THE COURT:  Mr. Kayser, you have no further
18   questions?
19             DR. KAYSER:  Yes.  No further questions.
20             THE COURT:  Okay, thank you.  Mr. Earley, do
21   you have any?
22             MR. EARLEY:  No, I have no questions.
23             THE COURT:  And if I don't state it, if they
24   -- the way I will phrase it is you can -- if Mr. Kayser
25   has asked questions, you don't need to ask the same
```

68

1   questions.  If there is additional testimony which you
2   wish to elicit in your case, you may do so, but you
3   don't have to re-elicit any testimony or evidence
4   that's already been introduced.  But that -- and that's
5   going to run through, throughout the day today.  That's
6   going to be the rule.  You don't need to re-elicit
7   testimony or evidence that's already been elicited in
8   anybody's else's case.  So with that caveat, anything
9   additional you wish, Mr. Earley, to cross-examine Mr.
10  Stern on?
11              MR. EARLEY:  No, sir.
12              THE COURT:  Okay, thank you.  Same thing, Mr.
13  Hager, any additional --
14              MR. HAGER:  I do have some questions.
15              THE COURT:  Yes, you may.
16              MR. HAGER:  And I'm not revisiting the same
17  issue, but it is the same word, but only for a reason.
18              THE COURT:  That's fine.
19  BY MR. HAGER:
20  Q    So Mr. Stern, who introduced the word "carve-
21  out" on our phone call at I believe it was 12:44 on
22  July 26, that phone call that was between Mr. Earley,
23  Mr. Kayser, myself and you?
24  A    I don't remember who brought that up.  It would
25  be speculation, based on my general recollection of

69

1   discussions, but I have no specific recollection of

2   that.

3   Q     Do you remember specifically what the topic that

4   we were discussing, that we had disagreement about,

5   that led to actually you stating, okay, then no carve-

6   outs?

7   A     I'll assume for the moment, based on your

8   question, that I was the one that brought up the phrase

9   carve-outs.  But regardless, what I do remember about

10  the discussion about release was that I think it was

11  Mr. Earley who was pushing for the notion -- maybe Mr.

12  Kayser or you.  I don't remember who it was.  I think

13  it was Mr. Earley, was saying we need full releases,

14  referring to these other agreements that were in place,

15  because you didn't want to be -- you didn't want

16  Tagnetics to be able to sue on any -- on any

17  intellectual property rights, anything related to the

18  employment agreement.  You wanted complete freedom from

19  Tagnetics, and I had expressed some concern about that

20  at some point, so I said nevertheless, I'm duty-bound

21  to discuss this with my client, and I will do so.

22       I did bring it up with Tagnetics, and I did

23  report back, to my surprise, that Tagnetics did -- was

24  willing to agree to the full releases you requested,

25  provided it was mutual, meaning no carve-outs, full

1   mutual releases, and that's my general recollection of

2   how that conversation occurred.

3           MR. HAGER:  I don't know if I can clarify

4   that conversation now, or do I need to do it later?

5           THE COURT:  I mean, do you want to ask Mr.

6   Stern any more questions about that conversation or are

7   you saying you want to testify as to your recollection

8   of that conversation?

9           MR. HAGER:  I guess I could ask a question,

10  maybe get the same --

11          THE COURT:  You can ask him more questions.

12  BY MR. HAGER:

13  Q    Did you request that Tagnetics reserve the right

14  to have essentially a carve-out, or to reserve the

15  right to be able to come back and sue the Petitioning

16  Creditors in that phone call?

17  A    Well, one of the things I did explain -- I

18  understand now -- I think I know what you're talking

19  about.  At one point, when I expressed my initial

20  concern about giving the full mutual release to you and

21  Mr. Earley and Mr. Kayser, was that since there was

22  reference to some intellectual property issues, maybe

23  theft of trade secrets -- I may have probably given as

24  an example -- that's one I often use as an example, I

25  said I don't know if I could recommend that Tagnetics

1   agree to this, because I don't know what you guys have

2   taken or not taken.

3       So I said, I will nevertheless discuss it with

4   the client, but the client was willing to agree to

5   that, again, provided that it's mutual and there were

6   no carve-outs, which is what you were asking for

7   yourselves and I remember then saying it's going to be

8   mutual, and it will be all the way around, for all

9   parties involved.

10  Q   So was this specific discussion that you wanted

11  to -- you requested the reservation of Tagnetics to be

12  able to come back and prosecute us, if you will, at

13  some later date, and we disagreed with that --

14  A   Right, and then I eventually said --

15  Q   -- request specifically?

16  A   And then I eventually said that there is no

17  reservation, it's full mutual releases, no carve-outs,

18  so meaning you got the release you wanted.

19  Q   But in the context of that discussion, to the

20  point of carve-outs in context, as you alluded is

21  proper, were we discussing our disagreement with

22  Tagnetics, reserving the right to come back and

23  prosecute us about our employment agreements,

24  participation in the Board, all the same points that

25  had been raised in the original July 20th proposal?

```
1   A      I don't know if it was in the context of the

2   July 20th proposal.  That I don't -- I don't recall

3   that being the case.  But again, you did express some

4   concerns, that is correct, about what Tagnetics may

5   come back after you on, and I had some concerns about

6   that.  Nevertheless, I reported back to Tagnetics, had

7   a conversation with Tagnetics about it.  Tagnetics

8   ultimately agreed to the concession you wanted

9   Tagnetics to make, which was the full release of the

10  three of you, and in return there would be a full

11  mutual release of Tagnetics, as well, which is what is

12  on that term sheet on July 26th, as exactly as we

13  discussed.  That phrase is something that we discussed

14  and made sure that that was part of the discussion.  It

15  wasn't just one-sided.  It was both.

16  Q      The other question I guess I have for you is in

17  your final emails on the 26th, as we call the flurry of

18  emails trying to get to the deadline, which would have

19  postponed the trial, did you label any of those emails

20  as this is a term sheet?

21  A      No, I did not.  I just --

22  Q      You have been referring to it as a term sheet,

23  which I understand -- my experience with term sheets

24  and raising funds years ago for Tagnetics was, you

25  know, it's specifically calling everything out, but in
```

1   those emails you refer to them as key terms.

2   A      Yes.

3   Q      Which would key terms allude to the fact that

4   that's a portion of the agreement?  There are key terms

5   to an agreement and there are other terms to an

6   agreement?

7   A      Well, there are material terms and there are

8   other terms, as written in the draft settlement

9   agreement, that as far as I could tell, there weren't

10  any objections to, for example, some of the other terms

11  in the settlement agreement.  The Section 18 about

12  waiver, Section 17 about prevailing party status.  Now,

13  that was in the July 26th email, but those are pretty

14  common types of terms in settlement agreements that

15  I've entered into.  And as I referred to in the email

16  on the 27th, saying that these are the key terms, but I

17  said we have an agreement in place that will be

18  documented more thoroughly in a settlement agreement.

19  Referring to that they will be more elaborated on in a

20  written agreement, which is what I provided to the

21  three of you on August 17th.  I'm bad with dates, so I

22  have to think about that.

23  Q      So going back to your response to the July 20th

24  proposal, you responded July 23rd.  Did you

25  specifically address or specifically state that the

74

1  items listed as other items needing to be in the
2  settlement, did you specifically say those were
3  rejected?
4  A      I'm sorry, can you ask the question again?
5  Q      Sorry, trying to read my notes on the fly here.
6  So when you responded to Mr. Kayser's proposal of the
7  20th, did you specifically reject any of the terms
8  below, any of our requested terms that were below the
9  cash payment schedule at the top?  Did you specifically
10 say those other items are no longer being considered,
11 or are not to be considered?
12 A      I think the -- what I did write was your demand
13 put forward is not realistic.
14 Q      Which is that -- that's a fairly general
15 statement, right?
16 A      It is, but it refers to the entirety of the
17 demand.
18 Q      But it would beg the next statement to be
19 clarification of what you disagree with, correct?
20 A      Well, I disagreed with the entirety of the
21 demand.
22 Q      I mean, if I said the weather was terrible
23 outside, you'd say well, what's terrible about it?
24 Right?
25 A      Not necessarily.

75

1   Q    So, yeah, so I can't testify, so I can't go much

2   further.  But so did you specifically talk about in

3   Paragraph 2 the shortness of funds or the lack of

4   funds, if you will, of Tagnetics, at this point in

5   time, being able to make a payment at this point in

6   time?

7   A    That's one of the things I discussed, but I also

8   discussed the concept of the default judgment that was

9   being discussed, which is not a monetary term.  So it

10  wasn't limited only to the money that -- we were not

11  discussing only money in that email.

12  Q    But was there any reference to the KBL Core

13  agreement, the loan for Mr. Earley or --

14  A    No.

15  Q    So nothing for us to believe that you had

16  rejected those items that were being proposed on the

17  July 20 --

18  A    Well, I don't know how else to interpret "The

19  demand you put forth is not realistic."  That's

20  rejection of the term.  Now, furthermore, your response

21  -- in fact, it was Mr. Earley, "Here's our offer, after

22  your email this morning.  Let us know if there's any

23  interest."  It doesn't refer to any other terms.  And

24  then after that the next email I got was -- or another

25  email where, again, there was no monetary terms

1    involved, but it was from Mr. Earley, on July 25th at

2    1:25 p.m., it says, "Here is my counter proposal." And

3    no other terms other than monetary terms in there.

4    What other non-monetary terms am I supposed to be

5    interpreting into that counter proposal on July 25th?

6    I don't know. There's no incorporation to the July

7    20th email, no reference made to terms in the July 20th

8    email, and there were two or three counter -- two

9    counter proposals, if I'm doing my math correctly, that

10   didn't refer to any other non-monetary terms between

11   now -- the July 20th -- and at least I'm looking at

12   July 25th. And again, the -- not once, not twice, but

13   three times in the confirmation emails on July 26th,

14   there were no other non-monetary terms included in the

15   emails from any of you.

16        In fact, the email from you on -- at 4:36,

17   Exhibit I, just to make sure there's no confusion.

18   Now, granted, that's the payment schedule, but if there

19   is some other non-monetary terms that I'm supposed to

20   be considering, I didn't see that in any of those three

21   emails.

22   Q    I just want to point out on that schedule, I was

23   correcting a typo, so on one of the charts that was

24   sent under my name, the first item was 300.

25   A    I saw that. But you also added --

1 Q    There were three zeros, so I went ahead and just

2 --

3 A    I saw it, but you also added "total" in

4 capitals.  I mean --

5 Q    I do spreadsheets every day and so I always do

6 "total" in capitals so I can see it.  I didn't want to

7 read a lot into that total, but that's beside the

8 point.  Did you get an email from me on July 30th?

9 A    I don't know.

10 Q    It's in our Exhibit 5, which I can pull out.

11 A    I don't know --

12         MR. KRACHT:  Objection.

13         MR. STERN:  -- if it was sent to me.

14         MR. KRACHT:  It's outside the scope.  It's

15 outside the scope, Your Honor.

16         THE COURT:  Any response to the objection,

17 Mr. Hager?  Basically what he's saying is your question

18 is outside the scope of his -- what he testified to on

19 direct examination.  It's beyond what he testified to

20 on --

21         MR. HAGER:  I guess I'm trying to make the

22 point that in his statements earlier he said that we

23 were making new claims, that we had buyer's remorse, if

24 I remember your phrasing, and we were introducing new

25 monetary demands at that later date.  Is that correct,

78

1   you said --

2          MR. STERN:  Yes, as just what I testified to,

3   I would say that's a fair description.

4          MR. HAGER:  And so I was trying to make the

5   point that on that Tuesday, which was the day after the

6   weekend that we were expecting to see some kind of

7   draft agreement --

8          THE COURT:  Not -- we're kind of getting into

9   testimony.

10          MR. HAGER:  I'm sorry.  I can cover that

11  later.

12          THE COURT:  Now, if you have that -- if you

13  have that exhibit and you want to present it to Mr.

14  Stern and ask him if he received that, you may do that.

15  That's certainly, I think, well within the scope of

16  cross-examination, if it relates to his direct

17  testimony.  So to that extent, I'm going to overrule

18  your objection, Mr. Kracht.

19          MR. HAGER:  I apologize for muddling through

20  this.  I'll do my best.

21  BY MR. HAGER:

22  Q    So this is the email that was sent on -- let's

23  see if I can show this -- Tuesday, July 30th, at 9:33

24  a.m.

25  A    Can you just do me a favor and put the entirety

1  of that first page on, so I can see the full string?

2  Like, does this --

3  Q    Well, the header, this is just wrapped on to

4  another page.  So that was the table on this as a

5  follow-up.

6            THE COURT:  Do you have a hard copy you can

7  present to --

8            MR. KRACHT:  And what exhibit is this?

9            MR. HAGER:  This is part of our Exhibit 5.

10           THE COURT:  Does somebody have a hard copy

11  for the witness?

12           MR. HAGER:  Is this for you, Your Honor?

13           THE COURT:  We will need copies of any

14  exhibits you seek to introduce.

15  BY MR. HAGER:

16  Q    This is still a part of that thick Exhibit 5,

17  which was all the emails.

18           THE COURT:  Okay.  Mr. Kracht, do you have

19  that?

20           MR. KRACHT:  Exhibit 5, correct?

21           THE COURT:  Yeah.  I just want to make sure

22  you have that.

23           MR. KRACHT:  I don't believe there are

24  exhibit stickers, but they appear to -- did you

25  identify your exhibits like at the top of a document?

80

1          MR. HAGER:  Yes, at the first page it was
2    identified, yes.  So it follows the last table here.
3    July 30th --
4          MR. KRACHT:  This is still part of Exhibit 5?
5          THE COURT:  If you have the files, the
6    exhibit -- proposed exhibits they filed in Document
7    112-5, it would be 112-5, Page 1 of 24.
8          MR. KRACHT:  For some reason, Your Honor, I
9    don't have that in what I printed from what they filed
10   electronically.  I've got 3, 4 and I'm not running into
11   that page of Exhibit 5 for some reason.
12         THE COURT:  What page of Exhibit 5 is that
13   you have on the document camera, Mr. Hager?
14         MR. HAGER:  Looks like Page 16 in this copy.
15         MR. KRACHT:  I'm going off of, Your Honor,
16   the exhibits that are time stamped, based on what they
17   filed with the Court.  And what -- he's referring to a
18   document that has no court filing marks of any sort, so
19   I think there's some problem, unless I missed it, and I
20   apologize, if I did.
21         MR. HAGER:  Right here, this is where it
22   starts.  It's this, understood from Joni Behnken's
23   email and then, unfortunately, your printout, you ran
24   out of ink.  That's the discussion.  I'll try to make
25   it quick.

1        MR. KRACHT:  Looks like we have it but

2   there's some copying issues from what we got off the

3   Court file.

4        THE COURT:  Yeah, I'm not sure -- Mr. Hager,

5   I'm not sure when you filed these or whoever filed

6   these with the Court, that in the process, that it all

7   got copied and into the system.

8        MR. HAGER:  He has the document.  It's just

9   the printout is faded.

10        MR. KRACHT:  You can't read it.

11        MR. HAGER:  Ran out of ink or something.

12        MR. KRACHT:  I don't think it's on our end.

13   I think it's -- I mean, I guess we could look at what

14   the Court shows as well, but the document he's

15   referring to, the text on the next page after that is

16   virtually illegible for several pages actually.

17        THE COURT:  Yeah.  I think there was a

18   problem --

19        MR. KRACHT:  How it was scanned when it was

20   fed in.

21        THE COURT:  Yeah, because what I'm looking at

22   in the court file exhibits does look significantly

23   different from what's on the monitor.

24        MR. HAGER:  Can I approach, Your Honor, just

25   show you what we have?

1        THE COURT:  Absolutely, yeah.

2        THE CLERK:  It is listed under 6, but it is

3   not legible.  It appears to be a scanning issue.  Your

4   Honor, if we took a recess I could probably retrieve it

5   from the Clerk's office.

6        THE COURT:  Yeah, why don't we take a short

7   recess to do that?  The Court is going to take a short

8   recess to retrieve the document from the Clerk's

9   office.

10       THE CLERK:  Court is in recess.

11       (Off the record from 11:50 a.m. until 12:06

12  p.m.)

13       THE CLERK:  Court is again in session.  You

14  may be seated.

15       THE COURT:  Okay.  We left off with Mr. Hager

16  trying to cross-examine Mr. Stern on what was part of -

17  - an email that was part of, I believe, the Petitioning

18  Creditors' Exhibit 5, and there was I think a scanning

19  problem or issue with the Petitioning Creditors'

20  exhibits at the Court, but I believe, Mr. Kracht, that

21  they did email these exhibits to you; is that correct?

22       MR. KRACHT:  I wasn't able to confirm that,

23  Your Honor, and it's very possible that that occurred.

24  I don't want to say that they weren't.

25       MR. HAGER:  We did.

83

1      THE COURT:  Okay.  Mr. Hager says they were

2   emailed to you.  Is there any objection at this point

3   as to Mr. Hager's examining Mr. Stern on that -- was

4   that a July 30th?  Is that right?

5      MR. HAGER:  That's correct.

6      THE COURT:  Email?

7      MR. KRACHT:  I have that right now.  And no.

8      THE COURT:  All right.  You may proceed, Mr.

9   Hager.  Thank you.

10  BY MR. HAGER:

11  Q    So this email here, I want to know if you had

12  received it on July 30th?

13  A    I have no specific recollection that I did, but

14  I have no basis of saying that I did not.

15  Q    So then whether you can answer or not, whether

16  you read the attachment that was attached to that

17  email?

18  A    I have no recollection one way or the other.

19  I'm not saying that it wasn't sent to me.  I don't

20  specifically recall doing it.

21  Q    Can you see in this attachment the --

22  A    You have to pull it up a little bit for me to

23  see the entirety of it.  Now I can.

24  Q    There you go.  And that's -- there's a whole

25  other page, but anyway, as it's written here -- I guess

1    I can put the whole thing -- basically this attachment

2    looked very similar to the original proposal on July

3    20th.

4    A       I don't know.  I'd have to do a comparison, but

5    in my mind, even if it did, it doesn't matter, because

6    that wasn't part of what we agreed to on July 26th.  I

7    remember -- what I do remember, after we reached

8    agreement on the 26th, there were some emails back and

9    forth, and admittedly, I didn't pay close attention.  I

10   had just gotten back from vacation.  I'm trying to get

11   up to speed.  We had the agreement in place.  My sole

12   focus was to comply with the Court's directive to get

13   the agreed order in place, and then work on the

14   settlement agreement afterwards.

15            So I remember there's some emails that I

16   received from one or some combination of you guys, but

17   I have no recollection of what the specifics were and I

18   didn't -- I remember, whatever I saw, I didn't really

19   pay close attention to.

20   Q       Okay.  So you don't think you read this email

21   then?

22   A       I may have, but if I did I didn't really process

23   it.  I would say I may have taken a quick skim through,

24   but it wasn't something I was planning on paying

25   attention to, reading carefully or paying close

**TAGNETICS (19-30822) 10-18-19**

1    attention to.  We had the agreement in place.  I was

2    worried about the agreed order, as far as this case was

3    concerned.  That was my focus, that I remember being

4    the case.

5    Q    So when you received our concerns about the

6    draft agreement, did you say that we had added new

7    terms?

8    A    I remember having those discussions or that, you

9    know, exchange, after I sent the draft agreement.  I

10   have no recollection of doing that beforehand.

11   Q    But in your testimony didn't you say we had

12   added new terms, things that were never discussed?

13   A    Yes, and even based on that email there,

14   assuming that's what was sent, I would still say those

15   are new terms from what we discussed, because the

16   agreement on the 26th didn't reflect those terms.  And

17   as you may recall from the email strings at one point,

18   you cut off or it wasn't you specifically, Mr. Earley

19   said, cut off discussions, saying no chance, see you in

20   court.  Then I asked for a counter proposal and, again,

21   there were counter proposals, but no reference to any

22   of these other terms.

23           MR. HAGER:  So -- I don't think I can say

24   that.  I guess I'll cover that in my -- in our

25   examination later or witness testimony.  Okay.  I have

**TAGNETICS (19-30822) 10-18-19**

86

