**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| TAGNETICS, INC., | : | |
| | : | |
| Appellant, | : | Case No. 3:19-cv-00363 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| KENNETH KAYSER, *et al.*, | : | |
| | : | |
| Appellees. | : | |

---

**ENTRY AND ORDER AFFIRMING THE BANKRUPTCY COURT'S**
**OCTOBER 25, 2019 ORDER AND TERMINATING CASE**

---

This matter is before the Court on an appeal from the United States Bankruptcy Court for the Southern District of Ohio ("Bankruptcy Court") pursuant to 28 U.S.C. § 158(a).  The case arose from the Appellees, Kenneth W. Kayser, Ronald E. Earley, and Jonathan Hager (collectively, the "Petitioning Creditors") filing an involuntary bankruptcy petition as to the alleged debtor corporation, the Appellant, Tagnetics, Inc. ("Tagnetics").  (*See* Doc. 2-2.)  The Petitioning Creditors allege in the petition that they are owed unpaid wages and salary related to their employment with Tagnetics.  (*Id.* at PAGEID # 30-31, 33.)  However, the issues on appeal only concern the parties' settlement negotiations and settlement agreement.  Petitioning Creditors are acting in this appeal *pro se*.[1]

---

[1] Tagnetics requests oral argument, while Petitioning Creditors ask that this Court not require oral argument.  (Doc. 12 at PAGEID # 475; Doc. 14 at PAGEID # 745.)  Pursuant to Federal Rule of Bankruptcy Procedure 8019, the Court has examined the briefs and record and determined that oral argument is unnecessary because "the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument."  FED. R. BANKR. P. 8019(b)(3).

1

Tagnetics appeals the Bankruptcy Court's October 25, 2019 "Order Granting in Part Tagnetics' Motion to Enforce Settlement Agreement (Doc. 101) and Ordering Other Matters" (the "October 25 Order").  (*See* Doc. 1; Doc. 12.)   Petitioning Creditors ask that the Court affirm the October 25 Order.  (*See* Doc. 14.)   For the reasons discussed below, the Court **AFFIRMS** the Bankruptcy Court's decision.   More specifically, the release in the parties' settlement agreement does not extend to related third parties (related individuals/entities), and the parties' settlement agreement—formed by an exchange of emails between the parties on July 26, 2019—is enforceable and does not suffer from a lack of a meeting of the minds.

## I.     BACKGROUND

### (1) The July 26, 2019 Email Exchanges

The parties commenced settlement discussions in earnest on or about July 19, 2019.  (*See* Doc. 12-1 at PAGEID # 512-13.)   After a series of offers, counteroffers, and rejections (*see id.* at PAGEID #507-12), Tagnetics and the Petitioning Creditors agreed to a settlement on July 26, 2019, the key terms of which were documented in an email from Tagnetics' counsel (Stephen Stern) to the Petitioning Creditors at 3:27 p.m. that day.   That email stated:

> Ron, Ken, and Jon:
>
> Below sets forth the terms of the agreement we reached by phone.  Each of you please reply confirming agreement to these terms and then I need you to initiate a call with the court to advise of the settlement (it makes no sense for any of us to have to show up at court on Monday now that we have an agreement in place that will be documented more thoroughly in a settlement agreement.   We can work on the written settlement agreement over the weekend.
>
> Key terms:
>
> Payment of $90,000 total ($30,000 each) within three days of a fully executed agreement.

> The remaining schedule of payments as you proposed below,[2] except in 12 and 18 months instead of 6 and 12 months.
>
> Full mutual releases (no carve outs)
>
> Dismissal/withdrawal of claims by each of you to be filed within one day of receiving payment
>
> I believe this captures the key terms we discussed. Please confirm.
>
> Stephen

(Doc. 12-1 at PAGEID # 506.)

In response, one of the Petitioning Creditors (Mr. Hager) sent the following email to Mr. Stern approximately 30 minutes later:

> Stephen
>
> Mr. Earley is discussing this with the court at this moment. I am responding for Kayser, Earley and Hager [i.e., the Petitioning Creditors] saying we agree to the terms put forth as documented above [i.e., Mr. Stern's July 26, 2019 at 3:27 p.m. email].

(*Id.*) Two minutes later, Mr. Hager followed up with another email to Mr. Stern (copying the other two Petitioning Creditors) in which he stated:

> Stephen,
>
> I will clarify that we agree to the terms you set forth in your last email and represented below [i.e., Mr. Stern's July 26, 2019 at 3:27 p.m. email].
>
> Key Terms:
>
> Payment of $90,000 total ($30,000 each) within three days of a fully executed agreement.
>
> The remaining schedule of payments as you proposed below, except in 12 and 18 months instead of 6 and 12 months.