```
 1   nothing further right now.
 2              THE COURT:  Thank you, Mr. Hager.  Any
 3   redirect examination, Mr. Kracht?  You may proceed.
 4          REDIRECT EXAMINATION OF STEPHEN STERN
 5   BY MR. KRACHT:
 6   Q     Directing your attention to Tagnetics Exhibit A,
 7   Page 3.
 8   A     Mm-hmm.
 9   Q     It's the email at the bottom of that page from
10   Mr. Earley to you, dated July 24th at 7:43; is that
11   what you were referring to, where they cut off all
12   discussions, terminated any discussions?
13   A     Yes, that's what I interpreted their response to
14   be.  And, in fact, if you look at my email above that,
15   my email on the 25th at 12:42 p.m., it's exactly the
16   phrasing I used.  It seems silly, and quite frankly
17   odd, to simply cut off negotiations.  I thought we were
18   done.  Whatever transpired is over, and I'm trying to
19   revive discussions at that point, asking for a
20   counteroffer.
21   Q     And you're starting anew from that point?
22   A     That's the way I thought.
23              MR. KRACHT:  Okay.  Nothing further.
24              THE COURT:  Thank you, Mr. Kracht.  Any
25   recross-examination of Mr. Stern, Mr. Kayser?
```

1                DR. KAYSER:  No.

2                THE COURT:  Mr. Earley?

3                MR. EARLEY:  No.

4                THE COURT:  Mr. Hager?

5                MR. HAGER:  No.

6                THE COURT:  Okay.  I've got a couple quick

7      questions, Mr. Stern, and then everybody is willing to

8      ask any additional questions based upon my questions.

9      There are just two questions.  One, the payment

10     schedule refers to a liquidity event.  What would you -

11     - what's your understanding as to what liquidity event

12     means?

13                MR. STERN:  We never discussed those details.

14     So when I put together the draft agreement, Your Honor,

15     there is a provision in the agreement, Section 2 on

16     Page 2 of Exhibit B, that -- where I provided a

17     definition of a liquidity event.  And my recollection

18     from the objections and concerns that I received from

19     the alleged Creditors, no one really objected to that

20     definition that I included.  It is a similar definition

21     -- I've written many agreements in my career.  This

22     doesn't come directly from another one, but it adopts

23     concepts that I've used before in other agreements, and

24     I wanted to make it as, you know, consistent with what

25     we were -- you know thinking of as what would be a

88

1    liquidity event and what would be an accurate and fair

2    description of that, and I think that's captured in

3    Section 2.

4            THE COURT:  Okay, thank you.  Well, that

5    answers that question for me.  I'm assuming then from

6    what you just testified, that your definition of

7    liquidity event, what was intended, in your

8    understanding of liquidity event, in that schedule, was

9    what you have in Paragraph 2 of your draft settlement

10   agreement?

11           MR. STERN:  Yes.  This is what I wanted to

12   use as the definition, and I think it fairly and

13   accurately describes the types of liquidity events that

14   would be potentially in play for Tagnetics.  And so to

15   -- I remember that was one of the conditions that they

16   wanted, they being the alleged Creditors, wanted for

17   the -- on the payment schedule for a certain event to

18   occur.  And I tried to -- my best to capture what the

19   concept was.  Granted, there were no details -- to be

20   fair, there were no details that were discussed between

21   us as to what would constitute a liquidity event.  It

22   was just a phrase that was used, and I tried to put

23   reasonable meat on the bones to fairly and accurately

24   describe what that might be, to capture that event, if

25   it were to occur.

1     THE COURT:  Thank you.  The second question

2  or area is some or all of the Petitioning Creditors, I

3  understand, I believe still have stock or equity

4  interest in Tagnetics.  From the July 26, if there

5  a July 26th settlement, what's your position as to the

6  impact of that settlement agreement on the stock or

7  equity interest?

8     MR. STERN:  That is a fair question that I

9  don't think is really captured in the agreement.  The -

10  - we didn't ask for them to relinquish their stock

11  certificates, because that wasn't part of the

12  discussion, but it was to relinquish any rights that

13  the release does capture, the relinquishment of any

14  rights they might have had vis-a-vis those -- whether

15  it be payment of profits, dividends or anything prior

16  to that date, I think is certainly captured in the

17  essence of full mutual releases, no carve-outs.  But in

18  terms of what they had to do with their stock

19  certificates was not covered.

20     THE COURT:  Thank you.  Those are the only

21  questions the Court had for Mr. Stern.  Any questions

22  based upon my questions, Mr. Kracht, for Mr. Stern?

23     MR. KRACHT:  No, Your Honor.

24     THE COURT:  Okay.

25     MR. STERN:  May I step down, Your Honor?

90

1          THE COURT:  Hold on.  Mr. Kayser, any

2    questions for Mr. Stern, based upon the questions I

3    just asked?

4          DR. KAYSER:  No.

5          THE COURT:  No?  Mr. Earley?

6          MR. EARLEY:  No.

7          THE COURT:  Mr. Hager?

8          MR. HAGER:  No, sir.

9          THE COURT:  Thank you.  Mr. Stern, you may be

10   excused.

11         MR. STERN:  Thank you.  It's been interesting

12   sitting on this side of the microphone.

13         THE COURT:  It is different.  I have been --

14   was there as an attorney years ago, and I agree, it is

15   a much different experience being on the other side.

16         Okay.  Mr. Kracht or Mr. Stern, any other

17   witnesses you wish to call in Tagnetics' case?

18         MR. KRACHT:  No, Your Honor.

19         THE COURT:  Any other evidence then you wish

20   to introduce?  We've admitted all your exhibits except

21   E.  We've got Mr. Stern's testimony.  Any other

22   evidence you wish to introduce?

23         MR. KRACHT:  Nothing further, Your Honor.

24         THE COURT:  Okay, thank you.  What time is

25   it?

**TAGNETICS (19-30822) 10-18-19**

1    THE CLERK:  It's 12:17, Your Honor.

2        THE COURT:  12:17.  I think we -- now would

3    probably be a good time to break for lunch.  As my wife

4    would let all of you know, it's in your all best

5    interest to let the Court take a lunch break.  Whoever

6    came up with that Snickers' commercial with the prima

7    donnas in the Snickers' commercial, I think must have

8    known me.  At least my wife would say they knew me.  So

9    I hopefully will be much better behaved after getting

10   some nourishment and taking a short break for that.  So

11   why don't we do that now.  But I'll leave it up to you

12   how long you think we -- you wish, because I know all

13   of you probably have flights and so forth you need to

14   catch, so the -- taking a lunch break is not

15   negotiable, but the length of the lunch break is

16   negotiable.

17       MR. STERN:  Your Honor, to the point about

18   leaving, I booked my flight as late as possible today.

19   It's out of Cincinnati.  The latest I could fly out of

20   Dayton was like 2:30, and I thought that might be a

21   problem, but I probably have to be on the road back to

22   Cincinnati -- I realize we do have to get through this

23   hearing, probably by about 3:00, to catch my flight, to

24   make sure I return the car on time and everything.

25       THE COURT:  Okay.

1          MR. STERN:  I think we should be able to

2    finish in that time, but I want the Court to be aware,

3    so we can plan accordingly.

4          THE COURT:  Yeah.

5          DR. KAYSER:  Excuse me.  What time is your

6    flight out of Cincinnati?

7          MR. STERN:  5:20.  And it's about an hour and

8    15 minutes --

9          DR. KAYSER:  We'll do our best to be brief.

10          THE COURT:  Okay.

11          MR. STERN:  I don't know how much time you

12    guys were going to use, but --

13          DR. KAYSER:  I think we'll be brief.

14          MR. STERN:  So we should be on track then.

15          THE COURT:  Why don't we plan on being here

16    back in 30 minutes?  We can for sure getting started by

17    one o'clock, and then Ms. Behnken can -- and court

18    personnel can guide you to different places you can go.

19    Thank you.

20          THE CLERK:  All rise.

21          (Lunch break from 12:20 p.m. until 1:03 p.m.)

22          THE CLERK:  Court is again in session.  You

23    may be seated.

24          THE COURT:  Okay.  Before we took an

25    adjournment for lunch, Tagnetics rested its case and we

1   are now, I believe, prepared for the Petitioning

2   Creditors' cases.  Mr. Kayser, or do one of you -- it

3   doesn't have to be Mr. Kayser.  Who wishes to proceed

4   with their case first?

5           DR. KAYSER:  Your Honor, I will take the

6   witness stand and present a narrative.

7           THE COURT:  You may do so.

8           THE CLERK:  I just remind you, sir, you're

9   still under oath.

10          DR. KAYSER:  Understood.

11          DIRECT TESTIMONY OF KENNETH KAYSER

12          DR. KAYSER:  Let me start at the beginning, a

13  brief introduction of who I am.  I got my Ph.D. from

14  Purdue University in 1973.  I was -- after that became

15  an assistant professor at Purdue, Director of the

16  Center for Applied Stochastics and a Professor in the

17  Department of Aeronautics and Astronautics

18          I also was the founder of Tagnetics'

19  predecessor 20-some years ago.  I was the name on the

20  patents for the technology.  And ultimately that

21  company was sold to Hobart and then re-acquired and

22  went forward under another name, was reorganized one

23  other time, to become Tagnetics.  Ron Earley was the

24  president of that company.  I was the chairman and I

25  have been a director of this company throughout the

1    history of the company.

2            As of the beginning of this year, I resigned

3    as a director, with the express statement that we would

4    take legal action against the company, if the issues

5    concerning our contracts, among other issues with

6    creditors, were not resolved quickly.

7            Three months later we filed the petition, and

8    that's how we got to where we are today.

9            On July 19th we received a request from Mr.

10   Stern to make a proposal to settle this.  The three of

11   us sat down or by phone conference agreed on what the

12   terms of that settlement proposal should be, and that's

13   expressed in my July 20th email.  We agreed going into

14   this those were our terms.

15           A couple days after I sent that email, we got

16   a response from Mr. Stern, which has been introduced

17   into evidence previously, requesting a change in the

18   payout schedule, but not disputing the total amount we

19   agreed to settle for, which was, incidentally,

20   approximately 40 percent, which we thought was

21   contractually due to us.

22           I wasn't particularly in favor of doing a

23   settlement at all, given my history of asking for a

24   settlement previously, but I agreed to go along with

25   the other two petitioners, as they had been long-time

1    employees of our company, and I wanted us all to be

2    more or less on the same page.

3         The terms of that July 20th letter, as far as

4    we knew, were never disputed except for the time table

5    on the payment of the funds.  I was not involved in the

6    negotiation, because I had agreed that I would -- it

7    would be up to the other two guys to determine what

8    that payout was to us.

9         When we first got the request to renegotiate

10   the payout terms, the three of us once again had a

11   conference call to agree and what we agreed to do was

12   allow Ron Earley to renegotiate the terms of that

13   payout.  We also agreed that the other terms were in

14   inviolate.  And we did not authorize Ron -- Mr. Earley,

15   nor did we expect there to be any renegotiation of

16   those terms.

17        We talked often over the next several days,

18   during the craziness of many conversations back and

19   forth concerning the amount.  In general, I didn't have

20   any significant input into that, other than to stress

21   in every conversation that the terms and conditions,

22   which we had outlined on July 20th, must be included in

23   any settlement agreement.

24        On Friday, a few hours before I guess around

25   3:00 or 3:30, I did hear that they had reached an

1   agreement on the payout schedule, and both Ron Earley

2   and Jon Hager confirmed to me that they had not

3   renegotiated any other term, nor were they brought up.

4   And when Joni called me at 5:30 that evening, or not

5   evening, five o'clock -- I'm not sure of the exact time

6   Joni called, but it was later than I expected her to be

7   here, I told her that I had agreed to go along with

8   whatever Mr. Earley and Mr. Hager had agreed to.  She

9   told me that they had both sent a note to the Court.  I

10  don't recall exactly how that was sent.

11          So I agreed to go ahead and cancel the trial

12  at that time, given the assurances I had received from

13  both Mr. Earley and Mr. Hager that the terms had not

14  been discussed, and had not been agreed to, any changes

15  in those terms and conditions.

16          When I finally got a chance to read the email

17  that Mr. Stern had sent to me at 3:30 on Friday -- I

18  had been out doing some things.  I don't even recall

19  what errands I was running, but I wasn't able to see

20  the email until 5:30.  It said two things of

21  significance to me.

22          One is it had this vague term of carve-outs.

23  Carve-out is a word, when I -- I wasn't very happy with

24  what I got back from him.  Being a lawyer, I expected

25  there to be more clarity in what he sent back, rather

97

1    than less.  I Googled carve-out, looking for the

2    definition of carve-out, because I wanted to understand

3    what he was trying to say.  And basically there is no

4    specific definition of carve-out.  It's entirely a

5    definition due to context.

6              And while from our perspective, all three of

7    us and mine, our perspective was that we were

8    negotiating from the July 20th document.  And I

9    understood why both Mr. Hager and Mr. Earley would have

10   interpreted no carve-outs as meaning no changes to our

11   provision, other than the payment schedule, which was

12   being negotiated.

13             However, in that 3:30 email on Friday from

14   Mr. Stern, he also committed to getting a draft of the

15   settlement agreement over the weekend done.  When we

16   did not receive that settlement agreement on Monday,

17   the three of us had another conference call, and said,

18   you know, there's been no clear restatement of the

19   terms of the settlement we had agreed to.

20             As a result of receiving no communication

21   from Mr. Stern on Monday, the three of us selected Jon

22   Hager to write a response, reiterating the terms which

23   we had agreed to.  That was sent on Tuesday.  I don't

24   know the date.

25             The Judge, Your Honor, you had ordered that

98

1  there be, I believe, two weeks from the Friday for us

2  to get an agreed order.  We did not hear from Mr.

3  Stern.  We saw an agreed order, which he said we had to

4  sign.  We didn't believe we had a clear agreement.  We

5  refused to sign that agreement.  We later received the

6  draft agreement, which he had sent, which we didn't

7  agree to and we didn't -- we never signed an agreed

8  order, because we did not have an agreement.

9          We consequently had another conference call

10  with Your Honor, and -- excuse me for a second.  I have

11  to think about the time line.  I'm old.  I can't see

12  well and I don't hear well, so it takes me a while to

13  look at this stuff.

14          We had another conference call with you to

15  discuss -- during which you set a new deadline for when

16  we needed to have the agreement put together by.  We

17  did not have the agreement together by then, and there

18  was no negotiation.  There were very large gaps which,

19  frankly, I can't testify to.  I'm sure that Mr. Hager

20  will testify to the time line of the gaps, when we

21  never heard -- we repeatedly reiterated the terms and

22  conditions under which we were willing to settle.  We

23  never saw any edit to the draft agreement concerning --

24  we had no conversation with working out our

25  differences.

99

1    I have negotiated many contracts in my life.

2  I've always been chairman of the board of companies or

3  an executive of companies, and I'm used to doing

4  negotiated settlements, and this did not follow the

5  normal course, in which if you had a disagreement, you

6  discuss it.

7    Because of that, when we were approaching the

8  date where for a ruling on the motion to enforce

9  settlement, I had my business attorney in Roanoke,

10  Virginia do a redline version of the draft agreement,

11  and I gave him two documents, the money -- the money

12  timetable and the original July 20th letter, and I

13  asked him to redline this agreement, based on those two

14  documents, without giving him any further guidelines on

15  what to do.  And that's the redline version I presented

16  to you.

17    That document reflects our -- what we thought

18  we agreed to on Friday, when we agreed to postpone the

19  trial.  There's also a clean version that was

20  presented.  And as of this date, even though part of

21  our verbal agreement was that it would be done quickly,

22  and it's now been three months, we will still go along

23  with what we agreed to as expressed by those documents.

24    I do not believe that there has been any real

25  interest in settling this, and that this has simply

1    been an effective way to further delay the trial.  And

2    I look forward to the Court setting a trial date, so it

3    has a chance to review the evidence as to the

4    insolvency of Tagnetics.

5              THE COURT:  Okay, hold on, Mr. Kayser.  Are

6    there exhibits which haven't already been introduced,

7    which you wish to introduce in your case?

8              DR. KAYSER:  I'm sorry, Your Honor.  I

9    couldn't understand.  Are there exhibits?

10             THE COURT:  Are there exhibits which haven't

11   already been introduced?

12             DR. KAYSER:  All the exhibits I'm quoting

13   have already been -- already come into evidence.

14             THE COURT:  Okay, okay.  All right.  Okay,

15   now, stay up there because they have the right to

16   cross-examine you.  I assume you're done with your

17   direct examination.

18             MR. EARLEY:  Your Honor, I guess to follow up

19   on that question, the exhibits that he mentioned were

20   ones that were submitted to the Court, but do they need

21   to be introduced right now?

22             THE COURT:  Yes, they need to be introduced.

23             MR. EARLEY:  So 4 -- did you take them up

24   there with you?

25             DR. KAYSER:  Yes.

1        MR. EARLEY: Exhibit 3 and Exhibit 4.

2        DR. KAYSER: Thank you.

3        THE COURT: Now, this is kind of the awkward

4 part. I think we're in Mr. Kayser's case.

5        MR. EARLEY: Okay.

6        THE COURT: So if he wants those admitted,

7 he's going to have to --

8        DR. KAYSER: Your Honor, all of these -- the

9 two documents have been previously sent to the Court in

10 the response, but we would like to enter them into

11 evidence.

12        THE COURT: Can you provide them to Mr.

13 Kayser so he can identify them for the Court, while

14 he's on the witness stand?

15        DR. KAYSER: Yes, this is Exhibit 1. This is

16 --

17        THE COURT: Hold on. Slow down. Slow down.

18 What is Exhibit 1? Can you tell me --

19        DR. KAYSER: Exhibit 1 is my original email

20 from July 20th responding to the request for a

21 settlement offer.

22        THE COURT: Okay, now that I think has been

23 admitted as part of Exhibit A. Is that right?

24        MR. STERN: Yes, Exhibit A, yes.

25        THE COURT: So everybody good with just

102

1   having it admitted as part of Exhibit A?

2            MR. KRACHT:  Yes.

3            THE COURT:  Exhibit 2 is the modified payment

4   schedule, and that was part of an exhibit that has been

5   already submitted.  I don't recall the exhibit number.

6            THE COURT:  Is that part of Exhibit A or --

7            MR. KRACHT:  I think that was I.

8            THE COURT:  I?

9            MR. EARLEY:  Yes, Exhibit I has that payment

10  schedule in it.

11           THE COURT:  All right.

12           MR. STERN:  Is Exhibit 2, if I'm

13  understanding correctly, it's labeled -- I've got

14  Exhibit 3.  I'm sorry, the email.  I'm getting

15  confused.  Exhibit 2 is the email from Mr. Hager to me

16  on July 26th on his email -- his proposal, with total

17  settlement at 4:35.  I think it was 4:36, on Exhibit I

18  for us.

19           MR. EARLEY:  It is Exhibit I, yes.

20           MR. STERN:  So that one is already admitted,

21  as well.

22           THE COURT:  All right.  We're in agreement

23  that that exhibit has been admitted as Tagnetics'

24  Exhibit I; is that right?

25           MR. EARLEY:  So the next one --

1          DR. KAYSER:  The next two exhibits haven't
2   been entered.  That's Exhibit 3 and Exhibit 4, and
3   these -- Exhibit 3 is the redline of the draft
4   agreement that was sent to us by Mr. Stern, and Exhibit
5   4 is a clean version of that same contract.
6          THE COURT:  Okay.  And are you seeking
7   admission of those two documents?
8          MR. EARLEY:  Yes.
9          THE COURT:  Mr. Kayser?
10         DR. KAYSER:  Say it again.  I'm sorry, Your
11  Honor.  I'm very hard of hearing.
12         THE COURT:  Are you seeking admission --
13         DR. KAYSER:  Yes.
14         THE COURT:  -- of those two documents?
15         DR. KAYSER:  Please.
16         MR. STERN:  There's no email attached to
17  them, Your Honor, but we're willing to submit to the
18  admission of those exhibits, provided that there's an
19  acknowledgment that those were sent after July 26th.
20  If that's what the understanding is, then we will not
21  object to being admitted.
22         THE COURT:  Are you in agreement those were
23  sent after July 26th?
24         DR. KAYSER:  Oh, absolutely.  These documents
25  were not done until a week before the hearing on the

104

1    motion.

2              THE COURT:  Okay, all right.  Then there's no

3    objections to admission -- those are labeled Exhibits 3

4    and 4?

5              DR. KAYSER:  Correct.

6              THE COURT:  To the admission of the

7    Petitioning Creditors' Exhibits 3 and 4?

8              MR. STERN:  That's fine, as long as they

9    acknowledge when it was sent, we're fine with that,

10   Your Honor.

11             THE COURT:  Okay.  Then Exhibits -- the

12   Petitioning Creditors' Exhibits 3 and 4 are admitted.

13             (Petitioning Creditors' Exhibits 3 and 4

14   received into evidence.)

15             THE COURT:  Is that it in terms of exhibits

16   that you wish to introduce, Mr. Kayser?

17             DR. KAYSER:  Yes.

18             THE COURT:  Okay.  Now, I assume you're done

19   with your direct testimony?

20             DR. KAYSER:  Correct.

21             THE COURT:  All right.  Do you wish to cross-

22   examine Mr. Kayser, Mr. Stern or Mr. Kracht?

23             MR. STERN:  Yes, Your Honor.

24             THE COURT:  You may do so.

25             MR. STERN:  Thank you.

**TAGNETICS (19-30822) 10-18-19**

105

1          CROSS-EXAMINATION OF KENNETH KAYSER

2    BY MR. STERN:

3    Q      Putting up what is referred to as July 20th

4    email, that's Exhibit A.  It's been admitted into

5    evidence.  This is the email you're referring to, Mr.

6    Kayser?

7    A      Yes, and I need you to speak into the

8    microphone.

9    Q      Sure, I'm sorry.  Am I more audible now?

10   A      Yeah, I'm just hard of hearing and I should have

11   gotten a hearing aid before I came to this court.

12   Q      Now, this July 20th email is in a string of

13   emails, correct?

14   A      Is in a what?

15   Q      It's in a string of emails to and from you, Mr.

16   Earley, and Mr. Hager, between me and the three of you?

17   A      There wasn't much of -- you know, I don't recall

18   whether we exchanged by email.  I thought we mostly

19   discussed these terms, and I did send them -- send this

20   letter to them prior to sending it to you, to make sure

21   they agreed with the terms.

22   Q      Now, in my email to the three of you on July

23   23rd, 2019, at 10:46 a.m., do you see in the second to

24   last paragraph, do you agree that I encouraged the

25   three of you to seek your own legal counsel?  Is that

106

1  what it says right where I'm pointing to?

2  A    Sure.

3  Q    Okay.  Then later on --

4  A    I would encourage anyone to seek their own legal

5  counsel.

6  Q    In that same email string, on an email from me

7  to the three of you, on July 24th at 5:56 p.m., which

8  is on Page 3 onto Page 4, I again -- I'm pointing to

9  where it says, "I encourage each of you to seek your

10  own legal advice."  Did I do that again in that email

11  string?

12  A    Absolutely.  I can read when it's on the screen

13  that big.

14  Q    Then again, on July 26th, early that day, the

15  day that we ultimately thought we reached an agreement,

16  I again suggested that you seek legal counsel; is that

17  correct?

18  A    Yes, I do.

19  Q    At any point did you authorize any legal counsel

20  to speak with me to negotiate a settlement?

21  A    Did I at any date what?

22  Q    Authorize any legal counsel to negotiate with me

23  to negotiate a settlement?

24  A    No, I did not.

25  Q    Now, earlier, if I understand your testimony

107

1    correctly, you said the terms of the July 20th, 2019

2    email were required to be included in any settlement

3    agreement that was reached with Tagnetics; is that

4    correct?

5    A       That's correct.

6    Q       Can you show me where that was communicated to

7    me at any point during the settlement negotiations?

8    A       I cannot and I also cannot show you any email

9    where they were discussed, and we were always

10   negotiating from that document, the original document.

11   Q       Can you explain where in the email string or

12   show me, I'm sorry, where in that email string that was

13   explained to me, that those terms of the July 20th

14   email were non-negotiable?

15   A       If you look back at the July 20th one, look at

16   the wording above there, the agreement -- the

17   settlement agreement must include.  We never rescinded

18   that declarative statement.

19   Q       So can you show me where it says that -- this is

20   also your final offer, it says in there too, correct?

21   Is that what it says?

22   A       The only thing Ron Earley was negotiating with

23   you was a payment schedule, because that's the only

24   thing you asked him to negotiate.

25   Q       Can you show me where I asked to negotiate only

1  payment terms?

2  A     That's reflected by your letter, where you have

3  several hundred words discussing the payment schedule

4  and the dire straits, which Tagnetics is in, so they

5  can't come up with paying their contracts, and there's

6  virtually -- I can't read it.  Would you focus that

7  document if you want me to tell you what it says?

8  Q     Oh, sorry.

9            THE CLERK:  I'm not sure that it can focus

10  any more.

11            MR. STERN:  Your Honor, if I may, to move

12  this along, could I refer to the exhibit binder, hand

13  that to the witness?

14            THE COURT:  That's fine, yeah.  That's fine.

15            MR. STERN:  May I approach the witness, Your

16  Honor?

17            DR. KAYSER:  I've got it.

18            THE COURT:  Yes, you may.

19            DR. KAYSER:  Which exhibit are you asking me

20  to --

21  BY MR. STERN:

22  Q     So now, referring to Exhibit A, and if you could

23  refer to Page 5 of that exhibit, in the second

24  paragraph, am I referring to any non-monetary terms,

25  such as a default judgment?

**TAGNETICS (19-30822) 10-18-19**

1   A     One again, you'll have to speak more clearly for

2   me to understand.

3   Q     In the second paragraph of that email on July

4   23rd, on Page 5, am I referring to a non-monetary term,

5   referred to as a default judgment?

6   A     Do I have a comment on that?

7   Q     Is there a non-monetary term referenced in

8   there, referred to as a default judgment?

9   A     I'll read it.  "We can also include a default

10  judgment provision if provision is intended to

11  demonstrate in part that Tagnetics is serious about a

12  resolution and is not trying to jerk you around as

13  incorrectly you suspect it is."

14  Q     Okay.  So --

15  A     That hardly sounds like clear language to me.

16  Q     Okay.

17  A     And you'll forget -- don't forget, I've been on

18  the Board of this company for years, and they have

19  failed to live up to the terms of the agreement, of our

20  employment agreement.

21         MR. STERN:  Object, Your Honor, to the non-

22  responsive and strike his testimony.

23         THE COURT:  Stop.  If there's an objection,

24  you need to stop.

25         DR. KAYSER:  I'm sorry.

110

1      THE COURT:  I think Mr. Stern is objecting,

2  because that's not responsive to his question.  So Mr.

3  Stern, if you want to ask your question again.

4      MR. STERN:  Sure.

5  BY MR. STERN:

6  Q    My question was whether or not there's any

7  reference in that paragraph to non-monetary term

8  referred to as a default judgment; is that yes or no?

9  A    Not that I'm aware of.

10  Q    Are you familiar with the term default judgment?

11  A    I am not.  I'm not an attorney.

12  Q    Is there a phrase in Paragraph 2 on that July

13  23rd, 2019 email that says "default judgment?"

14  A    Am I familiar with what that term -- you'll have

15  to ask the question in a clearer way for me.

16  Q    Is there a phrase in Paragraph 2 on that email

17  referring to a default judgment?

18  A    It says, "You can also include a default

19  judgment."

20  Q    Now, in terms of non-monetary terms, the

21  ultimate agreement that was reflected in an email or a

22  purported agreement, since you're contesting it, on

23  July 26, 2019, there are non-monetary terms in that

24  email, aren't there?  That's on Page 1 of the exhibit.

25  A    You'll have to restate the question again.

1  Which paragraph do you want me to look at?

2  Q     I'm looking at the email from me to you, Mr.

3  Earley and Mr. Hager, on July 26, 2019, at 3:27 p.m.,

4  which is on the first page of Exhibit A.  Do you see

5  that?

6  A     At 3:17 p.m.?

7  Q     3:27 p.m.

8  A     Which page is that?

9  Q     Page 1.  Actually, I'll come back to that in a

10 moment.  Why don't we turn to the email from Mr. Earley

11 to me on July 24, 2019, at 7:43 p.m.  It's on Page 3 of

12 Exhibit A.  See Mr. Earley's email, "Stephen, no

13 chance, look forward to meeting you on Monday."  Do you

14 see that?

15 A     Yes.

16 Q     And then my response to that, the email above

17 that, where it says, "It seems silly and, quite frankly

18 odd, to simply cut off negotiations."  Is my

19 characterization that Mr. Earley had cut off

20 negotiations an accurate description of where we were

21 at that point in time in our discussions?

22 A     You made an insulting offer to settle a $500,000

23 claim for $5,000, didn't seem appropriate to us.

24 Q     Is it an accurate description of the status of

25 the negotiations at that point in time that settlement

112

1  negotiations had been cut off?

2  A    Yes.

3  Q    Thank you.  So then negotiations picked up again

4  in earnest on the 26th, and ultimately there's an email

5  from me to you, Mr. Earley, Mr. Hager, on July 26th at

6  3:27 p.m., that includes monetary and non-monetary

7  terms, doesn't it?

8  A    It uses the word that's meant to be deceptive

9  and misleading, of carve-out.

10  Q    We'll get to that in a moment.

11  A    We were under the impression --

12  Q    I asked -- my question was, Mr. Kayser --

13  A    Okay.  My answer is --

14  Q    -- does that include monetary and non-monetary

15  terms?

16  A    The only non-monetary thing I see in there is a

17  full mutual release, no carve-outs.  And I thought that

18  was a very poor legal description of what we were

19  trying to agree on, and I believe it to this day.  And

20  if you would prefer I have a lawyer say that's a lousy

21  way to describe something you're attempting to clarify,

22  great.

23  Q    Are you familiar with the concept of what a full

24  mutual release is?

25  A    The terms we had agreed to --

113

1   Q     Are you familiar with the concept of what a full

2   mutual release is?

3   A     Did we agree to a full mutual release?  We

4   agreed to a release as defined by the terms of July

5   20th.

6   Q     Are you familiar with the term full mutual

7   release means?

8   A     It doesn't release you from fraud.  It doesn't

9   release you from many things.  And, no, I don't know

10  exactly what a full mutual release is, and we do not

11  agree with that language.

12  Q     So then when Mr. Earley responded to that email

13  on July 26 at 3:56 p.m., it says, "Mr. Earley is

14  discussing this --" I'm sorry, Mr. Hager.  "Mr. Earley

15  is discussing this with the Court at the moment.  I'm

16  responding for Kayser, Earley and Hager, saying we

17  agree to the terms put forth as documented above."  Was

18  Mr. Hager not speaking for you at that point in time?

19  A     He did and, frankly, I was a little critical of

20  his response, but --

21  Q     Did you reply to that email?

22  A     No, I did not.

23  Q     Advising me that he was not authorized to speak

24  for you?

25  A     Mr. Stern, I never saw this email until 5:30

114

1   that evening.

2   Q       Did you --

3   A       When I saw it.

4   Q       -- respond to me at 5:30 that evening saying

5   that Mr. Hager was not authorized to speak on your

6   behalf in response to the terms that I put out?

7   A       I discussed this with Mr. Hager and I discussed

8   it with Mr. Earley.  And Mr. Hager assured me that his

9   understanding was he had not agreed to taking the

10  provisions that outlined of the July 20th out.  And I -

11  - we sat down and we had a discussion.  And, frankly, I

12  viewed it as quite misleading and very poor language.

13  I expect the lawyers in this situation to clarify

14  things, not confuse them, and not attempt -- because we

15  weren't lawyers --

16              MR. STERN:  Your Honor, this is again, not

17  responsive.  I asked if this was communicated to me.

18              DR. KAYSER:  Excuse me, Your Honor.

19              THE COURT:  Sustained.  Ask your question

20  again.

21  BY MR. STERN:

22  Q       Did you communicate to me at any point on July

23  26th that Mr. Hager was not authorized to speak on your

24  behalf with respect to the terms of the July 26th email

25  at 3:27 p.m.?

**TAGNETICS (19-30822) 10-18-19**

1    A      I did not.  Mr. Hager was --

2    Q      Did Mr. Hager at any point communicate to me on

3    July 26th, 2019, after my 3:27 p.m. email, that that

4    email did not accurately reflect the terms of the

5    agreement?

6    A      Repeat your question.

7    Q      Did Mr. Hager communicate to me --

8    A      I wouldn't know.  You'll have to ask Mr. Hager.

9    Q      In the emails that you saw, did Mr. Hager

10   communicate to me that the email that I wrote at 3:27

11   p.m. did not accurately reflect the terms of our

12   agreement?

13   A      There was no email after -- until Tuesday, when

14   we hadn't heard from you.

15   Q      All right.  Now, going back to your

16   understanding of what the term "full mutual releases"

17   means.  Do you understand, based on the terms of the

18   agreement you thought we had reached --

19   A      Full mutual releases -- if you're asking me a

20   question --

21   Q      I haven't finished asking the question yet.  Did

22   you understand the term full "mutual releases, no

23   carve-outs," to mean that you could sue a Tagnetics

24   parent company?

25   A      We assumed -- Tagnetics has no parent company.

1  Q     Did you -- you, yourself, mentioned earlier,

2  that you had resigned from the Board.  You don't know

3  all the current financial status of Tagnetics,

4  according to your own statements.  So did you

5  understand that you had the right to sue a parent

6  company of Tagnetics, based on the agreement, "full

7  mutual releases, no carve-outs?"

8  A     If you'll repeat your question again, please.

9  Q     Did you have the understanding when you saw the

10  email "full mutual releases, no carve-outs," that you

11  could sue a parent company of Tagnetics?

12  A     I never considered the topic, because as of the

13  date when we filed the petition, there was no parent

14  company.

15  Q     Did you have the understanding --

16  A     And you have not provided any evidence to the

17  contrary.

18  Q     Did you have the understanding that you could

19  sue a subsidiary of Tagnetics based on the provision

20  "full mutual releases, no carve-outs?"

21  A     I would assume that a mutual release would

22  include whatever was negotiated during -- obviously

23  when you're in the middle of a negotiation process,

24  you're not negotiating those minute terms.  Normally,

25  you --

117

1   Q      Did you have an understanding --

2   A      -- negotiate the key terms.

3   Q      -- of what the full mutual releases, no carve-

4   outs means to include a release or the opportunity to

5   sue a subsidiary of Tagnetics?

6   A      I wouldn't -- wouldn't have an opinion without

7   consulting an attorney.

8   Q      Did you have the understanding that the term

9   "full mutual releases, no carve-outs" allowed you the

10  opportunity to sue an affiliate of Tagnetics?

11  A      The same answer applies.

12  Q      Did you have the understanding that the term

13  "full mutual releases with no carve-outs" gave you the

14  opportunity to sue an officer of Tagnetics?

15  A      You continue to ask me questions, which I

16  wouldn't answer without consulting an attorney.  We

17  were not negotiating legal terms.  We are negotiating

18  the overall structure of a settlement.

19  Q      Mr. Kayser --

20  A      It's Dr. Kayser, if you don't mind.

21  Q      Did Mr. Hager at 3:58 p.m. on July 26th copy my

22  email and include you on the email, that included the

23  phrase "full mutual releases, no carve-outs?"

24  A      He did copy me on that email and his explanation

25  to me, he was just -- you'll have to ask him.  He had

118

1    an explanation. I expected a document to be

2    transmitted to us, while -- I wasn't involved in this

3    negotiation with you. I expected a document to be

4    transmitted to us, which was clear and concise.

5    Q     When you say a document that was clear and

6    concise, are you referring to the settlement agreement

7    that's Exhibit B?

8    A     You're not speaking clearly enough for me to

9    comprehend.

10   Q     Are you -- when you're saying a clear and

11   concise document, are you referring to Exhibit B?

12   A     Exhibit B?  You did promise us a rough draft of

13   this agreement by Monday.  Am I expecting that?  No, I

14   was expecting --

15            MR. STERN:  Objection, Your Honor, as non-

16   responsive.  I asked if the document he was referring

17   to was a clear and concise agreement, if that's Exhibit

18   B.  Nothing about timing is at issue here.

19            DR. KAYSER:  Are you speaking to me or is it

20   the Judge?  I don't understand.

21            MR. STERN:  I made an objection.

22            THE COURT:  I don't ask questions unless I

23   specifically ask a question.

24            DR. KAYSER:  He's looking at you.

25            THE COURT:  Mr. Stern is asking you a

**TAGNETICS (19-30822) 10-18-19**

119

1   question and, Mr. Stern, you can correct me if I

2   paraphrased you incorrectly.  I believe Mr. Stern is

3   trying to ask you is do you believe that Exhibit B is a

4   clear and concise document.  Is that correct, Mr.

5   Stern?

6          MR. STERN:  Thank you, Your Honor.

7          DR. KAYSER:  Is that a clear and concise

8   document?  Yes.

9   BY MR. STERN:

10  Q    Thank you.  Now, did you have an understanding

11  at the time on July 26, 2019, that Compass Marketing,

12  Inc. owned at least some shares of Tagnetics, Inc.?

13  A    I don't have -- don't have access anymore, and I

14  didn't look --

15  Q    That's not my question, sir.  Did you have an

16  understanding as of July 26th --

17  A    That Compass Marketing -- very few, at most,

18  yes.

19  Q    You didn't know how many shares, but you knew

20  that Compass Marketing owned some shares of Tagnetics,

21  Inc., correct?

22  A    Did I know that?  No, I did not.

23  Q    So you assumed it?

24  A    It was never discussed in a Board meeting.

25  Q    I'll ask my question again, sir.  As of July 26,

120

1   2019, was it your understanding that Compass Marketing,

2   Inc. owned at least some shares of Tagnetics, Inc.?

3   A     I answered that.

4   Q     Yes or no?

5   A     No.  It was not my understanding that Compass

6   Marketing had shares of stock.