---

[2] The "remaining schedule of payments as you proposed below" is a schedule of payments reflected in an email sent by one of the Petitioning Creditors on July 25, 2019 at 1:25 p m. (*See* Doc. 12-1 at PAGEID # 507-08.)

3

>Full mutual releases (no carve outs)
>
>Dismissal//withdrawal of claims by each of you to be filed within one day of receiving payment

(*Id.* at PAGEID # 505-06.) Thus, the "Key Terms" listed in Mr. Stern's email and the "Key Terms" listed in Mr. Hager's second response matched. Mr. Stern responded one minute later with an email that simply states: "Thank you." (*Id.* at PAGEID # 505.)

### (2) The Draft Agreement

On August 14, 2019, approximately two-and-a-half weeks later, Tagnetics' counsel sent the Petitioning Creditors a draft agreement titled "Settlement and Mutual General Release Agreement." (Doc. 12-2.) Among other things, the draft agreement contained language in which each Petitioning Creditor "releases and discharges Tagnetics, as well as its current and former parent companies, corporate and operating affiliates, subsidiaries, and related entities (including specifically Compass Marketing, Inc.), as well as each of their current and former directors, officers, shareholders or other equity holders, agents, employees, accountants, attorneys, and insurers … from any and all causes of action, claims, debts, costs, liabilities, and demands arising from the beginning of time until the date of this Agreement … [Each Petitioning Creditor] understands that this is a GENERAL RELEASE." (*Id.* at PAGEID # 517-19.) The draft agreement also contained similar language in which Tagnetics "releases and discharges [the Petitioning Creditors] from any and all causes of action, claims, debts, costs, liabilities, and demands arising from the beginning of time until the date of this Agreement … Tagnetics understands that this is a GENERAL RELEASE." (*Id.* at PAGEID # 519.)

In response, the Petitioning Creditors raised several concerns about the draft agreement and stated that several changes would need to be addressed. (*See* Doc. 12-4 at PAGEID # 530.)

4

In turn, Tagnetics' counsel challenged what he alleged to be mischaracterizations and said that many of the terms included in the Petitioning Creditors' response to the draft agreement fell outside of the scope of what had been agreed to in the parties' July 26, 2019 email exchanges.  (*Id.* at PAGEID # 528-29.)   The Petitioning Creditors did not sign the draft agreement.

### (3) The Bankruptcy Court's Decision on Tagnetics' Motion to Enforce Settlement Agreement

Tagnetics then filed a "Motion to Enforce Settlement Agreement."  (Doc. 2-12.)   In its motion, Tagnetics argued that the parties reached a settlement agreement (with its key terms) by email on July 26, 2019, but the Petitioning Creditors were seeking to include additional terms that were not part of the agreement.  (*See id*; *see also* Doc. 7-3 at PAGEID # 379; Doc. 12-5.)   In response to the motion, the Petitioning Creditors argued that, because terms that they wanted included in the settlement agreement were mentioned in their initial proposal by email on July 20, 2019 (i.e., six days before the July 26 email exchanges discussed above), and Tagnetics (allegedly) did not dispute those terms, such terms were accepted and the parties' subsequent negotiations only concerned an acceptable payment schedule.  (*See* Doc. 2-14; *see also* Doc. 7-3 at PAGEID # 379; Doc. 12-5.)   On October 18, 2019, the Bankruptcy Court held an evidentiary hearing on Tagnetics' motion.  (*See* Doc. 12-5 (transcript of evidentiary hearing).)

On October 25, 2019, the Bankruptcy Court rendered an oral decision telephonically that included its findings of fact and conclusions of law (the "October 25 Oral Decision").   (*See* Doc. 7-3 (transcript of October 25 Oral Decision).)   In line with its subsequent October 25 Order issued later that day (Doc. 2-21), the Bankruptcy Court determined in its October 25 Oral Decision that the parties had entered into a settlement agreement on July 26, 2019, the terms of which were reflected in the parties' emails from July 26, 2019.  (Doc. 7-3 at PAGEID # 386, 388, 392.)   Thus,

the Bankruptcy Court rejected Petitioning Creditors' primary argument in response to the motion. (*See also id.* at PAGEID # 385-86.)   The Bankruptcy Court determined that "the emails from July 20th through July 26th … show the numerous rejections and then finally an acceptance and memorialization in writing of agreed key terms" later on July 26, 2019.   (*Id.* at PAGEID # 386.)