7   Q     Okay.  Can you turn to Exhibit H?  The last

8   page.  Is that your signature under Kayser Ventures,

9   Inc., or I'm sorry, Kayser Ventures, LTD?

10  A     Yes, of course.

11  Q     And that agreement you signed, that's the

12  earlier settlement agreement in this case involving the

13  entity that you owned, which is Kayser Ventures, LTD,

14  correct?

15  A     That settlement --

16  Q     Is that correct?

17  A     I can't be sure unless I can understand you

18  clearly, so please try to enunciate.

19  Q     Is this the settlement agreement that you

20  signed, while it's redacted, is that your signature to

21  show the settlement agreement you signed on behalf of

22  Kayser Ventures, LTD, with Tagnetics, Inc.?

23  A     I don't understand the nuance of what you're

24  asking me.  Yes, I signed the settlement agreement.

25  Q     Is that your signature on the last page of

121

1  Exhibit H?

2  A     Yes.  I already testified to that.

3  Q     Okay.  Now, in that settlement agreement there

4  is a release by Kayser Ventures, LTD, correct?  It's on

5  Section 5.

6  A     I relied on the advice of my counsel, yes.

7  Q     And at that time that release included a release

8  of all Tagnetics' parent companies, corporate and

9  operating affiliates, subsidiaries and related

10 entities, including specifically Compass Marketing,

11 Inc., correct?

12 A     Yes.  However --

13 Q     Yes?

14 A     Can I respond?

15 Q     My question was does it include the release of

16 Compass Marketing, Inc., with that language that I just

17 read back?

18 A     Including, yes.  I see where it says, "including

19 specifically Compass Marketing."

20 Q     And you signed that agreement?

21 A     I did.

22 Q     Thank you.  You didn't object to the settlement

23 that released Compass Marketing, Inc., as a corporate

24 or operating affiliate or subsidiary --

25 A     My lawyer told me it was not a significant

122

1    issue.

2    Q      Okay.

3    A      And I had no -- Kayser Ventures had no dealings

4    with Kayser Ventures and Kayser Ventures was making no

5    claims against --

6    Q      Did you have the understanding that you could

7    sue -- on July 26, that you wanted the opportunity to

8    sue one of Tagnetics' officers or directors, if you

9    needed to?  That's a bad question.  I'll withdraw it.

10   Let me rephrase.

11          On July 26, 2019, when you saw the phrase "full

12   mutual releases, no carve-outs," was it your

13   understanding that you could sue an officer or director

14   of Tagnetics, Inc.?

15   A      On Kayser Ventures' behalf?

16   Q      No, on July 26, going back to the agreement in

17   your individual capacity?

18   A      Which agreement?  Which exhibit?

19   Q      Exhibit A.

20   A      Now repeat your question.

21   Q      Was it your understanding when you saw the

22   phrase "full mutual releases, no carve-outs," that you

23   had the right to still sue an officer or director of

24   Tagnetics, Inc.?

25   A      If we did a settlement, you're talking about?

1   Q      Yes.

2   A      No.

3   Q      Okay.  Now, earlier you testified that you were

4   the founder of the predecessor company of Tagnetics.

5   Is that DET?

6   A      It's what the name became.  We had some other

7   name prior to that, before Hobart bought it, but it was

8   DET while it was at Hobart.

9   Q      And then you testified that it was reorganized,

10  meaning it was put into bankruptcy?

11  A      What was put into bankruptcy?

12  Q      Did you put the predecessor company into

13  bankruptcy?  You said the phrase "reorganized" during

14  your testimony earlier.

15  A      It was not necessary.

16  Q      Did you put it into bankruptcy?

17  A      No.

18  Q      What did you mean when you used the phrase

19  "reorganized" during your testimony?

20  A      It was -- you'll have to ask Ron Earley to

21  testify about that.  I don't really know the

22  particulars of that, and I don't know exactly how it

23  was done.

24  Q      Prior to this proceeding today, did you

25  communicate with shareholders of Tagnetics, Inc. about

124

1    this proceeding?
2    A     Have I communicated with shareholders?
3    Q     Yes.
4    A     Not outside of people involved in the company,
5    or in this hearing, I mean.
6    Q     Outside of Mr. Hager and Mr. Earley, did you
7    communicate with any other shareholders of Tagnetics?
8    A     Ms. Goldsmith may be a shareholder.  I don't
9    know.
10   Q     Okay.  Did you communicate with Dan White at any
11   point about this proceeding?
12   A     No.
13   Q     No, you did not?
14   A     Since when?
15   Q     Prior to the filing of the petition for
16   bankruptcy?
17   A     Oh, I did, and -- because Dan White sent me an
18   email out of the blue.  I didn't even have his email
19   address until he sent me an email.
20   Q     And that email from Dan White out of the blue
21   was in early 2019.  January sound correct?
22   A     I don't have it in front of me, but it could
23   have been in January certainly.
24   Q     If I were to show you something to refresh your
25   recollection, would that help, such as the email that

**TAGNETICS (19-30822) 10-18-19**

125

1    you produced in discovery in this case?

2              MR. STERN:  Your Honor, may I approach?

3              THE COURT:  Yes, you may.

4    BY MR. STERN:

5    Q    Does this email that I showed you refresh --

6    A    This was in February, not January.

7    Q    I'm looking at an email dated Saturday, January

8    26, 2019, at 11:33 p.m., from Daniel White.  It says,

9    "Ken, I hope this email finds you doing well, as well

10   as you can."

11   A    Okay.

12   Q    Is that the email you're referring to that came

13   out of the blue?

14   A    I don't see any email here on January 19th.

15   Q    I said January 26, 2019.

16   A    January 26th?  Yes.

17   Q    Is that the email you're referring to?

18   A    Excuse me a second.  Would you hand me my

19   reading glasses?  Oh, I've got them in my pocket,

20   excuse me.  Yeah.

21   Q    Is that correct?

22   A    It's an email, says it's on January 19th.  Or

23   no, 26th.

24   Q    Is this the email you're referring to that you

25   got out of the blue from Mr. Daniel White?

126

1   A      Repeat your question.

2   Q      Is this the email you were referring to that you

3   got out of the blue from Mr. Daniel White?

4   A      Yes, there's an email from Daniel White, January

5   26.

6   Q      And then the email above that on February 19th,

7   does he encourage you to communicate with him in his

8   personal email account at danieljwhite@msn.com?

9   A      I'm sorry, Mr. Stern, I'm having trouble

10  understanding you.  I don't mean to be --

11  Q      At the top of the email --

12  A      Yes.

13  Q      -- there's an email from Mr. White to you, dated

14  February 19th, 2019, at 3:03 p.m.  Do you see that in

15  the upper right-hand corner?

16  A      February 19th, yes.

17  Q      And the first line of the email, at the very far

18  right, Mr. White says to you, Dr. Kayser, in his

19  opening sentence, and at the end of that first line

20  says, "Please use danieljwhite@msn.com; is that

21  correct?

22  A      Yes.

23  Q      Did you communicate with Mr. White on more than

24  one occasion after that email in January?

25  A      I wouldn't be certain without looking at my

1    records. We made a couple of attempts to get together.

2    Dan White had been a long time acquaintance of mine,

3    but we never did get together.

4    Q     Did Mr. Daniel White encourage you to file this

5    bankruptcy proceeding against Tagnetics?

6    A     My only recollection -- did he encourage me to

7    do this? No, absolutely not.

8    Q     Did he say that it was something that he thought

9    needed to be done?

10   A     He did not. He sent me one email saying you did

11   the right thing, but I don't remember the exact date on

12   which that was.

13              MR. STERN: Your Honor, may I approach?

14              THE COURT: Yes, you may.

15   BY MR. STERN:

16   Q     Do you recognize this email string that I just

17   handed to you? The top one is from you to Mr. White,

18   on March 22nd, 2019, at 5:18 p.m. And it says, "Hi,

19   Dan, let me know when. I would like to get together.

20   Ken." Underneath that there's an email from Mr. White

21   at his msn.com email account, to you. "Good afternoon,

22   Dr. Kayser." It's dated March 22nd, 2019, at 1:25 p.m.

23   It says, "I noticed your bankruptcy filing online and

24   did share it with my brother, Mike." FWIW, I think.

25   It says, "It is certainly understandable from my

128

1    perspective and a necessary action."

2    A    Yes.

3    Q    Did you discuss the bankruptcy filing with

4    Daniel White prior to you filing?

5    A    No.

6    Q    Why did -- do you know why he knew to look it up

7    to see if it was filed?

8    A    He's an attorney and he is breaking off with his

9    brother and there's all sorts of legal action being

10   taken, and he probably follows all of it.  I don't

11   know.  You'll have to ask him.

12   Q    Okay.

13            MR. STERN:  Your Honor, if I may have one

14   second?

15            THE COURT:  Yes, you may.

16            MR. STERN:  Your Honor, I have no further

17   questions.

18            THE COURT:  Thank you, Mr. Stern.

19            DR. KAYSER:  Am I done, Your Honor?

20            THE COURT:  Do you wish to present any

21   redirect examination of yourself, based upon Mr.

22   Stern's cross-examination?

23            DR. KAYSER:  Not particularly, no.

24            THE COURT:  All right.  Then you may be

25   excused from the witness box.

**TAGNETICS (19-30822) 10-18-19**

1         THE CLERK:  Dr. Kayser, you can hang on to

2   those when you're over here, if it helps you hear.

3         DR. KAYSER:  All right, thank you.

4         THE COURT:  Mr. Kayser, do you wish to call

5   any other witnesses in your case?

6         DR. KAYSER:  One moment, Your Honor.  Yeah,

7   I'd like to call Ron Earley, please, Your Honor.

8         THE COURT:  You may do so.

9         THE CLERK:  I just want to remind you, you're

10  still under oath, sir.

11        MR. EARLEY:  I acknowledge that.

12        DIRECT EXAMINATION OF RONALD EARLEY

13  BY DR. KAYSER:

14  Q    Mr. Earley --

15  A    Can you ask me questions?  I'm not sure you can

16  ask me questions.

17        THE COURT:  Yeah, he can ask you questions in

18  his case.

19        MR. EARLEY:  Okay.

20  BY DR. KAYSER:

21  Q    Were you a participant in the drafting of the

22  original agreement sent by me on July 20th?

23  A    Yes, I was.

24  Q    Were you approached by Mr. Stern with an offer

25  of settlement, or negotiating settlement?  After July

130

1   20th -- let me restate the question.

2   A     All right.

3   Q     After July 20th were you negotiating terms for

4   restructuring of the timetable for the payments?

5   A     Yes, I was.

6   Q     Did you discuss what the boundaries of what you

7   were negotiating with both Jon Hager and I?

8   A     Yes, I did.

9   Q     Did those boundaries include any renegotiation

10  of the terms described in the July 20th letter, other

11  than the financial part of it?

12  A     No.  We were addressing what seemed to be the

13  concerns of Tagnetics, as they initially told us that

14  our -- that your letter that you sent on the 20th was

15  out of bounds, and they could not even get close to the

16  cash for that.  Then they sort of -- we were encouraged

17  to come back with a counteroffer, and obviously we were

18  focused on the cash, because that's the area that they

19  were also most focused on.

20  Q     Did you at any time believe that the terms and

21  conditions from the July 20th letter, other than the

22  financial, were ever being discussed?

23  A     No.

24           DR. KAYSER:  Your Honor, I have no other

25  questions.

131

1           THE COURT:  Thank you, Mr. Kayser.  Any
2    cross-examination for Mr. Earley?
3           MR. STERN:  Your Honor, if I may, just to
4    streamline this, maybe just wait until -- I assume Mr.
5    Earley is going to testify himself.  If there's going
6    to be more testimony later on, rather than do his
7    piecemeal, do it all at once.
8           THE COURT:  That's fine.  Mr. Earley, do you
9    intend on testifying in your own case?
10          MR. EARLEY:  I absolutely do.
11          THE COURT:  All right.
12          MR. STERN:  Then I'll just reserve until
13   then.
14          THE COURT:  He will reserve all his questions
15   for you at that time.
16          MR. EARLEY:  Perfect.
17          THE COURT:  The Court accepts that and
18   agrees.  Mr. Kayser, do you wish to call any other
19   witnesses in your case?
20          DR. KAYSER:  I don't think that's necessary,
21   Your Honor.
22          THE COURT:  Okay.  Thank you.  Any other
23   evidence then, Mr. Kayser, that you wish to introduce
24   in your case?
25          DR. KAYSER:  No.

1          THE COURT:  We've admitted Exhibits 3 and 4,

2     I believe it was.

3          DR. KAYSER:  Yes.

4          THE COURT:  Okay.  All right.  Then Mr.

5     Kayser, you rest your case?

6          DR. KAYSER:  I do.

7          THE COURT:  Okay, thank you.  Mr. Earley or

8     Mr. Hager, one of you want to proceed with your case?

9          MR. EARLEY:  Yes.

10          DIRECT TESTIMONY OF RONALD EARLEY

11          MR. EARLEY:  So now that you've met Mr.

12     Kayser, you can understand that he has a low

13     frustration rate.  So once we got through the letter of

14     the 20th, and this is all in Exhibit A, we got through

15     the letter from Mr. Kayser to Mr. Stern on the 20th,

16     and then Mr. Stern's response to Mr. Kayser on the

17     23rd.  Mr. Hager and Mr. Kayser and I had several phone

18     conversations and discussions, and we decided that I

19     would make an attempt to put together a payment

20     structure that Tagnetics might be able to agree to.

21          So on July 23rd at 1:33 I sent Mr. Stern an

22     email outlining a payment structure that would spread

23     out the payments.  It would not change the final

24     amount, but would spread out the payments over a two-

25     year period and, in fact, put some of the total payment

133

1  into an undetermined category, to be paid if and when
2  there was a liquidity event.
3         So we felt like this was a significant move
4  towards their trying to reach a settlement, because we
5  had gone from demanding, as you know, $186,000 for me,
6  151,000 for Mr. Kayser, 148,000 for Mr. Hager.  We went
7  to a settlement agreement would pay each of us $50,000
8  in the initial payment.  There would be two sub-
9  payments of $25,000, spread across six months, and then
10 there would be a -- the remainder would be paid out, if
11 and when the company had a liquidity event.
12        Mr. Stern -- and at this point I'm focused on
13 the cash, because he has told us, both in his emails
14 and in phone conversations we've had, that the company
15 just can't afford this.  He was sort of making our case
16 for us, as we look back to the bankruptcy filing.
17        And so we were trying to figure out a way,
18 because Jon and I actually preferred the settlement.
19 Mr. Kayser, on the other hand, we had to drag him to
20 that situation.  Mr. Stern came back to me in the
21 afternoon, later in the afternoon, and he thanked me
22 for putting together a structure that was closer in
23 line with what the company could pay, but basically
24 said there's no way we can make the initial payments.
25 And he suggested in his email of July 24th at 5:57 in

134

1    the -- it says, and I'm reading, "Initial payment of
2    $5,000, not $50,000, to each of you, within five
3    calendar days of you dismissing your claim."  And, of
4    course, when I saw that and after I had a moment -- not
5    very -- a while to discuss that with Jon and Ken, you
6    know, we said, you know, this is crazy.  They just paid
7    $90,000 to settle the claim with the other defendants,
8    and here they're asking us to take $5,000, and there's
9    no guarantee that we're going to get any additional
10   money.
11            And so that's what prompted me to write back
12   and say no chance.  Now, no chance to me means no
13   chance we'll accept your offer, or your counteroffer.
14   No chance doesn't mean that we're terminating the
15   negotiations.  It's just that you're so far down that
16   we can't really -- we're not even going to consider
17   that.
18            And then he came back to me, and as the week
19   goes along seems like he's more willing to talk to us.
20   He says he thinks it's silly that we've cut off
21   negotiations.  Well, we haven't cut off negotiations.
22   We were just responding to his weak offer, and we were
23   saying look, this doesn't seem like you're really
24   serious about settling this with us.
25            So after we received that email, I went back

1   and had conversations with Mr. Kayser and Mr. Hager,

2   and we talked about what would be best for us, and what

3   we would be willing to do, and we proposed a second

4   payment schedule. And that payment schedule was,

5   instead of $50,000 up front, we said well, you paid

6   KBL, you paid Bob Strain, and you paid S-Tek a total of

7   $90,000. Seems like it's reasonable that if you'll pay

8   us $90,000, as the initial payment, 30,000 apiece, then

9   we're willing to reduce our payments or spread out our

10  payments, and I proposed that to Mr. Stern.

11          We had a phone conversation after I proposed

12  that, and he said I'm willing to take this back to

13  management of Tagnetics, but is there any way you can

14  give me something? I mean, that was pretty much we're

15  negotiating. He said give me something. So I said,

16  look, I think, you know, we would be willing to push

17  out the second and third payments an extra six months.

18          So instead of paying the second payment in

19  six months and the third payment in 12 months, I'll go

20  back and sell the idea that we'll give you one year to

21  make the second payment, and we'll give you -- and the

22  third payment will be an additional six months, to 18

23  months, and oh, by the way, we still will allow the

24  balances of what we would like paid to be put in a

25  bucket and we'll only get that money if the company is

1  liquidated or has a liquidity event.

2          And at that point it seemed like we were

3  really close.  And, of course, as you know, it was

4  Friday and the closer we got to Friday afternoon and

5  the Court closing, and facing the fact that we were all

6  going to have to be in here on Monday morning, Mr.

7  Stern -- we all three had a conference call.  We talked

8  about this -- we talked about -- why does that do that

9  to me?  Come on, Ron.

10          The timing was right, the money was right,

11  and we talked about notifying the Court, but also --

12          MR. HAGER:  Mutual release.

13          MR. EARLEY:  Mutual release, right, and there

14  was discussion about that.  And so -- oh, and Mr. Stern

15  -- we asked for a full mutual release.  Mr. Stern

16  advised us that he didn't think his client would do

17  that and, in fact, he said to us very clearly, I would

18  advise against that.  I wouldn't even advise them to

19  give you a clear full release.  And we said well, you

20  know, we're right down to the wire here.  We want that

21  release, and let us know what they say.

22          So he took it back to them.  He called -- he

23  called -- must have been me back, and let me know that

24  they would accept that, and then I got ahold of Jon.

25  At the same time I was on my way here to the court to

137

1    file what we believed was going to be a settlement

2    agreement. And so he couldn't -- I wasn't in front of

3    my computer. There were some things going on. I

4    wasn't able to stay completely in touch with him. My

5    wife won't let me drive and text at the same time. I

6    don't know why she won't let me do that. But so I was

7    restricted in what I was able to do, but I was here.

8    Jon was on his computer. Ken was out -- out of pocket.

9    And we notified the Court we had a settlement.

10             At that moment, I believed that what we had

11   reached was an agreement that included the preliminary

12   information we put in, the July 20th, as well as the

13   cash settlement, which we had worked so hard to

14   negotiate, and I expected that we would be able to wrap

15   that up within a week or two. And I felt like that --

16   that we had -- we had all agreed that we wouldn't -- we

17   wouldn't allow the trial to be canceled, unless we all

18   three felt like we had a settlement we could live with.

19   And we all agreed we had a settlement we could live

20   with, and we were disappointed when we got the

21   settlement agreement, because to us it seemed like it

22   was -- there were -- that we lived in two worlds.

23             So that's all I have.

24             THE COURT: Okay. Are there any exhibits,

25   Mr. Earley, which you wish to introduce, other than

138

1   what's already been introduced and admitted?

2           MR. EARLEY:  No, sir.  Everything I talked

3   about has been admitted.

4           THE COURT:  Okay, thank you.  Mr. Stern, it

5   appears you may want to cross-examine Mr. Earley?

6           MR. STERN:  Yes, a few questions, Your Honor.

7           CROSS-EXAMINATION OF RONALD EARLEY

8   BY MR. STERN:

9   Q    Mr. Earley –

10          MR. STERN:  By the way, before I forget, Mr.

11  Kayser, where is the binder that I handed to you?  Is

12  that still up on the witness stand?

13          DR. KAYSER:  Where did I find what?

14  BY MR. STERN:

15  Q    Mr. Earley, do you have the exhibits in front of

16  you?

17  A    No, I don't.

18  Q    How about I just hand you this?

19  A    That would be perfect, yeah.

20          THE COURT:  You may do so.

21          MR. EARLEY:  Absolutely, that would be

22  wonderful.

23  BY MR. STERN:

24  Q    All right.  Mr. Earley, can you turn to Exhibit

25  A on Page 3?  You're describing the email at one point

1    during your testimony on -- you were describing the

2    email on July 24th at one point during your testimony,

3    where you said, "No chance," and --

4    A    Yes, sir.

5    Q    And if I remember, if I describe your testimony

6    correctly, you said, in your mind, you were not cutting

7    off negotiations at that point.  That's an inaccurate -

8    - so my email above, where I said, "to simply cut off

9    negotiations," you're saying is an inaccurate response?

10   I misinterpreted your email; is that correct?

11   A    Yes.

12   Q    All right.  But when you said "No chance," the

13   very next line in your email, July 24th, said, "Look

14   forward to meeting you on Monday."

15   A    Yes.

16   Q    Meaning see you in court?

17   A    Yes, because I didn't believe there was enough

18   time for us to get to a settlement.

19   Q    So you thought settlement negotiations were done

20   at that point in time, correct?

21   A    No, not particularly cut off, just didn't think

22   the timing was right.

23   Q    So you thought there was no way we could get a

24   deal done --

25   A    Right.

**TAGNETICS (19-30822) 10-18-19**

140

1  Q      -- before the trial?

2  A      I didn't think so.

3  Q      Okay.

4  A      But that doesn't mean that we weren't willing to

5  try and we weren't trying to keep the ball moving

6  forward.

7  Q      Did you offer a counter proposal in your email

8  of July 24th to me, where you said, "No chance, see you

9  on Monday?"

10  A      Absolutely.

11  Q      Where is the counteroffer on your July 24th

12  email?

13  A      No, on the July 24th email, I offered no counter

14  proposal.

15  Q      Okay.

16  A      But we were -- but we responded to your 25th

17  email quickly with a counter proposal, focused fully on

18  how much cash Tagnetics could afford to hand us.

19  Q      You're referring to your email to me on July

20  25th, 2019 at 1:25 p.m.?

21  A      Absolutely.  There's nothing here that indicates

22  that something is brand new.  This is a continuation of

23  what we were doing.

24  Q      In your email on July 25th, 2019 at 1:25 p.m. --

25  A      Mm-hmm.

**TAGNETICS (19-30822) 10-18-19**

141

1   Q       -- does your email -- does that email refer to

2   the email of July 20th, 2019, that Mr. Kayser had sent?

3   A       No, sir.  No.

4   Q       Okay.  Did you -- does that email of July 25th,

5   2019, at 1:25 p.m., from you to me, does that reference

6   any of the prior terms that were discussed in Mr.

7   Kayser's July 20th email?

8   A       No, sir.

9   Q       Does it reference any non-monetary terms in that

10  email at that point in time?

11  A       No, sir, and the reason is is because that was

12  our focus.

13  Q       Okay.

14  A       I was given --

15  Q       I was just asking whether or not you mentioned

16  that.  Now, earlier you testified that you and I were

17  discussing the concept of full mutual releases,

18  correct?

19  A       Yes.

20  Q       And you had said that it was something important

21  to you, that you asked for the full mutual releases,

22  correct?

23  A       So we -- so surrounding our employment

24  agreements, which this whole case is about, we were --

25  we were -- it was important to us that there be a

1  release from our -- from anything inside that contract
2  that bound us.
3  Q    If I remember correctly, during your testimony
4  you had said you had brought up the concept during our
5  discussions on July 26th about full mutual releases.
6  A    Well, I had brought up the concept of a release.
7  I'm not sure full mutual releases is what I did, but I
8  may have said that.
9  Q    That's --
10 A    But I'm not sure.  So if I did, it might have
11 been the first or second time I've ever used that term
12 in my life, so --
13 Q    Okay.
14 A    -- for me to have told you, we're really
15 concerned about full mutual release would have been
16 completely out of my engineering, what I do for a
17 living.
18 Q    But that is something that we discussed?
19 A    We did discuss the release, there's no question.
20 Q    And you agree that mutual releases are non-
21 monetary terms, correct?
22 A    Mutual release is a non-monetary term.
23 Q    And during that discussion that you and I had on
24 the phone, where we were discussing the full mutual
25 releases, did you bring up any of the other non-

1   monetary terms that Mr. Kayser mentioned in his July

2   20th email?

3   A     No, but there's a good reason.

4   Q     Yes or no, did you bring them up?

5   A     No, I didn't.

6   Q     Did you -- during those conversations did you

7   bring up any other payments than what we were

8   discussing in what ultimately became that chart that

9   you included in your July 25th email?  Did we discuss

10  any other monetary terms, other than what's reflected

11  on that chart?

12  A     The answer is no.

13  Q     Okay.

14  A     It was the only hurdle that we were working on.

15  Q     Then on July 26th, 2019, at 3:27 p.m., my email

16  to you -- Page 1 of Exhibit A, my email to you, Mr.

17  Kayser and Mr. Hager, set forth the key terms, and do

18  you agree that this set forth the key terms that we

19  discussed?

20  A     I agree these set forth the key terms that we

21  had been negotiating and hadn't agreed to, to this

22  point.

23  Q     And then is it an accurate statement in the

24  email from Mr. Hager to me on Page 1 of Exhibit A, on

25  July 26, 2019, at what appears to be 3:56 p.m., where

144

1   Mr. Hager says, "I am responding for Kayser, Earley and

2   Hager, saying we agree to the terms put forth as

3   documented above."  Really meaning below.  Is that an

4   accurate statement, that he was authorized to speak for

5   you at that point in time?

6   A     Yes, he was.

7               MR. STERN:  No further questions, Your Honor.

8               THE COURT:  Thank you, Mr. Stern.

9               MR. STERN:  I'm sorry.  Can I approach, Your

10  Honor, to get the binder back?

11              THE COURT:  Yes, you may.

12              MR. STERN:  Thank you.

13              THE COURT:  Mr. Earley, do you wish to

14  provide any redirect examination of yourself in

15  response to Mr. Stern's cross-examination?

16              REDIRECT TESTIMONY OF RONALD EARLEY

17              MR. EARLEY:  So my only -- my redirect is

18  that obviously if you follow this email train from the

19  20th through the 26th, when we agreed to it, it's clear

20  that there was a very limited focus to what we -- what

21  we and Tagnetics had not agreed to, and it was about

22  the cash.  Their initial push-back was we can't afford

23  that, we don't have the cash.  And the cash, cash,

24  cash.  So we became focused on getting the cash and

25  making the assumption on what that means, that the

1  terms that Mr. Kayser had put forth on the 20th,
2  because they were not specifically rejected, were still
3  in play.
4          That's all I have.
5          THE COURT:  Thank you, Mr. Earley.  Stay
6  there.  Stay there.
7          MR. EARLEY:  I'm sorry.  Thank you.
8          THE COURT:  Stay there.  Any recross-
9  examination?
10         MR. STERN:  No, Your Honor.
11         THE COURT:  Okay, now still stay there.
12         MR. EARLEY:  I am.
13         THE COURT:  Okay.  I've got the same two
14  questions for you that I asked Mr. Stern, when he was
15  on the stand.
16         MR. EARLEY:  Yes, sir.
17         THE COURT:  The first was -- and I think this
18  is particular relevant for you, since I think you're
19  the one who came up with this payment chart.  What does
20  liquidity event mean in your payment chart?
21         MR. EARLEY:  So liquidity to me means that if
22  there was a cash transaction or a transaction that --
23  where ownership of the company, 50 percent or 50.1
24  percent of the company changed from its current
25  ownership to a new ownership, then that's a liquidity

1    event, and we would expect to be paid out of that

2    transfer.  Because in general what happens during those

3    transfers is someone is putting a bunch of money in to

4    get the 51 percent that they need to control the

5    company.  So that to us is a liquidity event, whether

6    it happens through a stock swap, whether it happens by

7    someone buying up a bunch of options.  It really

8    doesn't matter how it happens.  It's when there's a

9    major cash event, where cash becomes available, to pay

10   previous creditors and along that line, and it

11   anticipates that that could still happen.

12          THE COURT:  Okay.  My second area was the

13   stock.

14          MR. EARLEY:  Mm-hmm.

15          THE COURT:  What was your understanding as to

16   the effect of a settlement -- if a settlement was

17   reached on July 26th, as to any stock or equity

18   interest, which you held in the company?

19          MR. EARLEY:  So my -- my -- well, clearly I

20   don't believe that Tagnetics has the capability to wipe

21   out my stock ownership.  I paid cash for it.  I own it.

22   It's in my name.  I've got the certificates.  I possess

23   them.  It's hard for me to believe that they can wipe

24   that out on the settlement.  It's also probably not a

25   legal thing they could do.

1          Number two, all the other equity I have in

2     the business I realize is at stake, and so the only way

3     that I would expect to get the other payments is if the

4     company were successful, or if someone came in and

5     decided to throw a lot of cash at it to try to make it

6     move forward.  But from a stock standpoint, what we

7     were asking for was nothing more than just acknowledge

8     that we have it, acknowledge that it's there.

9          But I don't believe they can touch -- there's

10    -- yeah, I believe there are laws that would keep them

11    from stripping us from our stock, just because we

12    settled an employment contract.  They are completely

13    two different things.

14          THE COURT:  Okay.  Thank you, Mr. Earley.

15    Any questions based upon the Court's questions, Mr.

16    Stern or Mr. Kracht?

17          MR. STERN:  No, Your Honor.

18          THE COURT:  Okay, thank you.  Mr. Kayser, any

19    questions for Mr. Earley, based upon my questions of

20    Mr. Earley?

21          DR. KAYSER:  No, sir.

22          THE COURT:  Mr. Hager?

23          MR. HAGER:  No, sir.

24          THE COURT:  Okay.  Thank you, Mr. Earley.

25    Now you may leave the witness box.

148

1          MR. EARLEY:  Thank you, Your Honor.

2          THE COURT:  Appreciate your participation.

3    Is there any other evidence, Mr. Earley, which you wish

4    to present in your case?

5          MR. EARLEY:  I'm going to turn it over to Mr.

6    Hager.

7          THE COURT:  Okay.  Thank you, Mr. Earley.  I

8    guess the floor is yours, Mr. Hager.

9          MR. HAGER:  Thank you, Your Honor.  I'll do

10   my best to keep it brief.

11         THE CLERK:  I just want to remind you, as

12   well, you're still under oath.

13         MR. HAGER:  Yes, understood.

14         DIRECT TESTIMONY OF JONATHAN HAGER

15         MR. HAGER:  I guess without regurgitating the

16   same story, I suppose, it was my understanding on July

17   26th that that was the culmination of the negotiation

18   for a portion of the proposal from July 20th, from Dr.

19   Kayser.  It was the portion that was raised

20   specifically at issue by Mr. Stern, to say that the

21   company was short on cash, they could not afford those

22   type of cash payments at this time.  Specifically, he

23   said at this time.

24         So as Mr. Kayser said, we talked with Mr.

25   Earley and he agreed that he would be the point person

1   to negotiate that cash settlement.  We agreed to kind

2   of meet Tagnetics part way to say we could go ahead and

3   come up with a schedule.  We continued down that path

4   of, I won't say giving in, but kind of compromising on

5   a number of things, to try to meet the goals that

6   Tagnetics was looking for, saying that they were short

7   on cash and needed something more reasonable.

8           I do believe we came up with something very

9   reasonable.  Nowhere in the initial response from the

10  July 20th proposal was there a specific call-out to say

11  these other terms that were required by Mr. Kayser's

12  proposal, that those were off the table.  That was

13  never mentioned.  It was never mentioned in any of the

14  other following discussions.  I understand Mr. Stern

15  says we did not re-mention it.  He never brought -- was

16  -- brought any disagreement to it, so we didn't feel

17  that was a topic that needed to be fine-tuned,

18  especially at the 11th hour, when we were trying to be

19  cognizant of when the court was going to close, which

20  would obviate the need for us to come here for court.

21          The only other point I guess I wanted to

22  include in here was that when -- we understood we would

23  see a draft agreement over the weekend, or by Monday,

24  and we didn't.  So on Tuesday I went ahead and

25  restated, summarized what we believed the agreement

150

1   should include, and I sent it to Mr. Stern.  Previous

2   testimony, he said he doesn't recall receiving that or

3   doesn't recall reading that.  And then there was no

4   response to that email.

5          We then got the draft agreement and in that

6   response to the draft agreement, I pointed out the same

7   issues.  I said, these are the things that are missing

8   in this draft agreement, which we believe we had

9   already agreed to.

10         At that point, and in testimony the statement

11  was these were new claims, these were new requirements,

12  these were things that were out of scope from the

13  agreement.  And I guess my point is that the email of

14  that Tuesday, I believe it was July 30th, demonstrated

15  that we were under the understanding of what we had

16  agreed to on Friday, conclusive of the July 20th email

17  and the modifications going into July 26, and we again

18  stated that again, after receiving the draft agreement.

19         There is one other point I wanted to make

20  about the draft agreement.  A draft, as my

21  understanding, means it's something that is welcome to

22  be modified or discussed.  And in my response, after

23  receiving the draft agreement, I even pointed out a

24  small fact, that the address that was listed for me in

25  that agreement was incorrect, and I had filed that

151

1  address change with the court many, many weeks before.

2  In fact, months before.  And all the correspondence

3  that I was receiving at home was going to the correct

4  address.

5           And I see in the evidence or exhibits

6  supplied to the court, that address still hasn't even

7  been changed.  So in other words, the draft agreement

8  has never been modified from the first day it was sent

9  to us, even after we had raised issues with it, and

10  wanted to discuss changes to it.

11          So I guess my concerns about this are that we

12  put forth a very good effort, I believe, to negotiate a

13  settlement in the hopes that Tagnetics could not only

14  have an option to succeed, but also pay their debts to

15  us, and that in response there really wasn't any

16  concerted effort to refine that agreement into

17  something that was acceptable.

18          THE COURT:  Okay.  Thank you, Mr. Hager.  Are

19  there any exhibits which you wish to introduce, which

20  have not already been introduced and admitted?

21          MR. HAGER:  If Exhibit 5 was already

22  introduced, I know we discussed it earlier.

23          MR. EARLEY:  Yes.

24          THE COURT:  So Exhibit 5 was admitted?

25          MR. HAGER:  It was the one that we had to get

152

1   a new copy of.

2           THE COURT:  I know 3 and 4 were admitted.  3

3   and 4 was admitted.  I do not believe 5 was admitted.

4           MR. HAGER:  Well, I'd like to admit 5,

5   because that has that email exchange on the -- on July

6   30th and past that.  The one that was recopied by the

7   Court.

8           THE COURT:  Is there an objection, Mr. Stern,

9   to --

10          MR. STERN:  I just want to make sure I'm

11  understanding.  Are you referring to the July 30th

12  email, if I remember correctly?

13          MR. HAGER:  Right.  We discussed the July

14  30th email, when you were on the stand.  And that's

15  what we had to re-photocopy.

16          MR. STERN:  If they want to admit that, I

17  have no objection to it being entered.  I just wanted

18  to be clear.

19          THE COURT:  Yeah, I want to be clear too.

20  Are we just talking -- was the July 30th email part of

21  a series of emails?

22          MR. HAGER:  Yes.

23          THE COURT:  So are you just seeking admission

24  of the July 30th email or the whole group?

25          MR. HAGER:  I mean, I guess the whole group

153

1    of Exhibit 5, but most of Exhibit 5 is in your Exhibit

2    A, I believe.

3              MR. STERN:  I think what happened, Your

4    Honor, if I may, and obviously if I'm wrong, please --

5    looks like the printout here cuts off some of the

6    earlier string, but it seems to allude to an earlier

7    part of the string, that goes back to either my August

8    14th -- no, it couldn't be the August 14th email.  I'm

9    not really sure what it goes back to, but it looks like

10   there's a reference to some earlier emails that just

11   are not part of or printed out as the exhibit.  And so

12   that's why I'm a little unclear as to what we're really

13   looking at.  Nevertheless, he's testified he sent me

14   that email.  I personally don't see it being relevant

15   to whether or not there was an agreement in place, but

16   I'm not going to really object to what -- to its

17   admission, if they want to get it admitted into

18   evidence.  If he's testifying that he sent it to me,

19   I'm not in a position to refute that.  I don't think

20   it's relevant to whether or not we had an agreement on

21   July 26th.  So if he wants that admitted, I'm going to

22   say as long as it's the email on July 30th or after,

23   I'll agree to its admission.  Does that make sense?

24             THE COURT:  Does it include emails prior to

25   July 30th?

154

1          MR. HAGER:  Yes.  Exhibit 5 included from the

2    beginning, July 20th, all the way through to, I

3    believe, August 3rd or 5th or, no, past that, all the

4    way through to the draft agreement and so on, and their

5    Exhibit A didn't include that portion, past July 26th.

6          MR. STERN:  Your Honor, as I'm looking at it

7    a little bit more closely, I don't want to be

8    difficult, but the way this is printing out, it's got

9    an August 1 email after July 30th email, so I'm not

10   really sure how this string is working and what's

11   really being included, so I -- my colleague and I are

12   trying to -- Mr. Kracht and I are trying to look at

13   this and try to understand it.  It's an odd printout,

14   not the way emails normally go, in reverse

15   chronological order, and we're really having trouble

16   making sense out of this.  And honestly, I don't

17   remember a lot of this stuff, and so I'm at a little

18   bit of a disadvantage.

19         MR. HAGER:  That's your correct address in

20   that statement.

21         MR. STERN:  It does.  I mean -- it does have

22   my email address there and that is my email,

23   stern@kaganstern.com.  That is correct.  You know,

24   that's why I say -- let me confer with Mr. Kracht for a

25   minute.