The Bankruptcy Court also specifically addressed the agreement's "Full mutual releases (no carve outs)" term.  It determined that the Petitioning Creditors and Tagnetics released each other from all liability and obligations owed or claimed to be owed.   (Doc. 7-3 at PAGEID # 389-90.)   However, the Bankruptcy Court did not construe that term "to include affiliates, parent corporations, officers, directors or other undisclosed third parties."   (*Id.* at PAGEID # 390.)   The Bankruptcy Court also stated:

> Although the settlement may not have resolved all disputes between Tagnetics and the Remaining Petitioning Creditors, by an objective standard a meeting of the minds occurred as to the payments to the Remaining Petitioning Creditors and a mutual release of any other obligations or damages.  The agreement did not address Compass or any affiliates, parent corporation, officers, directors or third parties.   Nor did it cover equity interests of the Remaining Petitioning Creditors, if any.   The parties either by reference to rejected offers which no longer have any legal effect or by draft settlement agreement proposed after the agreement date of July 26th, have attempted to expand the agreement beyond the plain meaning of its terms.   Thus, the agreement was as the parties agreed to by email on July 26th, 2019. …
>
> The parties mutually released any obligations to each other as to the salary, benefits, loans or other similar obligations owed to the Remaining Petitioning Creditors.  The agreement does not address any equity interests of the Remaining Petitioning Creditors.   It also does not release any third party obligations, including but not excluded to Compass Marketing.   Absent specific reference to such matters that had not occurred as of July 26th, the release of a stranger to a settlement is not ordinary, nor would ownership interest in a corporate entity be finalized by a general release.

(Doc. 7-3 at PAGEID # 391-393.)

Later that day, the Bankruptcy Court issued the October 25 Order, granting, in part,

6

Tagnetics' motion. (Doc. 2-21.) The October 25 Order states, in relevant part:

> Based upon the evidence admitted during the hearing, including the testimony of the witnesses and the documentary evidence, and the arguments of the parties, and in accordance with the court's oral decision rendered telephonically on October 25, 2019 at 11:30 a.m., including its findings of fact and conclusions of law stated therein, *Tagnetics' Motion to Enforce Settlement Agreement* (doc. 101) is **granted in part**. Accordingly, **IT IS ORDERED that** the settlement agreement agreed to by the parties on July 26, 2019, shall be enforced as follows:
>
> - [payment schedule]
> - Excepting the payments required by this Order as defining the terms of the settlement reached by the parties, the parties are mutually released from any past obligation to each other arising out of any contract or claim of any nature …
>
>   …
>
> Except as otherwise noted, nothing in this order should be construed as addressing any equity interest, if any, of the Remaining Petitioning Creditors. It also does not release any obligations owed to or from third parties, including, but not limited to, Compass Marketing, or any affiliates, subsidiaries, parent corporation, officers, or directors of Tagnetics, Inc.
>
>   ….

(Doc. 2-21 (emphasis in original).) This appeal of the October 25 Order followed.

## II. STANDARD OF REVIEW

A district court, serving in an appellate capacity, reviews a bankruptcy court's findings of fact for clear error and conclusions of law *de novo*. *Wesbanco Bank Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 106 F.3d 1255, 1259 (6th Cir. 1997); 28 U.S.C. § 158(a). "A factual finding will only be clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Ayen*, 997 F.2d 1150, 1152 (6th Cir. 1993).

Issues that were not raised in a bankruptcy court will not be considered by the district court on appeal. *See In re Eagle–Picher Industries, Inc.*, 963 F.2d 855, 863 (6th Cir. 1992) ("appellate

courts are not to address issues not raised for the first time in the trial court"). Additionally, the district court "is not obligated to search the record for support" of a party's argument. *Nat'l Credit Union Admin. Bd. v. Zovko*, 728 F. App'x 567, 569 (6th Cir. 2018).

### III. ANALYSIS

Tagnetics raises two issues in this appeal. First, whether the Bankruptcy Court erred when it held that the parties' settlement agreement did not include a release of Tagnetics' (and the Remaining Petitioning Creditors') related individuals/entities. (Doc. 12 at PAGEID # 478.) Second, if the Bankruptcy Court properly found that the release did not include a release of individuals/entities related to the parties, whether there was no meeting of the minds and, thus, no settlement agreement to enforce. (*Id.*) The Court will now address each of those issues.