```
 1          THE COURT:  Yeah, that's fine.
 2          MR. STERN:  So as I've talked with Mr.
 3  Kracht, we're not going to object to the admission, as
 4  long as it's limited to the -- what we're seeing is
 5  only emails from July 30th afterwards.  I'm not seeing
 6  anything prior to that.  We're not seeing --
 7          THE COURT:  It appears to me the first one is
 8  July 19th, at least at the top of my Exhibit 5.
 9          MR. HAGER:  Yeah, the emails prior to the
10  30th would be the 26th.
11          MR. STERN:  Does this continue through with
12  the 26th, and then more after that?
13          MR. HAGER:  Correct.
14          MR. STERN:  If that's the case, then we're
15  not going to object, Your Honor.
16          THE COURT:  Okay.  Then the Court will admit
17  Petitioning Creditors' Exhibit 5, which, from what I'm
18  reviewing, starts with a July 19th, 2019 email at 4:14
19  from, I believe, Mr. Stern, yeah, to Ken, and then it
20  goes to emails through -- let's see here -- appears to
21  be Friday, August 2nd, I believe.  Sunday, August 4th.
22  Yeah, Sunday August 4th, I think is the last --
23          MR. STERN:  That sounds correct, Your Honor,
24  is the last one in the string.
25          THE COURT:  Okay.  Then the Petitioning
```

**TAGNETICS (19-30822) 10-18-19**

156

1   Creditors' Exhibit 5 is admitted.

2          (Petitioning Creditors' Exhibit 5 received

3   into evidence.)

4          THE COURT:  Anything else you wish to -- any

5   other exhibits you wish to admit?

6          MR. HAGER:  No.  No, Your Honor.

7          THE COURT:  Okay.  Is there any cross-

8   examination, Mr. Stern or Mr. Kracht?

9          MR. STERN:  Just really briefly.

10          CROSS-EXAMINATION OF JONATHAN HAGER

11   BY MR. STERN:

12   Q    I think, Mr. Hager, you, I think, acknowledged

13   the point on your testimony, I just want to be clear.

14   None of the emails on July 26th from you to me did you

15   make any specific reference to any of the contents of

16   the July 20th email from Mr. Kayser, correct?

17   A    I did not.

18          MR. STERN:  No further questions, Your Honor.

19          THE COURT:  Okay, thank you, Mr. Stern.  Any

20   redirect examination of yourself, Mr. Hager, based upon

21   that question?

22          MR. HAGER:  No, Your Honor.

23          THE COURT:  I just have the same questions.

24   Is there any other different testimony you would

25   provide or information you'd provide with respect to

157

1    the definition of liquidity event?

2              MR. HAGER:  No, consistent with what I saw in

3    the draft agreement, I believe was what I also included

4    in that email on July 30th, as out of our employment

5    contracts.  I think the wording is similar or the same.

6              THE COURT:  And what about the stock

7    ownership issue, what is your -- do you have any --

8    what's your belief that any impact of a July 26

9    settlement, if there was a July 26 settlement, would

10   have on your stock or equity interest in Tagnetics?

11             MR. HAGER:  My understanding, correspondence

12   or agreement on July 26th would not affect any stock

13   ownership.  Unfortunately, my stock ownership was

14   diluted quite far and the stock options, which I

15   understood would no longer be valid, but --

16             THE COURT:  Okay, thank you, Mr. Hager.  Any

17   additional questions based upon the Court's questions?

18             MR. STERN:  No, Your Honor.

19             MR. EARLEY:  No, Your Honor.

20             THE COURT:  Either Mr. Kayser or Mr. Earley?

21   No.

22             MR. EARLEY:  No.

23             THE COURT:  Thank you, Mr. Hager.  Appreciate

24   your participation.  Any other evidence you wish to

25   present, Mr. Hager?

**TAGNETICS (19-30822) 10-18-19**

158

1        MR. HAGER:  No, thank you.

2        THE COURT:  Thank you.  I believe that

3    concludes everybody's cases; is that correct?

4        MR. EARLEY:  Yes, sir.

5        THE COURT:  Now, let's see.  It is -- what

6    time is it?  I'm trying to wake up my computer here.

7        THE CLERK:  2:38, Your Honor.

8        THE COURT:  2:38.  Now, do you wish to make

9    brief closing arguments or do you wish to waive closing

10   arguments?  Do you wish to file any post-trial brief or

11   memorandum in lieu of oral -- of arguments today?  I'll

12   leave it all up to you.  You're the ones who have to

13   travel.  So --

14       MR. STERN:  Your Honor, we'd be fine with

15   just brief closing arguments.  We want to just confirm

16   the exhibits that have been admitted.  It's our

17   understanding that our Exhibits A through I have been

18   admitted, except for Exhibit E.

19       THE COURT:  That's correct.

20       MR. STERN:  And then for the Petitioning

21   Creditors, they've had 3, 4 and part of 5 admitted.

22       THE COURT:  3, 4 and all of 5.

23       MR. STERN:  All of 5.

24       THE COURT:  3, 4 and 5, yes.

25       MR. STERN:  Just wanted to make sure that

1    we're in agreement as to what the exhibits were.

2              THE COURT:  Yeah.

3              MR. STERN:  If I may then, Your Honor?

4              THE COURT:  Yes, you may.

5              MR. STERN:  Thank you.  Your Honor,

6    notwithstanding the protestations to the contrary by

7    the Petitioning Creditors, the email string is clear

8    that they never included any reference or any notice

9    that those terms of that July 20th email that they're

10   referring to carry through in any respect.

11             To say that "See you in court on Monday"

12   means anything other than negotiations are terminated,

13   again, seems to defy logic.  And they had multiple

14   opportunities to reference those other terms that they

15   are now seeking to include.

16             And it further defies logic, when you see the

17   term "full mutual releases, no carve-outs," or as you

18   saw in the email where it says "Total settlement

19   payment," they're referring to other loan payments.

20   That's either some other payment beyond the total

21   payment that's in there, or it's a carve-out or

22   exception to the full mutual releases.  No matter how

23   you slice it, there's an inconsistency there with both

24   those terms.  That cannot be.

25             And yet they repeated it not once, not twice,

1    but three times in those emails from Mr. Hager to me,

2    on July 26th.  It's really clear that those terms are

3    reflected on the July 26th email.  The settlement

4    agreement that I drafted is consistent with that email.

5    Even Mr. Earley's description of what a liquidity event

6    was is consistent with the terms that were written in

7    there.  Not even objecting to that.

8            But they're seeking additional payments that

9    are beyond the total, capitalized total, that's

10   reflected in Exhibit A.  I'm sorry, Exhibit I.

11           And they are also seeking additional payments

12   beyond what's reflected there, which would be some sort

13   of carve-out.  You cannot have a full mutual release,

14   no carve-outs, and then say but, later on, well,

15   there's this other payment, this other loan, this

16   licensing agreement.  That's inconsistent on its face.

17   They cannot claim ignorance of what that term means and

18   expect to be -- to negotiate and then say well, we

19   didn't understand that, later on.

20           I repeated not once, not twice, but three

21   times in those email strings that we -- to seek legal

22   counsel for guidance.  And apparently they were having

23   the assistance of legal counsel behind the scenes, from

24   what they've testified to.

25           To sit here in court today and rewrite the

161

1  plain meaning of what those terms are is just not

2  right.  We have an agreement.  It's reflected in

3  Exhibit B.  The terms that I wrote are consistent with

4  what that email string says, and we believe the

5  agreement should be enforced as it is written.

6           Thank you, Your Honor.

7           THE COURT:  Thank you, Mr. Stern.  Mr.

8  Kayser, do you wish to present any closing argument?

9           DR. KAYSER:  Yes, Your Honor.  I think one

10 thing that's clear, regardless of all the testimony or

11 how you view it, is that we don't agree on an

12 agreement.  And we didn't realize it on Friday, when we

13 agreed to cancel the trial that we didn't agree, but I

14 think that was either intentionally misleading us or

15 planning on falling back on the fact that we are pro

16 se.

17           In every negotiation, usually the lawyers do

18 the language of the agreement.  They don't get involved

19 in the actual negotiation of the terms of the

20 agreement, and they certainly don't use legal terms to

21 disguise what they really mean.  The word carve-out has

22 a different meaning in a hundred different contexts,

23 and we thought the context it was being discussed in

24 was based on our July 20th, and when he said no carve-

25 out, he meant no changes to those conditions.  And we

162

1   don't have an agreement.  I request the Court go ahead

2   with the trial.

3           THE COURT:  Okay.  Thank you, Mr. Kayser.

4   Mr. Earley, do you wish to make a closing argument?

5           MR. EARLEY:  No, sir.

6           THE COURT:  Okay, thank you.  Mr. Hager, do

7   you wish to make a closing argument?

8           MR. HAGER:  I guess just one brief one.  So

9   there's been a lot of discussion about the use of this

10  word "full mutual release" and stating that we should

11  understand fully what that is.  And again, I just want

12  to point out the context where that was raised was on a

13  phone call between the four of us, where Tagnetics

14  wanted to reserve the right to, I guess, sue or

15  litigate against us, and not provide a release from our

16  employment and from their time on the Board.  And it

17  was slightly heated discussion, I must say.  And so at

18  the end of that discussion and the following conclusion

19  of that was that, fine, you'll get a full mutual

20  release if my client agrees to it.

21          So our understanding was it was focused on

22  one party's ability to sue the other party over our

23  employment or our involvement, in their case, on the

24  Board.  It has now been stretched to say a full mutual

25  release means any other agreements that were ever done

163

1    between Tagnetics and any of the three pro se parties

2    would be wiped out, and that was never an

3    understanding.  It was never clearly stated and that's

4    the point that we've all been trying to make, that when

5    that was introduced as part of the draft agreement,

6    that took us by surprise, and that's when we said we

7    don't feel we have an agreement on what those terms

8    are.  That's all I wanted to --

9              THE COURT:  Thank you, Mr. Hager.  The Court

10   anticipates issuing an oral decision.  We do that quite

11   a bit.  I can assure you we put as much time really

12   into our oral decisions as we do in our written

13   decisions, only we do save a little bit of time and are

14   able to get them up, our oral decisions done, quicker

15   than a formal written decision, simply because we're

16   not crossing all the T's and dotting the I's, in terms

17   of the way it appears on a piece of paper, and the oral

18   decisions I read.

19              I'm not going to do that today.  We're going

20   to digest all this and I will render an oral decision.

21   I'm thinking like in a week or so, but I'm going to

22   leave that to -- and I'll do it by telephone.  You

23   don't need to come back here or anything.  I'll leave

24   it to Ms. Behnken and the rest of you to come up with a

25   date and time for me to render that oral decision.  I'm

164

1    thinking like next Friday, if that works for people, or

2    somewhere in that time frame.  We will need a few days

3    to digest this, and get the oral decision put together

4    in writing, so that I can be in a position to read it.

5         I also wanted to throw out the caveat, is I

6    am now pretty much the only bankruptcy judge in Dayton,

7    and we've got a lot of different things up in the air,

8    and so I may need to have a little flexibility in

9    exactly when we end up having that oral decision.  But

10   if you need to get on the road, just touch base with

11   Ms. Behnken on Monday, or she'll touch base with you

12   and we'll get at least a tentative date and time set up

13   for me to render the oral decision on this.

14        Any questions on that or anything else at

15   this point?

16        MR. STERN:  No, Your Honor, that makes sense.

17   And Ms. Behnken, I guess we'll communicate next week

18   via email between the parties?

19        THE CLERK:  I will contact everybody by

20   email.

21        MR. STERN:  Thank you.

22        THE COURT:  Anything from the Petitioning

23   Creditors?

24        DR. KAYSER:  No.

25        THE COURT:  I want to thank you, everybody.

165

1  You all were very professional, and for being -- I have

2  to say, if you're not the best pro se parties I've ever

3  had in my courtroom, you're at the top of the list, so

4  I congratulate you on it and commend you on that,

5  commend Mr. Stern and Mr. Kracht for your professional

6  presentations.  It's been very helpful to the Court.

7  And, otherwise, we will talk to you when we're ready to

8  render the oral decision.  Thank you.

9            THE CLERK:  All rise.  Court is adjourned.

10           (End of proceedings at 2:48 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

166

State of Ohio          )

Cuyahoga County        )


CERTIFICATE


    I, Marc Eppler, a Notary Public, within and for

the State of Ohio, do hereby certify that the above

transcript is a true and accurate record of the hearing

held before the HONORABLE GUY R. HUMPHREY.  This record

was prepared from an audio recording provided by the

Court.

    IN WITNESS WHEREOF, I have hereunto set my hand

and seal of office in Cleveland, Ohio on this 7th day

of February, A.D., 2020.


                    -------------------------
                         MARC EPPLER
                    Notary Public - State of Ohio
                    My Commission expires 9-14-2023

## $

**$186,000 (1)**
133:5
**$25,000 (1)**
133:9
**$30,000 (3)**
33:13;50:9;51:8
**$486,700 (1)**
23:14
**$5,000 (3)**
111:23;134:2,8
**$50,000 (3)**
133:7;134:2;135:5
**$500,000 (1)**
111:22
**$90,000 (6)**
28:24,25;33:13;
134:7;135:7,8

## A

**ability (3)**
29:5;57:13;162:22
**able (20)**
6:15;7:12;9:4;
22:10,13;24:20;28:2;
41:21;69:16;70:15;
71:12;75:5;82:22;
92:1;96:19;132:20;
137:4,7,14;163:14
**above (10)**
24:17;34:10,10;
86:14;107:16;111:16;
113:17;126:6;139:8;
144:3
**Absolutely (12)**
4:18;17:22;46:3;
57:23;82:1;103:24;
106:12;127:7;131:10;
138:21;140:10,21
**acceleration (1)**
51:3
**accept (3)**
16:18;134:13;
136:24
**acceptable (3)**
26:9;43:19;151:17
**accepting (1)**
33:16
**accepts (1)**
131:17
**access (2)**
22:10;119:13
**accommodate (1)**
24:11
**accordance (1)**
6:13
**according (1)**
116:4
**accordingly (1)**
92:3

**account (3)**
21:5;126:8;127:21
**accountants (1)**
39:21
**accruing (1)**
50:10
**accurate (7)**
55:10;66:8;88:1;
111:20,24;143:23;
144:4
**accurately (7)**
15:22;36:6;37:2;
88:13;23;115:4,11
**acknowledge (5)**
23:23;104:9;
129:11;147:7,8
**acknowledged (1)**
156:12
**acknowledgment (1)**
103:19
**acquaintance (1)**
127:2
**across (1)**
133:9
**Acting (1)**
54:22
**action (5)**
29:18;56:18;94:4;
128:1,9
**actual (1)**
161:19
**actually (7)**
10:14;55:9;62:17;
69:5;81:16;111:9;
133:18
**adamant (1)**
31:24
**added (7)**
15:1,4;50:9;76:25;
77:3;85:6,12
**adding (1)**
64:15
**addition (2)**
45:12;49:2
**additional (15)**
15:10,18;16:22;
28:8;49:3;50:23;68:1,
9,13;87:8;134:9;
135:22;157:17;160:8,
11
**address (12)**
4:12;21:23;23:22;
34:19;73:25;124:19;
150:24;151:1,4,6;
154:19,22
**addressed (3)**
21:1;44:1;63:14
**addresses (2)**
55:2,3
**addressing (1)**
130:12
**adjourned (1)**
165:9

**adjournment (2)**
3:4;92:25
**adjust (1)**
20:17
**administrative (1)**
9:21
**admission (25)**
8:20;46:7;53:21;
54:7;55:21,25;56:6,
10,25;57:4;58:11,20,
24;59:18,21,25;103:7,
12,18;104:3,6;
152:23;153:17,23;
155:3
**admit (12)**
46:8;53:22;56:4;
57:9,14;60:6,8,9;
152:4,16;155:16;
156:5
**admitted (35)**
10:4,5,6,8,16,17;
18:18,20,21;57:11;
58:13;60:10;90:20;
101:6,23;102:1,20,23;
103:21;104:12;105:4;
132:1;138:1,3;
151:20,24;152:2,3,3;
153:17,21;156:1;
158:16,18,21
**Admittedly (2)**
36:20;84:9
**adopt (1)**
17:5
**adopting (1)**
16:25
**adopts (1)**
87:22
**advice (3)**
29:25;106:10;121:6
**advise (4)**
15:15;33:7;136:18,
18
**advised (1)**
136:16
**Advising (1)**
113:23
**Aeronautics (1)**
93:17
**affect (3)**
45:14,14;157:12
**affidavit (4)**
56:10,12;57:12;
58:16
**affiliate (8)**
43:4;51:16,21;55:6,
12,17;117:10;121:24
**affiliates (13)**
39:13,17;41:18;
42:3,5,7;43:1,10,20;
44:15,20;51:15;121:9
**afford (3)**
133:15;140:18;
144:22;148:21

**afternoon (6)**
25:25;30:13;
127:21;133:21,21;
136:4
**afterwards (2)**
84:14;155:5
**again (49)**
7:1;12:15;15:11;
25:13;27:25;28:23;
31:16;35:8,18;38:12;
42:17;43:21;44:18;
46:8;47:15;48:21;
49:9,13;51:12,13;
53:9;58:7;65:5;71:5;
72:3;74:4;75:25;
76:12;82:13;85:20;
92:22;95:10;103:10;
106:8,10,14,16;109:1;
110:3,25;112:3;
114:16,20;116:8;
119:25;150:17,18;
159:13;162:11
**against (9)**
29:4;31:20;41:22;
66:17;94:4;122:5;
127:5;136:18;162:15
**agents (2)**
39:21;42:8
**ago (4)**
35:1;72:24;90:14;
93:19
**agree (26)**
34:9,23;41:23;46:2,
9;47:4;62:5;69:24;
71:1,4;90:14;95:11;
98:7;105:24;112:19;
113:3,11,17;132:20;
142:20;143:18,20;
144:2;153:23;161:11,
13
**agreed (50)**
31:8;32:19,21;
34:13;36:1,6,10;
48:20;49:6,18;52:3;
53:10;63:25;72:8;
84:6,13;85:2;94:11,
13,19,24;95:6,11,13;
96:7,8,11,14;97:19,
23;98:2,3,7;99:18,18,
23;105:21;112:25;
113:4;114:9;137:16,
19;143:21;144:19,21;
148:25;149:1;150:9,
16;161:13
**agreement (152)**
13:24;14:4,8,9,12;
15:20,23;16:8,14,16;
31:7;33:4,6,9,11,12,
14;35:4,16,19,24;
36:19,20;37:1,10,20;
38:15,21;40:2;41:4;
42:11,14,22;43:3,14,
22;45:20;48:11,14;

**49:20;50:6,24;51:4,**
19;52:25;54:19;55:1;
61:22;62:8;64:1,24;
65:15,22,25;67:10;
69:18;73:4,5,6,9,11,
17,18,20;75:13;78:7;
84:8,11,14;85:1,6,9,
16;87:14,15;88:10;
89:6,9;99:23;96:1;
97:15,16;98:4,5,6,8,
16,17,23;99:10,13,21;
102:22;103:4,22;
106:15;107:3,16,17;
109:19,20;110:21,22;
115:5,12,18;116:6;
118:6,13,17;120:11,
12,19,21,24;121:3,20;
122:16,18;129:22;
133:7;137:2,11,21;
149:23,25;150:5,6,8,
13,18,20,23,25;151:7,
16;153:15,20;154:4;
157:3,12;159:1;
160:4,16;161:2,5,12,
18,20;162:1;163:5,7
**agreements (13)**
31:23;40:14;43:11,
20;65:13;66:1;69:14;
71:23;73:14;87:21,
23;141:24;162:25
**agrees (3)**
61:20;131:18;
162:20
**ahead (6)**
11:1;77:1;96:11;
149:2,24;162:1
**ahold (1)**
136:24
**aid (1)**
105:11
**air (1)**
164:7
**alleged (17)**
13:23;14:6,13;
15:10,15;20:7,20,21;
22:22;28:7,12;31:13;
37:4;39:2;43:17;
87:19;88:16
**allow (4)**
47:14;95:12;
135:23;137:17
**allowed (1)**
117:9
**allude (2)**
73:3;153:6
**alluded (1)**
71:20
**along (8)**
19:2;32:9;94:24;
96:7;99:22;108:12;
134:19;146:10
**always (3)**
77:5;99:2;107:9

**TAGNETICS, INC.**

**October 18, 2019**

ambiguity (1)
51:19
among (3)
35:16;38:16;94:5
amount (7)
19:1;35:24;62:16;
63:5;94:18;95:19;
132:24
amounts (3)
23:12;29:19;66:4
anew (1)
86:21
answered (1)
120:3
anticipated (1)
36:22
anticipates (2)
146:11;163:10
anymore (1)
119:13
apiece (1)
135:8
apologies (3)
15:7;18:4;23:9
apologize (2)
78:19;80:20
Apparently (3)
48:22;50:19;160:22
appear (3)
17:18;21:21;79:24
appearances (1)
3:9
appears (8)
20:22;39:23;82:3;
138:5;143:25;155:7,
20;163:17
Applied (1)
93:16
applies (1)
117:11
apply (3)
7:8;8:25;41:15
appreciate (6)
23:25;28:24;58:1;
62:23;148:2;157:23
approach (5)
81:24;108:15;
125:2;127:13;144:9
approached (1)
129:24
approaching (1)
99:7
appropriate (3)
40:6,7;111:23
approximately (2)
18:22;94:20
arbitration (1)
29:3
area (4)
19:4;89:2;130:18;
146:12
arguably (1)
51:11

argue (1)
9:6
argument (9)
11:22;40:23,25;
41:25;63:6;65:18;
161:8;162:4,7
arguments (5)
9:5;158:9,10,11,15
around (6)
28:24;30:14;49:16;
71:8;95:24;109:12
articulately (2)
57:2,10
articulating (1)
66:16
aspects (2)
38:5,7
assigns (1)
39:12
assistance (1)
160:23
assistant (1)
93:15
assume (5)
69:7;100:16;
104:18;116:21;131:4
assumed (2)
115:25;119:23
assumes (1)
24:17
assuming (3)
50:13;85:14;88:5
assumption (1)
144:25
assurances (1)
96:12
assure (1)
163:11
assured (1)
114:8
Astronautics (1)
93:17
attached (5)
14:25;15:3;17:18;
83:16;103:16
attaching (1)
36:19
attachment (3)
83:16,21;84:1
attempt (2)
114:14;132:19
attempting (1)
112:21
attempts (1)
127:1
attention (15)
21:19;22:15;24:21;
31:4;32:10;36:12;
37:5;50:2,17;54:15;
84:9,19,25;85:1;86:6
attorney (7)
38:2;90:14;99:9;
110:11;117:7,16;

128:8
attorneys (3)
17:7;22:23;39:22
attorneys' (1)
29:13
audible (1)
105:9
August (19)
16:8;48:1,6,12,15;
50:20,22;52:23;53:6,
8;64:25;73:21;153:7,
8;154:3,9;155:21,21,
22
authenticity (2)
56:3;59:20
authorize (3)
95:14;106:19,22
authorized (5)
31:7;113:23;114:5,
23;144:4
available (3)
22:9,11;146:9
avoid (2)
5:17;29:7
aware (4)
32:23;92:2;110:9
away (2)
22:7;54:5
awful (1)
41:11
awkward (3)
6:3,4;101:3

**B**

back (50)
5:18;17:6;21:3;
29:21,22;30:19;
32:17;35:8;39:2;
48:23;49:9,14;52:20;
54:25;58:2;65:24;
69:23;70:15;71:12,
22;72:5,6;73:23;84:8,
10;91:21;92:16;
95:18;96:24,25;
107:15;111:9;115:15;
121:17;122:16;
130:17;133:16,20;
134:11,18,25;135:12,
20;136:22,23;140:10;
153:7,9;161:15;
163:23
background (1)
18:16
bad (2)
73:21;122:9
balances (1)
135:24
ball (1)
140:5
Bankruptcy (17)
3:2;19:4;24:18;
25:5;27:12;29:25;

56:19;123:10,11,13,
16;124:16;127:5,23;
128:3;133:16;164:6
bar (1)
7:18
base (2)
164:10,11
based (25)
5:14;41:3;44:24;
50:24;55:11,15;57:8;
58:13;68:25;69:7;
80:16;85:13;87:8;
89:22;90:2;99:13;
115:17;116:6,19;
128:21;147:15,19;
156:20;157:17;
161:24
Basically (4)
77:17;84:1;97:3;
133:23
basis (6)
9:2;57:2;60:21;
61:7,10;83:14
became (5)
30:15;93:14;123:6;
143:8;144:24
become (1)
93:23
becomes (1)
146:9
beforehand (1)
85:10
beg (1)
74:18
begin (1)
3:1
beginning (4)
3:9;93:12;94:2;
154:2
behalf (15)
3:12;13:22;23:3,4,
6;37:17;39:11,12;
42:22;44:13,13;
114:6,24;120:21;
122:15
behaved (1)
91:9
behind (1)
160:23
Behnken (6)
11:15;17:23;92:17;
163:24;164:11,17
Behnken's (1)
80:22
belief (1)
157:8
below (9)
28:5;33:4,15;34:11,