#### (1) Scope of Release

As Tagnetics acknowledges, the first issue on appeal is narrow. (Doc. 12 at PAGEID # 484 ("While [Tagnetics'] Motion to Enforce the Settlement Agreement concerned several terms of the agreement between the parties, the only issue on appeal regarding the terms of the agreement is whether the scope of the release included individuals/entities that are related to the parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives").) Tagnetics argues that the Bankruptcy Court erred "when it found that the scope of the release given by the parties did not extend to related third parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives." (*Id.* at PAGEID # 474.)

"A settlement agreement is a type of contract and is governed by reference to state substantive law governing contracts generally." *Cogent Solutions Grp., LLC v. Hyalogic, LLC*,

712 F.3d 305, 309 (6th Cir. 2013) (internal quotation marks omitted). Here, there is no dispute that the substantive law to be applied is Ohio law. (*See generally* Docs. 12, 14, 15; *see also* Doc. 7-3 (transcript of October 25 Oral Decision) at PAGEID # 380 (Bankruptcy Court's analysis to support application of Ohio law).) Under Ohio law, "[t]he purpose of contract construction is to effectuate the intent of the parties." *Kelly v. Medical Life Ins. Co.*, 509 N.E.2d 411, 413, 31 Ohio St. 3d 130 (Ohio 1987). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Id.*

"[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150, 53 Ohio St. 2d 241 (Ohio 1978). "[W]here the terms of a contract are clear and unambiguous, extrinsic evidence may not be used as an aid in interpretation." *Whitley v. Canton City Sch. Dist. Bd. of Educ.*, 528 N.E.2d 167, 168, 38 Ohio St. 3d 300 (Ohio 1988); *see also Kelly*, 509 N.E.2d at 413 ("A court will resort to extrinsic evidence in its effort to give effect to the parties' intention only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning"). Thus, "[w]hen the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Transtar Elec. v. A.E.M. Elec. Servs. Corp.*, 16 N.E.3d 645, 648, 140 Ohio St. 3d 193 (Ohio 2014). Additionally, "where the terms in an existing contract are clear and unambiguous, … [a] court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander*, 374 N.E.2d at 150.

As shown above, the parties expressly agreed to "[f]ull mutual releases (no carve outs)." Tagnetics concedes that "[t]he scope of the release to which the parties agreed is clear and unambiguous," and, in fact, all of the parties agree that the terms in the settlement agreement are unambiguous. (Doc. 12 at PAGEID # 487, 495-96.) The Court likewise agrees and determines that the terms are clear and unambiguous. The interpretation of an unambiguous contract is a matter of law. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686, 73 Ohio St. 3d 107 (Ohio 1995) ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined"); *see also Latina v. Woodpath Dev. Co.*, 567 N.E.2d 262, 264, 57 Ohio St. 3d 212 (Ohio 1990) (the construction of written contracts is a matter of law).

In assessing the plain and ordinary meaning of the terms, Tagnetics acknowledges that courts in Ohio have defined "mutual" to mean "[c]ommon to both parties" or "reciprocal." (Doc. 12 at PAGEID # 493 (citing *Metalworking Machinery Co., Inc. v. Fabco, Inc.*, 477 N.E.2d 634, 637, 17 Ohio App. 3d 91 (Ohio Ct. App. 1984) (quoting Black's Law Dictionary (5th Ed. 1979)).) Additionally, Black's Law Dictionary defines "mutual release" as "[a] simultaneous exchange of releases of legal claims held by two or more parties against each other." Black's Law Dictionary (11th Ed. 2019) (defining "mutual release" under the definition of "release"). In context, it is clear that the words "full" and "(no carve outs)" are used to clarify that there are no exceptions to the "mutual releases," i.e., to the "simultaneous exchange of releases of legal claims held by [Tagnetics and the Petitioning Creditors] against each other." Black's Law Dictionary (11th Ed. 2019) (definition of "mutual release"); *Alexander*, 374 N.E.2d at 150 (in interpreting a contract, courts read terms in conjunction with their surrounding terms).

10

Therefore, the Court determines that the parties' settlement agreement does <u>not</u> include or apply to individuals or entities related to the parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, or personal representatives. "If the parties had intended" to expand the scope of the mutual releases to also include such individuals or entities then "they could have easily so stated" in the settlement agreement (the July 26 email exchanges), but they did not. *Alexander*, 374 N.E.2d at 150.