24;49:19;74:8,8;
144:3
beside (1)
77:7
best (11)

4:21,22;8:22;63:19;
78:20;88:18;91:4;
92:9;135:2;148:10;
165:2
better (3)
9:21;11:5;91:9
beyond (7)
14:14;15:11;36:11;
77:19;159:20;160:9,
12
big (1)
106:13
binder (5)
17:15,24;108:12;
138:11;144:10
bit (12)
9:18;24:10;30:14;
33:25;34:1;36:21;
49:8;83:22;154:7,18;
163:11,13
blah (12)
41:18,19,19;42:3,3,
4,7,8,8,8,8,9
blank (1)
23:7
blow (2)
48:24,24
blue (5)
124:18,20;125:13,
25;126:3
Board (8)
56:16;71:24;99:2;
109:18;116:2;119:24;
162:16,24
Bob (2)
29:9;135:6
bones (1)
88:23
booked (1)
91:18
booklet (1)
17:19
both (12)
9:10,10;21:21;29:7;
72:15;96:1,9,13;97:9;
130:7;133:13;159:23
bottom (5)
27:24;28:16;36:7;
49:12;86:9
bought (1)
123:7
bound (2)
31:3;142:2
boundaries (2)
130:6,9
bounds (1)
130:15
box (3)
6:6;7:2;8:12;11:11;
128:25;147:25
boy (2)
36:14,15
brand (1)

**LEGAL ELECTRONIC RECORDING, INC.**
216-881-8000 www.lerinc.com

TAGNETICS, INC.

October 18, 2019

140:22
breach (2)
    66:24;67:1
break (7)
    11:17;91:3,5,10,14,
    15;92:21
breaking (1)
    128:8
brief (15)
    4:14;14:20,22,22,
    25;15:7;54:25;92:9,
    13;93:13;148:10;
    158:9,10,15;162:8
briefly (1)
    156:9
bring (7)
    31:3;45:19;66:17;
    69:22;142:25;143:4,7
brother (2)
    127:24;128:9
brought (7)
    68:24;69:8;96:3;
    142:4,6;149:15,16
bucket (1)
    135:25
bunch (3)
    30:11;146:3,7
business (3)
    19:1;99:9;147:2
buyer's (2)
    52:11;77:23
buying (2)
    41:10;146:7

                C

calendar (1)
    134:3
call (30)
    5:8,9,13,24;7:7,24,
    25;8:1,3;12:20,24;
    17:10;28:4;32:18;
    33:7;48:25;68:21,22;
    70:16;72:17;90:17;
    95:11;97:17;98:9,14;
    129:4,7;131:18;
    136:7;162:13
called (6)
    34:1;52:6;96:4,6;
    136:22,23
calling (4)
    30:18;32:19;35:15;
    72:25
call-out (1)
    149:10
calls (4)
    22:10;30:11,15;
    32:14
came (12)
    30:21;32:15;38:22;
    53:7;91:6;105:11;
    125:12;133:20;
    134:18;145:19;147:4;

149:8
camera (1)
    80:13
can (111)
    5:24;6:13,23,25;
    7:24,25;8:1,2,2,11,11,
    16,19;10:6;11:6,13,
    17;12:11,21,21,22,23,
    25;13:8,9,19;18:16;
    19:23;20:14,17,17;
    21:2,20,23;22:25;
    23:11;25:2;33:11;
    35:7;36:15;41:2;
    47:22,24;49:5;50:4;
    52:14,19;54:6,17;
    55:24;56:8;57:21,24;
    59:2,10,21;60:24;
    62:11;63:15;67:11,
    24;70:3,11;74:4;77:6,
    10;78:10,23,25;79:1,
    6;81:24;83:15,21,23;
    84:1;85:23;92:3,16,
    17,18,18;101:12,13,
    18;106:12;107:6,11,
    19,25;108:9;109:9;
    110:18;119:1;120:7,
    17;121:14;125:10;
    129:1,15,15,17;
    132:12;133:24;
    135:13;138:24;144:9;
    146:23;147:9;163:11;
    164:4
cancel (3)
    61:24;96:11;161:13
canceled (1)
    137:17
capability (1)
    146:20
capacity (1)
    122:17
capitalized (1)
    160:9
capitals (2)
    77:4,6
caps (2)
    15:8;36:9
capture (3)
    88:18,24;89:13
captured (3)
    88:2;89:9,16
captures (1)
    33:24
car (1)
    91:24
career (3)
    18:24;42:22;43:3;
    64:9;87:21
careful (2)
    51:25;52:4
carefully (1)
    84:25
carries (1)
    28:18

carry (1)
    159:10
carve- (9)
    41:1,22;63:15;
    64:15,22;68:20;69:5;
    117:3;161:24
carve-out (28)
    38:23;40:12,24;
    41:12,14,17,23;42:15;
    44:1,4,7,22;45:22,22;
    63:23;64:4,6,10,19;
    70:14;96:23;97:1,2,4;
    112:9;159:21;160:13;
    161:21
carve-outs (36)
    14:16,18;15:12;
    31:10,15;32:5;33:21;
    45:23;49:4,7,10,24;
    51:14;52:10;63:21;
    64:13;69:9,25;71:6,
    17,20;89:17;96:22;
    97:10;112:17;115:23;
    116:7,10,20;117:9,13,
    23;122:12,22;159:17;
    160:14
Case (52)
    3:7;5:7,20,20,23;
    6:5;7:10;12:19,21;
    13:3,3,7,11;18:14;
    19:16;22:21,24;37:9,
    11;42:25;43:4,11;
    44:2;46:15;47:2;
    55:15;64:1;65:15;
    68:2,8;72:3;85:2,4;
    90:17;92:25;93:4;
    100:7;101:4;120:12;
    125:1;129:5,18;
    131:9,19,24;132:5,8;
    133:15;141:24;148:4;
    155:14;162:23
cases (12)
    5:22,25,25;6:24,25;
    7:1,3;8:5;12:19;
    19:10;93:2;158:3
cash (2)
    16:13;62:16;63:5;
    74:9;130:16,18;
    133:13;137:13;
    140:18;144:22,23,23,
    23,24,24;145:22;
    146:9,9,21;147:5;
    148:21,22;149:1,7
cash-strapped (1)
    26:4
catch (2)
    91:14,23
category (1)
    133:1
caveat (2)
    68:8;164:5
CC (1)
    22:21
CCs (1)
    28:18

25:13
Center (1)
    93:16
CEO (2)
    31:6;37:16
certain (5)
    23:11;31:1,22;
    88:17;126:25
certainly (7)
    30:16;52:2;78:15;
    89:16;124:23;127:25;
    161:20
certificates (3)
    89:11,19;146:22
CFO (2)
    54:20,22
chairman (3)
    47:1;93:24;99:2
chance (12)
    26:19;85:19;96:16;
    100:3;111:13;134:12,
    12,13,14;139:3,12;
    140:8
change (7)
    23:14;52:12;56:21;
    94:17;132:23;151:1
changed (2)
    145:24;151:7
changes (4)
    96:14;97:10;
    151:10;161:25
changing (1)
    51:5
characterization (1)
    111:19
characterize (1)
    65:23
chart (13)
    14:23;25:18,22;
    28:4,11,17;33:18;
    35:25;65:4;143:8,11;
    145:19,20
charts (2)
    61:13;76:23
chosen (1)
    30:1
chronological (1)
    154:15
Cincinnati (3)
    91:19,22;92:6
claim (6)
    29:19;30:2;111:23;
    134:3,7;160:17
claims (15)
    29:9;31:19;33:22;
    41:21;44:24;45:1,5,5,
    7;66:15,16;67:13;
    77:23;122:5;150:11
clarification (3)
    7:24;39:1;74:19
clarify (6)
    12:17;13:11;34:23;
    70:3;112:21;114:13

clarity (1)
    96:25
clause (1)
    51:3
clean (2)
    99:19;103:5
clear (21)
    24:13;31:21;64:5;
    65:20;97:18;98:4;
    109:15;118:4,5,10,17;
    119:4,7;136:19;
    144:19;152:18,19;
    156:13;159:7;160:2;
    161:10
clearer (1)
    110:15
clearly (15)
    13:25;14:3,13;33:3;
    48:19,25;49:3,17;
    52:3;109:1;118:8;
    120:18;136:17;
    146:19;163:3
CLERK (26)
    3:2,19;12:4,7,9,12,
    15;18:2,6,10;58:4,7;
    82:2,10,13;91:1;
    92:20,22;93:8;108:9;
    129:1,9;148:11;
    158:7;164:19;165:9
Clerk's (2)
    82:5,8
Cleveland (1)
    3:15
client (9)
    31:5;32:7,7;61:20;
    69:21;71:4,4;136:16;
    162:20
client's (1)
    31:3
close (6)
    84:9,19,25;130:15;
    136:3;149:19
closed (1)
    30:23
closely (1)
    154:7
closer (2)
    133:22;136:4
closing (7)
    9:4;136:5;158:9,9,
    15;161:8;162:4,7
co- (1)
    22:22
co-counsel (3)
    22:24;54:1,11
cognizant (1)
    149:19
collaboration (1)
    50:16
colleague (1)
    154:11
colleagues (1)
    66:17

**collectively (1)**
39:22
**combination (2)**
23:15;84:16
**commend (2)**
165:4,5
**comment (1)**
109:6
**commercial (3)**
19:1;91:6,7
**committed (2)**
36:23;97:14
**common (1)**
73:14
**communicate (12)**
22:9,13;114:22;
115:2,7,10;123:25;
124:7,10;126:7,23;
164:17
**communicated (5)**
14:9;52:5;107:6;
114:17;124:2
**communicating (3)**
20:3,23;22:13
**communication (4)**
21:6;23:2;25:10;
97:20
**communications (3)**
22:3;51:23;52:1
**companies (5)**
39:16;44:14;99:2,3;
121:8
**company (41)**
26:4;27:6,13;29:5,
12,19;31:1,6,12,19,
23;42:23;47:1;55:14;
56:15,17;93:21,24,25;
94:1,4;95:1;109:18;
115:24,25;116:6,11,
14;123:4,12;124:4;
133:11,14,23;135:25;
145:23,24;146:5,18;
147:4;148:21
**company's (3)**
29:1,21;32:1
**comparison (1)**
84:4
**Compass (32)**
38:15,24;39:3,18;
40:22,23;41:1,12,15,
17,19,22;42:3;43:4,6,
12,13;44:21;51:13,
15;55:3,15;56:16;
119:11,17,20;120:1,5;
121:10,16,19,23
**complete (3)**
5:19;66:22;69:18
**completed (1)**
61:23
**completely (5)**
26:16;30:25;137:4;
142:16;147:12
**completes (1)**

5:20
**comply (1)**
84:12
**composite (1)**
10:12
**comprehend (1)**
118:9
**compromising (1)**
149:4
**computer (3)**
137:3,8;158:6
**concept (8)**
32:4;75:8;88:19;
112:23;113:1;141:17;
142:4,6
**concepts (1)**
87:23
**concern (3)**
52:24;69:19;70:20
**concerned (3)**
56:9;85:3;142:15
**concerning (4)**
59:1;94:5;95:19;
98:23
**concerns (12)**
14:13;30:25;31:18;
50:8,24;51:1;72:4,5;
85:5;87:18;130:13;
151:11
**concerted (1)**
151:16
**concession (1)**
72:8
**concise (6)**
118:4,6,11,17;
119:4,7
**concludes (1)**
158:3
**conclusion (1)**
162:18
**conclusive (1)**
150:16
**conditions (10)**
28:12;53:10;63:5,7;
88:15;95:21;96:15;
98:22;130:21;161:25
**conduct (4)**
5:8,11,13,15
**conducted (2)**
55:8,8
**confer (1)**
154:24
**conference (7)**
36:24;94:11;95:11;
97:17;98:9,14;136:7
**conferring (2)**
54:10;58:19
**confirm (4)**
33:24;35:16;82:22;
158:15
**confirmation (3)**
34:12,20;76:13
**confirmed (3)**

14:7;34:14;96:2
**confirming (8)**
32:18,20;33:5;
35:18,23;49:20;52:7,
8
**confuse (1)**
114:14
**confused (1)**
102:15
**confusion (4)**
14:20;15:5;35:23;
76:17
**congratulate (1)**
165:4
**connection (1)**
19:21
**conscious (1)**
7:13
**consequently (1)**
98:9
**consider (4)**
27:5;47:10;61:19;
134:16
**consideration (4)**
27:6;39:10;44:12;
56:23
**considered (3)**
74:10,11;116:12
**considering (1)**
76:20
**consistent (5)**
87:24;157:2;160:4,
6;161:3
**constitute (2)**
6:22;88:21
**constitutes (1)**
51:21
**consulting (2)**
117:7,16
**contact (2)**
56:20;164:19
**contains (1)**
15:4
**contents (1)**
156:15
**contesting (1)**
110:22
**context (10)**
64:5,15,16,18;
71:19,20;72:1;97:5;
161:23;162:12
**contexts (1)**
161:22
**contingencies (1)**
26:11
**contingent (1)**
26:10
**continuation (1)**
140:22
**continue (3)**
26:12;117:15;
155:11
**continued (1)**

149:3
**Continuing (1)**
27:7
**contract (6)**
66:14,24;67:2;
103:5;142:1;147:12
**contracts (6)**
29:4;40:8;94:5;
99:1;108:5;157:5
**contractually (1)**
94:21
**contraption (1)**
20:13
**contrary (3)**
30:1;116:17;159:6
**contrast (1)**
42:13
**contrasting (1)**
42:12
**control (1)**
146:4
**controlling (1)**
39:14
**conversation (10)**
22:2;50:25;70:2,4,
6,8;72:7;95:21;98:24;
135:11
**conversations (7)**
21:12,15;95:18;
132:18;133:14;135:1;
143:6
**convincing (1)**
41:11
**copied (5)**
14:23;22:3;34:21,
22;81:7
**copies (3)**
8:14;9:14;79:13
**copy (12)**
35:6,21;48:1,5;
52:23;53:7;79:6,10;
80:14;117:21,24;
152:1
**copying (1)**
81:2
**Core (2)**
66:5;75:12
**corner (1)**
126:15
**corporate (7)**
39:13,17;44:14,19;
55:13;121:8,23
**correcting (1)**
76:23
**correctly (7)**
53:5;76:9;102:13;
107:1;139:6;142:3;
152:12
**correspondence (2)**
151:2;157:11
**costs (1)**
29:13
**counsel (20)**

3:9,15;8:14;15:15;
18:24;22:23;24:24;
25:3;29:10,25;37:25;
45:15;105:25;106:5,
16,19,22;121:6;
160:22,23
**counter (12)**
26:20;28:3,13;76:2,
5,8,9;85:20,21;140:7,
13,17
**counteroffer (5)**
27:4;86:20;130:17;
134:13;140:11
**counteroffers (1)**
20:9
**counterproductive (1)**
30:1
**couple (3)**
87:6;94:15;127:1
**coupled (1)**
47:15
**course (7)**
4:23;29:17;64:9;
99:5;120:10;134:4;
136:3
**Court (302)**
3:3,8,13,17,22,24;
4:1,12,16,18;5:1,5;
6:22;7:9,16;8:1,11,
23;9:10,11;10:15,21,
23;11:3,9;12:6,10,12,
15,17;13:6,14,17,22;
14:9;15:6;16:1,5,18,
25;17:3,6,13,16,22;
18:1;22:25;24:5;
27:12;29:2,4;32:18,
20;33:7,9;34:7;35:9,
15;36:25;40:9,19;
41:7,10,24;42:2,11,
17;45:16,21,25;
46:21;47:3,5,7,20;
52:6;53:17,20,24;
54:3,13;55:11,20,23;
56:11,24;57:6,8,17,
23;58:2,4,7,9,23;59:2,
10,14,24;60:4,6,6,8,
13;67:6,9,14,17,20,
23;68:12,15,18;70:5,
11;77:16;78:8,12;
79:6,10,13,18,21;
80:5,12,17,18;81:3,4,
6,14,17,21,22;82:1,6,
7,10,13,15,20;83:1,6,
8;85:20;86:2,24;87:2,
4,6;88:4;89:1,20,21,
24;90:1,5,7,9,13,19,
24;91:2,5,25;92:2,4,
10,15,17,22,24;93:7;
96:9;100:2,5,10,14,
20,22;101:3,6,9,12,
13,17,22,25;102:3,6,
8,11,22;103:6,9,12,
14,22;104:2,6,11,15,

**Min-U-Script®**

**TAGNETICS, INC.**

October 18, 2019

18,21,24;105:11;
108:14,18;109:23;
110:1;113:15;114:19;
118:22,25;125:3;
127:14;128:15,18,20,
24;129:4,8,17;131:1,
8,11,14,17,17,22;
132:1,4,7;136:5,11,
25;137:9,24;138:4,
20;139:16;144:8,11,
13;145:5,8,11,13,17;
146:12,15;147:14,18,
22,24;148:2,7;149:19,
20;151:1,6,18,24;
152:2,7,8,19,23;
153:24;155:1,7,16,16,
25;156:4,7,19,23;
157:6,16,20,23;158:2,
5,8,19,22,24;159:2,4,
11;160:25;161:7;
162:1,3,6;163:9,9;
164:22,25;165:6,9
**courtroom (3)**
6:2;11:21;165:3
**courts (1)**
19:2
**Court's (5)**
9:16,22;84:12;
147:15;157:17
**cover (7)**
17:8,9;36:17;53:24;
58:15;78:10;85:24
**covered (1)**
89:19
**craziness (1)**
95:18
**crazy (1)**
134:6
**creates (1)**
6:3
**Creditors (52)**
4:5;5:1,10,21;
10:24;11:16,18;12:8;
14:6,17;15:10,15;
16:7,10,12;19:22;
20:7,20;21:13;22:22;
25:9;26:15;27:20;
28:7,12;30:4;31:13,
19;32:5;37:4,7,11,12,
14,19;38:22;39:3;
40:16;43:17;51:24;
54:5;55:23;58:18;
70:16;87:19;88:16;
89:2;94:6;146:10;
158:21;159:7;164:23
**Creditors' (11)**
12:19;20:21;82:18,
19;93:2;104:7,12,13;
155:17;156:1,2
**critical (1)**
113:19
**cross (2)**
59:8,10

**cross- (4)**
57:13;59:18;
104:21;156:7
**cross-examination (11)**
5:11,16;60:14,18;
78:16;105:1;128:22;
131:2;138:7;144:15;
156:10
**cross-examine (7)**
59:11,16;60:15;
68:9;82:16;100:16;
138:5
**crossing (1)**
163:16
**culmination (1)**
148:17
**current (6)**
39:16,19;44:13,16;
116:3;145:24
**cut (12)**
27:4;85:18,19;
86:11,17;11:18,19;
112:1;134:20,21;
139:8,21
**cuts (1)**
153:5
**cutting (1)**
139:6

## D

**Dan (5)**
124:10,17,20;
127:2,19
**Daniel (6)**
125:8,25;126:3,4;
127:4;128:4
**danieljwhite@msncom (2)**
126:8,20
**date (17)**
19:23;21:16;36:23;
47:8,15;71:13;77:25;
89:16;97:24;99:8,20;
100:2;106:21;116:13;
127:11;163:25;
164:12
**dated (6)**
8:17;28:16;86:10;
125:7;126:13;127:22
**dates (2)**
47:9;73:21
**day (22)**
3:4;4:24;20:12;
21:16,25;22:1,8;
25:24;27:2,21;29:15;
30:9,10;33:22;50:12;
68:5;77:5;78:5;
106:14,15;112:19;
151:8
**days (5)**
33:14;94:15;95:17;
134:3;164:2
**Dayton (2)**

91:20;164:6
**deadline (2)**
72:18;98:15
**deal (6)**
24:11,14;30:23;
38:5;45:3;139:24
**dealings (1)**
122:3
**deals (1)**
38:7
**Debtor (1)**
13:23
**debts (1)**
151:14
**December (1)**
18:20
**deceptive (1)**
112:8
**decided (3)**
51:18;132:18;147:5
**decision (8)**
163:10,15,20,25;
164:3,9,13;165:8
**decisions (5)**
7:14;163:12,13,14,
18
**declaration (1)**
54:19
**declarative (1)**
107:18
**deemed (1)**
55:16
**default (13)**
49:12,17;63:9;75:8;
108:25;109:5,8,9;
110:8,10,13,17,18
**defendants (1)**
134:7
**deferred (1)**
66:6
**defies (1)**
159:16
**defined (3)**
55:13;64:16;113:4
**definitely (1)**
19:12
**definition (10)**
63:23;87:17,20,20;
88:6,12;97:2,4,5;
157:1
**defy (1)**
159:13
**delay (3)**
33:25;34:1;100:1
**deliberate (2)**
30:22;32:25
**demand (8)**
23:24;26:2;62:20,
24;74:12,17,21;75:19
**demanding (1)**
133:5
**demands (6)**
20:7;21:3;23:10,16,

16;77:25
**demonstrate (2)**
55:5;109:11
**demonstrated (1)**
150:14
**Department (1)**
93:17
**describe (8)**
8:13;22:25;52:14;
61:6;63:24;88:24;
112:21;139:5
**described (5)**
34:13,25;39:11;
44:12;130:10
**describes (1)**
88:13
**describing (2)**
138:25;139:1
**description (6)**
78:3;88:2;111:20,
24;112:18;160:5
**despite (1)**
31:13
**DET (2)**
123:5,8
**detail (1)**
49:9
**details (3)**
87:13;88:19,20
**determine (1)**
95:7
**determined (1)**
58:13
**dictated (1)**
32:5
**dictionary (1)**
64:20
**difference (2)**
16:15;36:2
**differences (2)**
36:2;98:25
**different (14)**
9:14;16:20;28:5;
40:1;53:9;81:23;
90:13,15;92:18;
147:13;156:24;
161:22,22;164:7
**difficult (2)**
11:21;154:8
**difficulties (1)**
22:12
**digest (2)**
163:20;164:3
**diluted (1)**
157:14
**dire (1)**
108:4
**direct (11)**
5:10;18:11;58:10;
77:19;78:16;93:11;
100:17;104:19;
129:12;132:10;
148:14

**Directing (10)**
21:19;22:15;24:21;
32:10;36:12;37:5;
50:2,17;54:15;86:6
**directive (1)**
84:12
**directly (1)**
87:22
**director (6)**
56:15;93:15,25;
94:3;122:13,23
**directors (5)**
39:20;41:18;44:16;
56:16;122:8
**disadvantage (2)**
7:13;154:18
**disagree (1)**
74:19
**disagreed (2)**
71:13;74:20
**disagreement (4)**
69:4;71:21;99:5;
149:16
**disappointed (1)**
137:20
**discharges (1)**
39:15
**discovery (1)**
125:1
**discuss (12)**
51:8;57:24;69:21;
71:3;98:15;99:6;
128:3;130:6;134:5;
142:19;143:9;151:10
**discussed (29)**
21:22;33:24;51:2,5,
12;63:4;72:13,13;
75:7,8,9;85:12,15;
87:13;88:20;96:14;
105:19;107:9;114:7,
7;119:24;130:22;
141:6;142:18;143:19;
150:22;151:22;
152:13;161:23
**discussing (10)**
34:7;69:4;71:21;
75:11;108:3;113:14,
15;141:17;142:24;
143:8
**discussion (20)**
24:4;31:17;49:16,
21;54:4;63:2,9;65:13;
69:10;71:10,19;
72:14;80:24;89:12;
114:11;136:14;
142:23;162:9,17,18
**discussions (24)**
11:9;15:13;19:20,
25;20:4,6,10;22:4;
31:6,16;48:17;49:11;
50:14;63:11;69:1;
85:8,19;86:12,12,19;
111:21;132:18;142:5;

**LEGAL ELECTRONIC RECORDING, INC.**
216-881-8000 www.lerinc.com

**TAGNETICS, INC.**

October 18, 2019

149:14
**disguise (1)**
  161:21
**dishonest (1)**
  45:4
**dismissal (1)**
  51:5
**Dismissal/withdrawal (1)**
  33:21
**dismissed (1)**
  65:2
**dismissing (1)**
  134:3
**dispute (1)**
  56:3
**disputed (1)**
  95:4
**disputing (1)**
  94:18
**distinction (1)**
  42:14
**distinctly (1)**
  30:8
**distributions (1)**
  66:23
**District (1)**
  3:3
**dividends (2)**
  66:21;89:15
**docket (1)**
  3:7
**document (24)**
  8:18;10:3;47:24;
  62:10;66:7;79:25;
  80:6,13,18;81:8,14;
  82:8;97:8;99:17;
  107:10,10;108:7;
  118:1,3,5,11,16;
  119:4,8
**documented (5)**
  33:10;34:9;73:18;
  113:17;144:3
**documents (8)**
  59:6;99:11,14,23;
  101:9;103:7,14,24
**dollar (1)**
  66:4
**done (19)**
  7:19;8:19;9:3;43:3,
  22;67:5;86:18;97:15;
  99:21;100:16;103:25;
  104:18;123:23;127:9;
  128:19;139:19,24;
  162:25;163:14
**donnas (1)**
  91:7
**door (1)**
  20:2
**dotting (1)**
  163:16
**down (10)**
  27:7;63:9;89:25;
  94:11;101:17,17;

114:11;134:15;
136:20;149:3
**DR (80)**
  3:21;5:3;6:21;7:6,
  15,22;8:9,22;13:5,13;
  16:23;17:2;40:4;
  45:10,18;46:22,25;
  56:9,13;57:21;58:1;
  59:4;60:16,19,25;
  61:4;67:3,5,16,19;
  87:1;90:4;92:5,9,13;
  93:5,10,12;100:8,12,
  25;101:2,8,15,19;
  103:1,10,13,15,24;
  104:5,17,20;108:17,
  19;109:25;114:18;
  117:20;118:19,24;
  119:7;126:18;127:22;
  128:19,23;129:1,3,6,
  13,20;130:24;131:20,
  25;132:3,6;138:13;
  147:21;148:18;161:9;
  164:24
**draft (30)**
  36:19;38:15;43:14;
  50:6;65:13;67:10;
  73:8;78:7;85:6,9;
  87:14;88:9;97:14;
  98:6,23;99:10;103:3;
  118:12;149:23;150:5,
  6,8,18,20,20,23;
  151:7;154:4;157:3;
  163:5
**drafted (7)**
  37:1;40:14;42:22;
  54:19,22;65:25;160:4
**drafting (1)**
  129:21
**drag (1)**
  133:19
**drawing (1)**
  23:7
**drive (1)**
  137:5
**driving (2)**
  30:10;32:7
**due (2)**
  94:21;97:5
**duplicate (1)**
  9:18
**duplicative (2)**
  9:13;10:2
**during (16)**
  4:23;6:10;21:12;
  95:18;98:15;107:7;
  116:22;123:13,19;
  139:1,2;142:3,4,23;
  143:6;146:2
**duty (1)**
  31:3
**duty-bound (1)**
  69:20

## E

**Earley (146)**
  3:23,23,24;4:5;5:4;
  12:20,22,24;13:7,8;
  16:3,6,19,21;20:1;
  21:18;23:6,12,21;
  25:12;26:17,22;
  27:23;28:14,16;
  30:16,17,18;32:15;
  34:2,5,7;35:22;36:18;
  47:3,4;48:1,6;50:7,19,
  25;52:23;53:8;57:3,5,
  18;60:1,3;61:11,12;
  65:1;67:20,22;68:9,
  11,22;69:11,13;
  70:21;75:13,21;76:1;
  85:18;86:10;87:2,3;
  90:5,6;93:23;95:12,
  14;96:1,8,13;97:9;
  100:18,23;101:1,5;
  102:9,19,25;103:8;
  105:16;107:22;111:3,
  10,19;112:5;113:12,
  13,14,16;114:8;
  123:20;124:6;129:7,
  11,12,14,19;131:2,5,
  8,10,16;132:7,9,10,
  11;136:13;137:25;
  138:2,5,7,9,15,21,24;
  144:1,13,16,17;145:5,
  7,12,16,21;146:14,19;
  147:14,19,20,24;
  148:1,3,5,7,25;
  151:23;157:19,20,22;
  158:4;162:4,5
**Earley's (9)**
  13:3;17:1;27:1;
  65:1,5;66:2,10;
  111:12;160:5
**earlier (23)**
  21:8,20,25;35:3;
  36:1;37:9;42:13;48:4;
  49:14;52:4;53:3;
  58:23;77:22;106:25;
  116:1;120:12;123:3,
  14;141:16;151:22;
  153:6,6,10
**early (5)**
  18:23;30:13;34:8;
  39:8;106:14;124:21
**earnest (2)**
  20:11;112:4
**ease (1)**
  9:21
**easier (3)**
  9:12,18;11:23
**edit (1)**
  98:23
**effect (6)**
  5:23;6:6,16;12:2,
  19;146:16

**effective (1)**
  100:1
**effort (2)**
  151:12,16
**either (10)**
  17:19;19:13;21:25;
  43:14;61:11;66:8;
  153:7;157:20;159:20;
  161:14
**elaborated (1)**
  73:19
**electronically (1)**
  80:10
**elements (1)**
  38:13
**elicit (2)**
  8:6;68:2
**elicited (2)**
  9:7;68:7
**else (4)**
  42:6;75:18;156:4;
  164:14
**else's (2)**
  13:11;68:8
**email (244)**
  8:17;9:11,24,25;
  14:1,5,21,23;15:5,8;
  20:2,19,25,25;22:2,3,
  5,10,16;23:1,11,19,
  21,23;25:1,7,12,12,
  16,17,19,21,24;26:13,
  14,16,18,22;27:2,20,
  23;28:13,16,21,23;
  30:4,6,6,7;31:9,11;
  32:16,20;33:3,19;
  34:5,11,13,16,21,22,
  24;35:2,14,17,19;
  36:16,18;37:3;41:5;
  42:5;47:25;48:2,4,8,
  15,20;49:1,15;50:7,
  20;52:21,22;53:2,6;
  60:20;61:8,11,12,15,
  16,17;63:4,8,13;
  64:11;65:5,6;73:13,
  15;75:11,22,24,25;
  76:7,8,16;77:8;78:22;
  80:23;82:17,21;83:6,
  11,17;84:20;85:13,
  17;86:9,14,15;94:13,
  15;96:16,20;97:13;
  101:19;102:14,15,16;
  103:16;105:4,5,12,18,
  22;106:6,6,10;107:2,
  8,11,12,14;109:3;
  110:13,16,21,24;
  111:2,10,12,16;112:4;
  113:12,21,25;114:24;
  115:3,4,10,13;116:10;
  117:22,22,24;124:18,
  18,19,20,25;125:5,7,
  9,12,14,17,22,24;
  126:2,4,6,8,11,13,17,
  24;127:10,16,20,21;

132:22;133:25;
134:25;138:25;139:2,
8,10,13;140:7,12,13,
17,19,24;141:1,1,2,4,
7,10;143:2,9,15,16,
24;144:18;150:4,13,
16;152:5,12,14,20,24;
153:8,14,22;154:9,9,
22,22;155:18;156:16;
157:4;159:7,9,18;
160:3,4,21;161:4;
164:18,20
**emailed (1)**
  83:2
**emails (40)**
  9:19;10:13;14:1;
  15:14;20:19,21,22;
  21:2,8,20;41:3;42:2;
  48:23;49:14,19;
  50:14;52:7;72:17,18,
  19;73:1;76:13,15,21;
  79:17;84:8,15;
  105:13,15;115:9;
  133:13;152:21;
  153:10,24;154:14;
  155:5,9,20;156:14;
  160:1
**emphasizing (1)**
  36:9
**employees (2)**
  39:21;95:1
**employment (9)**
  18:24;69:18;71:23;
  109:20;141:23;
  147:12;157:4;162:16,
  23
**encourage (5)**
  106:4,9;126:7;
  127:4,6
**encouraged (4)**
  15:14;24:24;
  105:24;130:16
**end (11)**
  25:2;44:8,23;45:8,
  24;52:5;81:12;
  126:19;162:18;164:9;
  165:10
**enforce (7)**
  4:3;8:24;13:24;
  19:16;54:18;55:1;
  99:8
**enforced (1)**
  161:5
**engineering (1)**
  142:16
**enough (2)**
  118:8;139:17
**enrichment (1)**
  67:2
**enter (1)**
  101:10
**entered (4)**
  46:13;73:15;103:2;

**TAGNETICS, INC.**

October 18, 2019

152:17
**entertain (1)**
53:18
**entertained (1)**
49:14
**entire (5)**
22:13;43:3;61:22;
65:17;66:12
**entirely (1)**
97:4
**entirety (5)**
65:7;74:16,20;
78:25;83:23
**entities (5)**
39:14,18;44:15,20;
121:10
**entitled (2)**
5:15;7:20
**entity (5)**
42:25;46:25;51:18;
55:13;120:13
**enunciate (1)**
120:18
**enunciating (1)**
65:17
**equipment (1)**
67:1
**equity (7)**
39:21;44:17;89:3,7;
146:17;147:1;157:10
**errands (1)**
96:19
**especially (1)**
149:18
**essence (1)**
89:17
**essentially (4)**
27:7;29:18;53:12;
70:14
**Even (20)**
20:20;24:3;27:15,
21;46:14;47:14;
50:11;84:5;85:13;
96:18;99:20;124:18;
130:15;134:16;
136:18;150:23;151:6,
9;160:5,7
**evening (5)**
26:17;96:4,5;114:1,
4
**event (22)**
15:5;22:9;24:2;
28:10;87:10,11,17;
88:1,7,8,17,21,24;
133:2,11;136:1;
145:20;146:1,5,9;
157:1;160:5
**events (2)**
50:15;88:13
**eventually (3)**
35:12;71:14,16
**everybody (6)**
4:19,21;87:7;

101:25;164:19,25
**everybody's (1)**
158:3
**everyone (1)**
22:2
**evidence (20)**
15:24;16:15;60:11;
68:3,7;90:19,22;
94:17;100:3,13;
101:11;104:14;105:5;