Some other meaning is <u>not</u> "clearly intended from the face or overall contents of the settlement agreement," and this construction of the phrase does <u>not</u> result in "manifest absurdity." *Alexander*, 374 N.E.2d at 150.   In fact, the district court in *NRRM, LLC v. Mepco Fin. Corp.*, Case No. 10 C 4642, 2015 U.S. Dist. LEXIS 39058, 2015 WL 150 WL 1501897 (N.D. Ill. Mar. 27, 2015) was faced with the essentially same issue presented here and came to the same conclusion. Like this case, in *NRRM,* one party (Mepco) moved to enforce its settlement with another party (NRRM).   The district court explained:

> NRRM argues that the fourth material term it offered—'[m]utual releases'— included not only NRRM's and Mepco's releasing of claims against each other, but also [third-party] Choice's releasing its claims against NRRM.  Not so, says Mepco: 'When two parties agree to enter into a mutual release, they agree to release their claims against one another, without regard for claims that may be held by a third party.  That is the objective and uniformly understood meaning of the term *mutual release*.' …
>
> The court agrees that Mepco's is indeed the common and generally accepted definition of 'mutual release.'  *See Black's Law Dictionary* 1480 (10th ed. 2014) (defining 'mutual release' as '[a] simultaneous exchange of releases of legal claims held by two or more parties *against each other*.') (emphasis added); *id.* at 1178 (defining 'mutual' as 'directed by each toward the other or others; reciprocal,' and 'reciprocally given, received, or exchanged') …
>
> Accordingly, the settlement agreement is not contingent on [third-party] Choice's releasing its claims against NRRM, because the generally accepted meaning of 'mutual release' does not include releases by third parties.

11

*NRRM*, 2015 U.S. Dist. LEXIS 39058 at *20-22 (emphasis in original).

Tagnetics makes a number of arguments in support of its position.  However, the Court initially notes a fundamental problem:  Tagnetics routinely refers to the draft agreement titled "Settlement and Mutual General Release Agreement" (Doc. 12-2) that it submitted to the Petitioning Creditors on August 14, 2019 as the "Settlement Agreement."  Although it is apparent that Tagnetics wishes that draft document was the parties' actual settlement agreement, it is not.  (*See* Doc. 12 at PAGEID # 483-84, 490; Doc. 12-2; Doc. 12-4.)  And, Tagnetics concedes that it is not—as it must, given that the Petitioning Creditors never signed that draft document and specifically objected to it.  (*Id.*)  Some of Tagnetics' arguments on appeal flow from its flawed understanding of the parties' agreement.

Tagnetics' first main argument is that "[i]t is common practice to include in any full release of a business entity a release of the entity's parent companies, subsidiaries, and affiliates (as well as other related individuals, including, but not limited to, officers and directors)" and that "it is understood that a general release encompasses such entities/individuals that are related to the business entity that is a party to a settlement."  (Doc. 12 at PAGEID # 487.)  In support of this argument, Tagnetics cites a series of cases from Florida and one federal case from Vermont.  However, the settlement agreement here does not state that contains a "general release," and the issue presented arises under Ohio law—not Florida or Vermont.[3]

---

[3] The cited Florida and Vermont cases are distinguishable for other reasons as well.  For example, *Bd. of Trs. of Fla. Atl. Univ. v. Bowman*, 853 So. 2d 507 (Fla. Ct. App. 2003) involved a motion for attorneys' fees due to an alleged rejection of a settlement proposal in light of a Florida state statute and rule of civil procedure.  Additionally, the settlement proposal expressly included a "General Release" that specifically provided for a release of related individuals/entities who were not parties to the lawsuit.  As another example, *Over & Under Piping Contrs., Inc. v. Vt. Gas Sys.*, Case No. 2:15-cv-169, 2019 U.S. Dist. LEXIS 807, 2019 WL 77044 (D. Vt. Jan. 2, 2019) involved whether the parties had entered into an oral settlement agreement; the court ordered one party to execute a general release that included the other party's employees and agents based on evidence that counsel for both parties understood that their releases would be broad general releases that are commonplace in Vermont legal practice.

Tagnetics says that it "has found no authority in Ohio or the Sixth Circuit that has addressed the issue before this Court regarding the scope of the releases." (Doc. 12 at PAGEID # 488.) The Court likewise has not found an Ohio case (or federal case applying Ohio law) that specifically deals with the interpretation of the phrase used in the settlement agreement. However, as shown above, Ohio caselaw does provide applicable principles for this Court to make its determination on this issue. And, the *NRRM* case discussed above is more analogous than any of the cases cited by Tagnetics.