116:16;131:23;148:3;
151:5;153:18;156:3;
157:24
**evidenced (1)**
43:5
**evidentiary (3)**
4:2;6:8;9:3
**exact (4)**
19:23;36:1;96:5;
127:11
**exactly (7)**
34:3;72:12;86:15;
96:10;113:10;123:22;
164:9
**exam (1)**
7:19
**examination (17)**
5:9,10,13;18:11;
58:10;64:17;77:19;
85:25;86:3,4;100:17;
128:21;129:12;
144:14;145:9;156:8,
20
**examine (10)**
6:24;12:21,24;13:7;
17:12;56:7;57:14;
58:25;59:19;104:22
**examining (1)**
83:3
**example (3)**
70:24,24;73:10
**examples (1)**
66:13
**except (6)**
15:3;36:2;60:7;
90:20;95:4;158:18
**excepting (1)**
41:19
**exception (6)**
19:12;49:3;51:13;
58:15;63:24;159:22
**exceptions (6)**
15:12,17;49:6;
52:11;63:21;64:14
**exchange (7)**
32:20;39:10;44:11;
48:20;49:1;85:9;
152:5
**exchanged (4)**
14:2,11;50:13;
105:18
**exchanges (1)**
37:3

**excluded (2)**
10:19;66:6
**exclusively (3)**
21:17;30:16,17
**Excuse (5)**
92:5;98:10;114:18;
125:18,20
**excused (2)**
90:10;128:25
**executed (1)**
33:14
**executive (1)**
99:3
**exhibit (158)**
9:11,15;10:1,7,12,
20;14:25;15:3,21,21,
22;17:17,24;20:14,
18;21:7,19;23:20;
26:25;27:17,24;
32:11;34:15;35:6,7,
20;36:13,25;37:6,9,
17;38:20;39:1,5;40:3;
43:17,25;44:10;46:2,
6,7,10,12,18;47:8,9,
16,22;48:7,12,16;
49:15;50:2,18;52:17,
17;53:4,24;54:12,15;
56:11,25;57:2,9,15,
16;58:12;60:1,8,24,
25;61:1,2,17,17;
62:12,12,13;64:12;
65:5,11;66:11;76:17;
77:10;78:13;79:8,9,
16,20,24;80:4,6,11,
12;82:18;86:6;87:16;
101:1,1,15,18,19,23,
24;102:1,3,4,5,6,9,12,
14,15,17,19,23,24;
103:2,2,3,4;105:4;
108:12,19,22,23;
110:24;111:4,12;
118:7,11,12,17;119:3;
120:7;121:1;122:18,
19;132:14;138:24;
143:16,24;151:21,24;
153:1,1,1,11;154:1,5;
155:8,17;156:1,2;
158:18;160:10,10;
161:3
**exhibits (73)**
8:10,12,15,20,21;
9:8,9,13,17;10:2,12;
14:25;15:1,2,2,22;
17:15;19:24;45:17;
47:14;53:23;54:7;
55:21,25;56:2,6,7;
57:17,20;58:11,11,18,
20,24;59:1,5,18,21,
22,25;60:7,9,10;
79:14,25;80:6,16;
81:22;82:20,21;
90:20;100:6,9,10,12,
19;103:1,18;104:3,7,

11,12,13,15;132:1;
137:24;138:15;151:5,
19;156:5;158:16,17;
159:1
**expect (5)**
95:15;114:13;
146:1;147:3;160:18
**expected (5)**
96:6,24;118:1,3;
137:14
**expecting (3)**
78:6;118:13,14
**experience (4)**
19:17;65:12;72:23;
90:15
**explain (8)**
6:6;24:3;26:5;
48:17;49:8;53:9;
70:17;107:11
**explained (2)**
24:9;107:13
**explaining (2)**
26:11,12
**explanation (2)**
117:24;118:1
**explode (1)**
42:4
**express (3)**
67:2;72:3;94:3
**expressed (4)**
69:19;70:19;94:13;
99:23
**expresses (1)**
50:8
**extensively (1)**
4:6
**extent (6)**
5:17;9:16,17;42:13;
46:4;78:17
**extra (1)**
135:17

**F**

**face (1)**
160:16
**facing (1)**
136:5
**fact (20)**
14:11;15:1,19;17:6;
32:22;43:5;47:1,16;
49:25;57:23;73:3;
75:21;76:16;86:14;
132:25;136:5,17;
150:24;151:2;161:15
**facts (2)**
8:4;9:6
**factual (1)**
6:8
**faded (1)**
81:9
**failed (1)**
109:19

**fair (4)**
78:3;88:1,20;89:8
**fairly (4)**
52:14;74:14;88:12,
23
**fall (1)**
48:19
**falling (1)**
161:15
**familiar (5)**
110:10,14;112:23;
113:1,6
**far (6)**
73:9;85:2;95:3;
126:17;134:15;
157:14
**fast (1)**
30:15
**favor (2)**
78:25;94:22
**favorable (1)**
47:11
**feasible (2)**
24:10;26:3
**February (4)**
125:6;126:6,14,16
**fed (1)**
81:20
**feel (3)**
7:12;149:16;163:7
**fees (1)**
29:13
**felt (3)**
133:3;137:15,18
**Fernandez (3)**
54:20;56:13,20
**Fernandez's (1)**
56:11
**few (8)**
50:9;54:12,24;
60:16;95:24;119:17;
138:6;164:2
**figure (3)**
15:11;54:6;133:17
**file (5)**
81:3,22;127:4;
137:1;158:10
**filed (14)**
4:3;5:6;7:10;33:22;
56:19;80:6,9,17;81:5,
5;94:7;116:13;128:7;
150:25
**files (1)**
80:5
**filing (9)**
47:8,9,15;80:18;
124:15;127:23;128:3,
4;133:16
**final (9)**
23:5;52:17;61:19;
62:2,3;63:13;72:17;
107:20;132:23
**finally (3)**

**TAGNETICS, INC.**

October 18, 2019

30:21;32:14;96:16
**financial (3)**
116:3;130:11,22
**find (3)**
28:2;62:10;138:13
**finds (2)**
9:12;125:9
**fine (18)**
10:15,17,21;12:6;
17:16;31:12;32:8;
53:20;54:13;68:18;
104:8,9;108:14,14;
131:8;155:1;158:14;
162:19
**fine-tuned (1)**
149:17
**finish (2)**
40:21;92:2
**finished (2)**
58:9;115:21
**firm's (1)**
55:11
**first (33)**
5:8;6:1;18:21;19:7;
20:3;21:15,24;23:11;
24:23;28:1;35:11;
36:16,17;38:17;48:8,
16;52:21,22;61:14,
18;64:8;76:24;79:1;
80:1;93:4;95:9;111:4;
126:17,19;142:11;
145:17;151:8;155:7
**five (3)**
66:24;96:5;134:2
**five- (1)**
11:16
**five-minute (3)**
12:10;57:24;58:2
**flat (2)**
20:8,9
**flat-out (2)**
26:16;57:9
**flexibility (1)**
164:8
**flight (3)**
91:18,23;92:6
**flights (1)**
91:13
**flipping (1)**
48:22
**floor (1)**
148:8
**flurry (1)**
72:17
**fly (2)**
74:5;91:19
**focus (6)**
84:12;85:3;108:6,9;
141:12;144:20
**focused (7)**
16:13;130:18,19;
133:12;140:17;
144:24;162:21

**follow (6)**
9:19;40:25;45:12;
99:4;100:18;144:18
**Following (6)**
22:1,8;25:24;35:23;
149:14;162:18
**follows (3)**
64:11;80:2;128:10
**follow-up (1)**
79:5
**foray (1)**
19:7
**forget (4)**
18:19;109:17,17;
138:10
**forgive (1)**
35:10
**forgot (2)**
19:23;20:1
**form (2)**
8:3;60:21
**formal (1)**
163:15
**former (4)**
39:16,20;44:14,16
**forms (2)**
61:6,10
**forth (30)**
13:25;14:15;15:23;
16:9;21:3;23:15;
24:19;25:15;30:19;
32:16;33:4;34:9,23;
35:8;41:4;48:9,23;
49:1;61:13;75:19;
84:9;91:13;95:19;
113:17;143:17,18,20;
144:2;145:1;151:12
**forthright (2)**
46:8,11
**Fortunately (2)**
6:1;22:12
**forward (12)**
24:2;26:19;27:6,13;
62:24;74:13;93:22;
100:2;111:13;139:14;
140:6;147:6
**forwarded (2)**
16:9;50:21
**found (1)**
11:19
**founder (2)**
93:18;123:4
**four (3)**
34:25;66:23;162:13
**fourth (2)**
25:1,6
**frame (2)**
34:18;164:2
**frank (1)**
15:16
**frankly (7)**
27:3;41:9;86:16;
98:19;111:17;113:19;

114:11
**fraud (1)**
113:8
**freedom (1)**
69:18
**frequently (1)**
30:18
**Friday (12)**
21:1;95:24;96:17;
97:13;98:1;99:18;
136:4,4;150:16;
155:21;161:12;164:1
**front (7)**
24:8;45:11,17;
124:22;135:5;137:2;
138:15
**frustration (1)**
132:13
**full (58)**
3:20;14:16;15:12;
18:6;30:25;31:10,13,
14;32:3;33:20;49:4,6,
9;51:14;52:9;63:20;
64:12;69:13,24,25;
70:20;71:17;72:9,10;
79:1;89:17;112:17,
23;113:1,3,6,10;
115:16,19,22;116:6,
10,20;117:3,9,13,23;
122:11,22;136:15,19;
141:17,21;142:5,7,15,
24;159:17,22;160:13;
162:10,19,24
**fully (5)**
32:1,2;33:14;
140:17;162:11
**funds (5)**
61:23;72:24;75:3,4;
95:5
**furious (1)**
30:15
**further (17)**
26:12;53:15;55:19;
63:9;67:15,17,19;
75:2;86:1,23;90:23;
99:14;100:1;128:16;
144:7;156:18;159:16
**furthermore (1)**
75:20
**FWIW (1)**
127:24

**G**

**gaps (2)**
98:18,20
**gave (2)**
99:11;117:13
**general (6)**
51:1;68:25;70:1;
74:14;95:19;146:2
**generally (2)**
11:8;43:9

**gentleman (1)**
37:20
**Gentlemen (3)**
3:19;12:7;23:18
**gets (2)**
10:16,17
**given (5)**
41:16;70:23;94:23;
96:12;141:14
**giving (4)**
31:12;70:20;99:14;
149:4
**glasses (1)**
125:19
**goals (1)**
149:5
**goes (8)**
17:6;21:7;23:14;
49:8;134:19;153:7,9;
155:20
**Goldsmith (1)**
124:8
**Good (17)**
3:11,13,17,22,24;
4:1;13:21;19:1;59:14,
15;63:16;64:3;91:3;
101:25;127:21;143:3;
151:12
**goods (1)**
66:25
**Googled (1)**
97:1
**graduated (1)**
18:19
**granted (2)**
76:18;88:19
**Great (5)**
10:24;13:14;112:22
**ground (3)**
5:18;17:8,9
**groundwork (4)**
4:19,21;10:7;22:7
**group (2)**
152:24,25
**growing (1)**
29:14
**guarantee (1)**
134:9
**guarantees (2)**
27:7;29:18
**guess (22)**
19:24;21:24;48:18;
51:25;59:7;70:9;
72:16;77:21;81:13;
83:25;85:24;95:24;
100:18;148:8,15;
149:21;150:13;
151:11;152:25;162:8,
14;164:17
**guidance (1)**
160:22
**guide (1)**
92:18

**guidelines (1)**
99:14
**Guy (1)**
3:5
**guys (7)**
7:17;32:18;67:16;
71:1;84:16;92:12;
95:7
**GW (1)**
18:19

**H**

**HAGER (145)**
3:25,25;4:1,5;6:16;
12:20,23,23;13:7,9;
14:24;17:4,5;23:8,9,
12,21;34:6,8,16;
35:14,21;36:19;39:8;
47:5,6,25;48:5,9;
50:20;52:22;53:7;
57:6,7,18;59:7,13,23;
60:4,5;65:6;68:13,14,
16,19;70:3,9,12;
77:17,21;78:4,10,19,
21;79:9,12,15;80:1,
13,14,21;81:4,8,11,
24;82:15,25;83:1,5,9,
10;85:23;86:2;87:4,5;
90:7,8;96:2,8,13;97:9,
22;98:19;102:15;
105:16;111:3;112:5;
113:14,16,18;114:5,7,
8,23;115:1,2,7,8,9;
117:21;124:6;130:7;
132:8,17;133:6;
135:1;136:12;143:17,
24;144:1,2;147:22,
23;148:6,8,9,13,14,
15;151:18,21,25;
152:4,13,22,25;154:1,
19;155:9,13;156:6,10,
12,20,22;157:2,11,16,
23,25;158:1;160:1;
162:6,8;163:9
**Hager's (7)**
13:3;50:8;66:10;
83:3
**hand (6)**
18:3;108:12;
125:18;133:19;
138:18;140:18
**handed (2)**
127:17;138:11
**hang (1)**
129:1
**happen (1)**
146:11
**happened (7)**
15:13;19:20;20:5;
30:5;41:20;47:1;
153:3
**happens (5)**

**LEGAL ELECTRONIC RECORDING, INC.**
216-881-8000  www.lerinc.com

25:5;146:2,6,6,8
**happy (1)**
  96:23
**hard (6)**
  79:6,10;103:11;
  105:10;137:13;
  146:23
**hardly (1)**
  109:15
**head (1)**
  42:24
**header (1)**
  79:3
**heading (1)**
  30:9
**hear (7)**
  29:20;32:17;35:9;
  95:25;98:2,12;129:2
**heard (3)**
  29:22;98:21;115:14
**hearing (8)**
  4:2,2;91:23;103:11,
  25;105:10,11;124:5
**hearings (1)**
  6:4
**hearsay (8)**
  56:25;57:1,3,10,10,
  11;58:14,15
**heart (1)**
  52:12
**heated (1)**
  162:17
**heirs (1)**
  39:12
**held (1)**
  146:18
**help (1)**
  124:25
**helpful (1)**
  165:6
**helps (1)**
  129:2
**hereby (1)**
  39:15
**herein (2)**
  39:11;44:12
**Here's (1)**
  75:21
**Hi (1)**
  127:18
**high (1)**
  26:4
**himself (2)**
  23:4;131:5
**hire (3)**
  7:14,14,16
**history (2)**
  94:1,23
**Hobart (3)**
  93:21;123:7,8
**Hold (3)**
  90:1;100:5;101:17
**holders (2)**

39:21;44:17
**home (2)**
  30:9;151:3
**honest (4)**
  40:21;41:7;46:8,11
**honestly (1)**
  154:16
**Honor (95)**
  3:11,14;4:13;7:6,
  23;8:9,16;10:11;12:4;
  13:13,16,21;15:25;
  16:6;17:11;40:4,10;
  41:6,14;45:10;46:17;
  47:19;53:16;54:10;
  55:19,22;56:9;57:22;
  59:7;60:12;67:3;
  77:15;79:12;80:8,15;
  81:24;82:4,23;87:14;
  89:23,25;90:18,23;
  91:1,17;93:5;97:25;
  98:10;100:8,18;
  101:8;103:11,17;
  104:10,23;108:11,16;
  109:21;114:16,18;
  118:15;119:6;125:2;
  127:13;128:13,16,19;
  129:6,7;130:24;
  131:3,21;138:6;
  144:7,10;145:10;
  147:17;148:1,9;
  153:4;154:6;155:15,
  23;156:6,18,22;
  157:18,19;158:7,14;
  159:3,5;161:6,9;
  164:16
**Honorable (1)**
  3:5
**hope (1)**
  125:9
**hoped (1)**
  29:1
**hopefully (2)**
  4:23;91:9
**hopes (1)**
  151:13
**hour (3)**
  27:22;92:7;149:18
**hours (1)**
  95:24
**Humphrey (1)**
  3:5
**hundred (2)**
  108:3;161:22
**hurdle (1)**
  143:14

**I**

**idea (1)**
  135:20
**identified (5)**
  38:20;48:4;52:24;
  53:3;80:2

**identifies (1)**
  22:2
**identify (11)**
  8:18;20:17;35:7;
  36:15;47:24;50:4;
  51:18;52:19;54:17;
  79:25;101:13
**identifying (2)**
  10:5;50:23
**ignorance (1)**
  160:17
**illegible (1)**
  81:16
**illustrative (2)**
  66:13;67:13
**impact (2)**
  89:6;157:8
**implied (1)**
  67:2
**important (4)**
  56:22;66:22;
  141:20,25
**imposes (1)**
  27:12
**impression (1)**
  112:11
**inaccurate (2)**
  139:7,9
**Inc (22)**
  13:23;37:20;38:16;
  39:4,19;43:5,6;44:21;
  55:4;119:12,12,21;
  120:2,2,9,22;121:11,
  16,23;122:14,24;
  123:25
**incidentally (1)**
  94:19
**include (24)**
  42:4,5,7,25;43:22;
  44:3,22;54:25;63:6;
  65:20;107:17;109:9;
  110:18;112:14;
  116:22;117:4,22;
  121:15;130:9;149:22;
  150:1;153:24;154:5;
  159:15
**included (20)**
  23:17;28:5;31:8;
  40:17;43:6;48:19;
  49:1,22;76:14;87:20;
  95:22;107:2;117:22;
  121:7;137:11;143:9;
  154:1,11;157:3;159:8
**includes (1)**
  112:6
**including (15)**
  22:22;38:15;39:3,
  18;40:23;41:1,12;
  44:21;61:23;66:1,14,
  19;121:10,18,18
**inconsistency (1)**
  159:23
**inconsistent (1)**

160:16
**Incorporated (1)**
  3:8
**incorporation (1)**
  76:6
**incorrect (1)**
  150:25
**incorrectly (2)**
  109:13;119:2
**Inc's (1)**
  55:4
**indicates (1)**
  140:21
**indicating (1)**
  61:21
**individual (7)**
  44:6,24;45:1,5,7;
  55:13;122:17
**individuals (1)**
  40:8
**information (2)**
  137:12;156:25
**initial (12)**
  24:8;26:3,6,9;28:6;
  70:19;133:8,24;
  134:1;135:8;144:22;
  149:9
**initially (1)**
  130:13
**initiate (1)**
  33:7
**ink (2)**
  80:24;81:11
**input (1)**
  95:20
**inside (1)**
  142:1
**insisted (1)**
  30:24
**insisting (1)**
  24:16
**insolvency (1)**
  100:4
**instance (2)**
  9:20;66:4
**instead (5)**
  33:16;36:4;51:6;
  135:5,18
**insulting (1)**
  111:22
**insurers (1)**
  39:22
**intellectual (2)**
  69:17;70:22
**intellectually (1)**
  45:3
**intend (2)**
  16:7;131:9
**intended (3)**
  7:7;88:7;109:10
**intentionally (1)**
  161:14
**interest (14)**

25:17;39:15;50:10;
  51:17;55:4,15;66:19;
  75:23;89:4,7;91:5;
  99:25;146:18;157:10
**interesting (1)**
  90:11
**interpret (2)**
  34:11;75:18
**interpreted (5)**
  23:4,5;50:15;86:13;
  97:10
**interpreting (2)**
  52:13;76:5
**into (31)**
  4:10;5:2;19:7;
  34:22;46:13;60:11;
  63:2;73:15;76:5;77:7;
  78:8;80:10;81:7;
  94:13,17;95:20;
  100:13;101:10;
  104:14;105:4,7;
  123:10,11,12,16;
  133:1;150:17;151:16;
  153:17;156:3;163:12
**introduce (9)**
  8:21;79:14;90:20,
  22;100:7;104:16;
  131:23;137:25;
  151:19
**introduced (14)**
  9:23;10:3;47:14;
  68:4,20;94:16;100:6,
  11,21,22;138:1;
  151:20,22;163:5
**introducing (1)**
  77:24
**introduction (3)**
  38:11;53:18;93:13
**inviolate (1)**
  95:14
**involuntary (1)**
  56:19
**involved (9)**
  22:14,21;29:24;
  71:9;76:1;95:5;118:2;
  124:4;161:18
**involvement (1)**
  162:23
**involving (2)**
  62:21;120:12
**irrelevant (5)**
  45:13;46:10,12,23;
  47:17
**I's (1)**
  163:16
**issue (9)**
  31:17;59:19;68:17;
  82:3,19;118:18;
  122:1;148:20;157:7
**issues (7)**
  38:22;70:22;81:2;
  94:4,5;150:7;151:9
**issuing (1)**

163:10
**Item (2)**
51:12;76:24
**items (6)**
21:22,23;74:1,1,10;
75:16

## J

**January (10)**
124:21,23;125:6,7,
14,15,16,22;126:4,24
**jerk (1)**
109:12
**Jon (16)**
3:25;22:11;23:22;
26:1;27:8;29:22;33:3;
50:8;67:16;96:2;
97:21;130:7;133:18;
134:5;136:24;137:8
**JONATHAN (2)**
148:14;156:10
**Joni (4)**
35:11;80:22;96:4,6
**Jon's (2)**
50:11,11
**Judge (5)**
35:6;61:21;97:25;
118:20;164:6
**judgment (13)**
49:13,17;63:10;
75:8;108:25;109:5,8,
10;110:8,10,13,17,19
**July (155)**
8:17;9:11,24,25;
14:3,22,24;16:10,13,
13;21:1,16;22:5,16;
25:6,25;26:22;27:14;
28:16;33:19;35:2,20;
37:4;41:2,5;42:2,5;
48:20;49:1;53:10,13;
60:20,21;61:11,11,17;
62:19;63:13;64:10;
68:22;71:25;72:2,12;
73:13,23,24;75:17;
76:1,5,6,7,11,12,13;
77:8;78:23;80:3;83:4,
12;84:2,6;86:10;89:4,
5;94:9,13;95:3,22;
97:8;99:12;101:20;
102:16;103:19,23;
105:3,12,22;106:7,14;
107:1,13,15;109:3;
110:12,23;111:3,11;
112:5;113:4,13;
114:10,22,24;115:3;
117:21;119:11,16,25;
122:7,11,16;129:22,
25;130:3,10,21;
132:21;133:25;
137:12;139:2,13;
140:8,11,13,19,24;
141:2,4,7;142:5;

143:1,9,15,25;146:17;
148:16,18;149:10;
150:14,16,17;152:5,
11,13,20,24;153:21,
22,25;154:2,5,9;
155:5,8,18;156:14,16;
157:4,8,9,12;159:9;
160:2,3;161:24

## K

**Kagan (1)**
22:11
**Kayser (189)**
3:21,21,22;4:5;5:3;
6:16,21;7:6,15,22;8:9,
22;12:20,23,24;13:2,
5,6,13;16:19,23;17:2;
20:1;21:1,16,25;
22:20;23:3,12,21;
34:3,8;35:22;36:18;
37:13,17,24;39:7,11,
14;40:4,6,17,18;43:7,
12,15;44:6,12,23;
45:10,13,15,17,18,20;
46:3,22,24,25;48:1,6;
50:20;52:23;53:7;
56:9,13,24;57:10,18,
21;58:1,22;59:3,4,24;
60:14,16,19,25;61:4;
66:4;67:3,5,16,17,19,
24;68:23;69:12;
70:21;86:25;87:1;
90:1,4;92:5,9,13;93:2,
3,5,10,11,12;100:5,8,
12,25;101:2,8,13,15,
19;103:1,9,10,13,15,
24;104:5,16,17,20,22;
105:1,6;108:17,19;
109:25;112:12;
113:16;114:18;
117:19,20;118:19,24;
119:7;120:8,9,13,22;
121:4;122:3,4,4,15;
126:18;127:22;
128:19,23;129:1,3,4,
6,13,20;130:24;131:1,
18,20,23,25;132:3,5,
6,12,15,16,17;133:6,
19;135:1;138:11,13;
141:2;143:1,17;
144:1;145:1;147:18,
21;148:19,24;156:16;
157:20;161:8,9;
162:3;164:24
**Kayser's (6)**
39:9;45:7;74:6;
101:4;141:7;149:11
**KB (1)**
41:4
**KBL (10)**
27:11;29:10;37:12;
44:5,7,11;45:5,6;

75:12;135:6
**keep (3)**
140:5;147:10;
148:10
**Ken (11)**
23:22;26:1;27:8,10;
29:9,22;125:9;
127:20;134:5;137:8;
155:19
**Kenneth (5)**
3:21;39:11,14;
93:11;105:1
**Kevin (1)**
33:3
**key (26)**
14:4,7,15;15:23;
20:12;21:16;30:23;
31:9;32:16;33:13,24;
34:24,25;35:3,18;
42:6;49:20;52:8;73:1,
3,4,16;117:2;143:17,
18,20
**kind (7)**
4:19;7:9;78:6,8;
101:3;149:1,4
**knew (6)**
44:23;45:1;91:8;
95:4;119:19;128:6
**knowing (1)**
64:5
**known (2)**
66:13;91:8
**Kracht (70)**
3:14,14,17,18;
10:11,18,22;17:12;
18:12;40:9,10;41:6,9,
13;42:1,10,12,20;
43:24;46:17,24;
47:19,21;53:15,17,18,
22,25;54:10,14;55:19,
22;58:10;60:12,23;
77:12,14;78:18;79:8,
18,20,23;80:4,8,15;
81:1,10,12,19;82:20,
22;83:7;86:3,5,23,24;
89:22,23;90:16,18,23;
102:2,7;104:22;
147:16;154:12,24;
155:3;156:8;165:5

## L

**label (2)**
57:1;72:19
**labeled (2)**
102:13;104:3
**lack (1)**
75:3
**language (16)**
38:8;39:9,23;43:18,
23;44:9,19,25;46:20;
51:1;66:9;109:15;
113:11;114:12;

121:16;161:18
**large (2)**
24:7;98:18
**largely (2)**
47:12,17
**last (15)**
18:25;27:10;28:10;
29:11;30:9;34:24;
35:12;37:16;64:24;
80:2;105:24;120:7,
25;155:22,24
**late (1)**
91:18
**later (22)**
25:11;26:17;27:21,
22;31:11;43:16;
50:12;51:20;65:18;
70:4;71:13;77:25;
78:11;85:25;94:7;
96:6;98:5;106:3;
131:6;133:21;160:14,
19
**latest (1)**
91:19
**law (15)**
6:23;7:12,18,20,20;
8:8,24,25,25;13:1;
18:19;51:16,20;
55:12,17
**laws (1)**
147:10
**lawyer (7)**
7:17;8:7;50:25;
56:20;64:4;96:24;
112:20;121:25
**lawyers (11)**
6:18,19;7:14,14,18;
13:10;18:13;64:7;
114:13,15;161:17
**lay (2)**
4:19,20
**lays (3)**
14:3;25:19;35:25
**leading (1)**
20:5
**learned (1)**
14:12
**least (12)**
16:2;21:4;34:4;
37:15;64:10;65:12;
76:11;91:8;119:12;
120:2;155:8;164:12
**leave (5)**
91:11;147:25;
158:12;163:22,23
**leaves (1)**
58:17
**leaving (1)**
91:18
**Lebit (1)**
3:15
**lectern (8)**
6:17;8:6;9:6;11:1,4,

10,23;12:22
**led (1)**
69:5
**left (2)**
38:9;82:15
**legal (19)**
9:7;11:22;40:25;
63:16;64:3;94:4;
105:25;106:4,10,16,
19,22;112:18;117:17;
128:9;146:25;160:21,
23;161:20
**legible (1)**
82:3
**length (1)**
91:15
**lengthier (1)**
11:8
**less (3)**
27:21;95:2;97:1
**letter (10)**
61:21;95:3;99:12;
105:20;108:2;130:10,
14,21;132:13,15
**license (1)**
66:5
**licensing (1)**
160:16
**lie (1)**
58:21
**lieu (1)**
158:11
**life (2)**
99:1;142:12
**light (1)**
29:24
**likely (1)**
38:5
**likewise (1)**
47:6
**limited (7)**
29:8;63:12;65:4;
66:15;75:10;144:20;
155:4
**line (16)**
22:16;24:20;26:2;
28:10;36:7;40:5;
48:18;61:14,18;
98:11,20;126:17,19;
133:23;139:13;
146:10
**liquidated (1)**
136:1
**liquidity (18)**
28:10;87:10,11,17;
88:1,7,8,13,21;133:2,
11;136:1;145:20,21,
25;146:5;157:1;160:5
**list (5)**
7:10;65:17;66:13;
67:12;165:3
**listed (3)**
74:1;82:2;150:24

**TAGNETICS, INC.**

**October 18, 2019**

lists (2)
28:3;34:25
litigate (1)
162:15
litigation (6)
18:23,25;19:2,10;
29:13;62:21
little (13)
9:18;24:10;25:11;
30:14;36:21;49:8;
83:22;113:19;153:12;
154:7;17;163:13;
164:8
live (3)
109:19;137:18,19
lived (1)
137:22
living (1)
142:17
loan (9)
50:9;51:8;65:1,8,
22;66:2;75:13;
159:19;160:15
loaned (1)
67:1
loans (1)
66:19
logic (4)
28:24;40:13;
159:13,16
long (8)
10:16;31:14;32:8;
91:12;104:8;127:2;
153:22;155:4
longer (3)
36:21;74:10;157:15
long-time (1)
56:14;94:25
look (32)
17:20;25:1;26:19;
27:13;37:16;39:4,5;
43:25;44:8;47:22;
49:14;50:18;52:16;
63:8;65:24;66:9;
81:13,22;86:14;
98:13;100:2;107:15,
15;111:1,13;119:14;
128:6;133:16;134:23;
135:16;139:13;
154:12
looked (3)
52:10;64:19;84:2
looking (18)
8:13,16;14:20;15:6;
26:5;48:23;61:2;
66:11;76:11;81:21;
97:1;111:2;118:24;
125:7;126:25;149:6;
153:13;154:6
looks (9)
22:16;25:25;27:21;
30:7;52:20;80:14;
81:1;153:5,9

lot (7)
18:24;41:11;77:7;
147:5;154:17;162:9;
164:7
lousy (1)
112:20
low (1)
132:12
lower (2)
26:6,7
LTD (7)
37:12,18;44:12;
120:9,13,22;121:4
Luis (3)
54:20;56:13,20
lunch (6)
91:3,5,14,15;92:21,
25

**M**

major (1)
146:9
majority (1)
19:9
makes (4)
6:3;13:18;33:8;
164:16
making (13)
11:2,5,8;24:13;
49:12;51:12;56:24;
59:17;77:23;122:4;
133:15;144:25;
154:16
management (1)
135:13
many (11)
19:3,3;32:14;48:18;
87:21;95:18;99:1;
113:9;119:19;151:1,1
March (2)
127:18,22
Marketing (20)
38:16;39:4,19;43:5,
6;44:21;51:13,16;
55:3,16;56:16;
119:11,17,20;120:1,6;
121:10,16,19,23
marks (1)
80:18
material (1)
73:7
math (1)
76:9
matter (5)
23:1;29:14;84:5;
146:8;159:22
matters (6)
4:9,11,11,15;5:2;
30:12
may (60)
3:5,8;5:8,14,25;
7:12;12:16;13:7,17,

21;17:20;20:2;21:15;
31:19;34:2;41:21;
54:3;56:18;58:8;
59:19;65:15;66:17;
68:2,15;70:23;72:4;
78:14;82:14;83:8;
84:22,23;85:17;86:3;
89:25;90:9;92:23;
93:7;104:24;108:11,
15,18;124:8;125:2,3;
127:13,14;128:13,15,
24;129:8;131:3;
138:5,20;142:8;
144:11;147:25;153:4;
159:3,4;164:8
maybe (7)
49:16;61:10;65:14;
69:11;70:10,22;131:4
McCarthy (1)
3:15
mean (19)
34:11;40:5;47:13;
48:18;70:5;74:22;
77:4;81:13;115:23;
123:18;124:5;126:10;
134:14;135:14;140:4;
145:20;152:25;
154:21;161:21
meaning (9)
64:13;69:25;71:18;
97:10;123:10;139:16;
144:3;161:1,22
means (12)
51:14;87:12;113:7;
115:17;117:4;134:12;
144:25;145:21;
150:21;159:12;
160:17;162:25
meant (3)
45:14;112:8;161:25
meat (1)
88:23
meet (2)
149:2,5
meeting (4)
26:19;111:13;
119:24;139:14
memorandum (1)
158:11
mention (3)
43:13;59:8;64:25
mentioned (9)
52:4,6;65:21;
100:19;116:1;141:15;
143:1;149:13,13
met (1)
132:11
microphone (3)
54:5;90:12;105:8
middle (1)
116:23
might (7)
7:9;51:11;88:24;

89:14;91:20;132:20;
142:10
Mike (1)
127:24
mind (4)
51:14;84:5;117:20;
139:6
mine (2)
97:7;127:2
minute (4)
11:17;54:1;116:24;
154:25
minutes (2)
92:8,16
mirror (1)
15:2
mirrored (2)
66:9,10
mirroring (1)
43:18
mirrors (1)
39:10
miscalculating (1)
28:25
misinterpreted (1)
139:10
misleading (3)
112:9;114:12;
161:14
mispronounce (1)
35:12
missed (2)
47:15;80:19
missing (2)
15:5;150:7
misunderstandings (1)
33:2
Mm-hmm (4)
42:1;86:8;140:25;
146:14
modifications (2)
54:23;150:17
modified (3)
102:3;150:22;151:8
modifying (1)
62:9
moment (10)
34:8;39:5;57:21;
69:7;111:10;112:10;
113:15;129:6;134:4;
137:10
momentarily (1)
35:15
moments (1)
35:1
Monday (13)
26:19;29:8;33:9;
97:16,21;111:13;
118:13;136:6;139:14;
140:9;149:23;159:11;
164:11
monetary (26)
21:22;23:10,11,16;

24:8,19;25:20,21;
26:6;31:8;38:5,7;
63:10,12;65:4,7,9;
75:9,25;76:3;77:25;
112:6,14;142:21;
143:1,10
money (12)
27:8,9,10;29:11;
75:10,11;99:11,11;
134:10;135:25;
136:10;146:3
monitor (1)
81:23
months (14)
28:8;33:16,17;36:5,
5;94:7;99:22;133:9;
135:17,19,19,22,23;
151:2
more (30)
6:3;9:19;16:23;
26:2;31:18;33:10;
36:10;47:11;49:9;
52:10,10,21;55:14,16;
70:6,11;73:18,19;
95:2;96:25;105:9;
108:10;109:1;126:23;
131:6;134:19;147:7;
149:7;154:7;155:12
morning (13)
3:7,11,13,17,22,24;
4:1;13:21;25:16;
28:22;30:11;75:22;
136:6
Most (10)
19:12;21:7;29:21;
38:1,5;46:12;48:3;
119:17;130:19;153:1
mostly (1)
105:18
motion (11)
4:3;5:6;13:24;14:2;
15:3,22;17:18;54:18;
55:1;99:8;104:1
motions (1)
19:14
move (9)
8:20;29:12;32:3;
46:7;53:21,22;
108:11;133:3;147:6
moving (2)
55:20;140:5
msncom (1)
127:21
much (13)
11:5;25:11;38:3;
46:6;75:1;90:15;91:9;
92:11;105:17;135:14;
140:18;163:11;164:6
muddling (1)
78:19
multiple (1)