Moreover, while it is true that extrinsic evidence of a general custom or trade usage is permitted "to show that the parties to a written agreement employed terms having a special meaning within a certain geographic location or a particular trade or industry," such extrinsic evidence "cannot vary the terms of an express contract." *Alexander*, 374 N.E.2d at 151. As the Ohio Supreme Court determined was the case in *Alexander*, this Court determines that the cited caselaw from two states that are not Ohio and the (arguably self-serving) testimony from Tagnetics' own counsel about his personal experience in drafting settlement agreements "does not evince a custom or usage so widespread" in the context of forming settlement agreements "as to support a valid presumption that the parties, having knowledge of the special usage, must have intended" a more expansive meaning for the mutual releases when they employed the phrase '[f]ull mutual releases (no carve outs)' in the settlement agreement.[4]  *Id.*

---

[4] Tagnetics argues that the Bankruptcy Court disregarded its counsel's "unrebutted testimony, which was improper and in error," concerning how he personally could not recall a single instance where a settlement involving a business entity did not include a release of related individuals/entities. (Doc. 12 at PAGEID # 489.) In support of this argument, Tagnetics cites an Ohio appellate court opinion that addressed its standard of review of an Ohio trial court's decision. As an initial matter, there is no support for the assertion that the Bankruptcy Court ignored this testimony. In fact, the October 25 Order and transcript of the October 25 Oral Decision indicate otherwise. (*See* Doc. 2-21; *see also* 7-3 at PAGEID # 376 (the Bankruptcy Court's judge presided over the October 18 hearing, at which testimony was presented and "[i]n reaching its determinations the [Bankruptcy] Court considered the demeanor and credibility of the witnesses who testified … [including] Stephen Stern, counsel for Tagnetics"); *id.* at

A number of Tagnetics' other arguments involve consideration of extrinsic evidence. Tagnetics points to language in the draft agreement that its counsel sent to the Petitioning Creditors on August 14, 2019, subsequent to the parties' settlement agreement (the July 26 email exchanges). Ohio law shows that a subsequent draft document is not to be considered for purposes of determining the issue presented here. *Whitley*, 528 N.E.2d at 168 (given that the terms of the parties' contract were clear and unambiguous, extrinsic evidence—namely, a prior practice and the language in a proposed bargaining agreement—could not be used as an aid in interpreting the contract). Thus, Tagnetics is wrong when it argues that "[t]he scope of the release Tagnetics proposed to give to the [] Petitioning Creditors also bears consideration." (Doc. 12 at PAGEID # 491.)

Similarly, Tagnetics argues that one of the three Petitioning Creditors—on behalf of an entity (Kayser Ventures, Ltd.)—previously signed a settlement agreement that contains the more expansive release language that is found in the draft document. (*See* Docs. 12-2 and 12-6.) That settlement agreement was between Tagnetics, two entities, and one individual (none of the Petitioning Creditors). Thus, it is not the settlement agreement at issue, and the parties to that settlement agreement are not the same. Once again, Ohio law provides that "[w]here the terms of a contract are clear and unambiguous, extrinsic evidence may not be used as an aid in interpretation." *Whitley*, 528 N.E.2d at 168; *Transtar Elec.*, 16 N.E.3d at 648 ("[w]hen the language of a written contract is clear, a court may look no further than the writing itself to find

---

PAGEID # 390 ("At the evidentiary hearing Stern stated that releasing affiliates of a company was common in these types of agreements").) Additionally, later in its brief, Tagnetics essentially concedes the irrelevance of the testimony to the issue presented on interpreting clear and unambiguous terms in an agreement. (*See* Doc. 12 at PAGEID # 494 (making this same argument in the context of an alternative scenario that assumes, *arguendo,* that the Bankruptcy Court "meant to find the phrase 'full mutual releases (no carve outs)' ambiguous").)

the intent of the parties"); *see also Kelly*, 509 N.E.2d at 413 ("A court will resort to extrinsic evidence in its effort to give effect to the parties' intention only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning").[5] Given that the terms of the settlement agreement are clear and unambiguous, the Court does not consider such extrinsic evidence for purposes of this issue.