159:13
must (7)

**LEGAL ELECTRONIC RECORDING, INC.**
**216-881-8000 www.lerinc.com**

48:22;61:22;91:7;
95:22;107:17;136:23;
162:17
**mutual (60)**
14:16;15:12;31:10,
14,15;32:4,8;33:20;
49:4,6,9;51:14;52:9;
63:20;64:12,14;
69:25;70:1,20;71:5,8,
17;72:11;89:17;
112:17,24;113:2,3,6,
10;115:16,19,22;
116:7,10,20,21;117:3,
9,13,23;122:12,22;
136:12,13,15;141:17,
21;142:5,7,15,20,22,
24;159:17,22;160:13;
162:10,19,24
**myself (1)**
68:23

# N

**name (13)**
3:20,21;18:6;27:15;
35:11,12;37:21;
76:24;93:19,22;
123:6,7;146:22
**narrative (4)**
6:6;7:2;8:4;93:6
**nature (2)**
18:16;40:1
**near (1)**
29:6
**necessarily (2)**
40:7;74:25
**necessary (2)**
123:15;128:1;
131:20
**need (25)**
6:11;7:18;10:4,6;
16:20,23;22:12;33:6;
44:5;67:25;68:6;
69:13;70:4;79:13;
91:13;100:20,22;
105:7;109:24;146:4;
149:20;163:23;164:2,
8,10
**needed (6)**
54:24;98:16;122:9;
127:9;149:7,17
**needing (1)**
74:1
**negotiable (3)**
31:24;91:15,16
**negotiate (13)**
29:1;30:19;44:25;
106:20,22,23;107:24,
25;117:2;137:14;
149:1;151:12;160:18
**negotiated (10)**
19:2,18;24:1;37:22,
24;62:23;97:12;99:1,

4;116:22
**negotiating (13)**
45:6,7;97:8;107:10,
22;116:24;117:17,17;
129:25;130:3,7;
135:15;143:21
**negotiation (7)**
95:6;98:18;116:23;
118:3;148:17;161:17,
19
**negotiations (25)**
16:11;19:13,22;
21:4;27:4;32:24;38:1,
2;40:15;60:22;61:7;
86:17;107:7;111:18,
20,25;112:1,3;134:15,
21,21;139:7,9,19;
159:12
**nevertheless (4)**
69:20;71:3;72:6;
153:13
**new (13)**
25:15;51:2;77:23,
24;85:6,12,15;98:15;
140:22;145:25;
150:11,11;152:1
**next (21)**
22:15;23:19;25:24;
27:2;28:18,22;30:6;
52:16;53:2,4;63:1,1;
74:18;75:24;81:15;
95:17;102:25;103:1;
139:13;164:1,17
**non- (4)**
109:21;118:15;
142:20,25
**non-compete (1)**
51:4
**none (3)**
6:19;35:1;156:14
**non-monetary (21)**
21:23;23:15;38:8;
49:21,23;63:14;76:4,
10,14,19;108:24;
109:4,7;110:7,20,23;
112:6,14,16;141:9;
142:22
**non-negotiable (1)**
107:14
**nor (2)**
95:15;96:3
**normal (1)**
99:5
**Normally (2)**
116:24;154:14
**note (2)**
10:11;96:9
**notes (2)**
66:18;74:5
**notice (1)**
159:8
**noticed (1)**
127:23

**notified (1)**
137:9
**notifying (1)**
136:11
**notion (1)**
69:11
**notwithstanding (1)**
159:6
**nourishment (1)**
91:10
**November (1)**
18:20
**Nowhere (1)**
149:9
**nuance (1)**
120:23
**Number (14)**
3:7;11:20;14:17;
21:21;22:21;26:7;
28:25,25;34:12,20;
48:9;102:5;147:1;
149:5
**numbers (2)**
15:9;28:5

# O

**oath (4)**
11:24;93:9;129:10;
148:12
**object (13)**
40:4;45:10;46:22;
47:4,6;57:5,7;103:21;
109:21;121:22;
153:16;155:3,15
**objected (2)**
57:2;87:19
**objecting (2)**
110:1;160:7
**objection (34)**
6:10,12,13,14;11:6,
7;39:3;40:20;42:18;
43:15,16;46:1,4,21;
47:3,18;56:25;57:1,3,
19;58:22;59:5;60:23;
62:15,16;77:12,16;
78:18;83:2;100:23;
118:15,21;152:8,17
**objections (16)**
24:6;38:14;47:8;
48:9,13;52:25;54:6;
55:24;57:8;58:19;
59:25;60:3,5;73:10;
87:18;104:3
**obviate (1)**
149:20
**obviously (6)**
50:13;62:4;116:22;
130:17;144:18;153:4
**occasion (1)**
126:24
**occur (2)**
88:18,25

**occurred (6)**
21:6;31:17;41:20;
56:22;70:2;82:23
**occurrence (1)**
28:9
**o'clock (3)**
30:14;92:17;96:5
**October (2)**
3:4;18:20
**odd (4)**
27:3;86:17;111:18;
154:13
**Off (25)**
12:13;20:5;27:4;
37:2;42:24;58:5;
80:15;81:2;82:11,15;
85:18,19;86:11,17;
111:18,19;112:1;
128:8;134:20,21;
139:7,8,21;149:12;
153:5
**offer (5)**
23:5;24:13;25:15,
16;61:20;62:2,3;
75:21;101:21;107:20;
111:22;129:24;
134:13,22;140:7
**offered (3)**
16:8;26:7;140:13
**office (3)**
55:8;82:5,9
**officer (3)**
117:14;122:13,23
**officers (5)**
39:20;41:18;42:8;
44:17;122:8
**often (3)**
47:13;70:24;95:17
**Ohio (7)**
3:3,15;7:21;51:16,
20;55:12,17
**old (1)**
98:11
**once (11)**
14:6;16:16;21:16;
34:2;49:22;76:12;
95:10;131:7;132:13;
159:25;160:20
**one (93)**
8:5,9;9:12;10:12,
16,19;11:14;12:17;
14:19;15:4,4;16:1;
17:16;18:13;20:21;
21:24;22:18;25:1;
30:14,18,20,22,23,23;
31:18;33:22;34:4,12;
36:1;37:13,14,17;
38:13,22;39:2;42:23;
47:11,12;48:3,4;
49:18,19;50:16;52:7,
17;53:4;61:3,9;63:11;
64:24;65:3;66:18;
69:8;70:17,19,24;

75:7;76:23;83:18;
84:16;85:17;87:9,19,
22;88:15;92:17;93:2,
22;96:22;102:20,25;
107:15;109:1;122:8;
126:24;127:10,17;
128:13;129:6;132:8;
135:20;138:25;139:2;
145:19;150:19;
151:25;152:6;155:7,
24;161:9;162:8,8,22
**ones (3)**
32:6;100:20;158:12
**one-sided (1)**
72:15
**online (1)**
127:23
**only (36)**
9:20;14:11;15:4;
16:13;19:19;20:21;
24:12;27:15;36:2;
38:10;45:6;47:13;
50:22;51:11;62:15;
63:4,10,12;68:17;
75:10,11;89:20;
107:22,23,25;112:16;
127:6;135:25;143:14;
144:17;147:2;149:21;
151:13;155:5;163:13;
164:6
**onto (2)**
28:18;106:8
**opening (23)**
4:14;5:6;10:10,25,
25;11:2,17;12:11;
13:14,18,19;16:4,19;
17:1,1;20:2;32:11;
39:9;48:18;61:24;
62:18,19;126:19
**opens (1)**
22:1
**operate (2)**
4:23;7:5
**operating (10)**
39:13,17;43:2,10;
44:14,19;51:15,16;
121:9,24
**opinion (1)**
117:6
**opportunities (1)**
159:14
**opportunity (12)**
4:14;5:21;9:5;
47:10;56:7;58:25;
59:11,22;117:4,10,14;
122:7
**option (1)**
151:14
**options (3)**
29:6;146:7;157:14
**oral (11)**
158:11;163:10,12,
14,17,20,25;164:3,9,

**LEGAL ELECTRONIC RECORDING, INC.**
216-881-8000 www.lerinc.com

TAGNETICS, INC.

October 18, 2019

13;165:8
order (7)
    21:10;84:13;85:2;
    98:2,3,8;154:15
ordered (1)
    97:25
oriented (1)
    18:23
original (8)
    40:2,15;71:25;84:2;
    99:12;101:19;107:10;
    129:22
originally (3)
    36:21;37:6,8
other's (2)
    8:5;17:7
otherwise (3)
    40:14;66:14;165:7
out (65)
    11:22;14:3,19;20:8,
    9;24:19;25:14,19;
    33:2;35:25;36:5,23;
    37:9;38:9;41:2,23;
    54:6;58:23;63:16;
    64:16,23;65:16,22;
    68:21;72:25;76:22;
    77:10;80:24;81:11;
    91:19,19;92:6;96:18;
    98:24;114:6,10;
    124:18,20;125:13,25;
    126:3;130:15;132:23,
    24;133:10,17;135:9,
    17;137:8,8;142:16;
    146:1,21,24;150:6,12,
    23;153:11;154:8,16;
    157:4;161:25;162:12;
    163:2;164:5
outcome (1)
    30:2
outlined (3)
    24:17;95:22;114:10
outlining (1)
    132:22
outs (2)
    69:6;117:4
outside (9)
    29:2;48:19;52:3;
    74:23;77:14,15,18;
    124:4,6
outside-the-contract (1)
    66:3
over (21)
    4:8;5:18,19;10:7;
    15:13;18:25;20:5;
    28:18;31:16,16,16;
    33:12;50:17;86:18;
    95:17;97:15;129:2;
    132:24;148:5;149:23;
    162:22
overall (2)
    41:16;117:18
overlap (1)
    9:9

overrule (3)
    40:19;42:18;78:17
oversight (1)
    15:7
overture (2)
    24:1;62:23
owed (1)
    29:19
own (17)
    5:23,25,25;6:5,24,
    25;24:24;25:3;39:11;
    44:13,24;105:25;
    106:4,10;116:4;
    131:9;146:21
owned (5)
    37:13;119:12,20;
    120:2,13
ownership (12)
    50:11;51:17;55:4,
    15;56:21;145:23,25,
    25;146:21;157:7,13,
    13
owns (2)
    44:6;55:14

P

page (53)
    4:10;13:12;14:22;
    23:20;25:18;26:24;
    27:16,24,24;28:15,16,
    18,18;32:10;34:15;
    36:16,17;37:16,18;
    38:12;44:9;48:7,16;
    61:3;62:12;66:11;
    79:1,4;80:1,7,11,12,
    14;81:15;83:25;86:7,
    9;87:16;95:2;106:8,8;
    108:23;109:4;110:24;
    111:4,8,9,11;120:8,
    25;138:25;143:16,24
pages (2)
    36:25;81:16
paid (10)
    29:19;133:1,10;
    134:6;135:5,6,6,24;
    146:1,21
paper (1)
    163:17
Paragraph (19)
    24:9,15;25:6;39:5,
    9;45:8;48:25;61:24;
    62:18;66:12;75:3;
    88:9;105:24;108:24;
    109:3;110:7,12,16;
    111:1
paragraphs (1)
    39:24
paraphrased (1)
    119:2
parens (2)
    27:9;64:13
parent (8)

39:16;44:14;
    115:24,25;116:5,11,
    13;121:8
parents (4)
    43:1,10,21;51:15
part (34)
    15:6;18:24;19:19;
    23:11;24:7;35:24;
    38:20;40:17;41:16;
    45:2;46:12;65:8;
    72:14;79:9,16;80:4;
    82:16,17;84:6;89:11;
    99:20;101:4,23;
    102:1,4,6;109:11;
    130:11;149:2;152:20;
    153:7,11;158:21;
    163:5
participant (1)
    129:21
participation (3)
    71:24;148:2;157:24
particular (4)
    44:2;55:2;56:10;
    145:18
particularly (6)
    4:19;10:3;57:11;
    94:22;128:23;139:21
particulars (1)
    123:22
parties (13)
    4:12,20;6:2;11:20;
    29:3;32:23;35:16;
    46:14,16;71:9;163:1;
    164:18;165:2
partner (1)
    22:11
party (5)
    12:25;42:25;46:24;
    73:12;162:22
party's (1)
    162:22
pass (1)
    7:18
passenger (1)
    30:11
past (3)
    152:6;154:3,5
patents (1)
    93:20
path (3)
    27:7;29:25;149:3
Pause (1)
    54:9
pay (9)
    27:9;29:12;84:9,19;
    133:7,23;135:7;
    146:9;151:14
paying (4)
    84:24,25;108:5;
    135:18
payment (49)
    14:14;24:8,8;25:21;
    26:3,6,8,9;28:4,6,9;

33:13,23;35:24,25;
    36:10;62:6,17;74:9;
    75:5;76:18;87:9;
    88:17;89:15;95:5;
    97:11;102:3,9;
    107:23;108:1,3;
    132:19,22,25;133:8;
    134:1;135:4,4,8,18,
    19,21,22;145:19,20;
    159:19,20,21;160:15
payments (33)
    15:10,18;16:13;
    23:13;25:20;26:10;
    28:7,11;33:15;36:4,7;
    48:25;49:2,3,5;51:3;
    52:8;62:16;65:10;
    130:4;132:23,24;
    133:9,24;135:9,10,17;
    143:7;147:3;148:22;
    159:19;160:8,11
payout (5)
    94:18;95:8,10,13;
    96:1
people (6)
    22:8,21,23;37:14;
    124:4;164:1
percent (7)
    55:14,16;56:17;
    94:20;145:23,24;
    146:4
Perfect (2)
    131:16;138:19
perfectly (1)
    15:16
period (3)
    15:13;21:13;132:25
permissible (2)
    46:18;54:2
permit (1)
    54:11
person (4)
    55:12,12;58:16;
    148:25
personal (1)
    126:8
personally (1)
    153:14
personnel (1)
    92:18
perspective (8)
    4:7;9:10,22;31:25;
    40:25;97:6,7;128:1
pertinent (2)
    14:1;31:2
petition (4)
    56:18;94:7;116:13;
    124:15
petitioners (1)
    94:25
Petitioning (45)
    4:4,25;5:10,21;
    10:24;11:16,18;12:8,
    18;16:6,10,12;19:22;

21:13;25:9;26:15;
    27:20;30:4;31:18;
    32:5;37:7,11,12,14,
    19;38:22;40:16;
    51:23;54:5;55:23;
    58:18;70:15;82:17,
    19;89:2;93:1;104:7,
    12,13;155:17,25;
    156:2;158:20;159:7;
    164:22
P-H (1)
    18:8
PhD (1)
    93:13
phone (14)
    21:12;22:10;30:15;
    32:14;33:5;68:21,22;
    70:16;94:11;132:17;
    133:14;135:11;
    142:24;162:13
phrase (20)
    14:15,15;31:15;
    33:20;52:11;63:20;
    64:7,8,10;67:24;69:8;
    72:13;88:22;110:12,
    16;117:23;122:11,22;
    123:13,18
phrasing (2)
    77:24;86:16
picked (2)
    20:10;112:3
piece (1)
    163:17
piecemeal (1)
    131:7
place (10)
    14:10;33:10;56:18;
    62:8;69:14;73:17;
    84:11,13;85:1;153:15
places (1)
    92:18
plain (1)
    161:1
plan (2)
    92:3,15
planning (2)
    84:24;161:15
play (3)
    19:21;88:14;145:3
please (21)
    3:9;11:4;12:7;
    13:22;17:22;18:2,6;
    20:15;21:23;27:5;
    33:5,24;50:4;54:17;
    60:24;103:15;116:8;
    120:18;126:20;129:7;
    153:4
plenty (1)
    47:10
pm (45)
    21:2;25:13,25;
    26:23;27:14,23;30:7,
    8;33:3;34:6,13,21;

35:21;48:2,6,21,21;
50:21;64:12;76:2;
82:12;86:15;92:21,
21;106:7;111:3,6,7,
11;112:6;113:13;
114:25;115:3,11;
117:21;125:8;126:14;
127:18,22;140:20,24;
141:5;143:15,25;
165:10
**pocket (2)**
125:19;137:8
**point (53)**
14:19;17:17;27:25;
33:1;36:9;40:11;55:2;
59:16;61:10;64:11;
65:3,14;67:14;69:20;
70:19;71:20;75:4,5;
76:22;77:8,22;78:5;
83:2;85:17;86:19,21;
91:17;106:19;107:7;
111:21,25;113:18;
114:22;115:2;124:11;
133:12;136:2;138:25;
139:2,7,20;141:10;
143:22;144:5;148:25;
149:21;150:10,13,19;
156:13;162:12;163:4;
164:15
**pointed (3)**
58:22;150:6,23
**pointing (2)**
106:1,8
**points (1)**
71:24
**poor (2)**
112:18;114:12
**portion (5)**
47:2;73:4;148:18,
19;154:5
**portions (1)**
38:13
**pose (1)**
10:14
**position (10)**
6:9;9:7;29:23;
40:22,23;42:19;62:1;
89:5;153:19;164:4
**possess (1)**
146:22
**possibility (3)**
20:4;24:13;49:17
**possible (5)**
4:21,22;5:17;82:23;
91:18
**possibly (1)**
24:11
**post- (1)**
51:22
**postpone (1)**
99:18
**postponed (1)**
72:19

**postponement (1)**
16:17
**post-trial (1)**
158:10
**potential (4)**
22:4;23:3;24:12;
26:6
**potentially (1)**
88:14
**practice (10)**
6:23;7:11;8:8;13:1;
18:17,18,21,23;19:4,
10
**practicing (1)**
18:22
**predecessor (3)**
93:19;123:4,12
**prefer (2)**
53:19;112:20
**preference (4)**
9:16,24;11:9;27:11
**preferred (1)**
133:18
**prejudice (2)**
51:6,7
**preliminary (6)**
4:9,11,11,15;5:2;
137:11
**prepared (1)**
93:1
**preparing (1)**
54:18
**present (11)**
5:7,22;8:10;24:5;
78:13;79:7;93:6;
128:20;148:4;157:25;
161:8
**presentations (3)**
9:4;11:8;165:6
**presented (2)**
99:15,20
**president (1)**
93:24
**presiding (1)**
3:5
**presume (1)**
62:1
**pretty (6)**
13:25;27:25;34:4;
73:13;135:14;164:6
**prevail (1)**
29:8
**prevailing (1)**
73:12
**prevails (1)**
29:12
**previous (2)**
146:10;150:1
**previously (6)**
49:6;51:4,9;94:17,
24;101:9
**prima (1)**
91:6

**primarily (3)**
21:17;30:16;59:5
**printed (2)**
80:9;153:11
**printing (1)**
154:8
**printout (2)**
80:23;81:9;153:5;
154:13
**prior (12)**
43:7,25;89:15;
105:20;123:7,24;
124:15;128:4;141:6;
153:24;155:6,9
**privileged (1)**
52:1
**pro (11)**
4:20,25;6:2;9:2;
11:20;12:25;32:23;
38:1;161:15;163:1;
165:2
**probably (11)**
18:25;46:6,7;70:23;
82:4;91:3,13,21,23;
128:10;146:24
**problem (5)**
24:7;80:19;81:18;
82:19;91:21
**procedure (2)**
43:2,9
**proceed (12)**
6:13;13:17;15:24;
23:14;24:17;25:5;
29:16;42:17;83:8;
86:3;93:3;132:8
**proceeding (9)**
24:18;38:1,10;45:2;
51:6;123:24;124:1,
11;127:5
**Proceedings (2)**
3:1;165:10
**process (6)**
10:4;15:16;22:14;
81:6;84:22;116:23
**produced (1)**
125:1
**professional (2)**
165:1,5
**professor (2)**
93:15,16
**Profits (2)**
66:22;89:15
**promise (1)**
118:12
**prompted (1)**
134:11
**proper (1)**
71:21
**property (2)**
69:17;70:22
**proposal (25)**
16:9;24:6;25:23;
26:20;28:3,13;29:20,

22;71:25;72:2;73:24;
74:6;76:2,4,5;84:2;
85:20;94:10,12;
102:16;140:7,14,17;
148:18;149:10,12
**proposals (2)**
76:9;85:21
**proposed (10)**
16:7,16;26:9;33:15;
58:11;75:16;80:6;
135:3,10,11
**prosecute (2)**
71:12,23
**protestations (1)**
159:6
**provide (8)**
18:16;44:4;45:9;
101:12;144:14;
156:25,25;162:15
**provided (12)**
26:10;39:7;48:11;
50:6;52:25;66:25;
69:25;71:5;73:20;
87:16;103:18;116:16
**provision (6)**
51:2;87:15;97:11;
109:10,10;116:19
**provisions (1)**
114:10
**pull (2)**
77:10;83:22
**Purdue (2)**
93:14,15
**purported (1)**
110:22
**purposes (2)**
9:21;38:10
**pursued (1)**
29:3
**pursuing (1)**
29:17
**push (1)**
135:16
**push-back (1)**
144:22
**pushing (1)**
69:11
**put (29)**
6:16;15:2;16:9;
24:2;25:15;34:9;
62:24;74:13;75:19;
78:25;84:1;87:14;
88:22;98:16;113:17;
114:6;123:10,11,12,
16;132:19,25;135:24;
137:12;144:2;145:1;
151:12;163:11;164:3
**puts (1)**
7:13
**putting (5)**
24:19;25:14;105:3;
133:22;146:3

## Q

**qualify (1)**
63:3
**quick (3)**
80:25;84:23;87:6
**quicker (1)**
163:14
**quickly (3)**
94:6;99:21;140:17
**quite (5)**
15:17;27:3;41:9;
86:16;111:17;114:12;
157:14;163:10
**quoting (1)**
100:12

## R

**raise (3)**
5:1;18:2;29:5
**raised (5)**
28:1;71:25;148:19;
151:9;162:12
**raising (1)**
72:24
**ran (2)**
80:23;81:11
**rate (1)**
132:13
**rather (3)**
9:13;96:25;131:6
**reach (4)**
24:1;30:20;62:23;
133:4
**reached (10)**
33:4;53:13;61:21;
84:7;95:25;106:15;
107:3;115:18;137:11;
146:17
**re-acquired (1)**
93:21
**reaction (1)**
52:15
**read (19)**
39:8;42:7;44:9;
46:5;61:14,25;67:11;
74:5;77:7;81:10;
83:16;84:20;96:16;
106:12;108:6;109:9;
121:17;163:18;164:4
**reading (9)**
23:24;45:11,21;
53:5;64:11;84:25;
125:19;134:1;150:3
**ready (5)**
4:7;13:14;15:23;
60:13;165:7
**real (2)**
30:25;99:24
**realistic (5)**
24:2,4;62:25;74:13;

**TAGNETICS, INC.**

October 18, 2019

75:19
realize (4)
50:14;91:22;147:2;
161:12
Really (32)
17:20;20:10,11;
22:14;30:5;34:10;
46:12;61:9,10;63:18;
84:18,22;87:19;89:9;
123:21;134:16,23;
136:3;142:14;144:3;
146:7;151:15;153:9,
12,16;154:10,11,15;
156:9;160:2;161:21;
163:11
reason (11)
9:20;10:18;11:18;
39:25;44:22;56:14;
68:17;80:8,11;
141:11;143:3
reasonable (5)
29:20;88:23;135:7;
149:7,9
reasons (1)
31:2
recall (9)
72:2;83:20;85:17;
96:10,18;102:5;
105:17;150:2,3
receipt (2)
23:23;62:20
receive (5)
26:14;27:8,19;30:3;
97:16
received (14)
27:10,22;29:11;
78:14;83:12;84:16;
85:5;87:18;94:9;
96:12;98:5;104:14;
134:25;156:2
receiving (6)
33:23;97:20;150:2,
18,23;151:3
recent (3)
21:7;29:21;48:3
recess (9)
12:11,12;57:24;
58:3,4;82:4,7,8,10
recognize (1)
127:16
recollection (12)
65:25;68:25;69:1;
70:1,7;83:13,18;
84:17;85:10;87:17;
124:25;127:6
recommend (1)
70:25
recommending (1)
31:5
recopied (1)
152:6
record (6)
3:20;12:13;18:7;

54:4;58:5;82:11
recording (1)
11:4
records (1)
127:1
recross- (1)
145:8
recross-examination (1)
86:25
redacted (12)
37:10;38:4;44:5;
45:9,18,22,23;46:2,5,
19;47:13;120:20
redirect (8)
5:13;86:3,4;128:21;
144:14,16,17;156:20
redline (4)
99:10,13,15;103:3
reduce (1)
135:9
re-elicit (2)
68:3,6
refer (12)
9:25;14:1,21;19:23;
35:5;60:24;73:1;
75:23;76:10;108:12,
23;141:1
reference (12)
14:21;70:22;75:12;
76:7;85:21;110:7;
141:5,9;153:10;
156:15;159:8,14
referenced (7)
17:17;25:20;26:22;
35:2;40:3;65:3;109:7
references (1)
66:1
referencing (1)
64:10
referred (7)
28:9;32:11;73:15;
105:3;109:5,8;110:8
referring (30)
9:14;33:17,18;
35:10,25;61:3,16;
67:10;69:14;72:22;
73:19;80:17;81:15;
86:11;105:5;108:22,
24;109:4;110:17;
118:6,11,16;125:12,
17,24;126:2;140:19;
152:11;159:10,19
refers (3)
50:11;74:16;87:10
refine (1)
151:16
reflect (6)
15:14;21:24;37:1;
85:16;115:4,11
reflected (19)
20:23;23:10,19;
25:18;26:21;27:23;
28:13;31:9,11;33:18;

37:15;63:13;108:2;
110:21;143:10;160:3,
10,12;161:2
reflection (1)
21:4
reflects (9)
14:5;15:8;23:2;
31:11;36:6;37:2,9;
65:4;99:17
refresh (2)
124:24;125:5
refused (1)
98:5
refute (1)
153:19
regarding (3)
22:3;38:21;66:25
regardless (2)
69:9;161:10
regurgitating (1)
148:15
reiterated (1)
98:21
reiterating (2)
65:8;97:22
reject (1)
74:7
rejected (7)
20:8,10;21:3;57:16;
74:3;75:16;145:2
rejecting (2)
25:14;61:8
rejection (2)
26:16;75:20
related (9)
11:13;30:12;39:13,
18;44:15,20;50:10;
69:17;121:9
relates (1)
78:16
release (54)
32:2,3,4;39:4,24;
40:24;41:1,12,15,16;
43:20;44:8;45:4;51:1;
65:17;66:9,10,11;
69:10;70:20;71:18;
72:9,11;89:13;
112:17,24;113:2,3,4,
7,8,9,10;116:21;
117:4;121:4,7,7,15;
136:12,13,15,19,21;
142:1,6,15,19,22;
160:13;162:10,15,20,
25
released (4)
31:22;32:1;40:16;
121:23
releasees (1)
39:23
releases (49)
14:16;15:12;30:25;
31:10,13,15;33:20;
38:13,16;39:7,15;

40:2;44:6,11,18;49:4,
7,10;51:14;52:9;
63:21;64:2,13,14;
69:13,24;70:1;71:17;
89:17;115:16,19,22;
116:7,10,20;117:3,9,
13,23;122:12,22;
141:17,21;142:5,7,20,
25;159:17,22
relevance (2)
40:5;46:15
relevant (5)
10:13;47:2;145:18;
153:14,20
relied (1)
121:6
relinquish (2)
89:10,12
relinquishment (1)
89:13
remainder (3)
26:8;60:22;133:10
remaining (4)
33:15;37:14;38:21;
58:17
remember (30)
20:22;21:14;30:8,
13,21;31:12;32:14,
15;33:25;34:3;35:11;
63:11;68:24;69:3,9,
12;71:7;77:24;84:7,7,
15,18;85:3,8;88:15;
127:11;139:5;142:3;
152:12;154:17
re-mention (1)
149:15
remind (3)
93:8;129:9;148:11
remorse (2)
52:11;77:23
removed (1)
10:19
render (4)
163:20,25;164:13;
165:8
rendered (1)
66:25
renegotiate (4)
62:5,7;95:9,12
renegotiated (1)
96:3
renegotiation (2)
95:15;130:9
reorganized (4)
93:22;123:9,13,19
Repeat (4)
115:6;116:8;
122:20;126:1
repeated (3)
49:10;159:25;
160:20
repeatedly (2)
15:14;98:21

repeating (1)
52:9
re-photocopy (1)
152:15
rephrase (1)
122:10
reply (2)
33:5;113:21
report (1)
69:23
reported (1)
72:6
represented (2)
34:24;37:25
representing (2)
9:1;31:1
represents (1)
35:7
request (5)
47:20;49:12;70:13;
71:15;94:9;95:9;
101:20;162:1
requested (4)
40:13;69:24;71:11;
74:8
requesting (2)
24:3;94:17
requests (1)
49:2
require (2)
29:4,12
required (2)
107:2;149:11
requirements (1)
150:11
requires (1)
64:17
reread (1)
66:12
rescinded (1)
107:17
research (3)
55:7,10,11
resembles (1)
16:9
reservation (2)
71:11,17
reservations (1)
31:14
reserve (11)
56:5;57:19;58:23;
59:9,17,21;70:13,14;
131:12,14;162:14
reserving (1)
71:22
resigned (2)
94:2;116:2
resolution (3)
24:1;62:24;109:12
resolve (1)
62:21
resolved (2)
19:13;94:6

**LEGAL ELECTRONIC RECORDING, INC.**
**216-881-8000  www.lerinc.com**

**TAGNETICS, INC.**

**October 18, 2019**

respect (4)
9:8;114:24;156:25;
159:10
respond (7)
23:18;25:9,23;27:1;
28:21;114:4;121:14
responded (7)
25:12;48:13;61:8;
73:24;74:6;113:12;
140:16
responding (7)
28:23;34:8;48:2;
101:20;113:16;
134:22;144:1
response (41)
4:4;23:19;24:21;
26:14;27:1,13,19,22;
28:15;30:3;32:1;34:6;
40:9;50:5,5;53:2,6;
62:10,11,11,14,19;
67:14;73:23;75:20;
77:16;86:13;94:16;
97:22;101:10;111:16;
113:20;114:6;132:16;
139:9;144:15;149:9;
150:4,6,22;151:15
responses (1)
39:2
responsive (4)
109:22;110:2;
114:17;118:16
rest (3)
67:11;132:5;163:24
restate (2)
110:25;130:1
restated (1)
149:25
restatement (1)
97:18
rested (1)
92:25
restricted (1)
137:7
restructuring (1)
130:4
result (2)
31:18;97:20
retain (1)
41:21
re-trade (1)
53:12
retrieve (2)
82:4,8
return (3)
29:11;72:10;91:24
returned (1)
27:12
revealing (1)
52:1
reverse (2)
21:10;154:14
review (1)
100:3

reviewed (1)
4:6
reviewing (1)
155:18
revised (2)
26:1;46:19
revisiting (1)
68:16
revive (1)
86:19
rewrite (1)
160:25
right (56)
5:5,11,12;18:3;
35:5;37:5;41:10;44:2;
46:3;56:1,4;59:16;
62:11;66:20;70:13,
15;71:14,22;74:15,
24;80:21;83:4,7,8;
86:1;100:14,15,21;
101:23;102:11,22,24;
104:2,21;106:1;
115:15;116:5;122:23;
126:18;127:11;
128:24;129:3;130:2;
131:11;132:4;136:10,
10,13,20;138:24;
139:12,22,25;152:13;
161:2;162:14
right-hand (1)
126:15
rights (3)
69:17;89:12,14
rise (4)
12:12;58:4;92:20;
165:9
risk (3)
8:25;27:9;29:7
risks (1)
29:24
R-N (1)
18:9
road (2)
91:21;164:10
Roanoke (1)
99:9
Robert (2)
3:14;37:21
role (1)
19:21
Romanette (7)
66:18,18,21,23,24;
67:1,4
Ron (15)
23:22;26:1;28:23;
33:3;64:25;65:1;66:2;
93:23;95:12,14;96:1;
107:22;123:20;129:7;
136:9
Ronald (3)
3:23;129:12;
132:10;138:7;144:16
Ron's (1)

27:15;65:22
rough (1)
118:12
royalties (1)
66:24
rule (4)
6:12,12;58:15;68:6
ruled (2)
29:4;58:12
ruling (8)
6:14;56:5;57:20;
58:24;59:9,17,21;
99:8
run (1)
68:5
running (2)
80:10;96:19

**S**

salary (1)
66:6
same (38)
4:9;5:18;9:15;10:2;
12:5,22,23;13:8,9,12;
16:21;17:3,8,9;25:4;
34:18;36:1;44:19;
46:14;60:3;62:12;
67:25;68:12,16,17;
70:10;71:24;95:2;
103:5;106:6;117:11;
136:25;137:5;145:13;
148:16;150:6;156:23;
157:5
sat (2)
94:11;114:11
Saturday (1)
125:7
save (1)
163:13
saw (15)
53:9;76:25;77:3;
84:18;98:3,23;
113:25;114:3;115:9;
116:9;122:11,21;
134:4;157:2;159:18
saying (27)
24:13;25:4;28:23;
34:6,9;35:14;38:19;
41:13,14,15;63:22;
69:13;70:7;71:7;
73:16;77:17;83:14,
19;85:19;113:16;
114:4;118:10;127:10;
134:23;139:9;144:2;
149:6
scanned (1)
81:19
scanning (2)
82:3,18
scenes (1)
160:23
schedule (24)

26:8;28:4;33:15,17,
18;35:24;62:6,17;
74:9;76:18,22;87:10;
88:8,17;94:18;96:1;
97:11;102:4,10;
107:23;108:3;135:4,
4;149:3
scheduled (1)
16:17
school (2)
7:18;18:19
scope (10)
14:14;40:1;48:19;
52:3;63:25;77:14,15,
18;78:15;150:12
screen (1)
106:12
se (11)
4:20,25;6:2;9:2;
11:20;12:25;32:23;
38:1;161:16;163:1;
165:2
seat (2)
11:7;30:11
seated (5)
3:6;12:16;58:8;
82:14;92:23
second (16)
23:24;36:4;62:21;
89:1;98:10;105:23;