Similar too is Tagnetics' argument that the Petitioning Creditors conceded that the scope of the release applied to related parties in a statement they made by email on August 19, 2019 concerning language in the draft settlement agreement (therefore, after the July 26 email exchanges that formed the settlement agreement). As an initial matter, the Court does not find the Petitioning Creditors' statement to be a concession regarding the scope of the phrase "[f]ull mutual releases (no carve outs)." More fundamentally, once again, the Court does not consider such extrinsic evidence for purposes of this issue. *Whitley*, 528 N.E.2d at 168. The Court notes that if the parties want to enter into a subsequent agreement or amendment to the settlement agreement, then they may do so, but that is not the issue on appeal.

Tagnetics also makes what turns out to be a strawman argument. It argues that the Petitioning Creditors understood the phrase "full mutual releases (no carve outs)" to mean that any exposure they may have from Tagnetics would be extinguished, but that they would not be providing Tagnetics a reciprocal release. (*See* Doc. 12 at PAGEID # 491-93.) In addition to the fact that such alleged subjective intent is not to be considered (*Transtar Elec.*, 16 N.E.3d at 648), the allegation is unsupported. And, as set forth in the "Background" section above, the Bankruptcy Court's decision does not align with that alleged understanding by Petitioning

---

[5] As shown above, the Court determines that the circumstances surrounding the parties' settlement agreement here do not "invest the language of the contract with a special meaning." *Kelly*, 509 N.E.2d at 413.

Creditors anyway; it determined that there were reciprocal releases between Petitioning Creditors and Tagnetics. (Doc. 2-21; Doc. 7-3 at PAGEID # 390-393.) Moreover, on appeal, the Petitioning Creditors do not challenge the Bankruptcy Court's decision and state that they accept it and believe it was a fair ruling.

Finally, Tagnetics makes several arguments where it "assum[es] *arguendo* that the Bankruptcy Court meant to find the phrase 'full mutual releases (no carve outs)' ambiguous." (Doc 12 at PAGEID # 494.) However, the Bankruptcy Court did not find the phrase ambiguous (and Tagnetics cites nothing to indicate otherwise). Thus, those arguments are irrelevant. Tagnetics concedes that the phrase is not ambiguous, and, as shown above, this Court determines that the phrase is not ambiguous and makes its analysis accordingly.

Therefore, the Court comes to the same conclusion as the Bankruptcy Court: the scope of the release in the parties' settlement agreement does not include individuals/entities that are related to the parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives.

### (2) Meeting of the Minds

For the second issue on appeal, Tagnetics argues that "there can be no meeting of the minds between Tagnetics and the … Petitioning Creditors if the phrase 'full mutual releases (no carve outs)' is found to exclude the parties' related individuals/entities…." (Doc. 12 at PAGEID # 499.) This Court disagrees.

Under Ohio law, "[e]ssential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Williams v. Ormsby*,

966 N.E.2d 255, 258, 131 Ohio St. 3d 427 (Ohio 2012). A party seeking to prove the existence of a contract "must show the elements of mutual assent (generally, offer and acceptance) and consideration," that there was a "meeting of the minds," and "that the contract was definite as to its essential terms." *Nilavar v. Osborn*, 711 N.E.2d 726, 732, 127 Ohio App. 3d 1 (Ohio Ct. App. 1998). Regarding the last requirement (concerning definiteness of essential terms), the Ohio Supreme Court has held that the terms of an agreement need to be "reasonably certain and clear" and has acknowledged that "all agreements have some degree of indefiniteness and some degree of uncertainty." *Kostelnik v. Helper*, 770 N.E.2d 58, 61, 96 Ohio St. 3d 1 (Ohio 2002).

"In order for a meeting of the minds to occur, both parties to an agreement must mutually assent to the substance of the exchange," with "a definite offer on one side and an acceptance on the other." *Turoczy Bonding Co. v. Mitchell*, 118 N.E.3d 439, 444, 2018-Ohio-3173 (Ohio Ct. App. 2018). "Ohio law does not require contracting parties to share a subjective meeting of the mind to establish a valid contract; otherwise, no matter how clearly the parties wrote their contract, one party could escape its requirements simply by contending that it did not understand them at the time." *216 Jamaica Ave., LLC v. S&R Playhouse Realty Co.*, 540 F.3d 433, 440 (6th Cir. 2008). "What it does require is that the terms of the agreement establish an objective meeting of the mind, which is to say that the contract was clear and unambiguous." *Id.* And, "expressions of assent are generally sufficient to show a meeting of the minds." *Nilavar*, 711 N.E.2d at 733 (courts consider "only objective manifestations of intent," and "[s]ecretly held, unexpressed intent is not relevant to whether a contract is formed"); *see also 216 Jamaica Ave.*, 540 F.3d at 441 (where the relevant terms of the agreement are clear and unambiguous, a party is not permitted to introduce extrinsic evidence of its intent in entering into the agreement).