108:23;109:3;125:18;
128:14;135:3,17,18,
21;142:11;146:12
secrets (1)
70:23
Section (11)
39:6,6,6;44:9,23;
65:1;73:11,12;87:15;
88:3;121:5
sections (1)
38:4
secured (1)
16:16
seeing (4)
15:17;155:4,5,6
seek (13)
15:15;24:24;25:2;
29:25;30:2;49:3,6;
79:14;105:25;106:4,
9,16;160:21
seeking (13)
14:17,18;15:10,11,
18;19:16;49:24;
103:6;12;152:23;
159:15;160:8,11
seem (3)
63:16;111:23;
134:23
seemed (4)
52:13;130:12;
136:2;137:21
seems (8)
27:3;30:1;86:16;

111:17;134:19;135:7;
153:6;159:13
selected (1)
97:21
sell (1)
135:20
send (5)
27:5;32:16;61:21;
105:19,19
sending (1)
105:20
sense (4)
33:8;153:23;
154:16;164:16
sensitive (1)
32:22
sensitivity (1)
32:24
sent (43)
14:23;22:20;27:2;
28:22;35:17;36:18;
43:17;50:16,19;
54:22,25;60:21;
64:25;65:6;76:24;
77:13;78:22;83:19;
85:9,14;94:15;96:9,
10,17,25;97:23;98:6;
101:9;103:4,19,23;
127:10;129:22;
130:14;132:21;141:2;
150:1;151:8;153:13,
18
sentence (5)
23:25;62:20,22;
63:1;126:19
sentences (1)
62:19
separate (5)
9:19;11:21;12:19;
44:25;46:25
separately (1)
38:3
series (5)
14:1;20:19;21:2;
25:19;152:21
serious (2)
109:11;134:24
serve (2)
7:17;13:10
services (1)
66:25
serving (2)
8:7;56:16
session (5)
3:4;12:15;58:7;
82:13;92:22
set (10)
9:12;13:25;14:15;
34:23;61:13;98:15;
143:17,18,20;164:12
sets (4)
15:22;32:16;33:4;

**TAGNETICS, INC.**

**October 18, 2019**

48:9
**setting (4)**
22:6;23:15;49:1;
100:2
**settle (6)**
40:6;94:10,19;
98:22;111:22;134:7
**settled (3)**
19:11;37:8;147:12
**settlement (124)**
4:3;13:24;14:8,12;
15:9,11,20;16:8,16;
19:13,15,18,22;20:4;
21:4;22:4;23:3,17;
24:4;27:10;28:2;29:2;
30:19;33:8,11,12;
35:4;36:8,10,19,20;
37:10,20,22,24;38:15,
21;40:2,7;41:3;42:11,
14,21;43:2,7,14;44:1,
25;45:13,19;46:14,
16;48:11,14;49:2;
50:6,24;51:23;52:25;
53:13;54:19;55:1;
64:24;65:9,21,24;
67:10;73:8,11,14,18;
74:2;84:14;88:9;89:5,
6;94:12,23,24;95:23;
97:15,16,19;99:9;
101:21;102:17;
106:20,23;107:2,7,17;
111:25;117:18;118:6;
120:12,15,19,21,24;
121:3,22;122:25;
129:25,25;133:4,7,18;
137:1,9,13,18,19,21;
139:18,19;146:16,16,
24;149:1;151:13;
157:9,9;159:18;160:3
**settlements (3)**
19:3;43:9;99:4
**settling (3)**
37:19;99:25;134:24
**seven (1)**
67:4
**several (5)**
21:20;81:16;95:17;
108:3;132:17
**share (1)**
127:24
**shared (1)**
55:9
**shareholder (2)**
56:17;124:8
**shareholders (5)**
39:20;44:17;
123:25;124:2,7
**shares (3)**
119:12,19,20;
120:2,6
**sharing (1)**
38:14
**sheet (8)**

14:2,16;32:12;
34:12;37:3;72:12,20,
22
**sheets (1)**
72:23
**short (10)**
26:18;27:2,25;
35:17;61:19;82:6,7;
91:10;148:21;149:6
**shortness (1)**
75:3
**show (17)**
16:7,11,15;33:8;
38:11,12;43:7;55:7;
78:23;81:25;107:6,8,
12,19,25;120:21;
124:24
**showed (1)**
125:5
**showing (1)**
65:6
**shows (6)**
27:15;28:5,11,15;
46:19;81:14
**side (4)**
9:13;65:14;90:12,
15
**sides (1)**
29:7
**sign (2)**
98:4,5
**signature (4)**
38:12;120:8,20,25
**signed (12)**
37:17;43:7,12,15;
54:21,24;98:7;
120:11,20,21,24;
121:20
**significance (1)**
96:21
**significant (5)**
16:15;29:14;95:20;
121:25;133:3
**significantly (1)**
81:22
**silly (4)**
27:3;86:16;111:17;
134:20
**similar (5)**
40:14;50:8;84:2;
87:20;157:5
**simply (6)**
27:3;86:17;99:25;
111:18;139:8;163:15
**single (1)**
42:23
**sit (1)**
160:25
**sitting (1)**
90:12
**situation (5)**
6:3;9:1;29:1;
114:13;133:20

**six (10)**
28:8;33:16;36:4;
37:7,8;67:1;133:9;
135:17,19,22
**skeptical (2)**
40:22;42:19
**skim (1)**
84:23
**skip (1)**
50:17
**slash (1)**
52:24
**slice (1)**
159:23
**slightly (1)**
162:17
**Slow (2)**
101:17,17
**small (2)**
54:24;150:24
**Snickers' (2)**
91:6,7
**sold (1)**
93:21
**sole (1)**
84:11
**somebody (2)**
57:12;79:10
**someone (3)**
146:3,7;147:4
**sometimes (1)**
20:21
**somewhere (1)**
164:2
**sorry (21)**
7:23;11:14;24:25;
38:25;59:13;74:4,5;
78:10;100:8;102:14;
103:10;105:9;107:12;
108:8;109:25;113:14;
120:9;126:9;144:9;
145:7;160:10
**sort (4)**
80:18;130:16;
133:15;160:12
**sorts (2)**
43:19;128:9
**sought (1)**
51:2
**sound (1)**
124:21
**sounds (2)**
109:15;155:23
**Southern (1)**
3:3
**speak (9)**
35:10,12;105:7;
106:20;109:1;113:23;
114:5,23;144:4
**speaking (7)**
21:14,17;23:6;34:3;
113:18;118:8,19
**specific (7)**

25:14;69:1;71:10;
83:13;97:4;149:10;
156:15
**specifically (25)**
38:16;39:18;43:6,
11,13;44:21;51:18;
55:3;69:3;71:15;
72:25;73:25,25;74:2,
7,9;75:2;83:20;85:18;
118:23;121:10,19;
145:2;148:20,22
**specifics (1)**
84:17
**speculation (1)**
68:25
**speed (1)**
84:11
**spoke (1)**
21:25
**spoken (2)**
21:15;34:2
**spread (2)**
132:22,24;133:9;
135:9
**spreadsheets (1)**
77:5
**stake (1)**
147:2
**stamped (1)**
80:16
**stand (13)**
3:19;6:17,17;9:6;
11:6,10;12:7;18:2;
93:6;101:14;138:12;
145:15;152:14
**standard (2)**
43:2,9
**standpoint (1)**
147:6
**start (2)**
16:2;93:12
**started (4)**
4:8;10:9;20:3;
92:16
**starting (2)**
30:13;86:21
**starts (3)**
20:25;80:22;155:18
**state (12)**
3:19;6:7;11:24;
12:2;16:20,21,24;
18:6;40:20;62:15;
67:23;73:25
**stated (5)**
6:10;16:21;57:10;
150:18;163:3
**statement (20)**
4:14;11:22;13:18;
16:4,19;17:1,1,5;
51:7;55:10;62:1;63:1;
74:15,18;94:3;
107:18;143:23;144:4;
150:10;154:20

**statements (13)**
5:7;6:7;10:10,25;
11:1,3,17;12:11;
13:15,20;57:14;
77:22;116:4
**States (1)**
3:2
**stating (3)**
8:4;69:5;162:10
**status (5)**
36:24;40:17;73:12;
111:24;116:3
**statute (1)**
66:14
**stay (6)**
100:15;137:4;
145:5,6,8,11
**S-T-E- (1)**
18:8
**S-Tek (5)**
29:10,10;37:20,25;
135:6
**step (2)**
22:11;89:25
**Stephen (15)**
3:12;13:22;18:5,8,
11;25:15;26:18;28:1;
34:22;35:15,22;
60:18;61:18;86:4;
111:12
**STERN (169)**
3:11,12,13;4:13,17;
8:17;11:1,14;13:16,
17,18,21,22;16:1;
17:9,11,14,20,24;
18:4,5,8,8,11,13;
40:15;42:21;45:24;
47:22;56:1;58:10,25;
59:11,16,19;60:14,15,
17,18,20;61:2;67:4,7,
12,15;68:10,20;70:6;
77:13;78:2,14;82:16;
83:3;86:4,25;87:7,13;
88:11;89:8,21,22,25;
90:2,9,11,16;91:17;
92:1,7,11,14;94:10,
16;96:17;97:14,21;
98:3;101:24;102:12,
20;103:4,16;104:8,22,
23,25;105:2;108:11,
15,21;109:21;110:1,3,
4,5;113:25;114:16,
21;118:15,21,25;
119:1,2,5,6,9;125:2,4;
126:9;127:13,15;
128:13,16,18;129:24;
131:3,12;132:15,21;
133:12,20;135:10;
136:7,14,15;138:4,6,
8,10,14,23;144:7,8,9,
12;145:10,14;147:16,
17;148:20;149:14;
150:1;152:8,10,16;

**LEGAL ELECTRONIC RECORDING, INC.**
**216-881-8000 www.lerinc.com**

153:3;154:6,21;
155:2,11,14,19,23;
156:8,9,11,18,19;
157:18;158:14,20,23,
25;159:3,5;161:7;
164:16,21;165:5
stern@kagansterncom (1)
154:23
Stern's (4)
90:21;128:22;
132:16;144:15
stickers (1)
79:24
still (18)
59:10,11,15;79:16;
80:4;85:14;89:3;93:9;
99:22;122:23;129:10;
135:23;138:12;145:2,
11;146:11;148:12;
151:6
Stochastics (1)
93:16
stock (17)
50:10;89:3,6,10,18;
120:6;146:6,13,17,21;
147:6,11;157:6,10,12,
13,14
stop (3)
6:11;109:23,24
story (1)
148:16
Strain (5)
37:21;38:1,3;41:4;
135:6
straits (1)
108:4
streamline (1)
131:4
stress (1)
95:20
stretch (1)
64:9
stretched (1)
162:24
strictly (1)
25:21
strike (1)
109:22
string (29)
14:5;20:19,25;
23:20;25:19;30:6;
35:20;48:3,3,5,8;
52:21,22;53:2,4;79:1;
105:12,15;106:6,11;
107:11,12;127:16;
153:6,7;154:10;
155:24;159:7;161:4
strings (2)
85:17;160:21
stripping (1)
147:11
structurally (1)
24:18

structure (6)
24:16;26:2;117:18;
132:20,22;133:22
structures (1)
24:11
struggling (1)
46:15
stuff (5)
17:9;25:4;30:12;
98:13;154:17
sub- (1)
133:8
subject (2)
23:1;27:11
submit (1)
103:17
submitted (3)
47:12;100:20;102:5
subs (3)
43:10,21;51:15
subsequent (4)
28:7;36:25;38:14;
61:7
subsequently (2)
50:21;62:5
subsidiaries (5)
39:17;43:1;44:15,
20;121:9
subsidiary (3)
116:19;117:5;
121:24
substantial (1)
29:7
substantive (2)
23:2;48:17
substitute (2)
46:18;47:11
succeed (1)
151:14
successful (1)
147:4
successors (1)
39:12
succinct (1)
26:18
sue (15)
69:16;70:15;
115:23;116:5,11,19;
117:5,10,14;122:7,8,
13,23;162:14,22
suggest (2)
29:24;59:9
suggested (2)
106:16;133:25
suggests (1)
62:7
summarized (1)
149:25
Sunday (2)
155:21,22
supplied (1)
151:6
support (1)

6:9;7:3;8:5;9:7
supports (1)
15:24
suppose (1)
148:16
supposed (3)
30:10;76:4,19
sure (46)
4:9;6:11;8:14;
18:18;19:23;20:19;
21:24;22:8,11;23:2;
24:7;25:3;31:25;
32:17;33:1;34:4;
35:22;49:4;51:25;
52:20;54:18;55:10;
65:16,18;72:14;
76:17;79:21;81:4,5;
91:24;92:16;96:5;
98:19;105:9,20;
106:2;108:9;110:4;
120:17;129:15;142:7,
10;152:10;153:9;
154:10;158:25
surprise (3)
43:8;69:23;163:6
surprised (6)
15:17;34:1;38:17;
43:18;52:2,2
surrounding (1)
141:23
suspect (1)
109:13
sustain (4)
45:25;46:3;47:7,18
Sustained (1)
114:19
swap (1)
146:6
swear (2)
11:15;12:3
swearing (1)
12:5
sworn (6)
11:19;12:1,1,3,8;
18:5
system (2)
11:4;81:7

T

table (5)
24:4;79:4;80:2;
95:4;149:12
Tagnetics (95)
3:8,10,12,16;4:4;
5:5,6,7,12,20;9:23;
10:2;13:19,23;16:12,
16;18:14;23:25;
24:20;26:3;27:5;
29:11,16;39:15,22;
40:8;41:18;42:3;43:4;
44:18;51:22;52:1;
54:21;55:4;56:22;

62:21,22;66:17;67:1;
69:16,19,22,23;70:13,
25;71:11,22;72:4,6,7,
7,9,11,24;75:4;86:6;
88:14;89:4;92:25;
93:23;100:4;107:3;
108:4;109:11;115:23,
25;116:3,6,11,19;
117:5,10,14;119:12,
20;120:2,22;122:14,
24;123:4,25;124:7;
127:5;130:13;132:20;
135:13;140:18;
144:21;146:20;149:2,
6;151:13;157:10;
162:13;163:1
Tagnetics' (13)
8:14;9:17,25;20:14;
29:13;52:15;58:11;
60:7;90:17;93:18;
102:23;121:8;122:8
talk (4)
61:9;75:2;134:19;
165:7
Talked (9)
24:10;95:17;135:2;
136:7,8,11;138:2;
148:24;155:2
talking (10)
11:3;19:15;28:17;
46:1,20;54:1;64:1;
70:18;122:25;152:20
team (2)
23:25;62:22
Technology (2)
66:5;93:20
telephone (1)
21:5;163:22
ten (3)
55:14,16;56:17
tend (1)
46:9
tentative (1)
164:12
term (32)
14:2,15;16:14;
24:14;29:6;32:12;
33:21;34:12;37:3;
65:14;72:12,20,22,23;
75:9,20;96:3,22;
109:4,7;110:7,10,14;
113:6;115:16,22;
117:8,12;142:11,22;
159:17;160:17
terminated (2)
86:12;159:12
terminating (1)
134:14
terms (152)
13:25;14:3,4,7,8,
14;15:23;16:7,14;
24:19;25:14,20;26:5;
28:12;29:3;30:21,23;

31:8,11,22;32:15,17;
33:4,6,13,24;34:9,23,
24,25;35:1,2,3,19;
38:8,9;41:3;42:6;
45:3;46:13;48:10,10,
19,24;49:11,18,20,21,
23;50:9;52:5,9;53:10;
61:13,20;63:5,6,10,
12,14,25;65:2,4,7;
73:1,3,4,5,7,8,10,14,
16;74:7,8;75:23,25;
76:3,3,4,7,10,14,19;
85:7,12,15,16,22;
89:18;94:12,14;95:3,
10,12,13,16,21;96:13,
15;97:19,22;98:21;
104:15;105:19,21;
107:1,13;108:1,24;
109:19;110:20,20,23;
112:7,15,25;113:4,17;
114:6,24;115:4,11,17;
116:24;117:2,17;
130:3,10,20;141:6,9;
142:21;143:1,10,17,
18,20;144:2;145:1;
149:11;159:9,14,24;
160:2,6;161:1,3,19,
20;163:7,16
terrible (2)
74:22,23
testified (10)
77:18,19;78:2;88:6;
121:2;123:3,9;
141:16;153:13;
160:24
testify (14)
5:25;6:4,23;7:1;
8:3;56:21;58:16;
64:23;70:7;75:1;
98:19,20;123:21;
131:5
testifying (7)
8:15;11:10;17:12;
46:4;57:12;131:9;
153:18
testimony (37)
6:11;8:7;11:6,23;
12:1,1,3;16:24;59:14;
66:22;68:1,3,7;78:9,
17;85:11,25;90:21;
93:11;104:19;106:25;
109:22;123:14,19;
131:6;132:10;139:1,
2,5;142:3;144:16;
148:14;150:2,10;
156:13,24;161:10
thanked (1)
133:21
thanks (1)
5:4
theft (1)
70:23
theme (1)

49:10
thick (1)
    79:16
thinking (3)
    87:25;163:21;164:1
third (7)
    15:8;24:15;35:18;
    36:4;135:17,19,22
thoroughly (2)
    33:10;73:18
though (7)
    13:2;20:20;27:15;
    46:14;47:14;50:11;
    99:20
thought (15)
    4:8;7:9;86:17,22;
    91:20;94:20;99:17;
    105:18;106:15;
    112:17;115:18;127:8;
    139:19,23;161:23
three (40)
    11:16;14:6;16:4;
    23:13;25:1;27:14;
    28:6,11;29:8;31:13;
    33:14;36:3;37:8,11;
    46:16;49:19;52:7;
    66:21;72:10;73:21;
    76:8,13,20;77:1;94:7,
    10;95:10;97:6,17,21;
    99:22;105:16,22,25;
    106:7;136:7;137:18;
    160:1,20;163:1
throughout (2)
    68:5;93:25
throw (2)
    147:5;164:5
times (5)
    14:6;48:22;76:13;
    160:1,21
timetable (2)
    99:12;130:4
timing (4)
    50:14;118:18;
    136:10;139:22
today (15)
    4:24;9:7;13:23;
    15:2;19:16;37:15;
    47:18;57:13;68:5;
    91:18;94:8;123:24;
    158:11;160:25;
    163:19
together (9)
    87:14;98:16,17;
    127:1,3,19;132:19;
    133:22;164:3
told (7)
    31:7;96:7,9;121:25;
    130:13;133:13;
    142:14
took (6)
    36:21;38:9;82:4;
    92:24;136:22;163:6
top (14)

25:18;27:16,24;
    28:18;34:15;35:19;
    42:24;61:14;74:9;
    79:25;126:11;127:17;
    155:8;165:3
topic (3)
    69:3;116:12;149:17
total (21)
    10:17;15:9,11;
    23:13;28:11;36:8,8,
    10;52:8;65:9;77:3,6,
    7;94:18;102:16;
    132:25;135:6;159:18,
    20;160:9,9
totally (1)
    47:17
totals (1)
    36:7
touch (4)
    137:4;147:9;
    164:10,11
towards (1)
    133:4
track (1)
    92:14
trade (1)
    70:23
train (1)
    144:18
transaction (4)
    38:6;61:22;145:22,
    22
transfer (2)
    61:23;146:2
transfers (1)
    146:3
transmitted (4)
    38:19;39:1;118:2,4
transpired (1)
    86:18
travel (1)
    158:13
treat (2)
    12:2,18
trial (13)
    16:17;19:10,12;
    61:24;72:19;96:11;
    99:19;100:1,2;
    137:17;140:1;161:13;
    162:2
tried (2)
    88:18,22
trouble (3)
    22:9;126:9;154:15
try (16)
    4:20;20:13;24:1;
    40:11;45:4,4;48:16;
    53:12;62:23;63:19;
    80:24;120:18;140:5;
    147:5;149:5;154:13
trying (23)
    11:12;30:19;46:5;
    53:9;72:18;74:5;

77:21;78:4;82:16;
    84:10;86:18;97:3;
    109:12;112:19;119:3;
    133:4,17;140:5;
    149:18;154:12,12;
    158:6;163:4
T's (1)
    163:16
Tuesday (6)
    78:5,23;97:23;
    115:13;149:24;
    150:14
turn (5)
    20:14;111:10;
    120:7;138:24;148:5
tweaks (2)
    54:23,24
twice (6)
    14:6;21:16;34:2;
    76:12;159:25;160:20
two (32)
    9:14;10:19;13:9,10;
    25:1;28:7;34:21;36:2;
    49:19;50:15;52:7;
    62:19;66:18;76:8,8;
    87:9;94:25;95:7;
    96:20;98:1;99:11,13;
    101:9;103:1,7,14;
    133:8;137:15,22;
    145:13;147:1,13
two- (1)
    132:24
type (1)
    148:22
types (4)
    66:16;67:13;73:14;
    88:13
typical (3)
    38:8;43:11,19
typo (1)
    76:23

U

ultimate (1)
    110:21
ultimately (9)
    30:20;31:8;32:7;
    35:9;72:8;93:20;
    106:15;112:4;143:8
unauthorized (4)
    6:23;7:11;8:8;13:1
unclear (1)
    153:12
under (16)
    11:24;51:16,20;
    55:8,11,17;76:24;
    82:2;93:9,22;98:22;
    112:11;120:8;129:10;
    148:12;150:15
Underneath (1)
    127:20
understandable (1)

127:25
understands (1)
    4:22
Understood (10)
    7:15;8:9;42:20;
    44:7;80:22;93:10;
    97:9;148:13;149:22;
    157:15
undetermined (1)
    133:1
unfortunate (1)
    36:22
unfortunately (5)
    6:1;11:20;29:6;
    80:23;157:13
unique (2)
    19:17,19
United (1)
    3:2
University (1)
    93:14
unjust (1)
    67:2
unknown (1)
    66:14
unless (6)
    6:18;54:3;80:19;
    118:22;120:17;
    137:17
Unpaid (5)
    66:17,18,19,21,23
un-redacted (2)
    44:4;45:9
unusual (1)
    65:12
up (48)
    8:2;11:7;17:14;
    20:6,10;22:1,1,24:8;
    28:15;33:9;38:23;
    64:19;68:24;69:8,22;
    83:22;84:11;91:6,11;
    95:7;96:3;100:15,18,
    23;105:3;108:5;
    109:19;112:3;128:6;
    135:5;137:15;138:12;
    142:4,6,25;143:4,7;
    145:19;146:7;149:3,
    8;158:6,12;163:14,
    24;164:7,9,12
upon (14)
    5:14;28:9;41:3;
    57:8;58:13;63:25;
    87:8;89:22;90:2;
    128:21;147:15,19;
    156:20;157:17
upper (1)
    126:15
use (15)
    9:12,17,25;10:6;
    20:13;52:11;63:15,
    17;64:5;70:24;88:12;
    92:12;126:20;161:20;
    162:9

127:25
used (9)
    64:6,7,8;86:16;
    87:23;88:22;99:3;
    123:18;142:11
uses (1)
    112:8
using (2)
    9:14;63:20
usually (1)
    161:17

V

vacation (5)
    19:20,25;22:7;30:9;
    84:10
vague (1)
    96:22
valid (1)
    157:15
various (2)
    49:24;66:16
Ventures (17)
    37:12,18,25;40:6,
    18;44:12;45:15,20;
    66:5;120:8,9,13,22;
    121:4;122:3,4,4
Ventures' (2)
    45:13;122:15
verbal (1)
    99:21
versa (1)
    13:4
version (10)
    37:10;44:4;45:9;
    46:19,19;47:13;
    99:10,15,19;103:5
versus (1)
    11:23
via (1)
    164:18
vice (1)
    13:4
view (2)
    51:22;161:11
viewed (1)
    114:12
viewpoint (1)
    6:8
Virginia (1)
    99:10
virtually (2)
    81:16;108:6
vis-a-vis (1)
    89:14
voluntary (1)
    51:5

W

wages (1)
    66:18
wait (2)

**TAGNETICS, INC.**

October 18, 2019

54:8;131:4
**waive (1)**
158:9
**waiver (1)**
73:12
**wake (1)**
158:6
**wants (2)**
101:6;153:21
**way (34)**
7:10;8:18;11:5,25;
16:8;19:2;24:19;26:4;
33:2;52:13,14;63:22;
65:13;67:24;71:8;
83:18;86:22;100:1;
110:15;112:21;
133:17,24;135:13,23;
136:25;138:10;
139:23;147:2;149:2;
154:2,4,8,14;163:17
**weak (1)**
134:22
**weather (1)**
74:22
**week (10)**
19:24,24;20:5;
27:10;29:11;103:25;
134:18;137:15;
163:21;164:17
**weekend (4)**
33:12;78:6;97:15;
149:23
**weeks (2)**
98:1;151:1
**welcome (1)**
150:21
**weren't (5)**
73:9;82:24;114:15;
140:4,5
**what's (14)**
11:22;26:21;45:12;
47:17;63:23;74:23;
81:23;87:11;89:5;
138:1;143:10;154:10;
157:8;160:12
**White (15)**
124:10,17,20;
125:8,25;126:3,4,13,
18,23;127:2,4,17,20;
128:4
**whole (6)**
10:17;83:24;84:1;
141:24;152:24,25
**wife (3)**
91:3,8;137:5
**willing (13)**
24:20;32:9;69:24;
71:4;87:7;98:22;
103:17;134:19;135:3,
9,12,16;140:4
**wipe (2)**
146:20,23
**wiped (1)**

163:2
**wiping (1)**
65:22
**wire (1)**
136:20
**wish (32)**
4:12;5:1;13:20;
16:20;17:10;60:15;
68:2,9;90:17,19,22;
91:12;100:7;104:16,
21;128:20;129:4;
131:18,23;137:25;
144:13;148:3;151:19;
156:4,5;157:24;
158:8,9,10;161:8;
162:4,7
**wishes (1)**
93:3
**withdraw (1)**
122:9
**within (6)**
33:13,22;34:18;
78:15;134:2;137:15
**without (11)**
25:14;43:15;48:24;
49:20;51:6;64:5;
99:14;117:6,16;
126:25;148:15
**witness (17)**
6:6;7:2,10;8:12;
11:3,11;17:12;18:5;
79:11;85:25;93:6;
101:14;108:13,15;
128:25;138:12;
147:25
**witnesses (17)**
5:8,9,12,16,24;7:7,
24,25;8:2;13:3;17:10;
56:2,7;59:1;90:17;
129:5;131:19
**witness's (1)**
11:6
**wonderful (1)**
138:22
**word (13)**
63:15,17,23;64:3,5,
16,17;68:17,20;
96:23;112:8;161:21;
162:10
**worded (1)**
30:22
**wording (2)**
107:16;157:5
**words (2)**
108:3;151:7
**work (3)**
9:21;33:11;84:13
**worked (2)**
36:20;137:13
**working (3)**
98:24;143:14;
154:10
**works (2)**

11:4;164:1
**worlds (1)**
137:22
**worried (1)**
85:2
**worry (1)**
11:25
**worthless (1)**
29:9
**wrap (1)**
137:14
**wrapped (1)**
79:3
**write (3)**
74:12;97:22;134:11
**writing (3)**
14:7;21:5;164:4
**written (13)**
14:12;33:11;36:5,8;
48:10;73:8,20;83:25;
87:21;160:6;161:5;
163:12,15
**wrong (1)**
153:4
**wrote (5)**
33:2,12;34:10;
115:10;161:3

---

### Y

**year (3)**
94:2;132:25;135:20
**years (6)**
18:22;19:1;72:24;
90:14;93:19;109:18

---

### Z

**zeros (1)**
77:1

---

### 1

**1 (14)**
32:10;34:15;51:12;
60:25;61:17;80:7;
101:15,18,19;110:24;
111:9;143:16,24;
154:9
**1:03 (1)**
92:21
**1:25 (7)**
27:23;28:17;76:2;
127:22;140:20,24;
141:5
**1:33 (1)**
132:21
**1:34 (1)**
25:12
**10:46 (3)**
23:22;25:7;105:23
**11:02 (1)**
58:5

11:14 (1)
58:5
**11:33 (1)**
125:8
**11:50 (1)**
82:11
**11:52 (1)**
50:7
**112-5 (2)**
80:7,7
**11th (1)**
149:18
**12 (6)**
28:8;33:16,16;36:5,
5;135:19
**12:06 (1)**
82:11
**12:17 (2)**
91:1,2
**12:20 (1)**
92:21
**12:42 (2)**
27:14;86:15
**12:44 (1)**
68:21
**123 (1)**
14:21
**148,000 (1)**
133:6
**14th (7)**
16:8;48:12;50:6;
53:1;64:25;153:8,8
**15 (2)**
18:25;92:8
**151,000 (1)**
133:6
**16 (2)**
19:1;80:14
**16th (4)**
20:6;48:6;50:7;
52:24
**17 (1)**
73:12
**17th (1)**
73:21
**18 (4)**
33:16;36:5;73:11;
135:22
**18th (1)**
3:4
**19 (2)**
22:5;48:1
**19-30822 (1)**
3:8
**1973 (1)**
93:14
**1996 (1)**
18:18
**19th (11)**
21:1;48:15;53:6;
94:9;125:14,22;
126:6,14,16;155:8,18

11:14 (1)
58:5

---

### 2

**2 (17)**
15:22;24:9;27:24;
28:15,16;44:9;48:7;
75:3;87:15,16;88:3,9;
102:3,12,15;110:12,
16
**2:19 (1)**
48:6
**2:30 (1)**
91:20
**2:38 (2)**
158:7,8
**2:48 (1)**
165:10
**20 (2)**
16:13;75:17
**2019 (37)**
3:5;8:17;9:11;14:3;
16:10;21:1;26:22;
27:14;35:20;48:1,6,
21;50:21;53:8;
105:23;107:1;110:13,
23;111:3,11;115:3;
119:11;120:1;122:11;
124:21;125:8,15;
126:14;127:18,22;
140:20,24;141:2,5;
143:15,25;155:18
**20-some (1)**
93:19
**20th (54)**
8:17;9:11,24,25;
16:10;22:16;35:2;
49:15;50:20;53:8;
60:21;61:17;71:25;
72:2;73:23;74:7;76:7,
7,11;84:3;94:13;95:3,
22;97:8;99:12;
101:20;105:3,12;
107:1,13,15;113:5;
114:10;129:22;130:1,
3,10,14,21;132:14,15;
137:12;141:2,7;
143:2;144:19;145:1;
148:18;149:10;
150:16;154:2;156:16;
159:9;161:24
**21st (1)**
50:22
**22nd (2)**
127:18,22
**23 (1)**
18:22
**23rd (10)**
25:6;49:16;61:11;
62:19;73:24;105:23;
109:4;110:13;132:17,
21
**24 (3)**
26:22;80:7;111:11

---

**LEGAL ELECTRONIC RECORDING, INC.**
216-881-8000  www.lerinc.com

**TAGNETICS, INC.**

**24th (12)**
  20:11;25:25;26:17;
  49:16;86:10;106:7;
  133:25;139:2,13;
  140:8,11,13

**25th (15)**
  20:11;27:14;28:17;
  33:19;61:12;65:5;
  76:1,5,12;86:15;
  140:16,20,24;141:4;
  143:9

**26 (27)**
  14:3,22,24;16:13;
  21:17;35:20;42:5;
  48:21;49:1;63:13;
  68:22;89:4;110:23;
  111:3;113:13;119:11,
  25;122:7,11,16;125:8,
  15;126:5;143:25;
  150:17;157:8,9

**26th (44)**
  20:11,11;37:4;41:2,
  5;42:2;53:11,13;
  63:20;64:10;72:12,
  17;73:13;76:13;84:6,
  8;85:16;89:5;102:16;
  103:19,23;106:14;
  112:4,5;114:23,24;
  115:3;117:21;119:16;
  125:16,23;142:5;
  143:15;144:19;
  146:17;148:17;
  153:21;154:5;155:10,
  12;156:14;157:12;
  160:2,3

**27th (1)**
  73:16

**2nd (1)**
  155:21

---

**3**

**3 (24)**
  26:24;27:16,25;
  28:18;66:11;80:10;
  86:7;101:1;102:14;
  103:2,3;104:3,7,12,
  13;106:8;111:11;
  132:1;138:25;152:2,
  2;158:21,22,24

**3:00 (2)**
  91:23;95:25

**3:03 (1)**
  126:14

**3:17 (1)**
  111:6

**3:27 (12)**
  30:7;33:3;34:13,21;
  64:12;111:3,7;112:6;
  114:25;115:3,10;
  143:15

**3:30 (3)**
  95:25;96:17;97:13

**3:56 (4)**
  34:6;48:21;113:13;
  143:25

**3:58 (3)**
  34:18;48:21;117:21

**30 (1)**
  92:16

**30,000 (2)**
  28:6;135:8

**300 (1)**
  76:24

**30th (17)**
  77:8;78:23;80:3;
  83:4,12;150:14;
  152:6,11,14,20,24;
  153:22,25;154:9;
  155:5,10;157:4

**3rd (1)**
  154:3

---

**4**

**4 (19)**
  39:6,7;48:25;80:10;
  100:23;101:1;103:2,
  5;104:4,7,12,13;
  106:8;132:1;152:2,3;
  158:21,22,24

**4:09 (1)**
  35:14

**4:14 (2)**
  21:2;155:18

**4:35 (1)**
  102:17

**4:36 (3)**
  35:20;76:16;102:17

**4:42 (1)**
  14:24

**4:54 (1)**
  22:17

**40 (1)**
  94:20

**4th (2)**
  155:21,22

---

**5**

**5 (33)**
  23:20;25:18;39:6,8;
  44:9,23;62:12;77:10;
  79:9,16,20;80:4,11,
  12;82:18;108:23;
  109:4;121:5;151:21,
  24;152:3,4;153:1,1;
  154:1;155:8,17;
  156:1,2;158:21,22,23,
  24

**5:13 (1)**
  50:21

**5:18 (1)**
  127:18

**5:20 (1)**
  92:7

**5:30 (4)**
  96:4,20;113:25;
  114:4

**5:56 (2)**
  25:25;106:7

**5:57 (1)**
  133:25

**50 (1)**
  145:23

**50.1 (1)**
  145:23

**51 (1)**
  146:4

**5th (1)**
  154:3

---

**6**

**6 (6)**
  14:22;37:18;39:6,8;
  61:3;82:2

---

**7**

**7:25 (1)**
  50:22

**7:43 (3)**
  26:23;86:10;111:11

**7:48 (1)**
  48:2

---

**8**

**8:24 (2)**
  28:22;30:7

---

**9**

**9:23 (1)**
  53:8

**9:33 (1)**
  78:23

**9:34 (1)**
  3:1

**9:50 (1)**
  12:13

**9:58 (1)**
  12:13

**90 (1)**
  28:2

**90,000 (1)**
  28:1

**90k (2)**
  28:25;29:6

**LEGAL ELECTRONIC RECORDING, INC.**
216-881-8000  www.lerinc.com