Finally, "[t]he existence of a valid agreement is not diminished by the fact that the parties have yet to memorialize the agreement." *RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 646 (6th Cir. 2001). Courts may look to objective acts of the parties to determine whether an agreement has been reached. *Id.*

Here, Tagnetics concedes that the July 26, 2019 email exchange contains the key terms of the parties' agreement. (Doc. 12 at PAGEID # 476.) Both sides agreed on those key terms— Tagnetics offered them and the Petitioning Creditors accepted them—and the agreement includes bargained for consideration. *Williams*, 966 N.E.2d at 258; *Turoczy Bonding*, 118 N.E.3d at 444 (despite the fact that the parties contemplated a future memorialized agreement, their email communications established a valid settlement agreement and did not expressly state that the agreement would only become binding after it was formally executed). The content of the emails exchanged on July 26 between the parties demonstrate that they reached an agreement on the terms in those emails. *Id.*; *RE/MAX, Int'l*, 271 F.3d at 646. The Court determines that the settlement agreement—as evidenced in the exchange of emails between the parties on July 26, 2019—is clear and unambiguous, contains and was definite as to its essential terms, and establishes an objective meeting of the mind (including on the release term at issue). *Turoczy Bonding*, 118 N.E.3d at 444; *Nilavar*, 711 N.E.2d at 333; *216 Jamaica Ave*, 540 F.3d at 440.

In support of its argument that prior history and the settlement negotiations demonstrates that there was no meeting of the minds, Tagnetics cites to two Ohio appellate court cases that are readily distinguishable from this case: *Beechwood Villa Apartments v. Nord Bitumi U.S., Inc.*, Case No. CA89-08-073, 1990 Ohio App. LEXIS 1561, 1990 WL 50003 (Ohio Ct. App. Apr. 23, 1990)—which is unpublished—and *Wilson v. Pride*, 2019-Ohio-3513, 2019 Ohio App. LEXIS

3610, 2019 WL 4134011 (Ohio Ct. App. 2019). Both of those cases involved an alleged oral settlement agreement that was never reduced to writing. Additionally, in *Beechwood Villa Apartments*, the trial court had relied on an affidavit in finding that the parties' oral agreement was enforceable, but that affidavit was unclear concerning a key term. *Beechwood Village Apartments*, 1990 Ohio App. LEXIS 1561, at *4-5. In *Wilson*, the parties were still negotiating a key term when one attorney emailed the court claiming that the parties had agreed on a settlement and, approximately 20 minutes later upon receiving that email, opposing counsel phoned the court to inform it that the parties actually had not reached a settlement. *Wilson*, 2019 Ohio App. LEXIS 3610, at *2-3, 15-16.

Much of Tagnetics' argument on the second issue relies on its unfounded assertion that the Bankruptcy Court reformed the language of the settlement agreement. However, that is incorrect; if anything, Tagnetics is the one that is attempting to reform the settlement agreement. Tagnetics has a fundamental misunderstanding of what the Bankruptcy Court did. The Bankruptcy Court determined that the parties formed a settlement agreement on July 26, 2019 through their email exchanges on that date, and it enforced that agreement based on what was written (which everyone agrees were unambiguous terms). (*See* Doc. 2-21; Doc. 7-3 at PAGEID # 386, 388, 392.) Tagnetics' related arguments concerning mutual mistake in the context of the Bankruptcy Court allegedly reforming the settlement agreement's terms are inapplicable.

## IV. CONCLUSION

The Bankruptcy Court's October 25, 2019 "Order Granting in Part Tagnetics' Motion to Enforce Settlement Agreement (Doc. 101) and Ordering Other Matters" is **AFFIRMED**. The release in the parties' settlement agreement does not extend to, or include, related third parties

(related individuals/entities).  Also, the parties' settlement agreement—formed by an exchange of emails between the parties on July 26, 2019—is enforceable and does not suffer from a lack of a meeting of the minds.  This case is **TERMINATED** on the docket of this Court.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, April 27, 2020.

                                                s/Thomas M. Rose
                                      _____
                                        THOMAS M. ROSE
                                UNITED STATES DISTRICT JUDGE